FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2016 APR 19  AM 8: 54

CLERK_____
SO. DIST. OF GA.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION
## IN ADMIRALTY

| | |
|---|---|
| RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED | §<br>§<br>§<br>§<br>§ |
| **PLAINTIFFS** | § |
| V. | §<br>§ |
| M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM* AND NEWLEAD CASTELLANO LTD. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |
| **DEFENDANTS** | §<br>§ |

**C V 4 1 6 - 0 9 3**

C.A. NO. _____

## VERIFIED COMPLAINT

Plaintiffs, Ray Capital Inc. ("Ray"), Oppenheim Capital Ltd. ("Oppenheim Capital"), Cheyenne Holdings Ltd. ("Cheyenne") and Labroy Shiptrade Limited ("Labroy"), through undersigned counsel, as and for their Verified Complaint against M/V NEWLEAD CASTELLANO, her engines, appurtenances, tackle, apparel, etc., a Liberian-flagged bulk carrier vessel of approximately 180 meters in length, Official Number 9686338 (the "Vessel") *in rem*, and Newlead Castellano Ltd. ("NC") *in personam* and stating an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, respectfully allege and plead:

## JURISDICTION AND VENUE

1.      This is an admiralty and maritime claim within the jurisdiction of the United States and this Honorable Court pursuant to 28 U.S.C. §1333 and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure ("F.R.Civ.P."). This is an action to: (i) enforce maritime liens *in rem* against the Vessel, pursuant to priority ship mortgages; and (ii) to attach the property of NC, both pursuant to guarantees and ship mortgages granted by NC to secure certain promissory notes issued by NC's parent, non-party NewLead Holdings Ltd. ("NewLead") in favor of Plaintiffs.

2.      This claim is brought pursuant to, and in accordance with, the provisions of The Ship Mortgage Act, as amended, 46 U.S.C. §31301, *et seq.*, and under Fed.R.Civ.P. Supplemental Rules B and C of the Federal Rules of Civil Procedure, and Rules 24(a)(1) and (2).

3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(c).

## IDENTITY OF PARTIES

4.      At all material times, Plaintiff Ray is and was a corporation organized under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

5.      At all material times, Plaintiff Oppenheim Capital is and was a corporation organized under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

6.     At all material times, Plaintiff Cheyenne is and was a corporation organized under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

7.     At all material times, Plaintiff Labroy is and was a corporation organized under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

8.     Upon information and belief, at all material times, Defendant NC is and was a Liberian company with a registered office at 80 Broad Street, Monrovia, Republic of Liberia.

9.     Upon information and belief, Defendant NC is a single asset company owning only the Vessel.

10.    Upon information and belief, NC is a wholly-owned subsidiary of NewLead established for the sole purpose of holding title to the Vessel.

11.    At all relevant times, the Vessel has been engaged in international commerce and owned by Defendant NC.  The Vessel is now, or shortly will be, within the jurisdiction of this Court.

<u>BACKGROUND</u>

12.    Plaintiffs were each owed money by NewLead for various business activities related to the operation of certain ocean-going vessels owned by NewLead's various subsidiaries.

13.    NewLead initially offered to pay Plaintiffs by transferring NewLead equity pursuant to certain warrants for the purchase of NewLead shares.

3

14.     However, due to a precipitous decline on NewLead's share price, the NewLead warrants could not be exchanged for tradable shares.

15.     In other words, NewLead was unable to offer sufficient value to pay Plaintiffs.

16.     With NewLead shares virtually worthless, NewLead instead issued each Plaintiff a promissory note pursuant to a series of exchange agreements.

17.     Accordingly, each Plaintiff now holds a promissory note, as amended (each a "Note" and together the "Notes") issued by NewLead.

18.     In sum, the Notes are:

i.      a Note dated December 27, 2013 issued to Ray in the amount of USD $6,000,000 (the "Ray Note") (attached hereto as Exhibit 1 is a true and correct copy of the Ray Note and amendments);

ii.     a Note dated August 4, 2014 issued to Oppenheim Capital in the amount of USD$2,499,955.98 (the "Oppenheim Capital Note") (attached hereto as Exhibit 2 is a true and correct copy of the Oppenheim Capital Note and amendments);

iii.    a Note Dated September 12, 2014 issued to Cheyenne in the amount of USD $1,250,000 (the "Cheyenne Note") (attached hereto as Exhibit 3 is a true and correct copy of the Cheyenne Note and amendments); and

iv.     a Note dated May 26, 2015 issued to Labroy in the amount of USD$1,215,000 (the "Labroy Note") (attached hereto as Exhibit 4 is a true and correct copy of the Labroy Note and amendments).

19.     Initially, each Note was, at NewLead's option, either: (i) convertible to equity in NewLead; or (ii) payable in cash.

20.     Subsequent to the issuance of each Note, NewLead sought to amend each Note to, *inter alia*, make quarterly interest and principal payments due only at maturity and to extend the maturity date of each Note.

21.     In order to obtain these concessions from Plaintiffs, NewLead offered to make the final payments in cash only and to secure the Notes with a guarantee from NewLead's wholly-owned subsidiary, NC. Accordingly, each Note is secured by an October 16, 2014 Guarantee and Indemnity issued by NC (each, a "Guarantee and Indemnity") (attached hereto as Exhibit 5 are true and correct copies of each Guarantee and Indemnity issued to Ray, Oppenheim Capital, Cheyenne, and Labroy).

## The NC Guarantee and Indemnity

22.     Pursuant to each Guarantee and Indemnity, NC agreed that "it is, and will throughout the Facility Period remain, a principal debtor in respect of the Guarantor's Liabilities". Ex. 5, ¶5.7.

23.     Each Guarantee and Indemnity secures NewLead's payment obligations, which stem from various shipping-related business transactions, to Plaintiffs.

24.     Accordingly, each Guarantee and Indemnity is a maritime contract.

25.     Each Guarantee and Indemnity provides:

The Guarantor:

5

Irrevocably and unconditionally guarantees the due and punctual observance and performance by the Company of all its obligations under the Finance Documents including, without limitation, the due and punctual payment of each and every part of the Indebtedness in accordance with the terms of the Finance Documents so that, if any of the Indebtedness is not paid when it is due and payable, whether on maturity or otherwise, the Guarantor will, immediately on demand, make such payment to the Holder in the manner specified by the Holder, together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment; and

Agrees, as a separate and independent obligation, that, if any of the Indebtedness is not recoverable from the Guarantor under Clause 3.1 for any reason, the Guarantor will be liable as a principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable, and agrees to discharge its liability under this Clause 3.2 by making payment to the Holder immediately on demand together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment.

Ex. 5, ¶¶3.1 – 3.2.

26.     Each Guarantee and Indemnity contains a number of undertakings, including that:

The Guarantor will not without the Holder's prior written consent:

Create nor permit to arise any Encumbrance or other third party rights over any of its present or future assets or undertaking other than in favor of Holder; nor

Except in the ordinary course of business, incur any liability to any third party which is in the Holder's opinion of a substantial nature. . .

Id., ¶¶6.4 – 6.4.2.

27.     Each Guarantee and Indemnity also provides:

The Guarantor shall supply to the Holder as soon as the same become available, but in any event within 180 days after the end of each of its financial years, its audited financial statements for that financial year. . .

Id., ¶6.5.

28.     Each Guarantee and Indemnity also states:

The Guarantor shall supply to the Holder:

6

> All documents dispatched by the Guarantor to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched . . .

Ex. 5, ¶6.8.

29.    NC secured each Guarantee and Indemnity by, *inter alia*, issuing a mortgage over the Vessel to each Plaintiff for the respective amounts owed (each, a "Mortgage" and together the "Mortgages") (attached hereto as Exhibit 6 is a true and correct copy of each Mortgage issued to Ray, Oppenheim Capital, Cheyenne, and Labroy).

30.    The Mortgages are governed by Liberian law.  However, Plaintiffs retained their right to bring suit in any other court of competent jurisdiction and the right to arrest the Vessel wherever it may be found. Ex. 6, ¶19.1 – 19.4.

31.    Each Mortgage states:

> The Owner agrees in accordance with the Guarantee to guarantee and indemnify the Mortgagee in respect of the Company's obligations to repay the Debt, to pay interest on the Debt and to pay all other sums at any time due to the Mortgagee under or pursuant to the Finance Documents.

Id., ¶3.

32.    Each Mortgage further provides:

> In consideration of the premises, the Owner has granted, conveyed, mortgaged, transferred, set over and confirmed, and by this Mortgage grants, conveys, mortgages, transfers, sets over and confirms, to the Mortgagee the whole of the Vessel TO HAVE AND TO HOLD the same unto the Mortgagee forever on the terms and subject to the conditions of this Mortgage for the enforcement of the payment to the Mortgagee of the Indebtedness.

Id., ¶4.1 (emphasis in original).

33.    Each Mortgage also provides:

> The Owner covenants with the Mortgagee:

7

> To keep the Vessel seaworthy and in a state of complete repair . . .

Ex. 6, ¶6.1.

34.     The Mortgages also require NC not "to employ the Vessel in any way which might impair the security interest created by the Finance Documents". Id., ¶6.17.

35.     Although it is traded "over the counter" and is hence a public company, NewLead is a holding company with no inherent value (as of the date hereof, NewLead's share price was approximately $0.003 with a total market capitalization of approximately $22,000).

36.     Because NewLead is little more than a hollow shell, the only cognizable security held by Plaintiffs are the Mortgages.

37.     The Mortgages are maritime contracts.

38.     The Mortgages are duly and validly registered with the Vessel's flag state, Liberia, as evidenced by the Liberian Certificate of Ownership and Encumbrance (the "COE"), which shows no other registered liens (attached hereto as Exhibit 7 is a true and correct copy of the COE).

### The Events of Default

39.     The Ray Note, Addendum 3, provides that:

That the Company agrees that any amount of the Note, including the Principal and any accrued interest thereon and any True up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder.  Failure to pay any amounts pursuant to this clause shall constitute an Event of Default under clause 4 of the Note as this has been amended by Addendum No. 1 and Addendum No. 2 and is further amended hereby or may be amended.

8

40.     The maturity date of the Ray Note was December 27, 2015.  Ex. 1, Addendum No. 3, ¶(c).

41.     NewLead failed to pay the Ray Note on December 27, 2015, and has not paid the Ray Note as of the date hereof.

42.     By letter dated December 29, 2015, Ray notified NewLead that it was in default, but NewLead failed to cure this default (the "Ray Default Notice").  Attached hereto as Exhibit 8 is a true and correct copy of the Ray Default Notice.

43.     Plaintiff Ray is owed, as of April 18, 2016, $1,661,967 under the Ray Note.

44.     NewLead's default under the Ray Note is a material breach of the Ray Note that entitles Ray to call on the Guarantee and Indemnity.

45.     By letter dated January 8, 2016, Ray notified NC that NewLead had defaulted under the Ray Note.  However, NC did not cure this breach.

46.     In addition to the failure to pay the Ray Note at maturity, NC has committed numerous additional defaults entitling Ray, Cheyenne, Oppenheim and Labroy to foreclose on the Vessel.

47.     Upon information and belief, NC has allowed significant debt to accumulate against the Vessel other than obligations that could be characterized as liabilities incurred during the ordinary course of business.

48.     Upon information and belief, some of the debt that has been accumulated by the Vessel may prime the Mortgages, prejudicing Plaintiffs' security.

49.     Moreover, upon information and belief, some of these debts meet the definition of an "Encumbrance" in the Mortgages in that they are secured by maritime liens or other security interests.

50.     NC also undertook to provide Plaintiffs with copies of NC's audited financial statements.  However, NewLead has since advised that there are no audited financial statements limited to only NC.  Accordingly, other than through NewLead's unaudited representations as to the financial performance of NC, Plaintiffs are unable to determine the Vessel's performance.

51.     Unfortunately, NC has not provided Plaintiffs with copies of the documents provided to NewLead by NC pursuant to NewLead's role as the sole shareholder of NC.

52.     If NC fully performed under the Guarantee and Indemnity and related agreements Plaintiffs would be able to calculate the Vessel's actual performance by reference to NC's reports to its parent NewLead.

53.     In addition, upon information and belief, NC has not kept the vessel in a complete state of repair because NC lacks the cash flow to properly maintain the Vessel.

54.     NC's failure to provide audited financial statements also impairs Plaintiffs' ability to fully determine the extent to which the Vessel has accumulated debt that primes Plaintiffs' mortgages.

55.     NC has also recently positioned the vessel in an area that makes it impossible for Plaintiffs to realize their security.  Prior to the commencement of the voyage terminating in this judicial district, NC directed the Vessel to lay idle in the Philippines, thus placing her entirely out of Plaintiffs' reach.

## FIRST CAUSE OF ACTION

F.R.Civ.P. Rule E Foreclosure of Maritime Lien *In Rem* Over M/V NEWLEAD CASTELLANO
Pursuant to the Ray Note

56.     Plaintiffs repeat and re-allege as if fully set forth herein the allegations set forth in paragraphs 1-55 above.

57.     Non-party NewLead has breached the Ray Note by, *inter alia*, failing to make the required payment on the Ray Note maturity date.

58.     NewLead's breach of the Ray Note entitles Plaintiff Ray to foreclose on the Vessel pursuant to the Guarantee and Indemnity given by NC, including the security provided by NC by way of the Mortgage and the maritime lien created thereby.

59.     Specifically, Plaintiff Ray is entitled to foreclose its maritime mortgage lien pursuant to the Maritime Lien Act and the Ship Mortgage Act, 46 U.S.C. §31301, *et seq.*

60.     The current amount due and payable under the Ray Note is $1,661,967, exclusive of interest, costs, fees and expenses, all of which are also recoverable pursuant to the terms of the Ray Note, the Guarantee and Indemnity, and the Mortgage.

61.     Plaintiff Ray has duly performed all of its obligations to NewLead under the terms of the Ray Note and the First Priority Ship Mortgage.

62.     Plaintiff Ray agrees to hold harmless and indemnify the U.S. Marshal and all his deputies from any liability as a result of seizing the aforesaid property.

## SECOND CAUSE OF ACTION

<u>Foreclosure of M/V NEWLEAD CASTELLANO for Breach of each Guarantee and
Indemnity Pursuant to F.R.Civ.P. Rule B</u>

63.     Plaintiffs repeat and re-allege as if fully set forth herein the allegations set forth in
Paragraphs 1-62 above.

64.     NC is also liable to Plaintiffs *in personam* for breach of maritime contract and
hence Plaintiffs are also entitled to attach NC's property located in the district.

65.     Defendant NC has breached the Guarantee and Indemnity by failing to provide its
audited financial statements.

66.     Defendant NC has further breached the Guarantee and Indemnity by not providing
Plaintiffs with the various documents NC provides to its sole shareholder, NewLead.

67.     As a result of the above-described events of default under the Guarantee and
Indemnity, Plaintiffs are entitled to attach NC's property in the district, including the Vessel.

68.     The current amount due and payable under the Notes is $7,171,000, exclusive of
interest, costs, fees and expenses, all of which are also recoverable pursuant to the terms of each
Guarantee and Indemnity and the Mortgages.

69.     Plaintiffs have duly performed all of their obligations to NewLead under the terms
of the Notes.

70.     Plaintiffs agree to hold harmless and indemnify the U.S. Marshal and all his
deputies from any liability as a result of seizing the aforesaid property.

12

### THIRD CAUSE OF ACTION

Foreclosure of Maritime Lien *In Rem* Over M/V NEWLEAD CASTELLANO for Breach of
Preferred Ship Mortgages Pursuant to F.R.Civ.P Rule E

71.     Plaintiffs repeat and re-allege as if fully set forth herein the allegations set forth in
Paragraphs 1-70 above.

72.     Upon information and belief, Defendant NC has breached the terms of the
Mortgages by failing to keep the Vessel in a state of complete repair.

73.     Upon information and belief, Defendant NC has also breached the terms of the
Mortgages by, prior to the current voyage, positioning the Vessel so that she is out of reach of the
Mortgagees.

74.     As a result of the above-described defaults under the Mortgages, Plaintiffs are
entitled to foreclose their maritime mortgage liens pursuant to the Maritime Lien Act and the Ship
Mortgage Act, 46 U.S.C. 313 *et seq*.

75.     The current amount due and payable under the Notes is $7,171,000, exclusive of
interest, costs, fees and expenses, all of which are also recoverable pursuant to the terms of the
Guarantee and Indemnity and the Mortgage.

76.     Plaintiffs have duly performed all of their obligations to NewLead under the terms
of the Notes.

77.     Plaintiffs agree to hold harmless and indemnify the U.S. Marshal and all his
deputies from any liability as a result of seizing the aforesaid property.

13

80426823v1

## FOURTH CAUSE OF ACTION

### Attachment of M/V NEWLEAD CASTELLANO for Breach of Contract Pursuant to F.R.Civ.P Rule B

78.     Plaintiffs repeat and re-allege as if fully set forth herein the allegations set forth in Paragraphs 1-77 above.

79.     In addition to the *in rem* maritime liens created by the Mortgages, NC is also liable to Plaintiffs *in personam* for breach of maritime contract and hence Plaintiffs are also entitled to attach NC's property located in this judicial district.

80.     Upon information and belief, Defendant NC has breached the terms of the Mortgages by failing to keep the Vessel in a state of complete repair.

81.     Upon information and belief, Defendant NC has also breached the terms of the Mortgages by, prior to the current voyage, positioning the Vessel so that she is out of reach of the Mortgagees.

82.     The current amount due and payable under the Notes is $7,171,000, exclusive of interest, costs, fees and expenses, all of which are also recoverable pursuant to the terms of the Guarantee and Indemnity and the Mortgage.

83.     Plaintiffs have duly performed all of their obligations to NewLead under the terms of the Notes.

84.     Plaintiff agrees to hold harmless and indemnify the U.S. Marshal and all his deputies from any liability as a result of seizing the aforesaid property.

80426823v1

85.     Plaintiff is entitled to judgment *in personam* against NewLead in an amount in excess of $7,171,000 together with interest, costs, expenses and attorneys' fees.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request:

A.     That process of arrest, in due form of law, according to the course and practice of this Honorable Court in causes of Admiralty and Maritime Jurisdiction within the meaning of the Constitution of the United States and Rule 9(h) of the Federal Rules of Civil Procedure, may issue against the Vessel M/V NEWLEAD CASTELLANO and her engines, tackle, apparel, etc., and all other necessaries and equipment belonging and appurtenant thereto, as provided in F.R.Civ.P. Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims, and that all persons claiming any interest in the Vessel may be cited to appear and answer the matters aforesaid, and that the Vessel, her engine, tackle, apparel, etc., and all other necessaries belonging and appurtenant thereto, may be seized, condemned and sold to pay the demands and claims aforesaid, with interest, costs, expenses and attorneys' fees, and to pay other amounts required to be paid by the Defendant NC to Plaintiffs under the Notes and the Guarantee and Indemnity agreements and secured by the Mortgages, together with interest, costs, expenses and attorneys' fees, and that Plaintiffs have such other and further relief as in law and justice they may be entitled to receive; and

B.     That process of attachment, in due form of law, according to the course and practice of this Honorable Court in causes of Admiralty and Maritime Jurisdiction within the meaning of the Constitution of the United States and Rule 9(h) of the Federal Rules of Civil Procedure, may issue against the assets of Defendant NC that may be found within this judicial district, to wit the Vessel M/V NEWLEAD CASTELLANO and her engines, tackle, apparel, etc.,

15

and all other necessaries and equipment belonging and appurtenant thereto, as provided in F.R.Civ.P. Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and that all persons claiming any interest in the Vessel may be cited to appear and answer the matters aforesaid, and that the Vessel, her engine, tackle, apparel, etc., and all other necessaries belonging and appurtenant thereto, may be seized, condemned and sold to pay the demands and claims aforesaid, with interest, costs, expenses and attorneys' fees, and to pay other amounts required to be paid by Defendant NC to Plaintiffs under the Notes, Guarantee and Indemnity agreements and the Mortgages, together with interest, costs, expenses and attorneys' fees, and that Plaintiffs may have such other and further relief as in law and justice they may be entitled to receive; and

C.       That the Mortgages granted by NC may be declared to be valid and subsisting liens upon the Vessel, her engines, tackle, apparel, etc., and all other equipment and necessaries belonging and appurtenant thereto, which is prior and superior to the interest, liens or claims or any and all persons, firms or corporations whatsoever; and

D.       That it may be decreed that any and all persons, firms and corporations claiming any interest in the Vessel are forever barred and foreclosed from all rights or equities for redemption or claim of, in or to the mortgaged Vessel, her engines tackle, apparel, etc., and all other necessaries and equipment belonging and appurtenant thereto and every part thereof; and

E.       That judgment be issued against the Vessel, M/V NEWLEAD CASTELLANO *in rem* in an amount in excess of the full amount due under the Notes and the Mortgages at the time the warrant of arrest is issued, plus interest, charges, costs, expenses and attorneys' fees, as well as any and all other amounts required to be paid or to be paid by NewLead to Plaintiffs under the Notes with interest and costs and expenses and fees, and that the Vessel be arrested under

16

Supplemental Rule C of the Federal Rules of Civil Procedure to secure such claim, and further, that Plaintiffs reserve the right to proceed against NewLead, and any other party whether named in this lawsuit or not, for any deficiency that may remain due after applying the available proceeds of the sale of the mortgaged Vessel to the judgment herein and that Plaintiffs have such other and further relief as in law and justice it may be entitled to recover; and

F.      That judgment be issued against NC *in personam* in an amount in excess of the full amount due under the Notes, Guarantee and Indemnity agreements and the Mortgages at the time the warrant of arrest is issued, plus interest, charges, costs, expenses and attorneys' fees, as well as any and all other amounts required to be paid or to be paid by Defendant NC to Plaintiff under the Notes, Guarantee and Indemnity agreements and the Mortgages together with interest and costs and expenses and fees, and that the Vessel be attached under Supplemental Rule B of the Federal Rules of Civil Procedure to secure such claim, and further, that Plaintiffs reserve the right to proceed against NewLead, and any other party whether named in this lawsuit or not, for any deficiency that may remain due after applying the available proceeds of the sale of the mortgaged Vessel to the judgment herein and that the Plaintiffs have such other and further relief as in law and justice they may be entitled to recover; and

Dated: Savannah, Georgia
       April 19, 2016

_____
Bouhan Falligant LLP
The Armstrong House
447 Bull Street (31401)
Post Office Box 2139
Savannah, Georgia  31402-2139
(912) 232-7000
tmbaiad@bouhan.com

17

**Of Counsel**
(*Pro Hac Vice* Admission pending)
Neil A. Quartaro (NQ 9640)
Zachary Farley (Federal admission pending)
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
(212) 922-2200
nquartaro@wfw.com
zfarley@wfw.com

80426823v1

## **VERIFICATION**

1.      My name is Dimitrios Tsouvelekakis.  I am over the age of 21 and am competent to testify to the matters attested to herein.

2.      I am a Director of Plaintiff Oppenheim Capital Ltd. and am authorized to act on behalf of Ray Capital Inc., Cheyenne Holdings Ltd. and Labroy Shiptrade Limited, affiliates of Oppenheim Capital Ltd.

3.      I have read the foregoing Verified Complaint.  Based upon my personal knowledge and upon a review of documents and correspondence kept in the ordinary course of business, I verify that the contents of the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief, except for those allegations made upon information and belief, and these I believe to be true.

4.      I DECLARE under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 19th day of April, 2016

_____
Dimitrios Tsouvelekakis

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| **RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED** | § § § § § | |
| **PLAINTIFFS** | § | C.A. NO. _____ |
| **V.** | § § | |
| **M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC.,** *IN REM***, AND NEWLEAD CASTELLANO LTD.** | § § § § § § § § | |
| **DEFENDANTS** | § | |

## VERIFIED COMPLAINT

EXHIBIT "1"

THIS NOTE AND THE SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET FORTH HEREIN.   NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE PURSUANT HERETO MAY BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER SUCH ACT.   THIS NOTE IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT CERTAIN EXCHANGE AGREEMENT, DATED DECEMBER 27, 2013, BY AND BETWEEN THE COMPANY AND THE HOLDER.

**NEWLEAD HOLDINGS LTD.**
**Unsecured Convertible Note**

$6,000,000                                              December 27, 2013
                                                                          Piraeus, Greece

NEWLEAD HOLDINGS LTD., a company organized under the laws of Bermuda (the "Company"), for value received, hereby promises to pay to Ray Capital Inc. a company established under the laws of the Mashall Islands with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands, or registered assigns (the "Holder"), the principal amount of US$6,000,000 (United States Dollars six million) (the "Principal").

This Note has been issued pursuant to an Exchange Agreement Dated December 27th, 2013 between the Company and *Tiger Capital Partners Ltd.* of Vanterpool Plaza, 2nd floor, Wickhams Cay I, Road Town, Tortola, British Virgin Islands (the "Exchange Agreement"). Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Exchange Agreement.

    1.     **Payments.**

        (a)     Sixty dates hereof, the Company shall:

        (i)     pay US$6,000,000 (United States Dollars six million) by issuance of its common shares, par value $0.01 (the "Common Stock"), at the Stock Price (as defined below).

Stock Price. The number of shares of Common Stock shall be determined by dividing (i) the amount payable by, (ii) the Closing Price, as adjusted for any stock splits or stock dividends (the "Stock Price"). "Closing Price" means the average of the closing prices for the ten (10) trading days immediately prior to (but not including) the date of issuance of the shares, provided the Common Stock is then listed or quoted on the NASDAQ, OTC Bulletin Board or any other national securities exchange, market or trading or quotation facility (a "Trading Market").

**True up Amounts.** Commencing from the first annual anniversary of the Agreement and each succeeding anniversary (the "Measurement Dates"), for a Period of five (5) years from the date of execution of the Agreement, the Holder shall be entitled to recover the shortfall incurred in additional shares or cash or any combination at the Company's option. The True up Amounts are equal to the Principal less the Market Value (as defined below) of the shares issued or the cash paid as part of any Payments prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days after the Measurement Dates.

**Market Value.** Market Value with respect to the shares issued as part of the Principal, means the aggregate gross proceeds received by the Holder from one or more sales, as evidenced by brokerage statements for such sales; *provided, however,* that if the sale price is not reasonably related to the trading price on the sale date, such sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale.

(ii)   For a period of 5 years after the execution date of this Note, at the date when either, (i) all Common Stock being issued to the Holder under 1(a)(i) above, or (ii) all Common Stock being issued to the Holder under any True up Amounts (As defined hereinabove), are sold in full and the Holder is entitled to additional True up Amounts. The Company may elect to pay the additional True up Amounts by either (i) wire transfer of immediately available funds to an account designated in writing by the Holder, or (ii) issuance by the Company of its Common Stock at the Stock Price determined as of such date, or (iii) any combination thereof, at the sole option of the Company. The Holder will be entitled for as many additional True up Amounts are required to collect in total the Principal in cash either by the sale of Common Stock or by cash receipts by the Company. Six (6) months prior the lapse of the five (5) year period the Holder is entitled to request for an extension of the true-up period for an additional three (3) years by providing a written notice to the Company.

(b)   **Termination of Rights Under this Note.** Immediately upon the payment of the Principal and/ or any applicable True up Amount due under this Note, this Note shall no longer be deemed outstanding and all rights with respect to this Note shall immediately cease and terminate, except only for the right of the Holder under clause 1(a)(ii) of this Note.

(c)   **Taxes or other Issuance Charges.** The issuance of any shares of Common Stock in payment of this Note, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

2

(d)     Holder Not a Stockholder. The Holder shall not have, solely on account of such status as a holder of this Note, any rights of a stockholder of the Company, either at law or in equity, or any right to any notice of meetings of stockholders or of any other proceedings of the Company until such time as this Note has been paid in shares of Common Stock pursuant to Section 1(a), at which time the Holder shall be deemed to be the holder of record of Common Stock that has been issued, as applicable, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(e)     Fractional Shares. No fractional shares of Common Stock shall be issued when paying this Note. In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up or down to the nearest whole share of Common Stock.

(f)     Payment in Common Stock or Cash. Each Payment may be paid by the Company in cash or shares of its Common Stock, at its sole discretion; provided, however, that if the Common Stock is not then listed or quoted on a Trading Market (or a similar organization or agency succeeding to its functions of reporting prices), then the Company may not pay by issuing shares of its Common Stock.

2.      Trading Market Limitations. Unless permitted by the applicable rules and regulations of the principal securities market on which the Common Stock is then listed or traded, in no event shall the Company issue upon conversion of or otherwise pursuant to this Note and the other Notes issued pursuant to the Exchange Agreement more than the maximum number of shares of Common Stock that the Company can issue pursuant to any rule of the principal United States securities market on which the Common Stock is then traded (the "Maximum Share Amount"), which shall be 4.99% of the total shares outstanding on the Closing Date, subject to equitable adjustment from time to time for stock splits, stock dividends, combinations, capital reorganizations and similar events relating to the Common Stock occurring after the date hereof.

3.      Ranking. The Company, for itself, its successors and assigns, covenants and agrees, that the payment of the Principal of this Note is senior in right of payment to the payment of all existing and future Junior Debt (as defined below). "Junior Debt" shall mean all existing and future Indebtedness (as defined below), (B) Indebtedness (as defined below) incurred after the date hereof, solely as it relates to the Collateral, and (C) as otherwise agreed to by the Holder in writing. "Indebtedness" shall mean (x) any liability of the Company for borrowed money, (1) evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), including any given in connection with the acquisition of property, assets or service, or (2) for the payment of rent or other amounts relating to capitalized lease obligations; (y) any liability of others of the nature described in clause (1) which the Company has guaranteed or which is otherwise its legal liability; and (z) any modification, renewal, extension, replacement or refunding of any such liability described in clause (x) or (y); provided, that Indebtedness does not include unsecured trade credit.

(a)     The Company covenants and agrees to cause any current holder of Junior Debt and to cause any future holder of Junior Debt permitted to be incurred pursuant to this Note

3

to execute such subordination agreements, instruments or waivers as may be necessary to reflect the terms set forth herein.

(b)     Until the payment in full of all amounts of principal of this Note, and all other amounts owing under this Note, no payment may be made with respect to the principal of or other amounts owing with respect to any Junior Debt, or in respect of any redemption, retirement, purchase or other acquisition thereof, provided that the Company may pay scheduled interest thereon so long as no Event of Default shall have occurred and be continuing.

(c)     Upon any payment or distribution of the assets of the Company to creditors upon dissolution, total or partial liquidation or reorganization of, or similar proceeding, the Holder of the Note will be entitled to receive payment in full before any holder of Junior Debt is entitled to receive any payment.

4.     **Events of Default.**   The entire unpaid principal of this Note or any True up Amounts shall become and be immediately due and payable in cash or shares of Common Stock of the Company, in either case without any other notice or demand of any kind or any presentment or protest, if any one of the following events occurs and be continuing at the time of such demand (each such event, an "Event of Default"):

(a)     The Company's failure to pay any portion of the principal as provided in Section 1 hereof; or

(b)     (i) The commencement by the Company, or any subsidiary, of a voluntary case under 11 U.S.C. Section 101 *et. seq.* (the "Bankruptcy Code") or any foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or (ii) the consent by the Company, or any subsidiary, to the entry of an order for relief in an involuntary bankruptcy or similar case, or to the conversion of an involuntary case to a voluntary case, under any such law, or (iii) the consent by the Company, or any subsidiary, to the appointment of, or the taking of possession by, a receiver, trustee or other custodian for all or a substantial part of the Company's properties, or (iv) the making by the Company, or any subsidiary, of any assignment for the benefit of creditors, or (v) the admission by the Company, or any subsidiary, in writing of the Company's inability to pay the Company's debts as such debts become due, or (vi) the discontinuance of business, dissolution, winding up, liquidation or cessation of existence by or of the Company, or any subsidiary; or

(d)     (i) The entry by a court of competent jurisdiction a decree or order for relief with respect to the Company, or any subsidiary, in an involuntary case under the Bankruptcy Code or any applicable foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed or dismissed within 60 days of the entry thereof, or (ii) the entry by a court of a decree or order for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other person having similar powers over the Company or over all or a substantial part of its properties;

(f)     The Company materially breaches any covenant contained in the Exchange Agreement; or

4

The Company agrees that if it fails to timely make any payment due under this Note or upon the happening of any Event of Default, and fails to remedy the situation within a ten (10) day grace period, the outstanding principal, together with all other expenses, including, reasonable attorneys' fees, shall immediately become due and payable at the option of the Holder.  For purposes hereof, attorneys' fees shall include, without limitation, fees and disbursements for legal services incurred by the holder hereof in collecting or enforcing payment hereof whether or not suit is brought, and if suit is brought, then through all appellate actions. From and after any Event of Default, the interest rate of this Note shall be the highest rate permitted under applicable law.

5.   **Miscellaneous.**

(a)   The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; *provided, however,* that neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party.  Assignment of all or any portion of this Note in violation of this Section shall be null and void.  Nothing in this Note, expressed or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b)   Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in accordance with Section 11.5 of the Exchange Agreement.

(c)   Upon receipt of evidence satisfactory to the Company, of the loss, theft, destruction or mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the Holder thereof that this Note has been lost, stolen, destroyed or mutilated, together with an indemnity against any claim that may be made against the Company on account of such lost, stolen, destroyed or mutilated Note, and upon reimbursement of the Company's reasonable incidental expenses, the Company shall execute and deliver to the Holder a new Note of like date, tenor and denomination.

(d)   No course of dealing and no delay or omission on the part of the Holder or the Company in exercising any right or remedy shall operate as a waiver thereof or otherwise prejudice the Holder's or the Company's rights, powers or remedies, as the case may be.  No right, power or remedy conferred by this Note upon the Holder or the Company shall be exclusive of any other right, power or remedy referred to herein or now or hereafter available at law, in equity, by statute or otherwise, and all such remedies may be exercised singly or concurrently.  Any waiver must be in writing.

(e)   If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.  This Note may be amended only by a written instrument executed by the

Company and the Holder. Any amendment shall be endorsed upon this Note, and all future Holders shall be bound thereby.

(f)     If any date specified in this Note as a date for the making of any payment of principal or interest under this Note falls on a Saturday, Sunday or on a day that is a legal holiday in the State of New York, then the date for the making of that payment shall be the next subsequent day that is not a Saturday, Sunday or legal holiday.

(g)     This Note shall be governed by and construed in accordance with the laws of the New York City, without giving effect to principles governing conflicts of law.

(h)     The Company hereby irrevocably submits to the exclusive jurisdiction of any United States Federal court over any suit, action or proceeding arising out of or related to the Note. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; *provided* that service of process is effected upon the Company in the manner permitted by law.

(i)     The parties hereto agree that all monetary amounts set forth herein are referenced in United States dollars, unless otherwise stated.

*(Remainder of page left intentionally blank. Signature page to follow.)*

IN WITNESS WHEREOF, the Company has caused this Senior Secured Note
to be executed and dated the day and year first above written.

NEWLEAD HOLDINGS LTD.

By: _____

Name: MICHAEL ZOLOTAS

Title: CEO

This Addendum No.3 (hereinafter the "Addendum"), is made on March 3, 2015

BETWEEN:

(1)  NEWLEAD HOLDINGS LTD., a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "Company");

-and-

(2)  RAY CAPITAL INC., a corporation established in the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called the "Ray").

*(Jointly the Parties, singly the Party)*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note.*

## RECITALS

WHEREAS, pursuant to an Unsecured Convertible Note dated 27th December 2013 as amended by Addenda 1 and 2 on 28th December 2013, (the "Note") issued to Ray pursuant to an Exchange Agreement dated December 27th, 2013, between the Company and Tiger Capital Partners Ltd. of the BVI, (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied, the "Agreement" and together with the Note, the "Security Documents"), the Company promises to pay to Ray the principal amount of USD 6,000,000 (United States Dollars six million) under the terms and conditions set forth therein.

WHEREAS, in consideration of the payment of the Note a First Preferred Liberian Mortgage m.v. "NEWLEAD CASTELLANO" has been issued between NEWLEAD CASTELLANO LTD and Ray dated 16 October 2014 (the "Mortgage"), pursuant to which "Events of Default" shall mean any events or circumstances set out in clause 4 of the Note.

WHEREAS, pursuant to Addendum No. 1 to the Note dated December 28th 2013 (the "Addendum No. 1") the Maturity Date of the Note was extended to December 27th 2014.

WHEREAS, under clause 1 (a)(i) the Company shall pay US$6,000,000 (United States Dollars six million) by issuance of its common shares, par value $0.01 (the "Common Stock") at the Stock Price as defined in the Note, as this was amended by Addendum No. 2 dated December 28th 2013 clause (1).

WHEREAS, under the Note the Company shall at all times reserve and keep available out of its

authorized but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, fifty times the number of Common shares that its actually issuable upon such conversion.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree as follows:

(a) To waive the Company's obligation to reserve and keep available fifty times the number of Common shares that are actually issuable upon conversion of the Note, such waiver being effective as from the date of execution of the Note.

(b) That the Company as from the date hereof, shall at its discretion reserve, but always keep available out of its authorized but unissued shares of capital stock, such shares of Common Stock as shall from time to time be sufficient to effect the conversion of this Note.

(c) The Maturity Date of the Note is extended from the Maturity Date provided for in the Addendum No. 1, it being December 27th, 2015 (hereinafter the "Maturity Date").

(d) That the Company agrees that any amount of the Note, including the Principal and any accrued interest thereon and any True up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder. Failure to pay any amounts pursuant to this clause shall constitute an Event of Default under clause 4 of the Note as this has been amended by Addendum No. 1 and Addendum No. 2 and is further amended hereby or may be amended.

(e) That, as of the date hereof, at an Event of Default pursuant to clause 4 of the Note the entire unpaid principal and accrued interest of the Note or any True-up Amounts shall become and be immediately due and payable in cash without any other notice or demand of any kind or any presentment or protest, if any of the events under this clause 4 occur and be continuing at the time of such demand.

(f) That the Holder agrees and warrants that it shall sell up to twenty percent (20%) of the Monthly Dollar Volume (as defined herein below) of the Company's Common Stock per month to reduce the Company's outstanding obligations owing to the Holder pursuant to the Note. "Monthly Dollar Volume" means a dollar amount of the Company's Common Stock which is traded in the US public markets in the relevant month in which it is calculated (not including the amount of any shares of the Company's Common Stock traded by the Holder).

(g) All other provisions of the Note shall remain in full force and effect.
This Addendum shall be governed by and construed by and interpreted in accordance with the internal laws of the state of New York.

(SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, the Parties have hereunto set their hands and affixed their seals as of the day and year first above written.

NEWLEAD HOLDINGS LTD.

By: _____
Name: Michail S. Zolotas
Title: CEO/ Chairman

RAY CAPITAL INC.

By: _____
Name: DIMITRIOS STAVRIANOS
Title: ATTORNEY.

DATE 28 December 2013

-------------------------------------

NEWLEAD HOLDINGS LTD
Of Bermuda
-and-

RAY CAPITAL INC
Of The Republic of Marshall Islands

---

ADDENDUM NO. 2
to
the Unsecured Convertible Note dated 27th December 2013.

---

THIS ADDENDUM No. 2 is made on the 28th day of December 2013

BETWEEN

(1)  **NEWLEAD HOLDINGS LTD**, a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street Hamilton HM12, Bermuda (hereinafter called the "**Company**"); and

(2)  **RAY CAPITAL INC.**, a corporation established in the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called "RAY")

(each a **Party** and together with the **Parties**)

**WHEREAS**, Pursuant to an Unsecured Convertible Note dated 27th December 2013 entered into and between the Company and RAY as it is further amended by Addendum no. 1 of even date hereof (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied the "Note"), the Company promises to pay to RAY the principal amount of USD6,000,000 (United States Dollars six million) (hereinafter the "Principal Amount") under the terms and conditions set forth therein.

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree to amend the Note as follows:

1.  The Company promises to pay RAY the Principal together with interest from the date of the Note on the unpaid principal balance and on the True-Up amount outstanding from time to time hereof, at a rate equal to ten percent (10%) per annum, computed daily and on the basis of the actual number of days elapsed and a year of 365 days (hereinafter the "Interest").

2.  Any accrued and unpaid interest on the Note shall be due and payable in quarterly instalments concluding with the final instalments on the Maturity Date and upon any partial or full conversion of the Note as well as any issuances of True-Up adjustments.

3.  The Company shall at all times reserve and keep available out of its authorised but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, fifty times the number of Common shares that its actually issuable upon such conversion and if at any time the number of authorised but unissued Common shares shall not be sufficient to effect the conversion of the Note, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorised but unissued Common Shares to such number of shares as shall be sufficient for such purpose.

4.  The Note as amended by this Addendum represent the entire agreement among the parties hereto with respect to the subject matter hereof and supersede any prior expressions of intent or understanding with respect to this transaction and may be amended only by an instrument in writing executed by the party or parties to be bound or burdened thereby.

5.  This Addendum shall in all respects be governed by, and construed in accordance with the internal laws of the State of New York.

IN WITNESS WHEREOF the presents have been duly executed the day and year first before written.

SIGNED by:                          )
M. ZOLOTAS                          )
for and on behalf of:               )
NEWLEAD HOLDINGS LTD                 )
in the presence of:                  )



ACKNOWLEDGED by:          )
D. TSOUVELEKAKIS          )
for and on behalf of:     )
RAY CAPITAL INC.          )
in the presence of:       )

DATE 28 December 2013

------------------------------

NEWLEAD HOLDINGS LTD
Of Bermuda
-and-

RAY CAPITAL INC
Of The Republic of Marshall Islands

ADDENDUM NO. 1
to
the Unsecured Convertible Note dated 27th December 2013.

THIS ADDENDUM No. 1 is made on the 28th day of December 2013

BETWEEN

(1)   **NEWLEAD HOLDINGS LTD**, a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**"); and

(2)   **RAY CAPITAL INC.**, a corporation established in the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called "Ray")

(each a **Party** and together with the **Parties**)

**WHEREAS,** Pursuant to an Unsecured Convertible Note dated 27th December 2013 between the Company and Ray (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied the "Note"), the Company promises to pay to Ray the principal amount of USD6,000,000 (United States Dollars six million) (hereinafter the "Principal Amount") under the terms and conditions set forth therein.

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree to amend the Note as follows:

1.  The Maturity Date of the Note is set one year after the execution date of the Note, being December 27th, 2014 (hereinafter the "Maturity Date").

2.  Clause 1(a)(i) of the Note is amended to read that the Note is to be paid by the Company *upon the Maturity Date.*

3.  Ray shall have the right from time to time and at any time during the period commencing from the date of execution of the Note and ending on the later of

the Maturity Date, to convert all or any part of the outstanding and unpaid Principal Amount of the Note into fully paid and non-assessable shares of Common Stock of the Company at the Stock Price.

4. The Closing Price definition is amended to *"the closing price of the trading day immediately prior to the date of issuance of the shares (the "Closing Price")"*.

5. The definition of the **True up Amounts** is amended in its entirety to read as follows *"For a period of five (5) years from the date of execution of the Note, Ray shall be entitled to recover the shortfall incurred in additional shares or cash or any combination at the Company's option. The True up Amounts are equal to the Principal Amount less the Market (as defined below) of the shares issued or the cash paid as part of any Payment prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days upon receipt of the request from Ray."*

6. The Note as amended by this Addendum represent the entire agreement among the parties hereto with respect to the subject matter hereof and supersede any prior expressions of intent or understanding with respect to this transaction and may be amended only by an instrument in writing executed by the party or parties to be bound or burdened thereby.

7. This Addendum shall in all respects be governed by, and construed in accordance with the internal laws of the State of New York.

IN WITNESS WHEREOF the presents have been duly executed the day and year first before written.

**SIGNED** by:                              )
M. ZOLOTAS                                )
for and on behalf of:                        )
NEWLEAD HOLDINGS LTD              )
in the presence of:                          )

2

**ACKNOWLEDGED** by:     )
D. TSOUVELEKAKIS      )
for and on behalf of:       )
RAY CAPITAL INC.        )
in the presence of:        )

3

DATE: 7 December 2015

---

## NEWLEAD HOLDINGS LTD.
of Bermuda


-and-


## RAY CAPITAL INC.
Of the Republic of Marshall Islands

---

## ADDENDUM NO. 5

to

the Unsecured Convertible Note dated 27th December, 2013
in the amount of USD 6,000,000 (United States Dollars six million)

---

This Addendum No.5 (hereinafter the "**Addendum**"), is made on 7 December 2015

**BETWEEN:**

(1) **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Cumberland House, 9th Floor, 1 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**");

-and-

(2) **RAY CAPITAL INC.,** a corporation established in the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called the "**Ray**").

*(Jointly the Parties, singly the Party)*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note.*

**RECITALS**

**WHEREAS,** pursuant to an Unsecured Convertible Note dated 27th December 2013 as amended by Addenda 1, 2, 3 and 4 on 28th December 2013 (the first two addenda), 3 March 2015 and 8 April 2015, respectively (the "**Note**") issued to Ray pursuant to an Exchange Agreement dated December 27th, 2013, between the Company and Tiger Capital Partners Ltd. of the BVI, (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied, the "**Agreement**" and together with the Note, the "**Security Documents**"), the Company promises to pay to Ray the principal amount of USD 6,000,000 (United States Dollars six million) under the terms and conditions set forth therein.

**WHEREAS** the Maturity Date of the Note is 27 December 2015.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree as follows:

(a) The Maturity Date is deferred to 27 December 2018

(b) All other provisions of the Note shall remain in full force and effect.

(c) This Addendum shall be governed by and construed by and interpreted in accordance with the internal laws of the state of New York.

**(SIGNATURE PAGE FOLLOWS)**

**IN WITNESS WHEREOF,** the Parties have hereunto set their hands and affixed their seals as of the day and year first above written.

SIGNED by:                     )
M. ZOLOTAS                     )
for and on behalf of:          )
**NEWLEAD HOLDINGS LTD .**     )
in the presence of:            )


SIGNED by:                     )
                               )
for and on behalf of:          )
**RAY CAPITAL INC.**           )
in the presence of:            )

Date 8 April 2015

**NEWLEAD HOLDINGS LTD.**
of Bermuda

-and-

**RAY CAPITAL INC.**
of
the Republic of Marshall Islands

**ADDENDUM NO. 4**

to

the Unsecured Convertible Note dated 27th December, 2013
in the amount of USD 6,000,000 (United States Dollars six million)

This Addendum No.4 (hereinafter the "Addendum"), is made on April 8, 2015

**BETWEEN:**

(1) **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**");

-and-

(2) **RAY CAPITAL INC.,** a corporation established in the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called the "**Ray**").

*(Jointly the Parties, singly the Party)*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note.*

**RECITALS**

**WHEREAS,** pursuant to an Unsecured Convertible Note dated 27ᵗʰ December 2013 as amended by Addenda 1, 2 and 3 on 28ᵗʰ December 2013 and 3 March 2015, respectively (the "Note") issued to Ray pursuant to an Exchange Agreement dated December 27ᵗʰ, 2013, between the Company and Tiger Capital Partners Ltd. of the BVI, (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied, the "**Agreement**" and together with the Note, the "**Security Documents**"), the Company promises to pay to Ray the principal amount of USD 6,000,000 (United States Dollars six million) under the terms and conditions set forth therein.

**WHEREAS,** under the Note the Company shall pay any accrued and unpaid interest on the Note shall be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree as follows:

(a) To waive the payment of the accrued and unpaid interest on the Note in quarterly installments, such waiver being effective as from the date of execution of the Note.

(b) That the payment of the accrued and unpaid interest to be due and payable on the Maturity Date.

(c) All other provisions of the Note shall remain in full force and effect.

(d) This Addendum shall be governed by and construed by and interpreted in accordance with the internal laws of the state of New York.

**(SIGNATURE PAGE FOLLOWS)**

IN WITNESS WHEREOF, the Parties have hereunto set their hands and affixed their seals as of the day and year first above written.

NEWLEAD HOLDINGS LTD

By: _____
Name: Michail S. Zolotas
Title: CEO/ Chairman

RAY CAPITAL INC.

By: _____
Name:
Title:

DATE: 14 September 2015

**NEWLEAD HOLDINGS LTD.**
of Bermuda

-and-

**RAY CAPITAL INC.**
Of the Republic of Marshall Islands

**ADDENDUM NO. 5**

to

the Unsecured Convertible Note dated 27th December, 2013
in the amount of USD 6,000,000 (United States Dollars six million)

This Addendum No.5 (hereinafter the "**Addendum**"), is made on 14 September 2015

**BETWEEN:**

(1) **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**");

-and-

(2) **RAY CAPITAL INC.,** a corporation established in the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called the "**Ray**").

*(Jointly the Parties, singly the Party)*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note.*

**RECITALS**

**WHEREAS,** pursuant to an Unsecured Convertible Note dated 27th December 2013 as amended by Addenda 1, 2, 3 and 4 on 28th December 2013 (the first two addenda), 3 March 2015 and 8 April 2015, respectively (the "**Note**") issued to Ray pursuant to an Exchange Agreement dated December 27th, 2013, between the Company and Tiger Capital Partners Ltd. of the BVI, (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied, the "**Agreement**" and together with the Note, the "**Security Documents**"), the Company promises to pay to Ray the principal amount of USD 6,000,000 (United States Dollars six million) under the terms and conditions set forth therein.

**WHEREAS** the Maturity Date of the Note is 27 December 2015.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree as follows:

(a) The Maturity Date is deferred to 27 December 2018

(b) All other provisions of the Note shall remain in full force and effect.

(c) This Addendum shall be governed by and construed by and interpreted in accordance with the internal laws of the state of New York.

**(SIGNATURE PAGE FOLLOWS)**

**IN WITNESS WHEREOF,** the Parties have hereunto set their hands and affixed their seals as of the day and year first above written.

| | |
|---|---|
| **SIGNED** by: | ) |
| M. ZOLOTAS | ) |
| for and on behalf of: | ) |
| **NEWLEAD HOLDINGS LTD .** | ) |
| in the presence of: | ) |

| | |
|---|---|
| **SIGNED** by: | ) |
| | ) |
| for and on behalf of: | ) |
| **RAY CAPITAL INC.** | ) |
| in the presence of: | ) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED | § § § § § | |
| **PLAINTIFFS** | § | C.A. NO. _____ |
| V. | § § | |
| M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM*, AND NEWLEAD CASTELLANO LTD. | § § § § § § § § | |
| **DEFENDANTS** | § | |

### VERIFIED COMPLAINT

EXHIBIT "2"

THIS NOTE AND THE SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT
BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE
"ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET
FORTH HEREIN.    NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE
PURSUANT HERETO MAY BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED
OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER
THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS
UNDER SUCH ACT.  THIS NOTE IS SUBJECT TO THE TERMS AND CONDITIONS
OF THAT CERTAIN EXCHANGE AGREEMENT, DATED AUGUST 1, 2014, BY AND
BETWEEN THE COMPANY AND THE HOLDER.

**NEWLEAD HOLDINGS LTD.**
**Unsecured Convertible Note**
**(the "Note")**

**US $2,499,955.98**                                     **August 4, 2014**
                                                        **Piraeus, Greece**

**NEWLEAD HOLDINGS LTD.**, a company organized under the laws of Bermuda (the
"**Company**"), for value received, hereby promises to pay to *Oppenheim Capital Ltd* of Trust
Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Republic of the Marshall
Islands or registered assigns (the "**Holder**"), the principal amount of USD2,499,955.98 (United
States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety
eight) together with any interest as set forth herein (the "**Principal**") on August 4, 2016, (the
"**Maturity Date**"), and to pay interest from the date hereof on the unpaid principal balance at a
rate equal to ten percent (10%) per annum, computed daily and on the basis of the actual number
of days elapsed and a year of 365 days. Any accrued and unpaid interest on the Note shall be due
and payable in quarterly installments concluding with the final installments on the Maturity Date.

        This Note has been issued pursuant to an Exchange Agreement dated August 4, 2014
between the Company and *the Holder* (the "**Exchange Agreement**"). Capitalized terms used
herein and not otherwise defined shall have the respective meanings ascribed to such terms in the
Exchange Agreement.

        1.      **Payments.**

                (a) The Company shall:

                (i)      pay the Principal or any amount thereof by issuance of its common shares,
                         (the "**Common Stock**"), at the Stock Price (as defined below) on the
                         Maturity Date.

**Stock Price**. The number of shares of Common Stock shall be determined by dividing (i) the
amount payable by, (ii) the Closing Price, as adjusted for any stock splits or stock dividends (the
"**Stock Price**").  "**Closing Price**" means the closing price the trading date immediately prior to
(but not including) the date of issuance of the shares, provided the Common Stock is then listed

or quoted on any national securities exchange, market or trading or quotation facility (a "**Trading Market**").

        (ii)      From the date of execution of the Note and for a period of 5 years after the execution date of this Note (the "Measurement Dates"), at the date when either, (i) all Common Stock being issued to the Holder under 1(a)(i) above, or (ii) all Common Stock being issued to the Holder under any True up Amounts **(As defined hereinbelow)**, are sold in full and the Holder is entitled to additional True up Amounts. The Company may elect to pay the additional True up Amounts by either (i) wire transfer of immediately available funds to an account designated in writing by the Holder, or (ii) issuance by the Company of its Common Stock at the Stock Price determined as of such date, or (iii) any combination thereof, at the sole option of the Company. The Holder will be entitled for as many additional True up Amounts are required to collect in total the Principal in cash either by the sale of Common Stock or by cash receipts by the Company. Six (6) months prior the lapse of the five (5) year period the Holder is entitled to request for an extension of the true-up period for an additional three (3) years by providing a written notice to the Company.

**True up Amounts**. The True up Amounts are equal to the Principal less the Market Value (as defined below) of the shares issued or the cash paid as part of any Payments prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days after the Measurement Dates.

**Market Value**. Market Value with respect to the shares issued as part of the Principal, means the aggregate gross proceeds received by the Holder from one or more sales, as evidenced by brokerage statements for such sales; *provided, however,* that if the sale price is not reasonably related to the trading price on the sale date, such sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale.

        (b)    **Termination of Rights Under this Note**.  Immediately upon the payment of the Principal and/ or any applicable True up Amount due under this Note, this Note shall no longer be deemed outstanding and all rights with respect to this Note shall immediately cease and terminate, subject to clause 1(a)(ii) of this Note.

        (c)    **Taxes or other Issuance Charges**.  The issuance of any shares of Common Stock in payment of this Note, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance.  The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(d)     **Holder Not a Stockholder**.  The Holder shall not have, solely on account of such status as a holder of this Note, any rights of a stockholder of the Company, either at law or in equity, or any right to any notice of meetings of stockholders or of any other proceedings of the Company until such time as this Note has been paid in shares of Common Stock pursuant to Section 1(a), at which time the Holder shall be deemed to be the holder of record of Common Stock that has been issued, as applicable, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(e)     **Fractional Shares**.  No fractional shares of Common Stock shall be issued when paying this Note.  In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up or down to the nearest whole share of Common Stock.

(f)     **Payment in Common Stock or Cash**.  Each Payment may be paid by the Company in cash or shares of its Common Stock, at its sole discretion; provided, however, that if the Common Stock is not then listed or quoted on a Trading Market (or a similar organization or agency succeeding to its functions of reporting prices), then the Company may not pay by issuing shares of its Common Stock.

(g)     The Company shall at all times reserve and keep available out of its authorised but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, fifty times the number of Common shares issuable from time to time upon such conversion and if at any time the number of authorised but unissued Common shares shall not be sufficient to effect the conversion of the Note, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorised but unissued Common Shares to such number of shares as shall be sufficient for such purpose.

2.       **Trading Market Limitations**.  Unless permitted by the applicable rules and regulations of the principal securities market on which the Common Stock is then listed or traded, in no event shall the Company issue upon conversion of or otherwise pursuant to this Note and the other Notes issued pursuant to the Exchange Agreement more than the maximum number of shares of Common Stock that the Company can issue pursuant to any rule of the principal United States securities market on which the Common Stock is then traded (the "Maximum Share Amount"), which shall be 4.99% of the total shares outstanding on the Closing Date, subject to equitable adjustment from time to time for stock splits, stock dividends, combinations, capital reorganizations and similar events relating to the Common Stock occurring after the date hereof.

3.       **Ranking**.  The Company, for itself, its successors and assigns, covenants and agrees, that the payment of the Principal of this Note is senior in right of payment to the payment of all existing and future Junior Debt (as defined below).  "**Junior Debt**" shall mean all existing and future Indebtedness (as defined below), (B) Indebtedness (as defined below) incurred after the date hereof, solely as it relates to the Collateral, and (C) as otherwise agreed to by the Holder in writing.  "**Indebtedness**" shall mean (x) any liability of the Company for borrowed money, (1) evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), including any given in connection with the acquisition

3

of property, assets or service, or (2) for the payment of rent or other amounts relating to capitalized lease obligations; (y) any liability of others of the nature described in clause (1) which the Company has guaranteed or which is otherwise its legal liability; and (z) any modification, renewal, extension, replacement or refunding of any such liability described in clause (x) or (y); provided, that Indebtedness does not include unsecured trade credit.

(a)     The Company covenants and agrees to cause any current holder of Junior Debt and to cause any future holder of Junior Debt permitted to be incurred pursuant to this Note to execute such subordination agreements, instruments or waivers as may be necessary to reflect the terms set forth herein.

(b)     Until the payment in full of all amounts of principal of this Note, and all other amounts owing under this Note, no payment may be made with respect to the principal of or other amounts owing with respect to any Junior Debt, or in respect of any redemption, retirement, purchase or other acquisition thereof, provided that the Company may pay scheduled interest thereon so long as no Event of Default shall have occurred and be continuing.

(c)     Upon any payment or distribution of the assets of the Company to creditors upon dissolution, total or partial liquidation or reorganization of, or similar proceeding, the Holder of the Note will be entitled to receive payment in full before any holder of Junior Debt is entitled to receive any payment.

4.     **Events of Default**.  The entire unpaid principal of this Note or any True up Amounts shall become and be immediately due and payable in cash or shares of Common Stock of the Company, in either case without any other notice or demand of any kind or any presentment or protest, if any one of the following events occurs and be continuing at the time of such demand (each such event, an "**Event of Default**"):

(a)     The Company's failure to pay any portion of the principal as provided in Section 1 hereof; or

(b)     (i) The commencement by the Company, or any subsidiary, of a voluntary case under 11 U.S.C. Section 101 *et. seq.* (the "Bankruptcy Code") or any foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or (ii) the consent by the Company, or any subsidiary, to the entry of an order for relief in an involuntary bankruptcy or similar case, or to the conversion of an involuntary case to a voluntary case, under any such law, or (iii) the consent by the Company, or any subsidiary, to the appointment of, or the taking of possession by, a receiver, trustee or other custodian for all or a substantial part of the Company's properties, or (iv) the making by the Company, or any subsidiary, of any assignment for the benefit of creditors, or (v) the admission by the Company, or any subsidiary, in writing of the Company's inability to pay the Company's debts as such debts become due, or (vi) the discontinuance of business, dissolution, winding up, liquidation or cessation of existence by or of the Company, or any subsidiary; or

(d)     (i) The entry by a court of competent jurisdiction a decree or order for relief with respect to the Company, or any subsidiary, in an involuntary case under the Bankruptcy Code or any applicable foreign, federal or state bankruptcy, insolvency or other

4

similar law now or hereafter in effect, which decree or order is not stayed or dismissed within 60 days of the entry thereof, or (ii) the entry by a court of a decree or order for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other person having similar powers over the Company or over all or a substantial part of its properties;

(f)     The Company materially breaches any covenant contained in the Exchange Agreement; or

The Company agrees that if it fails to timely make any payment due under this Note or upon the happening of any Event of Default, and fails to remedy the situation within a ten (10) day grace period, the outstanding principal, together with all other expenses, including, reasonable attorneys' fees, shall immediately become due and payable at the option of the Holder.    For purposes hereof, attorneys' fees shall include, without limitation, fees and disbursements for legal services incurred by the holder hereof in collecting or enforcing payment hereof whether or not suit is brought, and if suit is brought, then through all appellate actions. From and after any Event of Default, the interest rate of this Note shall be the highest rate permitted under applicable law.

5.    **Miscellaneous.**

(a)     The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; *provided, however,* that neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party.   Assignment of all or any portion of this Note in violation of this Section shall be null and void.  Nothing in this Note, expressed or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b)     Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in accordance with Section 11.5 of the Exchange Agreement.

(c)     Upon receipt of evidence satisfactory to the Company, of the loss, theft, destruction or mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the Holder thereof that this Note has been lost, stolen, destroyed or mutilated, together with an indemnity against any claim that may be made against the Company on account of such lost, stolen, destroyed or mutilated Note, and upon reimbursement of the Company's reasonable incidental expenses, the Company shall execute and deliver to the Holder a new Note of like date, tenor and denomination.

(d)     No course of dealing and no delay or omission on the part of the Holder or the Company in exercising any right or remedy shall operate as a waiver thereof or otherwise prejudice the Holder's or the Company's rights, powers or remedies, as the case may be.    No right, power or remedy conferred by this Note upon the Holder or the Company shall be exclusive of any other right, power or remedy referred to herein or now or hereafter available at

5

law, in equity, by statute or otherwise, and all such remedies may be exercised singly or concurrently. Any waiver must be in writing.

(e)   If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms. This Note may be amended only by a written instrument executed by the Company and the Holder. Any amendment shall be endorsed upon this Note, and all future Holders shall be bound thereby.

(f)   If any date specified in this Note as a date for the making of any payment of principal or interest under this Note falls on a Saturday, Sunday or on a day that is a legal holiday in the State of New York, then the date for the making of that payment shall be the next subsequent day that is not a Saturday, Sunday or legal holiday.

(g)   This Note shall be governed by and construed in accordance with the laws of the New York City, without giving effect to principles governing conflicts of law.

(h)   The Company hereby irrevocably submits to the exclusive jurisdiction of any United States Federal court over any suit, action or proceeding arising out of or related to the Note. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; *provided* that service of process is effected upon the Company in the manner permitted by law.

(i)   The parties hereto agree that all monetary amounts set forth herein are referenced in United States dollars, unless otherwise stated.

*(Remainder of page left intentionally blank. Signature page to follow.)*

6

**IN WITNESS WHEREOF,** the Company has caused this Senior Secured Note to be executed and dated the day and year first above written.

NEWLEAD HOLDINGS LTD.

By:
Name:   Michael S. Zolotas
Title:    Chairman & CEO

# EXCHANGE AGREEMENT

THIS EXCHANGE AGREEMENT (this "Agreement") is dated as of August 4th 2014, entered into and between:

1. NewLead Holdings Ltd., organized under the laws of Bermuda (the "Company"),

and

2. Oppenheim Capital Ltd. established under the laws of the Republic of the Marshall Islands (the "Holder").

*(Jointly the Parties and singly the Party)*

## Preliminary Statement

**WHEREAS,** the Company and the Holder have entered into a Remuneration Agreement dated December 16, 2013, whereby the Company has agreed to pay the Holder as consideration for its services, a a compensation fee of USD2,500,000 (United States Dollars two million five hundred thousand) in Company's common stock. (the "Remuneration").

**WHEREAS,** the Remuneration Fee was settled with the issuance of *1,773,050* Company's shares on December 16th, 2013 (hereinafter the "Success Shares").

**WHEREAS,** the current value of the Success Shares is USD44.02 (United States Dollars forty four and two) and the Holder has now suffered a deficit of USD2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight) (hereinafter the "Deficit").

**WHEREAS,** the Company desire to issue and the Holder desire to accept a 10% Convertible Note of the Company in the form attached hereto as Exhibit A, for the amount up to USD2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight), convertible into shares of common stock at terms and conditions as agreed therein (hereinafter the "Note") in exchange of the *Deficit.*

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby agreed and acknowledged, the parties hereby agree as follows:

1. Securities Exchange.

(a)    Upon the following terms and subject to the conditions contained herein, and in express reliance upon the representations, warranties, covenants, terms and conditions of this Agreement, the Note shall be executed at an even date of this Agreement

(b)    The closing under this Agreement (the "Closing") shall take place at the Company's offices upon the satisfaction of each of the conditions set forth in Sections 4 and 5 hereof (the "Closing Date").

(c)     At the Closing, the Company shall deliver the original copy of the Note to the Company.

(d)     Upon fulfillment of the representations, conditions and warranties as set forth in this Agreement, the Remuneration Agreement shall be considered as null and void.

2.     Representations and Warranties of the Holder. The Holder represents and warrants to the Company as follows: The Holder is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization.

(b)     The Holder has the full power and authority to enter into this Agreement. This Agreement, when executed and delivered by the Holder, will constitute a valid and legally binding obligation of the Holder, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c)     The Holder understands and acknowledges that the Securities have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Holder is aware that the Company is under no obligation to effect any such registration with respect to the Securities or to file for or comply with any exemption from registration. The Holder has not been formed solely for the purpose of making this investment. The Holder is and will be acquiring the Securities for the Holder's own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Holder has no present intention of selling, granting any participation in, or otherwise distributing the same.

(d)     The Holder acknowledges that the Securities will contain a restrictive legend in substantially the following form:

> THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

(e)     The Holder has (i) been furnished with all information which it deems necessary to evaluate the merits and risks of the purchase of the Securities; (ii) had the opportunity to ask questions concerning the Securities; (iii) had the opportunity to obtain any additional information it deems necessary to verify the accuracy of any information obtained concerning the Securities; and (4) such knowledge and experience in financial and business matters that it is able to evaluate the merits and risks of its investment in the Company and to make an informed investment decision relating thereto.

(f)     The Holder is not receiving the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar

2



media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(g)     The Holder owns and holds, beneficially and of record, the entire right, title, and interest in and to the Note free and clear of all rights and Encumbrances (as defined below). The Holder has full power and authority to transfer and dispose of the Note free and clear of any right or Encumbrance other than restrictions under the Securities Act and applicable state securities laws. Other than the transactions contemplated by this Agreement, there is no outstanding vote, plan, pending proposal, or other right of any person to acquire the Note. "Encumbrances" shall mean any security or other property interest or right, claim, lien, pledge, option, charge, security interest, contingent or conditional sale, or other title claim or retention agreement, interest or other right or claim of third parties, whether perfected or not perfected, voluntarily incurred or arising by operation of law, and including any agreement (other than this Agreement) to grant or submit to any of the foregoing in the future.

(h)     Except as may be disclosed in any filings by the Holder with the Securities and Exchange Commission, Holder has not agreed to act with any other holder of any Company securities for the purpose of acquiring, holding, voting or disposing of the Securities purchased hereunder for purposes of Section 13(d) under the Securities and Exchange Act of 1934, as amended, and Holder is acting independently with respect to its investment in the Securities. The decision of the Holder to purchase Securities pursuant to this Agreement has been made by Holder independently of any other person and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of the Company or of its subsidiaries which may have been made or given by any other person or by any agent or employee of any other person, and no person or any of its agents or employees of such person shall have any liability to Holder (or any other person) relating to or arising from any such information, materials, statements or opinions.

(i)     The Holder understands that the exemption of this transaction from registration under applicable federal and state securities laws is dependent on the accuracy of the foregoing representations and warranties.

3.     Representations and Warranties of the Company. The Company represents and warrants to the Holder as follows:The Company is a corporation duly organized, validly existing and in good standing under the laws of Bermuda and has all the requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted.

(b)     The Company has the full power and authority to enter into this Agreement. This Agreement, when executed and delivered by the Company, will constitute a valid and legally binding obligation of the Company, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c)     The Securities, when issued, sold and delivered in accordance with the terms hereof and for the consideration expressed herein, will be duly and validly issued, fully paid and non-assessable, and based in part upon the accuracy of the representation and warranties of the Holder in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

(d)     None of the execution, delivery and performance by the Company of this Agreement and compliance with the terms and provisions hereof or the consummation of the transactions contemplated

3



hereby will (i) contravene any applicable provision of any applicable law of any governmental authority[1], (ii) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any lien upon any of the property or assets of the Company pursuant to, the terms of any material indenture, loan agreement, lease agreement, mortgage or deed of trust, or any other contractual obligation to which the Company is a party or by which it or any of its property or assets is bound or (iii) violate any provision of the organization documents of the Company, except in the case of clauses (i) and (ii), for any such violations, conflicts, breaches, or defaults or any liens, charges, or encumbrances which would not have a Material Adverse Effect. For purposes of this Agreement, "Material Adverse Effect" shall mean any material adverse effect on the business, operations, properties, prospects, or financial condition of the Company and its subsidiaries and/or any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its obligations under this Agreement in any material respect.

(e)     The delivery and issuance of the Securities in accordance with the terms of and in reliance on the accuracy of Holder's representations and warranties set forth in this Agreement will be exempt from the registration requirements of the Securities Act.

4.     Conditions Precedent to the Obligation of the Company to Issue the Securities.

The obligation hereunder of the Company to issue and deliver the Securities to the Holder is subject to the satisfaction or waiver, at or before the Closing Date, of each of the conditions set forth below. These conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion.

(a)     The Holder shall have executed and delivered this Agreement.

(b)     The Holder shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by such Holder at or prior to the Closing Date.

(c)     Each of the representations and warranties of the Holder in this Agreement shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of the date when made and as of the Closing Date as though made at that time, except for representations and warranties that are expressly made as of a particular date, which shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of such date.

5.     Conditions Precedent to the Obligation of the Holder to Accept the Securities.   The obligation hereunder of the Holder to accept the Securities is subject to the satisfaction or waiver, at or before the Closing Date, of each of the conditions set forth below. These conditions are for Holder's sole benefit and may be waived by Holder at any time in its sole discretion.

(a)     The Company shall have executed and delivered this Agreement.

(b)     The Company shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date.

(c)     Each of the representations and warranties of the Company in this Agreement shall be true and correct in all material respects (except for those representations and warranties that are qualified

---

4



by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date when made and as of the Closing Date as though made at that time, except for representations and warranties that speak as of a particular date, which shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of such date.

6.      Value of Securities.

(a)      Upon the earlier of (i) the date of the final sale of all of the Securities by the Holder and (ii) the five years anniversary of this Agreement (either such date, the "Measurement Date"), if the aggregate gross proceeds from the sale of the Securities by the Holder is less than USD2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight) (any such deficit referred to herein as the "True-Up Amount") as evidenced by brokerage statements for such sales; provided, however, that if the sale price is not reasonably related to the trading price on the sale date, such sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale, then the Company shall pay the True-Up Amount to the Holder, in cash, shares of Common Stock or a combination thereof, at the Company's sole option, by no later than fifteen (15) days after the Measurement Date. If the True-Up Amount is to be paid in shares of Common Stock, then the per share price of such shares shall be equal to the Closing Price (as defined below), as adjusted for any stock splits or stock dividends. Notwithstanding the foregoing, if the True-Up Amount is to be paid in shares of Common Stock, in no event shall the aggregate number of shares of Common Stock issued pursuant to this Agreement exceed 4.99% of the Company's shares of Common Stock outstanding at the time of such issuance. The Holder shall notify the Company immediately in writing of the date of final sale of all of the Securities by the Holder. "Closing Price," means the closing price for the trading day immediately prior to (but not including) the Measurement Date, provided the Common Stock is then listed or quoted on any national securities exchange, market or trading or quotation facility (a "Trading Market").

(b)      If the Company elects to pay the True-Up Amount in shares of Common Stock pursuant to Section 6(a), the Holder shall be deemed to be the holder of record of the shares of Common Stock to be issued as of the Measurement Date, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(c)      The issuance of any shares of Common Stock in payment of the True-Up Amount, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(d)      No fractional shares of Common Stock shall be issued when paying the True-Up Amount. In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up or down to the nearest whole share of Common Stock.

7.      Release. Upon receipt of the Securities, the Holder agrees and acknowledges that: (a) all outstanding indebtedness (including, without limitation, for principal, interest and fees) and other liabilities and obligations of the Holder under, or relating to, the Remuneration Agreement shall be deemed to be and shall be paid and satisfied in full and automatically irrevocably discharged, terminated and released; (b) all liens, security interests, pledges, charges, mortgages, claims or other encumbrances granted to or held by Holder (whether held for such party's own benefit or the benefit of another party) in any property shall

5



be automatically forever and irrevocably satisfied, released and discharged; and (c) the Remuneration Agreement shall automatically terminate and be of no further force or effect other than those provisions therein that specifically survive termination.

       8.     Fees and Expenses. Each party shall pay the fees and expenses of its advisors, counsel, accountants and other experts, if any, and all other expenses, incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement.Indemnification.

       (a)     The Company hereby agrees to indemnify and hold harmless the Holder and its officers, directors, shareholders, members, managers, employees, agents and attorneys against any and all losses, claims, damages, liabilities and reasonable expenses (collectively "Claims") incurred by each such person in connection with defending or investigating any such Claims, whether or not resulting in any liability to such person, to which any such indemnified party may become subject, insofar as such Claims arise out of or are based upon any breach of any representation, warranty, covenant or agreement made by the Company in this Agreement.

       (b)     The Holder hereby agrees to indemnify and hold harmless the Company and its officers, directors, shareholders, members, managers, employees, agents and attorneys against any and all Claims incurred by each such person in connection with defending or investigating any such Claims, whether or not resulting in any liability to such person, to which any such indemnified party may become subject, insofar as such Claims arise out of or are based upon any breach of any representation, warranty, covenant or agreement made by such Holder in this Agreement.

       10.     Governing Law; Consent to Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of New York, without giving effect to principles governing conflicts of law. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; provided that service of process is effected upon the Company in the manner permitted by law.

       11.     Notices. All notices and other communications provided for or permitted hereunder shall be made in writing by hand delivery, express overnight courier, registered first class mail, or telecopier (provided that any notice sent by telecopier shall be confirmed by other means pursuant to this Section 11), initially to the address set forth below, and thereafter at such other address, notice of which is given in accordance with the provisions of this Section 11.

       (a)     if to the Company:

            NewLead Holdings Ltd.
            83 Akti Miaouli & Flessa Str.
            Piraeus Greece 185 38
            Attention: Chief Executive Officer
            Tel. No.: +30 213 014 8000
            Fax No.: +30 213 014 8019

       (b)     if to the Holder:

            Oppenheim Capital Ltd.
            90 Kapodistriou Ave.



N. Ionia, 14235
Athens, GREECE

Tel: +30 211 311 1111

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; when receipt is acknowledged, if telecopied; or when actually received or refused if sent by other means.

12.    Entire Agreement.  This Agreement constitutes the entire understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior and/or contemporaneous oral or written proposals or agreements relating thereto all of which are merged herein.  This Agreement may not be amended or any provision hereof waived in whole or in part, except by a written amendment signed by all of the parties hereto.

13.    Counterparts.  This Agreement may be executed by facsimile signature and in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Agreement was duly executed on the date first written above.

NewLead Holdings Ltd.

By: 
Name: Michael Zolotas
Title: CEO

Oppenheim Capital Ltd.

By: 
Name: D. TSOUVELEKAKIS
Title: ATTORNEY

8

This Addendum no. 1 (hereinafter the "**Addendum**") is made on March 16, 2015

**BETWEEN:**

(1) **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**");

-and-

(2) **OPPENHEIM CAPITAL LTD.,** a corporation established under the laws of the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter referred to as "**Oppenheim**").

*(Jointly the Parties, singly the Party)*

**RECITALS**

**WHEREAS,** Pursuant to an Unsecured Convertible Note dated 4th August 2014 (the "**Note**") issued to Oppenheim pursuant to an Exchange Agreement dated August 4th, 2014 entered into and between the Company and Oppenheim (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied, the "**Agreement**", together with the Note, the "**Security Agreements**"), the Company promises to pay to Oppenheim the principal amount of USD 2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight cents) (hereinafter the "**Principal Amount**") under the terms and conditions set forth therein.

**WHEREAS,** under the Note dated 4th August 2014 any accrued and unpaid interest on the Note shall be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree as follows:

1. To waive the requirement for any accrued and unpaid interest on the Note to be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

2. That any accrued and unpaid interest on the Note to be paid by the Company on the Maturity Date.

IN WITNESS WHEREOF, the Parties have hereunto set their hands and affixed their seals as of the day and year first above written.

NEWLEAD HOLDINGS LTD.

By: _____
Name: Michail S. Zolotas
Title: CEO/ Chairman

OPPENHEIM CAPITAL LTD.

By: _____
Name: D. TSOUVELEKAS
Title: ATTORNEY

# Remuneration Agreement
## (the "Agreement")

Dated 16th December 2013

This Agreement is entered into and between:

1) NewLead Holdings Ltd. a Bermuda Corporation. with its registered office at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda. and with a Greek office at 83. Akti Miaouli Street, Piraeus 185 38, Greece, (hereinafter the "Company") and

2) Oppenheim Capital Ltd., a company duly established under the laws of the Marshall Islands (hereinafter "Oppenheim").

(together the Parties, each a Party)

### Introduction

**WHEREAS**, the Company concluded a business transaction relating to the acquisition of two mines, namely the "Viking" and the "Marrowbone" mines, and a wash plant, all situated in Kentucky, USA (the "Assets").

**WHEREAS**, pursuant to an Engagement Letter dated April 4th, 2013, entered into and between the Company and Oppenheim, Oppenheim was engaged to act as the Company's financial advisor and to this end it managed to obtain a financial offer for the acquisition of the Assets.

**WHEREAS**, in consideration for the services rendered, the Parties have agreed to a compensation fee consisting of (a) USD500,000 (United States Dollars five hundred thousand) in cash, (the "Funds") and (b) a warrant up to the amount of USD1,800,000 (United States Dollars one million eight hundred thousand) (the "Warrant", together with the Funds, the "Remuneration")

**WHEREAS**, the Company offered to Oppenheim in full and final settlement of the Remuneration USD2,500,000 (United States Dollars two million five hundred thousand) worth of shares of common stock of the Company (the "Remuneration Shares").

**NOW, THEREFORE**, the Parties hereto hereby agree as follows:

1. Oppenheim accepts the offer of the Company to receive in full and final settlement of the Remuneration, the Remuneration Shares.

2. The Company hereby agrees to issue the Remuneration Shares to Oppenheim and/ or its nominated assignees.

3. Subject to the terms and conditions hereof, the number of shares to be issued shall be determined by dividing USD2,500,000 (United States Dollars two million five hundred thousand) by the closing price of the last trading day prior the execution date of this Agreement (the "Stock Price).

4. Oppenheim and/or its nominated assignee(s) hereby represent and warrant to the Company that:

a. is a duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, and all necessary corporate or other entity action.

b. is not a U.S. person ("U.S. person") as that term is defined in Regulation S of the Securities Act.

c. the execution, delivery and performance of this Agreement have been duly authorized and constitute valid and legal.

d. has (1) been furnished with all information which it deems necessary to evaluate the merits and risks of the purchase of the Remuneration Shares; (2) had the opportunity to ask questions concerning the Remuneration Shares; (3) has had the opportunity to obtain any additional information it deems necessary to verify the accuracy of any information obtained concerning the Remuneration Shares; and (4) such knowledge and experience in financial and business matters that it is able to evaluate the merits and risks of purchasing the Remuneration Shares and to make an informed investment decision relating thereto.

e. is not receiving the Remuneration Shares as a result of any advertisement, article, notice or other communication regarding the Remuneration Shares published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

f. understands that the exemption of this transaction from registration under applicable U.S. Securities Laws is dependent on the accuracy of the foregoing representations and warranties and indemnifies the Company and the Company from any damages resulting from any inaccuracy therein.

5. As of the one year anniversary of the Closing date or such earlier date that Oppenheim and/or its nominated assignees liquidate the Remuneration Shares and their market value is less than the aggregate of USD2,500,000 (such deficit, the "True-Up Amount"), then the Company shall pay the True-Up Amount to Oppenheim and/or its nominated assignees, in shares of Common Stock by no later than ten (10) business days after the date that the Remuneration Shares have been liquidated. The per share price of such shares shall be equal to the Stock Price.

6. Notices. All communications, notices, requests, consents or demands given or required under this Agreement shall be in writing and shall be deemed to have been duly given when delivered to, or received by prepaid registered or certified mail or recognized overnight courier addressed to, or upon receipt of a facsimile sent to, the party for whom intended, at the address set forth opposite such party's name on the signature page.

7. This Agreement and any instruments to be executed hereunder, set forth the entire understanding of the parties hereto with respect to its subject matter, and supersede all other understandings. No waiver of any provision of this Agreement shall be deemed to be a waiver of the same or any other provision in any other instance. Failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of its rights under such provision.

(Signature Page to follow)

2

SIGNED, SEALED and DELIVERED as a DEED )
By )
for and on behalf of )
**Oppenheim Capital Ltd.** )
in the presence of: )

16/12/13

D. TSOUGLECAEIS - DIRECTOR

OPPENHEIM CAPITAL LTD

SIGNED, SEALED and DELIVERED as a DEED )
By Michael Zolotas. CEO / Director )
for and on behalf of )
**NEWLEAD HOLDINGS LTD of Bermuda** )
in the presence of: )

3

**DATE: 14 September 7 July 2015**

NEWLEAD HOLDINGS LTD.
Of Bermuda


-and-


OPPENHEIM CAPITAL LTD.
Of the Republic of the Marshall Islands


ADDENDUM No. 2

to

the Unsecured Convertible Note dated 4ᵗʰ August 2014.
In the amount of USD2,499,955.98 (United States Dollars two million four hundred ninety nine
thousand nine hundred fifty five and ninety eight cents)


THIS ADDENDUM No. 2 is made on this 14 7ᵗʰ day of July September 2015,

**BETWEEN:**

(1)     **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**"); and

(2)     **OPPENHEIM CAPITAL LTD.,** a corporation established under the laws of the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter referred to as "**OPPENHEIM**" or "**Holder**");

*(Jointly the "Parties", singly the "Party").*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note or previous Addendum(s).*

**WHEREAS,** Pursuant to an Unsecured Convertible Note dated 4th August 2014 as amended by an Addendum No.1 dated March 16, 2015, issued by the Company to OPPENHEIM (hereinafter called as the same as has been and as may from time to time be further amended, supplemented or varied the "**Note**"), the Company promises to pay to OPPENHEIM the principal amount of USD 2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety cents) (hereinafter the "**Principal Amount**") under the terms and conditions set forth therein.

**WHEREAS,** in consideration of the payment of the Note, a Third Preferred Liberian Mortgage m.v. "NEWLEAD CASTELLANO" has been issued between NEWLEAD CASTELLANO LTD and OPPENHEIM dated 16 October 2014 (the "**Mortgage**"), pursuant to which "Events of Default" shall mean any events or circumstances set out in clause 4 of the Note as amended by this Addendum.

WHEREAS, the Maturity Date of the Note is 4 August 2016.

**WHEREAS,** pursuant to the Note, the Company shall at all times reserve and keep available out of its authorised but unissued shares of its Common Stock, available fifty times the number of Common shares that are actually issuable upon conversion of the Note.

**WHEREAS,** pursuant to Addendum No. 1 of the Note dated March 16th 2015 (the "**Addendum No. 1**"), the parties agreed as follows:
-   To waive the requirements for any accrued and unpaid interest of the Note to be due and payable in quarterly instalments concluding with the final instalments on the Maturity Date.
-   That any accrued and unpaid interest on the Note to be paid by the Company on the Maturity Date.

2

- That Oppenheim agrees and warrants that its shall sell up to twenty percent (20%) of the Monthly Dollar Value (as defined herein below) of the Company's Common Stock per month. "Monthly Dollar Volume" means a dollar amount of the Company's Common Stock which is traded in the U.S. public markets in the relevant month in which it is calculated (not including the amount of shares of the Company's Common Stock traded by Oppenheim).

**NOW THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree to amend the Note as follows:

1. To waive the Company's obligation to reserve fifty times the number of Common shares that are actually issuable upon conversion of the Note, such waiver being effective as from the date of execution of the Note.

2. That the Company as from the date hereof, shall at its discretion reserve, but always keep available out of its authorized but unissued shares of capital stock, such shares of Common Stock as shall from time to time be sufficient to effect any conversions of this Note.

3. To amend Clause 1 of the Note (Payments) such that any and all Payments effected on the Maturity Date are to be due in cash and not in stock. Specifically, the Company Agrees that:

   a. Any amount of the Note, including the Principal and any accrued unpaid interest thereon and any True-up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder. Failure to pay any amounts pursuant to this clause shall constitute an Event of Default under clause 4 of the Note as ~~this has been amended by addendum No. 1 and~~ is ~~further~~ amended hereby or may be further amended from time to time.

   b. ~~As of the date hereof, at an Event of Default pursuant to clause 4 of the Note, the entire unpaid Principal and accrued interest of the Note and any True-up Amounts shall shall become due and payable immediately in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder.~~

   Comment [e1]: THIS IS A REPETITION OF CL. 3A.

4. To amend clause 4 of the Note (Events of Default), and to add as an additional Event of Default, that for any of the last ~~ninety~~ thirty (~~9~~30) calendar days preceding the Maturity Date:

   a. ~~The failure of the Company's Common Stock to be traded on a National Market System ("NMS") as defined by the U.S. S.E.C. 17 CFR Part § 242.600 (NMS Security Designation and Definitions).~~

   b. ~~The Company's Common Stock Market Capitalization (defined as the total outstanding shares multiplied by the closing stock price) to be less than five (5) times~~

3

~~the total Outstanding Note Amount (defined as the Principal and any accrued interest thereon and any True-up Amount remaining unpaid of the Note).~~

c.~~a.~~ The Company's Common Stock to be ~~traded~~ quoted on the OTCQX, OTCQB, or OTC Pink market.

d.   ~~The Daily Average Dollar Volume of the Company's Common Stock to be less than $100,000 (one hundred thousand dollars).~~

5.   The Maturity Date is deferred to 4 August 2018.

~~5.~~6.   All other provisions of the Note shall remain in full force and effect.

~~6.~~7.   This Addendum shall in all respects be governed by, and construed in accordance with the internal laws of the State of New York.

**IN WITNESS WHEREOF,** the presents have been duly executed the day and year first before written.

**SIGNED** by:                                )
M. ZOLOTAS                               )
for and on behalf of:                        )
**NEWLEAD HOLDINGS LTD .**       )
in the presence of:                          )

~~ACKNOWLEDGED~~ **SIGNED** by:                    )
                                                      )
for and on behalf of:                        )
**OPPENHEIM CAPITAL LTD.**          )
in the presence of:                          )

**DATE: 14 September 2015**

NEWLEAD HOLDINGS LTD.
Of Bermuda

-and-

OPPENHEIM CAPITAL LTD.
Of the Republic of the Marshall Islands

ADDENDUM No. 2

to

the Unsecured Convertible Note dated 4th August 2014.
In the amount of USD2,499,955.98 (United States Dollars two million four hundred ninety nine
thousand nine hundred fifty five and ninety eight cents)

THIS ADDENDUM No. 2 is made on this 14th day of September 2015,

**BETWEEN:**

(1)  **NEWLEAD HOLDINGS LTD.**, a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**"); and

(2)  **OPPENHEIM CAPITAL LTD.**, a corporation established under the laws of the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter referred to as "**OPPENHEIM**" or "**Holder**");

*(Jointly the "Parties", singly the "Party").*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note or previous Addendum(s).*

**WHEREAS**, Pursuant to an Unsecured Convertible Note dated 4th August 2014 as amended by an Addendum No.1 dated March 16, 2015, issued by the Company to OPPENHEIM (hereinafter called as the same as has been and as may from time to time be further amended, supplemented or varied the "**Note**"), the Company promises to pay to OPPENHEIM the principal amount of USD 2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight cents) (hereinafter the "**Principal Amount**") under the terms and conditions set forth therein.

**WHEREAS**, in consideration of the payment of the Note, a Third Preferred Liberian Mortgage m.v. "NEWLEAD CASTELLANO" has been issued between NEWLEAD CASTELLANO LTD and OPPENHEIM dated 16 October 2014 (the "**Mortgage**"), pursuant to which "Events of Default" shall mean any events or circumstances set out in clause 4 of the Note as amended by this Addendum.

**WHEREAS**, the Maturity Date of the Note is 4 August 2016.

**WHEREAS**, pursuant to the Note, the Company shall at all times reserve and keep available out of its authorised but unissued shares of its Common Stock, available fifty times the number of Common shares that are actually issuable upon conversion of the Note.

**WHEREAS**, pursuant to Addendum No. 1 of the Note dated March 16th 2015 (the "**Addendum No. 1**"), the parties agreed as follows:
- To waive the requirements for any accrued and unpaid interest of the Note to be due and payable in quarterly instalments concluding with the final instalments on the Maturity Date.
- That any accrued and unpaid interest on the Note to be paid by the Company on the Maturity Date.
- That Oppenheim agrees and warrants that it shall sell up to twenty percent (20%) of the Monthly Dollar Value (as defined herein below) of the Company's Common Stock per month. "Monthly Dollar Volume" means a dollar amount of the Company's

Common Stock which is traded in the U.S. public markets in the relevant month in which it is calculated (not including the amount of shares of the Company's Common Stock traded by Oppenheim).

**NOW THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree to amend the Note as follows:

1. To waive the Company's obligation to reserve fifty times the number of Common shares that are actually issuable upon conversion of the Note, such waiver being effective as from the date of execution of the Note.

2. That the Company as from the date hereof, shall at its discretion reserve, but always keep available out of its authorized but unissued shares of capital stock, such shares of Common Stock as shall from time to time be sufficient to effect any conversions of this Note.

3. To amend Clause 1 of the Note (Payments) such that any and all Payments effected on the Maturity Date are to be due in cash and not in stock. Specifically, the Company Agrees that:

   a. Any amount of the Note, including the Principal and any accrued unpaid interest thereon and any True-up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder. Failure to pay any amounts pursuant to this clause shall constitute an Event of Default under clause 4 of the Note as is amended hereby or may be further amended from time to time.

4. To amend clause 4 of the Note (Events of Default), and to add as an additional Event of Default, that for any of the last thirty (30) calendar days preceding the Maturity Date:

   a. The Company's Common Stock to be quoted on the OTCQX, OTCQB, or OTC Pink market.

5. The Maturity Date is deferred to 4 August 2018.

6. All other provisions of the Note shall remain in full force and effect.

7. This Addendum shall in all respects be governed by, and construed in accordance with the internal laws of the State of New York.

**IN WITNESS WHEREOF**, the presents have been duly executed the day and year first before written.

2

**SIGNED** by:                           )
M. ZOLOTAS                               )
for and on behalf of:                    )
**NEWLEAD HOLDINGS LTD** .               )
in the presence of:                      )


**SIGNED** by:                           )
                                         )
for and on behalf of:                    )
**OPPENHEIM CAPITAL LTD.**               )
in the presence of:                      )

3

NOTICE OF ASSIGNMENT OF CONVERTIBLE PROMISSORY NOTE

To:     NewLead Holdings Ltd. (hereinafter "NewLead")
        Canon's Court 22, Hamilton HM12
        Bermuda

Date:   May 19ᵗʰ 2015

Dear Sirs,

We refer to the Convertible Promissory Note in the amount of USD 2,190,320 (United States Dollars two million one hundred ninety thousand three hundred twenty) issued by NewLead to **Oppenheim & Co. Limited** (hereinafter "OppCo") (the "Note").

**NOW WE HEREBY GIVE YOU NOTICE THAT:**

1. We have assigned to **LABROY SHIPTRADE LIMITED**, a Marshall Islands company (Reg. No. 72822) with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter "LABROY" or the "Assignee"), the amount of **USD 1,215,000** (United States Dollars one million two hundred fifteen thousand) of the Note from the inception of the Note (the "Assignment"), including our rights, title, interest and benefits resulting pro-rata therefrom of the Note.

2. You are hereby irrevocably authorized and instructed by us to issue a Convertible Promissory Note to LABROY, under the terms and conditions agreed between NewLead and OppCo of the amount of **USD 1,215,000** (United States Dollars one million two hundred fifteen thousand) and any accrued interest.

3. The authority and instructions herein contained cannot be revoked or varied by us without the consent of the Assignee, to whom a copy of this Assignment Notice is given today.

4. The Assignee's correspondence details are as follows:

   Dimitrios Stavrianos LAW          Tel:     +30 6942 880874
   90 Kapoditriou Avenue            Email:   dstav@stavrianoslaw.com
   N. Ionia, 14235, GREECE

This Notice of Assignment is governed by the Laws of England. In relation to this Notice of Assignment and all claims and disputes arising herefrom, we submit for the exclusive benefit of you to the jurisdiction of the English courts.

For and on behalf of Oppenheim & Co. Limited

DIMITRIOS TSOUVELEKAKIS
OPPENHEIM & CO.LIMITED

Dimitrios Tsouvelekakis, Director
Tudor House, 1st Floor
Le Bordage, St Peter Port
Guernsey, GY1 1DB, Channel Islands

Acknowledged, Agreed and Accepted:

Dimitrios Stavrianos, Director
LABROY SHIPTRADE LIMITED
Trust Company Complex, Ajeltake Road
Ajeltake Island, Majuro, MH96960, Marshall Islands

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED | § § § § § | |
| PLAINTIFFS | § | C.A. NO. _____ |
| V. | § § | |
| M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM*, AND NEWLEAD CASTELLANO LTD. | § § § § § § § § | |
| DEFENDANTS | § | |

## VERIFIED COMPLAINT

EXHIBIT "3"

THIS NOTE AND THE SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET FORTH HEREIN.  NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE PURSUANT HERETO MAY BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER SUCH ACT.

**NEWLEAD HOLDINGS LTD.**
**Unsecured Convertible Note**
**(the "Note")**

**US $1,250,000.00**                                        September 12, 2014
                                                           Piraeus, Greece

NEWLEAD HOLDINGS LTD., a company organized under the laws of Bermuda (the "Company"), for value received, hereby promises to pay to CHEYENNE HOLDING LTD. of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Republic of the Marshall Islands or registered assigns (the "Holder"). the principal amount of USD1,250,000.00 (United States Dollars one million two hundred fifty thousand) together with any interest as set forth herein (the "Principal") on September 12, 2017, (the "Maturity Date"), and to pay interest from the date hereof on the unpaid principal balance and on the True-Up amount outstanding from time to time hereof at a rate equal to ten percent (10%) per annum, computed daily and on the basis of the actual number of days elapsed and a year of 365 days. Any accrued and unpaid interest on the Note shall be due and payable in quarterly installments concluding with the final installments on the Maturity Date. Any accrued and unpaid interest on the Note shall be due and payable in quarterly instalments concluding with the final Maturity Date and upon any partial or full conversion of the Note as well as any issuances of True-Up adjustments.

1.    Payments.

    (a) The Company shall:

      (i)    pay the Principal and any accrued interest thereon or any amount thereof by issuance of its common shares. (the "Common Stock"). at the Stock Price (as defined below) or cash on the Maturity Date.

**Stock Price**. The number of shares of Common Stock shall be determined by dividing (i) the amount payable by, (ii) the Closing Price, as adjusted for any stock splits or stock dividends (the "Stock Price"). "Closing Price" means the closing price the trading date immediately prior to (but not including) the date of issuance of the shares. provided the Common Stock is then listed or quoted on any national securities exchange. market or trading or quotation facility (a "Trading Market").

    (ii)     From the date of execution of the Note and for a period of 5 years after the execution date of this Note (the "Measurement Dates"), at the date when either, (i) all Common Stock being issued to the Holder under 1(a)(i) above, or (ii) all Common Stock being issued to the Holder under any True up Amounts (As defined hereinbelow), are sold in full and the Holder is entitled to additional True up Amounts. The Company may elect to pay the additional True up Amounts by either (i) wire transfer of immediately available funds to an account designated in writing by the Holder, or (ii) issuance by the Company of its Common Stock at the Stock Price determined as of such date, or (iii) any combination thereof, at the sole option of the Company. The Holder will be entitled for as many additional True up Amounts are required to collect in total the Principal and any accrued interest thereon in cash either by the sale of Common Stock or by cash receipts by the Company. Six (6) months prior the lapse of the five (5) year period the Holder is entitled to request for an extension of the true-up period for an additional three (3) years by providing a written notice to the Company.

**True-up Amounts.** For a period of five (5) years from the date of execution of the Note, the Holder shall be entitled to recover the shortfall incurred in additional shares or cash or any combination thereof at the Company's option. The True-up amounts are equal to the Principal Amount plus any accrued interest less the Market Value (as defined below) of the shares issued or the cash paid as part of any Payment prior to such calculation date. The Company shall pay the True-up amounts no later than three (3) days upon receipt of the request from the Holder

**Market Value.** Market Value with respect to the shares issued as part of the Principal, means the aggregate gross proceeds received by the Holder from one or more sales, as evidenced by brokerage statements for such sales; *provided, however,* that if the sale price is not reasonably related to the trading price on the sale date, such sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale.

    (b)    **Termination of Rights Under this Note.** Immediately upon the payment of the Principal and/ or any applicable True up Amount due under this Note, this Note shall no longer be deemed outstanding and all rights with respect to this Note shall immediately cease and terminate, subject to clause 1(a)(ii) of this Note.

    (c)    **Taxes or other Issuance Charges.** The issuance of any shares of Common Stock in payment of this Note, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(d)     Holder Not a Stockholder.   The Holder shall not have, solely on account of such status as a holder of this Note, any rights of a stockholder of the Company, either at law or in equity, or any right to any notice of meetings of stockholders or of any other proceedings of the Company until such time as this Note has been paid in shares of Common Stock pursuant to Section 1(a), at which time the Holder shall be deemed to be the holder of record of Common Stock that has been issued, as applicable, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(e)     Fractional Shares.   No fractional shares of Common Stock shall be issued when paying this Note. In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up or down to the nearest whole share of Common Stock.

(f)     Payment in Common Stock or Cash.   Each Payment may be paid by the Company in cash or shares of its Common Stock, at its sole discretion; provided, however, that if the Common Stock is not then listed or quoted on a Trading Market (or a similar organization or agency succeeding to its functions of reporting prices), then the Company may not pay by issuing shares of its Common Stock.

(g)     Reservation. The Company shall at all times reserve and keep available out of its authorised but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, fifty times the number of Common shares issuable from time to time upon such conversion and if at any time the number of authorised but unissued Common shares shall not be sufficient to effect the conversion of the Note, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorised but unissued Common Shares to such number of shares as shall be sufficient for such purpose.

2.     Conversion. The Holder shall have the right from time to time and at any time during the period commencing from the date of execution of the Note and ending on the later of the Maturity Date, to convert all or part of the outstanding and unpaid Principal Amount or True-up amount of the note into fully paid non-assessable shares of Common Stock of the Company at the Stock Price.

3.     Trading Market Limitations. Unless permitted by the applicable rules and regulations of the principal securities market on which the Common Stock is then listed or traded, in no event shall the Company issue upon conversion of or otherwise pursuant to this Note and the other Notes issued pursuant to the Exchange Agreement more than the maximum number of shares of Common Stock that the Company can issue pursuant to any rule of the principal United States securities market on which the Common Stock is then traded (the "Maximum Share Amount"), which shall be 4.99% of the total shares outstanding on the Closing Date, subject to equitable adjustment from time to time for stock splits, stock dividends, combinations, capital reorganizations and similar events relating to the Common Stock occurring after the date hereof.

4.     Ranking. The Company, for itself, its successors and assigns, covenants and agrees, that the payment of the Principal of this Note is senior in right of payment to the payment

of all existing and future Junior Debt (as defined below). "Junior Debt" shall mean all existing and future Indebtedness (as defined below), (B) Indebtedness (as defined below) incurred after the date hereof, solely as it relates to the Collateral, and (C) as otherwise agreed to by the Holder in writing. "Indebtedness" shall mean (x) any liability of the Company for borrowed money, (1) evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), including any given in connection with the acquisition of property, assets or service, or (2) for the payment of rent or other amounts relating to capitalized lease obligations; (y) any liability of others of the nature described in clause (1) which the Company has guaranteed or which is otherwise its legal liability; and (z) any modification, renewal, extension, replacement or refunding of any such liability described in clause (x) or (y); provided, that Indebtedness does not include unsecured trade credit.

(a)     The Company covenants and agrees to cause any current holder of Junior Debt and to cause any future holder of Junior Debt permitted to be incurred pursuant to this Note to execute such subordination agreements, instruments or waivers as may be necessary to reflect the terms set forth herein.

(b)     Until the payment in full of all amounts of principal of this Note, and all other amounts owing under this Note, no payment may be made with respect to the principal of or other amounts owing with respect to any Junior Debt, or in respect of any redemption, retirement, purchase or other acquisition thereof, provided that the Company may pay scheduled interest thereon so long as no Event of Default shall have occurred and be continuing.

(c)     Upon any payment or distribution of the assets of the Company to creditors upon dissolution, total or partial liquidation or reorganization of, or similar proceeding, the Holder of the Note will be entitled to receive payment in full before any holder of Junior Debt is entitled to receive any payment.

5.     **Events of Default**.  The entire unpaid principal and accrued interest of this Note or any True up Amounts shall become and be immediately due and payable in cash or shares of Common Stock of the Company, in either case without any other notice or demand of any kind or any presentment or protest, if any one of the following events occurs and be continuing at the time of such demand (each such event, an "Event of Default"):

(a)     The Company's failure to pay any portion of the principal as provided in Section 1 hereof; or

(b)     (i) The commencement by the Company, or any subsidiary, of a voluntary case under 11 U.S.C. Section 101 *et. seq.* (the "Bankruptcy Code") or any foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or (ii) the consent by the Company, or any subsidiary, to the entry of an order for relief in an involuntary bankruptcy or similar case, or to the conversion of an involuntary case to a voluntary case, under any such law, or (iii) the consent by the Company, or any subsidiary, to the appointment of, or the taking of possession by, a receiver, trustee or other custodian for all or a substantial part of the Company's properties, or (iv) the making by the Company, or any subsidiary, of any assignment for the benefit of creditors, or (v) the admission by the Company, or any subsidiary, in writing of the Company's inability to pay the Company's debts as such debts become due, or (vi) the

discontinuance of business, dissolution, winding up, liquidation or cessation of existence by or of the Company, or any subsidiary; or

(d)   (i) The entry by a court of competent jurisdiction a decree or order for relief with respect to the Company, or any subsidiary, in an involuntary case under the Bankruptcy Code or any applicable foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed or dismissed within 60 days of the entry thereof, or (ii) the entry by a court of a decree or order for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other person having similar powers over the Company or over all or a substantial part of its properties;

(f)   The Company materially breaches any covenant contained in the Exchange Agreement; or

The Company agrees that if it fails to timely make any payment due under this Note or upon the happening of any Event of Default, and fails to remedy the situation within a ten (10) day grace period, the outstanding principal, together with all other expenses, including, reasonable attorneys' fees, shall immediately become due and payable at the option of the Holder. For purposes hereof, attorneys' fees shall include, without limitation, fees and disbursements for legal services incurred by the holder hereof in collecting or enforcing payment hereof whether or not suit is brought, and if suit is brought, then through all appellate actions. From and after any Event of Default, the interest rate of this Note shall be the highest rate permitted under applicable law.

6.   **Miscellaneous.**

(a)   The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; *provided, however,* that neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party. Assignment of all or any portion of this Note in violation of this Section shall be null and void. Nothing in this Note, expressed or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b)   Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in accordance with Section 11.5 of the Exchange Agreement.

(c)   Upon receipt of evidence satisfactory to the Company, of the loss, theft, destruction or mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the Holder thereof that this Note has been lost, stolen, destroyed or mutilated, together with an indemnity against any claim that may be made against the Company on account of such lost, stolen, destroyed or mutilated Note, and upon reimbursement of the Company's reasonable incidental expenses, the Company shall execute and deliver to the Holder a new Note of like date, tenor and denomination.

(d)     No course of dealing and no delay or omission on the part of the Holder or the Company in exercising any right or remedy shall operate as a waiver thereof or otherwise prejudice the Holder's or the Company's rights, powers or remedies, as the case may be.  No right, power or remedy conferred by this Note upon the Holder or the Company shall be exclusive of any other right, power or remedy referred to herein or now or hereafter available at law, in equity, by statute or otherwise, and all such remedies may be exercised singly or concurrently.  Any waiver must be in writing.

(e)     If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.  This Note may be amended only by a written instrument executed by the Company and the Holder. Any amendment shall be endorsed upon this Note, and all future Holders shall be bound thereby.

(f)     If any date specified in this Note as a date for the making of any payment of principal or interest under this Note falls on a Saturday, Sunday or on a day that is a legal holiday in the State of New York, then the date for the making of that payment shall be the next subsequent day that is not a Saturday, Sunday or legal holiday.

(g)     This Note shall be governed by and construed in accordance with the laws of the New York City, without giving effect to principles governing conflicts of law.

(h)     The Company hereby irrevocably submits to the exclusive jurisdiction of any United States Federal court over any suit, action or proceeding arising out of or related to the Note. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; *provided* that service of process is effected upon the Company in the manner permitted by law.

(i)     The parties hereto agree that all monetary amounts set forth herein are referenced in United States dollars, unless otherwise stated.

*(Remainder of page left intentionally blank. Signature page to follow.)*

IN WITNESS WHEREOF, the Company has caused this Senior Secured Note to be executed and dated the day and year first above written.

NEWLEAD HOLDINGS LTD.

By: _____
Name: _____
Title: _____

## SECURITIES PURCHASE
## AGREEMENT

This **SECURITIES PURCHASE AGREEMENT** (the "Agreement"), dated as of September 12, 2014 by and between NEWLEAD HOLDINGS LTD., a Bermuda corporation, with its office located at 83 Akti Miaouli & Flessa Street, 185 38 Piraeus, Greece (the "**Company**"), and CHEYENNE HOLDING LTD., a Marshall Islands corporation, with a registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (the "**Buyer**").

### WHEREAS:

A.    The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by the rules and regulations as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act");

B.    The Buyer desires to purchase and the Company desires to issue and sell, upon the terms and conditions set forth in this Agreement a 10% Convertible Note of the Company, in the form attached hereto as Exhibit A, up to the aggregate amount of $1,250,000 (United States Dollars one million two hundred fifty thousand) (the "**Purchase Price**") (together with any note(s) issued in replacement thereof or as a dividend thereon or otherwise with respect thereto in accordance with the terms thereof, the "**Note**"), convertible into shares of common stock, $0.01 par value per share, of the Company (the "**Common Stock**"), upon the terms and subject to the limitations and conditions set forth in such Note.

C.    The Buyer wishes to purchase, upon the terms and conditions stated in this Agreement, such principal amount of Note as is set forth immediately below its name on the signature pages hereto; and

NOW THEREFORE, the Company and the Buyer severally (and not jointly) hereby agree as follows:

1.    **Purchase and Sale of Note.**

a.    **Purchase of Note.** On the Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company such principal amount of Note as is set forth immediately below the Buyer's name on the signature pages hereto.

b.    **Form of Payment.** On the Closing Date (as defined below), (i) the Buyer shall pay USD1,250,000 (United States Dollars one million two hundred fifty thousand) against delivery of the Note and the balance of the purchase price shall be paid by September 12, 2017 or such other date as the parties may agree (the "**Maturity Date**") (as defined below) by wire transfer of immediately available funds to the Company, in accordance with the Company's written wiring instructions, in the principal amount equal to the Purchase Price as is set forth immediately below the Buyer's name on the signature pages hereto, and (ii) the Company shall deliver such duly executed Note on behalf of the Company, to the Buyer, against delivery of the first tranche of the Purchase Price.

c.    **Closing Date.** Subject to the satisfaction (or written waiver) of the conditions thereto set forth in Section 6 and Section 7 below, the date and time of the issuance and sale of the Note pursuant to this Agreement (the "**Closing Date**") shall be 12:00 noon, Eastern Standard Time on or about September 12, 2014 , or such other mutually agreed upon date / time. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall occur on the Closing Date or such other mutually agreed upon date at such location as may be agreed to by the

1

parties.

2.    **Buyer's Representations and Warranties.**

The Buyer represents and warrants to the Company that:

a       The Buyer is not a **"U.S. Person"**, as defined by Regulation S of the United States Securities Act of 1933, and as amended (the "**Securities Act**"), and is not acquiring the Securities for the account or benefit of a U.S. Person, and was not in the United States at the time of the offer to purchase the Shares;

b.      The Buyer acknowledges that the Shares are **"Restricted Securities"** within the meaning of the Securities Act and will be issued to the Buyer in accordance with Regulation S of the Securities Act;

c       The Buyer acknowledges that the Shares are being acquired from the Company in a transaction not involving a public offering, and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act only in certain limited circumstances. The Buyer represents that it is familiar with Rule 144 under the Securities Act, as presently in effect, and also acknowledges that any sales of the Shares in reliance upon Rule 144, if the provisions of Rule 144 should then be available as to the Shares, can only be made after the holding period specified in Rule 144 and in accordance with all the terms and conditions of Rule 144, and that, in the case of Shares to which Rule 144 is not applicable, compliance with Regulation S under the Securities Act or other exemption will be required;

d.      Information. The Buyer and its advisors, if any, have been, and for so long as the Note remains outstanding will continue to be, furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by the Buyer or its advisors. The Buyer and its advisors, if any, have been, and for so long as the Note remains outstanding will continue to be, afforded the opportunity to ask questions of the Company. Notwithstanding the foregoing, the Company has not disclosed to the Buyer any material nonpublic information and will not disclose such information, unless such information is disclosed to the public prior to or promptly following such disclosure to the Buyer. Neither such inquiries nor any other due diligence investigation conducted by Buyer or any of its advisors or representatives shall modify, amend or affect the Buyer's right to rely on the Company's representations and warranties contained in Section 3 below. The Buyer understands that its investment in the Securities involves a significant degree of risk. The Buyer is not aware of any facts that may constitute a breach of any of the Company's representations and warranties made herein.

e.      Governmental Review. The Buyer understands that no United States federal or state agency, or any other government or governmental agency, has passed upon or made any recommendation or endorsement of the Securities.

f.      Transfer or Re-Sale. The Buyer understands that (i) the sale or re-sale of the Securities has not been and is not being registered under the 1933 Act or any applicable state securities laws, and the Securities may not be transferred unless (a) the Securities are sold pursuant to an effective registration statement under the 1933 Act, (b) the Buyer shall have delivered to the Company, at the cost of the Buyer, an opinion of counsel that shall be in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that the Securities to be sold or transferred may be sold or transferred pursuant to an exemption from such registration, and this opinion shall be accepted by the Company, (c) the Securities are sold or transferred to an "Affiliate" (as defined in Rule 144 promulgated under the 1933 Act (or a successor rule) ("Rule 144")) of the Buyer who agrees to sell or otherwise transfer the Securities only in accordance with this Section 2(f), (d) the Securities are sold pursuant to Rule 144, or (e) the Securities are sold pursuant to Regulation S under the 1933 Act (or a successor rule) ("Regulation S"), and the Buyer shall have delivered to the Company, at the cost of the Buyer, an opinion of counsel that shall be in form, substance and scope customary for opinions of counsel in corporate transactions, and this opinion shall be accepted by the Company; (ii) any sale of such Securities made in reliance on Rule 144 may be made only in accordance with the terms of the said Rule and further, if the said Rule is not applicable, any re-sale of such Securities under circumstances in

2



which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other person is under any obligation to register such Securities under the 1933 Act or any state securities laws or to com ply with the terms and conditions of any exemption thereunder (in each case). Notwithstanding the foregoing or anything else contained herein to the contrary, the Securities may be pledged as collateral in connection with a bona fide margin account or other lending arrangement.

   g.  Legends. The Buyer understands that the Note, and, until such time as the Conversion Shares have been registered under the 1933 Act may be sold pursuant to Rule 144 or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, the Conversion Shares may bear a restrictive legend substantially in the following form (and a stop- transfer order may be placed against transfer of the certificates for such Securities):

> "NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of any Security upon which it is stamped, if, unless otherwise required by applicable state securities laws, (a) such Security is registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to Rule 144 or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) such holder provides the Company with an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Security may be made without registration under the 1933 Act, and the opinion shall be accepted by the Company so that the sale or transfer is effected. The Buyer agrees to sell all Securities, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Company does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144 or Regulation S, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

   h.  Authorization; Enforcement. This Agreement has been duly and validly authorized. This Agreement has been duly executed and delivered on behalf of the Buyer, and this Agreement constitutes a valid and binding agreement to the Buyer, enforceable in accordance with its terms.

3



3.     Representations and Warranties of the Company.

The Company represents and warrants to the Buyer that:

i.     Organization and Qualification. The Company and each of its Subsidiaries (as defined below), if any, is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted. Schedule 3(a) sets forth a list of all of the Subsidiaries of the Company and the jurisdiction in which each is incorporated. The Company and each of its Subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which its ownership or use of property or the nature of the business conducted by it makes such qualification necessary except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. "**Material Adverse Effect**" means any material adverse effect on the business, operations, assets, financial condition or prospects of the Company or its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith. "**Subsidiaries**" means any corporation or other organization, whether incorporated or unincorporated, in which the Company owns, directly or indirectly, any equity or other ownership interest.

ii.     Authorization; Enforcement. (i) The Company has all requisite corporate power and authority to enter into and perform this Agreement and the Note, and to consummate the transactions contemplated hereby and thereby, and to issue the Securities, in accordance with the terms hereof and thereof, (ii) the execution and delivery of this Agreement and the Note by the Company and the consummation by it of the transactions contemplated hereby and thereby (including without limitation, the issuance of the Note and the issuance and reservation for issuance of the Conversion Shares issuable upon conversion or exercise thereof) have been duly authorized by the Company's Board of Directors and no further consent or authorization of the Company, its Board of Directors, or its shareholders is required, (iii) this Agreement has been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement and the other documents executed in connection herewith and bind the Company accordingly, and (iv) this Agreement constitutes, and upon execution and delivery by the Company of the Note, each of such instruments will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

iii.     Capitalization. As of the date hereof, the authorized capital stock of the Company consists of: (i) 1,000,000,000 shares of Common Stock, $0.01 par value per share, of which 42,627,978 shares are issued and outstanding; and (ii) 500,000,000 shares of Preferred Stock, $0.01 par value per share, of which no shares are issued and outstanding. The Company has furnished to the Buyer true and correct copies of the Company's Certificate of Incorporation as in effect on the date hereof ("**Certificate of Incorporation**"), the Company's By-laws, as in effect on the date hereof (the "**By-laws**"), and the terms of all Securities convertible into or exercisable for Common Stock of the Company and the material rights of the holders thereof in respect thereto. The Company shall provide the Buyer with a written update of this representation signed by the Company's Chief Executive on behalf of the Company as of the Closing Date.

iv.     Issuance of Shares. The Conversion Shares are duly authorized and reserved for issuance and, upon conversion of the Note in accordance with its respective terms, will be validly issued, fully paid and non-assessable and free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Company and will not impose personal liability upon the holder thereof.

v.     Acknowledgment of Dilution. The Company understands and acknowledges the potentially dilutive effect to the Common Stock upon the issuance of the Conversion Shares upon conversion of the Note. The Company further acknowledges that its obligation to issue Conversion Shares upon conversion of the Note in accordance with this Agreement, the Note is absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership

4



interests of other shareholders of the Company.

     vi.    No Conflicts. The execution, delivery and performance of this Agreement, the Note by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance and reservation for issuance of the Conversion Shares) will not (i) conflict with or result in a violation of any provision of the Certificate of Incorporation or By-laws, or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, patent, patent license or instrument to which the Company or any of its Subsidiaries is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which the Company or its securities are subject) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect). Neither the Company nor any of its Subsidiaries is in violation of its Certificate of Incorporation, By-laws or other organizational documents and neither the Company nor any of its Subsidiaries is in default (and no event has occurred which, with notice or lapse of time or both, could put the Company or any of its Subsidiaries in default), and neither the Company nor any of its Subsidiaries has taken any action or failed to take any action that would give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party, or by which any property or assets of the Company or any of its Subsidiaries are bound or affected, except for possible defaults as would not, individually or in the aggregate, have a Material Adverse Effect. The businesses of the Company and its Subsidiaries, if any, are not being conducted, and shall not be conducted so long as the Buyer owns any of the Securities, in violation of any law, ordinance or regulation of any governmental entity. Except as specifically contemplated by this Agreement and as required under the 1933 Act and any applicable state securities laws, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency, regulatory agency, self regulatory organization or stock market or any third party in order for it to execute, deliver or perform any of its obligations under this Agreement, the Note in accordance with the terms hereof or thereof or to issue and sell the Note in accordance with the terms hereof and to issue the Conversion Shares upon conversion of the Note. All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof. The Company and its Subsidiaries are unaware of any facts or circumstances, which might give rise to any of the foregoing.

     vii.    SEC Documents; Financial Statements. The Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act") for the year preceding the date of execution of this Agreement. Upon written request the Company will deliver to the Buyer true and complete copies of the SEC Documents, except for such exhibits and incorporated documents. As of their respective dates, the SEC Documents com plied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the statements made in any such SEC Documents is, or has been, required to be amended or updated under applicable law (except for such statements as have been amended or updated in subsequent filings prior the date hereof). As of their respective dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with United States generally accepted accounting principles, consistently applied, during the periods involved and fairly present in all material respects the consolidated financial position of the Company and its consolidated



Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). Except as set forth in the financial statements of the Company included in the SEC Documents, the Company has no liabilities, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to December 31, 2012, and (ii) obligations under contracts and commitments incurred in the ordinary course of business and not required under generally accepted accounting principles to be reflected in such financial statements, which, individually or in the aggregate, are not material to the financial condition or operating results of the Company. The Company is subject to the reporting requirements of the 1934 Act.

viii.     Absence of Certain Changes. Since December 31, 2013, except as disclosed in the SEC Documents, there has been no material adverse change and no material adverse development in the assets, liabilities, business, properties, operations, financial condition, results of operations, prospects or 1934 Act reporting status of the Company or any of its Subsidiaries.

ix.     Absence of Litigation. Except as disclosed in the Company's SEC Documents, there is no action, suit, claim, proceeding, inquiry or investigation before or by any court, public board, government agency, self- regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company or any of its Subsidiaries, or their officers or directors in their capacity as such, that could have a Material Adverse Effect. The Company and its Subsidiaries are unaware of any facts or circumstances, which might give rise to any of the foregoing.

x.     Patents, Copyrights, etc. The Company and each of its Subsidiaries owns or possesses the requisite licenses or rights to use all patents, patent applications, patent rights, inventions, know-how, trade secrets, trademarks, trademark applications, service marks, service names, trade names and copyrights ("Intellectual Property") necessary to enable it to conduct its business as now operated (and, as presently contemplated to be operated in the future); there is no claim or action by any person pertaining to, or proceeding pending, or to the Company's knowledge threatened, which challenges the right of the Company or of a Subsidiary with respect to any Intellectual Property necessary to enable it to conduct its business as now operated (and, as presently contemplated to be operated in the future); to the best of the Company's knowledge, the Company's or its Subsidiaries' current and intended products, services and processes do not infringe on any Intellectual Property or other rights held by any person; and the Company is unaware of any facts or circumstances which might give rise to any of the foregoing. The Company and each of its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of their Intellectual Property.

xi.     Disclosure. All information relating to or concerning the Company or any of its Subsidiaries set forth in this Agreement and provided to the Buyer pursuant to Section 2(d) hereof and otherwise in connection with the transactions contemplated hereby is true and correct in all material respects and the Company has not omitted to state any material fact necessary in order to make the statements made herein or therein, in light of the circumstances under which they were made, not misleading. No event or circumstance has occurred or exists with respect to the Company or any of its Subsidiaries or its or their business, properties, prospects, operations or financial conditions, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed (assuming for this purpose that the Company's reports filed under the 1934 Act are being incorporated into an effective registration statement filed by the Company under the 1933 Act).

xii.     Acknowledgment Regarding Buyer' Purchase of Securities. The Company acknowledges and agrees that the Buyer is acting solely in the capacity of arm's length purchasers with respect to this Agreement and the transactions contemplated hereby. The Company further acknowledges that the Buyer is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any statement made by the Buyer or any of its respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is not advice or a recommendation and is merely incidental to the Buyer' purchase of the Securities. The Company further represents to the Buyer that the Company's decision to enter into this Agreement has been based solely on the independent evaluation of the Company and its representatives.

xiii.     No Integrated Offering. Neither the Company, nor any of its affiliates, nor any

6



person acting on its or their behalf, has directly or indirectly made any offers or sales in any security or solicited any offers to buy any security under circumstances that would require registration under the 1933 Act of the issuance of the Securities to the Buyer. The issuance of the Securities to the Buyer will not be integrated with any other issuance of the Company's securities (past, current or future) for purposes of any shareholder approval provisions applicable to the Company or its securities.

 xiv. No Brokers. The Company has taken no action, which would give rise to any claim by any person for brokerage commissions, transaction fees or similar payments relating to this Agreement or the transactions contemplated hereby.

 xv. Environmental Matters. There are, to the Company's knowledge, with respect to the Company or any of its Subsidiaries or any predecessor of the Company, no past or present violations of Environmental Laws (as defined below), releases of any material into the environment, actions, activities, circumstances, conditions, events, incidents, or contractual obligations which may give rise to any common law environmental liability or any liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 or similar federal, state, local or foreign laws and neither the Company nor any of its Subsidiaries has received any notice with respect to any of the foregoing, nor is any action pending or, to the Company's knowledge, threatened in connection with any of the foregoing. The term "**Environmental Laws**" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants contaminants, or toxic or hazardous substances or wastes (collectively, "**Hazardous Materials**") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

 xvi. No Hazardous Materials. Other than those that are or were stored, used or disposed of in compliance with applicable law, no Hazardous Materials are contained on or about any real property currently owned, leased or used by the Company or any of its Subsidiaries, and no Hazardous Materials were released on or about any real property previously owned, leased or used by the Company or any of its Subsidiaries during the period the property was owned, leased or used by the Company or any of its Subsidiaries, except in the normal course of the Company's or any of its Subsidiaries' business.

 xvii. No Underground Storage Tanks. There are no underground storage tanks on or under any real property owned, leased or used by the Company or any of its Subsidiaries that are not in compliance with the applicable law.

 xviii. Title to Property. The Company and its Subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in Schedule 3(t) or such as would not have a Material Adverse Effect. Any real property and facilities held under lease by the Company and its' Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as would not have a Material Adverse Effect.

 xix. Insurance. The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as the management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged. Neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect. Upon written request, the Company will provide to the Buyer true and correct copies of all policies relating to directors' and officers' liability coverage, errors and omissions coverage, and commercial general liability coverage.

 xx. Internal Accounting Controls. The Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient, in the judgment of the Company's

7



board of directors, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

     xxi.    Foreign Corrupt Practices. Neither the Company, nor any of its Subsidiaries, nor any director, officer, agent, employee or other person acting on behalf of the Company or any Subsidiary has, in the course of his actions for, or on behalf of, the Company, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

     xxii.    No Investment Company. The Company is not, and, upon the issuance and sale of the Securities as contemplated by this Agreement, will not be an "Investment Company" required to be registered under the Investment Company Act of 1940 (an "Investment Company"), and the Company is not controlled by an Investment Company.

     xxiii.    Breach of Representations and Warranties by the Company. If the Company breaches any of the representations or warranties set forth in this Section 3, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of Default under Section 5 of the Note.

4.    Covenants.

     a) Best Efforts. The parties shall use their best efforts to satisfy timely each of the conditions described in Section 6 and 7 of this Agreement.

     b) Use of Proceeds. The Company shall use the proceeds for general working capital purposes.

     c) Financial Information. Upon written request the Company agrees to send or make available the following reports to the Buyer until the Buyer transfers, assigns, or sells all of the Securities: (i) within ten (10) days after the filing with the SEC, a copy of its Annual Report on Form 20-F and any Current Reports on Form 6-K; (ii) within one (1) day after a release, copies of all press releases issued by the Company or any of its Subsidiaries; and (iii) contemporaneously with the making available or giving to the shareholders of the Company, copies of any notices or other information the Company makes available or gives to such shareholders.

     d) Listing. The Company will obtain until December 31, 2014, and, so long as the Buyer owns any of the Securities, maintain the listing and trading of its Common Stock or equivalent replacement exchange on the NASDAQ, Nasdaq Capital, NYSE, AMEX or OTCBB, and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Financial Industry Regulatory Authority ("FINRA") and such exchanges, as applicable. The Company shall promptly provide to the Buyer copies of any notices it receives from the national securities exchange market or trading or quotation facility on which it trades and any other exchanges or quotation systems on which the Common Stock is then listed regarding the continued eligibility of the Common Stock for listing on such exchanges and quotation systems.

     e) Corporate Existence. So long as the Buyer beneficially owns any Note, the Company shall maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except in the event of a merger or consolidation or sale of all or substantially all of the Company's assets, where the surviving or successor entity in such transaction (i) assumes the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith, and (ii) is a publicly traded corporation whose Common Stock is listed for trading on the NASDAQ, Nasdaq Capital, NYSE, AMEX or OTCBB.



f) Breach of Covenants. If the Company breaches any of the covenants set forth in this Section 4, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of Default under Section 3.4 of the Note.

g) Failure to Comply with the 1934 Act.   So long as the Buyer beneficially owns the Note, the Company shall comply with the reporting requirements of the 1934 Act; and the Company shall continue to be subject to the reporting requirements of the 1934 Act.

h) Trading Activities. Neither the Buyer nor its affiliates has an open short position in the common stock of the Company and the Buyer agrees that it shall not, and that it will cause its affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

5.     Transfer Agent Instructions.

The Company shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of the Buyer or its nominee, for the Conversion Shares in such amounts as specified from time to time by the Buyer to the Company upon conversion of the Note in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions"). In the event that the Borrower proposes to replace its transfer agent, the Borrower shall provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including, but not limited to, the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower. Prior to registration of the Conversion Shares under the 1933 Act or the date on which the Conversion Shares may be sold pursuant to Rule 144 without any restriction as to the number of Securities as of a particular date that can then be immediately sold, all such certificates shall bear the restrictive legend specified in Section 2(g) of this Agreement. The Company warrants that: (i) no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, and stop transfer instructions to give effect to Section 2(f) hereof (in the case of the Conversion Shares, prior to registration of the Conversion Shares under the 1933 Act or the date on which the Conversion Shares may be sold pursuant to Rule 144 without any restriction as to the number of Securities as of a particular date that can then be immediately sold), will be given by the Company to its transfer agent and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Note; (ii) it will not direct its transfer agent not to transfer or delay, impair, and / or hinder its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for Conversion Shares to be issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement; and (iii) it will not fail to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement. Nothing in this Section shall affect in any way the Buyer's obligations and agreement set forth in Section 2(g) hereof to comply with all applicable prospectus delivery requirements, if any, upon re-sale of the Securities. If the Buyer provides the Company, at the cost of the Buyer, with (i) an opinion of counsel in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the 1933 Act and such sale or transfer is effected, or (ii) the Buyer provides reasonable assurances that the Securities can be sold pursuant to Rule 144, the Company shall permit the transfer, and, in the case of the Conversion Shares, promptly instruct its transfer agent to issue one or more certificates, free from restrictive legend, in such name and in such denominations as specified by the Buyer. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer, by vitiating the intent and purpose of the transactions contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 may be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that the Buyer shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and

9



requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required.

### 6.    Conditions to the Company's Obligation to Sell.

The obligation of the Company hereunder to issue and sell the Note to the Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions thereto, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

a.    The Buyer shall have executed this Agreement and delivered the same to the Company.

b.    The Buyer shall have delivered the Purchase Price in accordance with Section 1(b) above.

c.    The representations and warranties of the Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Closing Date.

d.    No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self- regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

### 7.    Conditions to the Buyer's Obligation to Purchase.

The obligation of the Buyer hereunder to purchase the Note at the Closing is subject to the satisfaction, at or before the Closing Date of each of the following conditions, provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion:

a.    The Company shall have executed this Agreement and delivered the same to the Buyer.

b.    The Company shall have delivered to the Buyer the duly executed Note (in such denominations as the Buyer shall request) in accordance with Section 1 (b) above.

c.    The Irrevocable Transfer Agent Instructions, in form and substance satisfactory to a majority-in-interest of the Buyer, shall have been delivered to and acknowledged in writing by the Company's Transfer Agent.

d.    The representations and warranties of the Company shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at such time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date. The Buyer shall have received a certificate or certificates, executed by the chief executive officer of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Buyer including, but not limited to certificates with respect to the Company's Certificate of Incorporation, By-laws and Board of Directors' resolutions relating to the transactions contemplated hereby.

e.    No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions



contemplated by this Agreement.

f. No event shall have occurred which could reasonably be expected to have a Material Adverse Effect on the Company including, but not limited to, a change in the 1934 Act reporting status of the Company or the failure of the Company to be timely in its 1934 Act reporting obligations.

g. The Buyer shall have received an officer's certificate described in Section 3(c) above, dated as of the Closing Date.

## 8.   Governing Law; Miscellaneous.

a.        Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state and county of Nassau. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Company and Buyer waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

b.        Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party.

c.        Headings. The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of this Agreement.

d.        Severability. In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute or rule of law. Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

e.        Entire Agreement; Amendments. This Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the majority in interest of the Buyer.

f.        Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified

11



herein. shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Company, to:
        NEWLEAD HOLDING LTD.
        83Akti Miaouli & Flessa Street
        185 38 Piraeus, Greece
        Attn: MICHAIL ZOLOTAS, Chief Executive Officer
With a copy by fax only to (which copy shall not constitute notice):

If to the Buyer:
        CHEYENNE HOLDING LTD.
        Trust Company Complex, Ajeltake Road, Ajeltake Island,
        Majuro, MH 96960, Marshall Islands

Each party shall provide notice to the other party of any change in address.

      g.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, subject to Section 2(f), the Buyer may assign its rights hereunder to any person that purchases Securities in a private transaction from the Buyer or to any of its "affiliates," as that term is defined under the 1934 Act, without the consent of the Company,

      h.    Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

      i.    Survival. The representations and warranties of the Company and the agreements and covenants set forth in this Agreement shall survive the closing hereunder notwithstanding any due diligence investigation conducted by or on behalf of the Buyer. The Company agrees to indemnify and hold harmless the Buyer and all their officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred.

      j.    Publicity. The Company, and the Buyer shall have the right to review a reasonable period of time before issuance of any press releases, SEC, NASDAQ or FINRA filings, or any other public statements with respect to the transactions contemplated hereby; provided, however, that the Company shall be entitled, without the prior approval of the Buyer, to make any press release or SEC, NASDAQ (or other applicable trading market) or FINRA filings with respect to such transactions as is required by applicable law and regulations (although the Buyer shall be consulted by the Company in connection with any such press release prior to its release and shall



be provided with a copy thereof and be given an opportunity to comment thereon).

k.  Further Assurances. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

l.  No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent and no rules of strict construction will be applied against any party.

m.  Remedies. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

[SIGNATURE PAGE TO FOLLOW]



IN WITNESS WHEREOF, the undersigned Buyer and the Company have caused this Agreement to be duly executed as of the date first above written.

NEWLEAD HOLDINGS LTD

By: _____
Name: Michail S. Zolotas
Title: CEO/ Chairman
Date:

CHEYENNE HOLDING LTD

By: _____
Name: D. STAVRIANOS
Title: DIRECTOR
Date: 12 SEP 2014

*[Corporate Seal: CHEYENNE HOLDING LTD. Corporate Seal 2014 Reg. Number: 71520 Republic of Marshall Islands]*

AGGREGATE SUBSCRIPTION AMOUNT:

Aggregate Amount of Note:                          $1,250,000

Aggregate Purchase Price:                          $1,250,000

This Addendum No.1 (hereinafter the "Addendum"), is made on March 3, 2015

BETWEEN:

(1) NEWLEAD HOLDINGS LTD., a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "Company");

-and-

(2) CHEYENNE HOLDING LTD., a corporation established in the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called the "Cheyenne").

*(Jointly the Parties, singly the Party)*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Securities Purchase Agreement and Convertible Promissory Note.*

RECITALS

WHEREAS, pursuant to a Securities Purchase Agreement entered into and between the Company and Cheyenne on September 12, 2014 (hereinafter the "SPA"), the Company has issued to Cheyenne a Convertible Promissory Note in the amount of USD 1,250,000 (United States Dollars One Million Two Hundred Fifty Thousand) dated September 12, 2014 (hereinafter the "Note").

WHEREAS, In consideration of the payment of the Note a Second Preferred Liberian Mortgage m.v. "NEWLEAD CASTELLANO" has been issued between NEWLEAD CASTELLANO LTD and Cheyenne dated 16 October 2014 (the "Mortgage"), pursuant to which "Events of Default" shall mean any events or circumstances set out in the relevant clause of the Note.

WHEREAS, under Clause 5 of the SPA, the Company has agreed to issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of Cheyenne or its nominee, for the conversion shares in such amounts as specified from time to time by Cheyenne (hereinafter the "Irrevocable Transfer Agent Instructions").

WHEREAS, under clause 1 (a)(i) the Company shall pay the Principal and any accrued interest or any amount thereof by issuance of its common shares (the "Common Stock") at the Stock Price or cash on the Maturity Date as both are defined in the Note.

WHEREAS, under Clause 5 of the Note, the Company has agreed that at an event of default, the entire unpaid principal and accrued interest of the Note or any True-up Amounts shall become and be immediately due and payable in cash or shares of Common Stock of the Company, in