either case without any other notice or demand of any kind or any presentment or protest, if any one of the events under this clause occur and be continuing at the time of such demand (each such event, an "Event of Default").

WHEREAS, pursuant to the Note any accrued and unpaid interest on the Note shall be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

WHEREAS, under Clause 1(g) of the Note the Company shall at all times reserve and keep available out of its authorised but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, fifty times the number of Common shares issuable from time to time.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree as follows:

    (a) To waive the Irrevocable Transfer Agent Instructions condition contained in Clause 5 of the SPA, such waiver being effective as from the date of execution of the SPA.

    (b) To waive the requirement for any accrued and unpaid interest on the Note to be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

    (c) That any accrued and unpaid interest on the Note to be paid by the Company no later than three (3) days upon the request from Cheyenne.

    (d) To waive the Company's obligation to reserve and keep available fifty times the number of Common shares issuable from time to time contained in Clause 1(g) of the Note, such waiver being effective as from the date of execution of the SPA and the Note.

    (e) That the Company, as from the date hereof, shall at its discretion reserve, but always keep available out of its authorized but unissued shares of capital stock, such shares of Common Stock as shall from time to time be sufficient to effect the conversion of this Note.

    (f) That the Company agrees that any amount of the Note, including the Principal and any accrued interest thereon and any True up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder. Failure to pay any amounts pursuant to this clause shall constitute an Event of Default under clause 5 of the Note as this is amended hereby or may be amended.

    (g) That, as of the date hereof, at an Event of Default pursuant to clause 5 of the Note the entire unpaid principal and accrued interest of the Note or any True-up Amounts shall become and be immediately due and payable in cash without any other notice or demand of any kind or any presentment or protest, if any of the events under this clause 5 occur

and be continuing at the time of such demand.

(h) That the Holder agrees and warrants that it shall sell up to twenty percent (20%) of the Monthly Dollar Volume (as defined herein below) of the Company's Common Stock per month. "Monthly Dollar Volume" means a dollar amount of the Company's Common Stock which is traded in the US public markets in the relevant month in which it is calculated (not including the amount of any shares of the Company's Common Stock traded by the Holder).

(i) All other provisions of the Note shall remain in full force and effect.

(j) This Addendum shall be governed by and construed by and interpreted in accordance with the internal laws of the state of New York.

(SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, the Parties have hereunto set their hands and affixed their seals as of the day and year first above written.

NEWLEAD HOLDINGS LTD.

By: _____
Name: Michail S. Zolotas
Title: CEO/ Chairman

CHEYENNE HOLDING LTD.

By: _____
Name: DIKITRIOS STAVNANGS
Title: ATTORNEY

**DATE: 14 September 2015**

---

NEWLEAD HOLDINGS LTD.
Of Bermuda


-and-


CHEYENNE HOLDING LTD.
Of the Republic of the Marshall Islands

---

ADDENDUM No. 2

to

the Unsecured Convertible Note dated 12th September 2014.
In the amount of USD1,250,000 (United States Dollars one million two hundred fifty thousand)

---

**THIS ADDENDUM No. 2 is made on this 14ᵗʰ day of September 2015,**

**BETWEEN:**

(1)    **NEWLEAD HOLDINGS LTD.**, a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the **"Company"**); and

(2)    **CHEYENNE HOLDING LTD.**, a corporation established under the laws of the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter referred to as **"CHEYENNE"** or **"Holder"**);

*(Jointly the "Parties", singly the "Party").*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note or previous Addendum(s).*

**WHEREAS,** Pursuant to an Unsecured Convertible Note dated 12ᵗʰ September 2014 as amended by an Addendum No.1 dated March 3, 2015, issued by the Company to CHEYENNE (hereinafter called as the same as has been and as may from time to time be further amended, supplemented or varied the **"Note"**), the Company promises to pay to CHEYENNED the principal amount of USD 1,250,000 (United States Dollars one million two hundred fifty thousand) (hereinafter the **"Principal Amount"**) under the terms and conditions set forth therein.

**WHEREAS,** the Maturity Date of the Note is 12 September 2017.

**NOW THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree to amend the Note as follows:

1.    The Maturity Date is deferred to 12 September 2018.

2.    All other provisions of the Note shall remain in full force and effect.

3.    This Addendum shall in all respects be governed by, and construed in accordance with the internal laws of the State of New York.

**IN WITNESS WHEREOF,** the presents have been duly executed the day and year first before written.

SIGNED by:                          )
M. ZOLOTAS                          )
for and on behalf of:               )
NEWLEAD HOLDINGS LTD .              )
in the presence of:                 )


SIGNED by:                          )
                                    )
for and on behalf of:               )
CHEYENNE HOLDING LTD.               )
in the presence of:                 )

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED | § § § § § | |
| **PLAINTIFFS** | § § | C.A. NO. _____ |
| V. | § § | |
| M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM*, AND NEWLEAD CASTELLANO LTD. | § § § § § § § § | |
| **DEFENDANTS** | § § | |

**VERIFIED COMPLAINT**

EXHIBIT "4"

THIS NOTE AND THE SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET FORTH HEREIN. NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE PURSUANT HERETO MAY BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER SUCH ACT.

THIS TEN PERCENT (10%) CONVERTIBLE PROMISSORY NOTE IS ISSUED IN EXCHANGE FOR A PORTION OF THAT CERTAIN CONVERTIBLE PROMISSORY NOTE ISSUED TO OPPENHEIM & CO. LIMITED. FOR PURPOSES OF RULE 144, THIS NOTE SHALL BE DEEMED TO HAVE BEEN ISSUED ON AUGUST 1, 2014. FURTHER THIS NOTE IS ONLY A $1,215,000.00 PORTION OF THE ORIGINAL NOTE ISSUED TO OPPENHEIM & CO. LIMITED ON AUGUST 1, 2014. THIS NOTE DOES NOT REQUIRE PHYSICAL SURRENDER OF THE NOTE IN THE EVENT OF A PARTIAL REDEMPTION OR CONVERSION.

### PARTIAL REPLACEMENT NOTE – ORIGINALLY ISSUED ON AUGUST 1, 2014
### NEWLEAD HOLDINGS LTD.
10% Unsecured Convertible Note (the "Note")
Due August 1, 2016

US$ 1,215,000.00                                              **May 26, 2015**
                                                             Piraeus, Greece

NEWLEAD HOLDINGS LTD., a company organized under the laws of Bermuda (the "Company"), for value received, hereby promises to pay to LABROY SHIPTRADE LIMITED, of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands, or registered assigns (the "Holder"), the principal amount of US$ 1,215,000 (United States Dollars one million two hundred fifteen thousand) (the "Principal") on August 1, 2016, (the "Maturity Date"), together with interest of US$ 99,197.26 (United States Dollars ninety nine thousand one hu
ndred ninety seven and twenty six cents) accrued until the closing of May 25, 2015, and any other interest to be accrued from the date hereof on the unpaid Principal balance at a rate equal to ten percent (10%) per annum, computed daily and on the basis of the actual number of days elapsed and a year of 365 days (hereinafter the "Interest"). Any accrued and unpaid interest on the Note shall be due and payable on the Maturity Date.

This Note has been assigned to the Holder by Oppenheim & Co. Limited of 3rd Floor, NatWest House, Le Truchot, St. Peter Port, Guernsey, GY1 1WD, Channel Islands (hereinafter "OppCo"), as per relevant Notice of Assignment dated May 19, 2015.

1.     Payments.

(a)     (i) Anytime and upon demand of the Holder, the Company shall pay the Principal, the accrued interest or any other amount thereof including any True up amounts by issuance of its common shares (the **"Common Stock"**), at the Stock Price (as defined below.

(ii) Nonwithstanding anything to the contrary herein any amount of the Note, including the Principal and any accrued interest thereon and any True up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder.

**Stock Price.** The number of shares of Common Stock shall be determined by dividing (i) the amount payable by, (ii) the Closing Price, as adjusted for any stock splits or stock dividends (the **"Stock Price"**). **"Closing Price"** means the closing price the trading date immediately prior to (but not including) the date of issuance of the shares, provided the Common Stock is then listed or quoted on the NASDAQ, OTC Bulletin Board or any other national securities exchange, market or trading or quotation facility (a **"Trading Market"**).

(ii)   From the date of execution of the Note and for a period of 5 years after the execution date of this Note (the **"Measurement Dates"**), at the date when either, (a) all Common Stock being issued to the Holder under l(a)(i) above, and/ or (b) all Common Stock being issued to the Holder under any True up Amounts (as defined herein below), are sold in full and the Holder is entitled to additional True up Amounts, the Company may elect to pay the additional True up Amounts by either (i) wire transfer of immediately available funds to an account designated in writing by the Holder, or (ii) issuance by the Company of its Common Stock at the Stock Price determined as of such date, or (iii) any combination thereof, at the sole option of the Company. The Holder will be entitled for as many additional True up Amounts are required to collect in total the Principal and any accrued interest in cash either by the sale of Common Stock or by cash receipts by the Company. Six (6) months prior the lapse of the five (5) year period the Holder is entitled to request for an extension of the true-up period for an additional three (3) years by providing a written notice to the Company.

**True up Amounts.** The True up Amounts are equal to the Principal less the Market Value (as defined below) of the shares issued or the cash paid as part of any payments prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days after the Measurement Dates.

**Market Value.** Market Value with respect to the shares issued as part of the Principal and/ or any accrued interest and/ or any amount thereof, means the aggregate gross proceeds received by the Holder from one or more sales, as evidenced by brokerage statements for such sales; *provided, however,* that if the sale price is not reasonably related to the trading price on the sale date, such

2

sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale.

(b)    **Termination of Rights under this Note.** Immediately upon the payment of the Principal together with its accrued interest and/ or any applicable True up Amount due under this Note, this Note shall no longer be deemed outstanding and all rights with respect to this Note shall immediately cease and terminate.

(c)    **Taxes or other Issuance Charges.** The issuance of any shares of Common Stock in payment of this Note, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(d)    **Holder Not a Stockholder.** The Holder shall not have, solely on account of such status as a holder of this Note, any rights of a stockholder of the Company, either at law or in equity, or any right to any notice of meetings of stockholders or of any other proceedings of the Company until such time as this Note has been paid in shares of Common Stock pursuant to Section 1 (a), at which time the Holder shall be deemed to be the holder of record of Common Stock that has been issued, as applicable, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(e)    **Fractional Shares.** No fractional shares of Common Stock shall be issued when paying this Note. In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up to the nearest whole share of Common Stock.

(f)    **Company Reserve.** The Company shall at its discretion reserve but always keep available out of its authorized but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, such number of Common Stock as shall from time to time be sufficient to effect the conversion of this Note and if at any time the number of authorized but unissued Common shares shall not be sufficient to effect the conversion of the Note, the Company will take such corporate action as may, in the

3

opinion of its counsel, be necessary to increase its authorized but unissued Common Shares to such number of shares as shall be sufficient for such purpose.

2.      **Trading Market Limitations.** Unless permitted by the applicable rules and regulations of the principal securities market on which the Common Stock is then listed or traded or quoted, in no event shall the Company issue upon conversion of or otherwise pursuant to this Note and the other Notes issued pursuant to the Exchange Agreement more than the maximum number of shares of Common Stock that the Company can issue pursuant to any rule of the principal United States securities market on which the Common Stock is then traded (the "**Maximum Share Amount**"), which shall be 4.99% of the total shares outstanding on the Closing Date, subject to equitable adjustment from time to time for stock splits, stock dividends, combinations, capital reorganizations and similar events relating to the Common Stock occurring after the date hereof.

3.      **Obligation of the Holder to Sell.** The Holder agrees and warrants that it shall sell up to twenty percent (20%) of the Monthly Dollar Volume (as defined herebelow) of the Company's Common Stock per month. "**Monthly Dollar Volume**" means a dollar amount of the Company's Common Stock which is traded or quoted in the US public markets in the relevant month in which it is calculated (not including the amount of any shares of the Company's Common Stock traded by the Holder).

4.      **Mortgage.** In consideration of the payment of the Note a Fourth Preferred Liberian Mortgage m.v. "NEWLEAD CASTELLANO" will be issued between NEWLEAD CASTELLANO LTD and the Holder (the "**Mortgage**"), pursuant to which "Events of Default" shall mean any events or circumstances set out in the relevant clause of the Note.

5.      **Assignability.** Assignability. Note shall be binding upon the Company and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns. The Holder may assign or transfer this Note to any transferee or have the shares that it converts under this Note sent to any third party. If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note registered as the Holder may request and the Company may accept, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note to the Holder representing the outstanding Principal not being transferred. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, following conversion or redemption of any portion of this Note, the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

6.      **Ranking.** The Company, for itself, its successors and assigns, covenants and agrees, that the payment of the Principal of this Note is senior in right of payment to the payment of all future

4

Junior Debt (as defined below). "**Junior Debt**" shall mean all future Indebtedness (as defined below), incurred after the date hereof. "Indebtedness" shall mean any liability of the Company for borrowed money, evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), including any given in connection with the acquisition of property, assets or service.

(a)     Until the payment in full of the Principal of this Note, and all other amounts owing under this Note, no payment may be made with respect to the Principal of or other amounts owing with respect to any Junior Debt, or in respect of any redemption, retirement, purchase or other acquisition thereof, provided that the Company may pay scheduled interest thereon so long as no Event of Default shall have occurred and be continuing.

(b)     Upon any payment or distribution of the assets of the Company to creditors upon dissolution, total or partial liquidation or reorganization of, or similar proceeding, the Holder of the Note will be entitled to receive payment in full before any holder of Junior Debt is entitled to receive any payment.

7.     **Events of Default**. The entire unpaid Principal of this Note and any True up Amounts and accrued interest or any other amounts due under the Note shall become and be immediately due and payable in cash, in either case without any other notice or demand of any kind or any presentment or protest, if any one of the following events occurs and be continuing at the time of such demand (each such event, an "**Event of Default**"):

(a)     The Company's failure to pay any portion of the Principal as provided in Section 1 hereof; or

(b)     (i) The commencement by the Company, or any subsidiary, of a voluntary case under 11 U.S.C. Section 101 *et. seq.* (the "**Bankruptcy Code**") or any foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or (ii) the consent by the Company, or any subsidiary, to the entry of an order for relief in an involuntary bankruptcy or similar case, or to the conversion of an involuntary case to a voluntary case, under any such law, or (iii) the consent by the Company, to the appointment of, or the taking of possession by, a receiver, trustee or other custodian for all or a substantial part of the Company's properties, or (iv) the making by the Company, of any assignment for the benefit of creditors, or (v) the discontinuance of business, dissolution, winding up, liquidation or cessation of existence by or of the Company; or

(c)     (i) The entry by a court of competent jurisdiction a decree or order for relief with respect to the Company, or any subsidiary, in an involuntary case under the Bankruptcy Code or any applicable foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in

5

effect, which decree or order is not stayed or dismissed within 60 days of the entry thereof, or (ii) the entry by a court of a decree or order for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other person having similar powers over the Company or over all or a substantial part of its properties;

or

(d)      The Company agrees that if it fails to timely make any payment due under this Note or upon the happening of any Event of Default, and fails to remedy the situation within a three (3) day grace period, the outstanding Principal, together with all other expenses, including, reasonable attorneys' fees, shall immediately become due and payable at the option of the Holder. For purposes hereof, attorneys' fees shall include, without limitation, fees and disbursements for legal services incurred by the holder hereof in collecting or enforcing payment hereof whether or not suit is brought, and if suit is brought, then through all appellate actions. From and after any Event of Default, the interest rate of this Note shall be the highest rate permitted under applicable law.

(e)      Beginning 15 days after the Issuance Date, the failure of any of the DWAC Eligible Conditions to be satisfied at any time thereafter during which the Company has obligations under this Note or the Company loses its status as "*DTC Eligible*"; or the Company's shareholders shall lose the ability to deposit (either electronically or by physical certificates, or otherwise) shares into the DTC System; or the Company shall become delinquent in its filing requirements as a fully reporting issuer registered with the SEC; or (x) the Company shall fail to meet all requirements to satisfy the availability of Rule 144 to the Holder or its assigns including but not limited to timely fulfillment of its filing requirements as a fully-reporting issuer registered with the SEC, requirements for XBRL filings, and requirements for disclosure of financial statements on its website

(f)      Withdrawal from registration of the Company under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), either voluntary or involuntary;

8.      **Miscellaneous**.

(a)      The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; *provided, however,* that neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party. Assignment of all or any portion of this Note in violation of this Section shall be null and void. Nothing in this Note, expressed or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b)      Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered as follows:

        If to the Company:

NEWLEAD HOLDINGS LTD.
83 Akti Miaouli & Flessa Street
185 38 Piraeus, Greece
Attn: MICHAIL S. ZOLOTAS, Chief Executive Officer

If to the Holder:
LABROY SHIPTRADE LIMITED
[•]

(c)     Upon receipt of evidence satisfactory to the Company, of the loss, theft, destruction or
mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the
Holder thereof that this Note has been lost, stolen, destroyed or mutilated, together with an
indemnity against any claim that may be made against the Company on account of such lost,
stolen, destroyed or mutilated Note, and upon reimbursement of the Company's reasonable
incidental expenses, the Company shall execute and deliver to the Holder a new Note of like date,
tenor and denomination.

(d)     No course of dealing and no delay or omission on the part of the Holder or the Company
in exercising any right or remedy shall operate as a waiver thereof or otherwise prejudice the
Holder's or the Company's rights, powers or remedies, as the case may be. No right, power or
remedy conferred by this Note upon the Holder or the Company shall be exclusive of any other
right, power or remedy referred to herein or now or hereafter available at law, in equity, by statute
or otherwise, and all such remedies may be exercised singly or concurrently. Any waiver must be
in writing.

(e)     If one or more provisions of this Note are held to be unenforceable under applicable law,
such provision shall be excluded from this Note and the balance of this Note shall be interpreted
as if such provision were so excluded and shall be enforceable in accordance with its terms. This
Note may be amended only by a written instrument executed by the Company and the Holder.
Any amendment shall be endorsed upon this Note, and all future Holders shall be bound thereby.

(f)     If any date specified in this Note as a date for the making of any payment of Principal or
interest under this Note falls on a Saturday, Sunday or on a day that is a legal holiday in the State
of New York and/ or Greece, then the date for the making of that payment shall be the next
subsequent day that is not a Saturday, Sunday or legal holiday.

(g)     This Note shall be governed by and construed in accordance with the laws of the New
York City, without giving effect to principles governing conflicts of law.

(h)     The Company hereby irrevocably submits to the exclusive jurisdiction of any United

7

States Federal court over any suit, action or proceeding arising out of or related to the Note. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; *provided* that service of process is effected upon the Company in the manner permitted by law.

(i)      The parties hereto agree that all monetary amounts set forth herein are referenced in United States dollars, unless otherwise stated.

**[SIGNATURE PAGE FOLLOWS]**

8

**IN WITNESS WHEREOF,** the Company has caused this Unsecured Convertible Note to be executed and dated the day and year first above written.

                                                            **NEWLEAD HOLDINGS LTD.**


                                               By: _____
                                             Name: _____
                                             Title: _____

**EXHIBIT "B"**

**FORM OF GUARANTEE AS EXECUTED**


(SEE ATTACHED)

**THIS NOTE AND THE SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET FORTH HEREIN. NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE PURSUANT HERETO MAY BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER SUCH ACT.**

**THIS TEN PERCENT (10%) CONVERTIBLE PROMISSORY NOTE IS ISSUED IN EXCHANGE FOR A PORTION OF THAT CERTAIN CONVERTIBLE PROMISSORY NOTE ISSUED TO OPPENHEIM & CO. LIMITED. FOR PURPOSES OF RULE 144, THIS NOTE SHALL BE DEEMED TO HAVE BEEN ISSUED ON AUGUST 1, 2014. FURTHER THIS NOTE IS ONLY A $1,215,000.00 PORTION OF THE ORIGINAL NOTE ISSUED TO OPPENHEIM & CO. LIMITED ON AUGUST 1, 2014. THIS NOTE DOES NOT REQUIRE PHYSICAL SURRENDER OF THE NOTE IN THE EVENT OF A PARTIAL REDEMPTION OR CONVERSION.**

**PARTIAL REPLACEMENT NOTE – ORIGINALLY ISSUED ON AUGUST 1, 2014**
**NEWLEAD HOLDINGS LTD.**
10% Unsecured Convertible Note (the "Note")
Due August 1, 2016

**US$ 1,215,000.00**                                                    **May 26, 2015**
                                                                        Piraeus, Greece

**NEWLEAD HOLDINGS LTD.**, a company organized under the laws of Bermuda (the "Company"), for value received, hereby promises to pay to **LABROY SHIPTRADE LIMITED**, of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands, or registered assigns (the "Holder"), the principal amount of US$ 1,215,000 (United States Dollars one million two hundred fifteen thousand) (the "Principal") on August 1, 2016, (the "Maturity Date"), together with interest of US$ 99,197.26 (United States Dollars ninety nine thousand one hu

ndred ninety seven and twenty six cents) accrued until the closing of May 25, 2015, and any other interest to be accrued from the date hereof on the unpaid Principal balance at a rate equal to ten percent (10%) per annum, computed daily and on the basis of the actual number of days elapsed and a year of 365 days (hereinafter the "Interest"). Any accrued and unpaid interest on the Note shall be due and payable on the Maturity Date.

This Note has been assigned to the Holder by Oppenheim & Co. Limited of 3rd Floor, NatWest House, Le Truchot, St. Peter Port, Guernsey, GY1 1WD, Channel Islands (hereinafter "OppCo"), as per relevant Notice of Assignment dated May 19, 2015.

1.    **Payments.**

(a)    (i) Anytime and upon demand of the Holder, the Company shall pay the Principal, the accrued interest or any other amount thereof including any True up amounts by issuance of its common shares (the **"Common Stock"**), at the Stock Price (as defined below.

(ii) Notwithstanding anything to the contrary herein any amount of the Note, including the Principal and any accrued interest thereon and any True up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder.

**Stock Price.** The number of shares of Common Stock shall be determined by dividing (i) the amount payable by, (ii) the Closing Price, as adjusted for any stock splits or stock dividends (the **"Stock Price"**). **"Closing Price"** means the closing price the trading date immediately prior to (but not including) the date of issuance of the shares, provided the Common Stock is then listed or quoted on the NASDAQ, OTC Bulletin Board or any other national securities exchange, market or trading or quotation facility (a **"Trading Market"**).

(ii)   From the date of execution of the Note and for a period of 5 years after the execution date of this Note (the **"Measurement Dates"**), at the date when either, (a) all Common Stock being issued to the Holder under l(a)(i) above, and/ or (b) all Common Stock being issued to the Holder under any True up Amounts (as defined herein below), are sold in full and the Holder is entitled to additional True up Amounts, the Company may elect to pay the additional True up Amounts by either (i) wire transfer of immediately available funds to an account designated in writing by the Holder, or (ii) issuance by the Company of its Common Stock at the Stock Price determined as of such date, or (iii) any combination thereof, at the sole option of the Company. The Holder will be entitled for as many additional True up Amounts are required to collect in total the Principal and any accrued interest in cash either by the sale of Common Stock or by cash receipts by the Company. Six (6) months prior the lapse of the five (5) year period the Holder is entitled to request for an extension of the true-up period for an additional three (3) years by providing a written notice to the Company.

**True up Amounts.** The True up Amounts are equal to the Principal less the Market Value (as defined below) of the shares issued or the cash paid as part of any payments prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days after the Measurement Dates.

**Market Value.** Market Value with respect to the shares issued as part of the Principal and/ or any accrued interest and/ or any amount thereof, means the aggregate gross proceeds received by the Holder from one or more sales, as evidenced by brokerage statements for such sales; *provided, however,* that if the sale price is not reasonably related to the trading price on the sale date, such

2

sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale.

(b)     **Termination of Rights under this Note**. Immediately upon the payment of the Principal together with its accrued interest and/ or any applicable True up Amount due under this Note, this Note shall no longer be deemed outstanding and all rights with respect to this Note shall immediately cease and terminate.

(c)     **Taxes or other Issuance Charges.** The issuance of any shares of Common Stock in payment of this Note, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(d)     **Holder Not a Stockholder.** The Holder shall not have, solely on account of such status as a holder of this Note, any rights of a stockholder of the Company, either at law or in equity, or any right to any notice of meetings of stockholders or of any other proceedings of the Company until such time as this Note has been paid in shares of Common Stock pursuant to Section l (a), at which time the Holder shall be deemed to be the holder of record of Common Stock that has been issued, as applicable, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(e)     **Fractional Shares.** No fractional shares of Common Stock shall be issued when paying this Note. In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up to the nearest whole share of Common Stock.

(f)     **Company Reserve.** The Company shall at its discretion reserve but always keep available out of its authorized but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, such number of Common Stock as shall from time to time be sufficient to effect the conversion of this Note and if at any time the number of authorized but unissued Common shares shall not be sufficient to effect the conversion of the Note, the Company will take such corporate action as may, in the

3

opinion of its counsel, be necessary to increase its authorized but unissued Common Shares to such number of shares as shall be sufficient for such purpose.

2.      **Trading Market Limitations.** Unless permitted by the applicable rules and regulations of the principal securities market on which the Common Stock is then listed or traded or quoted, in no event shall the Company issue upon conversion of or otherwise pursuant to this Note and the other Notes issued pursuant to the Exchange Agreement more than the maximum number of shares of Common Stock that the Company can issue pursuant to any rule of the principal United States securities market on which the Common Stock is then traded (the "**Maximum Share Amount**"), which shall be 4.99% of the total shares outstanding on the Closing Date, subject to equitable adjustment from time to time for stock splits, stock dividends, combinations, capital reorganizations and similar events relating to the Common Stock occurring after the date hereof.

3.      **Obligation of the Holder to Sell.** The Holder agrees and warrants that it shall sell up to twenty percent (20%) of the Monthly Dollar Volume (as defined herebelow) of the Company's Common Stock per month. "**Monthly Dollar Volume**" means a dollar amount of the Company's Common Stock which is traded or quoted in the US public markets in the relevant month in which it is calculated (not including the amount of any shares of the Company's Common Stock traded by the Holder).

4.      **Mortgage.** In consideration of the payment of the Note a Fourth Preferred Liberian Mortgage m.v. "NEWLEAD CASTELLANO" will be issued between NEWLEAD CASTELLANO LTD and the Holder (the "**Mortgage**"), pursuant to which "Events of Default" shall mean any events or circumstances set out in the relevant clause of the Note.

5.      **Assignability.** Assignability. Note shall be binding upon the Company and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns. The Holder may assign or transfer this Note to any transferee or have the shares that it converts under this Note sent to any third party. If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note registered as the Holder may request and the Company may accept, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note to the Holder representing the outstanding Principal not being transferred. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, following conversion or redemption of any portion of this Note, the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

6.      **Ranking.** The Company, for itself, its successors and assigns, covenants and agrees, that the payment of the Principal of this Note is senior in right of payment to the payment of all future

4

Junior Debt (as defined below). "**Junior Debt**" shall mean all future Indebtedness (as defined below), incurred after the date hereof. "Indebtedness" shall mean any liability of the Company for borrowed money, evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), including any given in connection with the acquisition of property, assets or service.

(a)      Until the payment in full of the Principal of this Note, and all other amounts owing under this Note, no payment may be made with respect to the Principal of or other amounts owing with respect to any Junior Debt, or in respect of any redemption, retirement, purchase or other acquisition thereof, provided that the Company may pay scheduled interest thereon so long as no Event of Default shall have occurred and be continuing.

(b)      Upon any payment or distribution of the assets of the Company to creditors upon dissolution, total or partial liquidation or reorganization of, or similar proceeding, the Holder of the Note will be entitled to receive payment in full before any holder of Junior Debt is entitled to receive any payment.

7.      **Events of Default**. The entire unpaid Principal of this Note and any True up Amounts and accrued interest or any other amounts due under the Note shall become and be immediately due and payable in cash, in either case without any other notice or demand of any kind or any presentment or protest, if any one of the following events occurs and be continuing at the time of such demand (each such event, an "**Event of Default**"):

(a)      The Company's failure to pay any portion of the Principal as provided in Section 1 hereof; or

(b)      (i) The commencement by the Company, or any subsidiary, of a voluntary case under 11 U.S.C. Section 101 *et. seq.* (the "**Bankruptcy Code**") or any foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or (ii) the consent by the Company, or any subsidiary, to the entry of an order for relief in an involuntary bankruptcy or similar case, or to the conversion of an involuntary case to a voluntary case, under any such law, or (iii) the consent by the Company, to the appointment of, or the taking of possession by, a receiver, trustee or other custodian for all or a substantial part of the Company's properties, or (iv) the making by the Company, of any assignment for the benefit of creditors, or (v) the discontinuance of business, dissolution, winding up, liquidation or cessation of existence by or of the Company; or

(c)      (i) The entry by a court of competent jurisdiction a decree or order for relief with respect to the Company, or any subsidiary, in an involuntary case under the Bankruptcy Code or any applicable foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in

effect, which decree or order is not stayed or dismissed within 60 days of the entry thereof, or (ii) the entry by a court of a decree or order for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other person having similar powers over the Company or over all or a substantial part of its properties;

or

(d)     The Company agrees that if it fails to timely make any payment due under this Note or upon the happening of any Event of Default, and fails to remedy the situation within a three (3) day grace period, the outstanding Principal, together with all other expenses, including, reasonable attorneys' fees, shall immediately become due and payable at the option of the Holder. For purposes hereof, attorneys' fees shall include, without limitation, fees and disbursements for legal services incurred by the holder hereof in collecting or enforcing payment hereof whether or not suit is brought, and if suit is brought, then through all appellate actions. From and after any Event of Default, the interest rate of this Note shall be the highest rate permitted under applicable law.

(e)     Beginning 15 days after the Issuance Date, the failure of any of the DWAC Eligible Conditions to be satisfied at any time thereafter during which the Company has obligations under this Note or the Company loses its status as "*__DTC Eligible__*"; or the Company's shareholders shall lose the ability to deposit (either electronically or by physical certificates, or otherwise) shares into the DTC System; or the Company shall become delinquent in its filing requirements as a fully reporting issuer registered with the SEC; or (x) the Company shall fail to meet all requirements to satisfy the availability of Rule 144 to the Holder or its assigns including but not limited to timely fulfillment of its filing requirements as a fully-reporting issuer registered with the SEC, requirements for XBRL filings, and requirements for disclosure of financial statements on its website

(f)     Withdrawal from registration of the Company under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), either voluntary or involuntary;

## 8.     Miscellaneous.

(a)     The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; *provided, however*, that neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party. Assignment of all or any portion of this Note in violation of this Section shall be null and void. Nothing in this Note, expressed or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b)     Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered as follows:

        If to the Company:

6

NEWLEAD HOLDINGS LTD.
83 Akti Miaouli & Flessa Street
185 38 Piraeus, Greece
Attn: MICHAIL S. ZOLOTAS, Chief Executive Officer

If to the Holder:
LABROY SHIPTRADE LIMITED
[•]

(c)     Upon receipt of evidence satisfactory to the Company, of the loss, theft, destruction or
mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the
Holder thereof that this Note has been lost, stolen, destroyed or mutilated, together with an
indemnity against any claim that may be made against the Company on account of such lost,
stolen, destroyed or mutilated Note, and upon reimbursement of the Company's reasonable
incidental expenses, the Company shall execute and deliver to the Holder a new Note of like date,
tenor and denomination.

(d)     No course of dealing and no delay or omission on the part of the Holder or the Company
in exercising any right or remedy shall operate as a waiver thereof or otherwise prejudice the
Holder's or the Company's rights, powers or remedies, as the case may be. No right, power or
remedy conferred by this Note upon the Holder or the Company shall be exclusive of any other
right, power or remedy referred to herein or now or hereafter available at law, in equity, by statute
or otherwise, and all such remedies may be exercised singly or concurrently. Any waiver must be
in writing.

(e)     If one or more provisions of this Note are held to be unenforceable under applicable law,
such provision shall be excluded from this Note and the balance of this Note shall be interpreted
as if such provision were so excluded and shall be enforceable in accordance with its terms. This
Note may be amended only by a written instrument executed by the Company and the Holder.
Any amendment shall be endorsed upon this Note, and all future Holders shall be bound thereby.

(f)     If any date specified in this Note as a date for the making of any payment of Principal or
interest under this Note falls on a Saturday, Sunday or on a day that is a legal holiday in the State
of New York and/ or Greece, then the date for the making of that payment shall be the next
subsequent day that is not a Saturday, Sunday or legal holiday.

(g)     This Note shall be governed by and construed in accordance with the laws of the New
York City, without giving effect to principles governing conflicts of law.

(h)     The Company hereby irrevocably submits to the exclusive jurisdiction of any United

7

States Federal court over any suit, action or proceeding arising out of or related to the Note. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; *provided* that service of process is effected upon the Company in the manner permitted by law.

(i)    The parties hereto agree that all monetary amounts set forth herein are referenced in United States dollars, unless otherwise stated.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the Company has caused this Unsecured Convertible Note to be executed and dated the day and year first above written.

**NEWLEAD HOLDINGS LTD.**

By: _____
Name: _____
Title: _____

**EXHIBIT "B"**

**FORM OF GUARANTEE AS EXECUTED**

(SEE ATTACHED)

DATE 14 September 2015

---

## NEWLEAD HOLDINGS LTD.
of Bermuda

-and-

## LABROY SHIPTRADE LIMITED
Of the Republic of the Marshall Islands

---

## ADDENDUM NO. 1

to

the Unsecured Convertible Note dated 26 May 2015
(Partial Replacement Note originally issued on August 1,2014)
in the amount of USD1,215,000 (United States Dollars one million two hundred fifteen
thousand)

---

This Addendum No.1 (hereinafter the "**Addendum**"), is made on 14 September 2015

**BETWEEN:**

(1) **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**");

-and-

(2) **LABROY SHIPTRADE LIMITED,** a company established under the laws of the Republic of the Marshall Islands with a registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called "**LABROY**" or the "**Holder**")

*(Jointly the Parties, singly the Party)*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note.*

**RECITALS**

**WHEREAS,** pursuant to a 10% Unsecured Convertible Note dated 26th May 2015 (Partial Replacement Note originally issued on August 1, 2014) issued to LABROY by the Company (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied, the "**Note**"), the Company promises to pay to LABROY the principal amount of USD 1,215,000 (United States Dollars one million two hundred fifteen thousand) under the terms and conditions set forth therein.

**WHEREAS,** the Maturity Date of the Note is 1 August 2016.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree as follows:

(a) The Maturity Date of the Note is deferred to 1 August 2018.

(b) All other provisions of the Note shall remain in full force and effect.

(c) This Addendum shall be governed by and construed by and interpreted in accordance with the internal laws of the state of New York.

**(SIGNATURE PAGE FOLLOWS)**

**IN WITNESS WHEREOF,** the Parties have hereunto set their hands and affixed their seals as of the day and year first above written.

**SIGNED** by:                                    )
M. ZOLOTAS                                        )
for and on behalf of:                             )
**NEWLEAD HOLDINGS LTD .**                        )
in the presence of:                               )


**SIGNED** by:                                    )
                                                  )
for and on behalf of:                             )
**LABROY SHIPTRADE LIMITED**                      )
in the presence of:                               )

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

RAY CAPITAL INC., OPPENHEIM          §
CAPITAL LTD, CHEYENNE               §
HOLDINGS LTD. AND LABROY            §
SHIPTRADE LIMITED                   §
                                    §
            PLAINTIFFS              §            C.A. NO. _____
V.                                  §
                                    §
M/V NEWLEAD CASTELLANO,             §
IMO NO. 9686338                     §
HER ENGINES, TACKLE,                §
EQUIPMENT, FURNITURE,               §
APPURTENANCES, ETC., *IN REM*,      §
AND                                 §
NEWLEAD CASTELLANO LTD.             §
                                    §
            DEFENDANTS              §

## VERIFIED COMPLAINT

EXHIBIT "5"

**DATED 26 June 2015**


**NEWLEAD CASTELLANO LTD**

**- to -**

**LABROY SHIPTRADE LIMITED**


---

**GUARANTEE AND INDEMNITY**

---




**STEPHENSON HARWOOD**

**CONTENTS**

Page

| 1 | Definitions and Interpretation | 1 |
|---|---|---|
| 2 | Representations and Warranties | 3 |
| 3 | Guarantee and Indemnity | 5 |
| 4 | Preservation of Guarantor's Liability | 6 |
| 5 | Preservation of Holder's Rights | 7 |
| 6 | Undertakings | 9 |
| 7 | Payments | 10 |
| 8 | Currency | 12 |
| 9 | Application of Moneys | 12 |
| 10 | Partial Invalidity | 13 |
| 11 | Further Assurance | 13 |
| 12 | Miscellaneous | 13 |
| 13 | Notices | 13 |
| 14 | Law and Jurisdiction | 15 |

**GUARANTEE AND INDEMNITY**

**Dated:** 26 **June 2015**

**BY:**

(1)    **NEWLEAD CASTELLANO LTD,** a company incorporated according to the law of the Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Guarantor")**

**IN FAVOUR OF:**

(2)    **LABROY SHIPTRADE LIMITED,** a corporation incorporated under the law of the Republic of the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the **"Holder").**

**WHEREAS:**

(A)    NewLead Holdings Ltd., a company incorporated according to the law of Bermuda whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece (the **"Company")** has issued and the Holder has accepted in consideration of payment by the Holder to the Company of the amount of an unsecured convertible note dated 26 May 2015, executed by the Company in favour the Holder (the **"Note"),** the outstanding amount of the debt being at the date hereof equal to one million two hundred and fifteen thousand Dollars ($1,215,000) principal amount plus interest accruing, as of the terms of the note (the **"Debt").**

(B)    The Guarantor is a wholly owned subsidiary of the Company.

(C)    As consideration for the Holder's agreement to accept the Note, the Company has agreed to procure that the Guarantor execute and deliver this Guarantee and Indemnity in favour of the Holder.

**THIS DEED WITNESSES** as follows:

**1      Definitions and Interpretation**

1.1    In this Guarantee and Indemnity:

        **"Business Day"** means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Piraeus and New York.

PIRAEUS\2665491.3

**"Dollars"** and **"$"** each means available and freely transferable and convertible funds in lawful currency of the United States of America.

**"Encumbrance"** means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**"Facility Period"** means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

**"Finance Documents"** means the Note, the Guarantor's Security Documents, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Holder and the Company.

**"GAAP"** means generally accepted accounting principles in IFRS.

**"Guarantor's Liabilities"** means all of the liabilities and obligations of the Guarantor to the Holder under or pursuant to this Guarantee and Indemnity, from time to time, whether in respect of principal, interest, costs or otherwise and whether present, future, actual or contingent.

**"Guarantor's Security Documents"** means this Guarantee and Indemnity and any and all documents which may at any time be executed by the Guarantor as security for the payment of all or any part of the Guarantor's Liabilities.

**"IFRS"** means International Financial Reporting Standards issued and/or adopted by the International Accounting Standards Board.

**"Indebtedness"** means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to the Holder under all or any of the Finance Documents.

**"Original Financial Statements"** means the audited consolidated financial statements of the Company for the financial year ended 31 December 2014.

**"Security Parties"** means the parties to any of the Finance Documents (other than the Holder).

1.2     Unless otherwise specified in this Guarantee and Indemnity, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Guarantee and Indemnity.

1.3     In this Guarantee and Indemnity:

    1.3.1   words denoting the plural number include the singular and vice versa;

    1.3.2   words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

    1.3.3   references to Clauses are references to clauses of this Guarantee and Indemnity;

    1.3.4   references to this Guarantee and Indemnity include the recitals to this Guarantee and Indemnity;

    1.3.5   the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Guarantee and Indemnity;

    1.3.6   references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

    1.3.7   references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted; and

    1.3.8   references to the Holder include its successors, transferees and assignees.

## 2    Representations and Warranties

The Guarantor represents and warrants to the Holder at the date of this Guarantee and Indemnity and (by reference to the facts and circumstances then pertaining) on each day throughout the Facility Period that:

2.1     all representations and warranties given by the Company in the Note in respect of the Guarantor are and will remain correct and none of them is or will become misleading; and

2.2     the Guarantor is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation and has the power to own its assets and to carry on its business as it is being conducted; and

2.3     the Guarantor has the power to enter into and perform the Guarantor's Security Documents and has taken all necessary action to authorise its entry into and performance of the Guarantor's Security Documents; and

2.4     the Guarantor is not insolvent or in liquidation or administration or subject to any other formal or informal insolvency procedure, and no receiver, administrative receiver, administrator, liquidator, trustee or analogous officer has been appointed in respect of the Guarantor or all or any part of its assets; and

2.5     this Guarantee and Indemnity constitutes legal, valid, binding and enforceable obligations of the Guarantor and each of the other Guarantor's Security Documents will, when executed and delivered by the Guarantor, constitute legal, valid, binding and enforceable obligations of the Guarantor; and

2.6     all consents, licences, approvals and authorisations of, or registrations with or declarations to, any governmental authority, bureau or agency which may be required in connection with the entry into, performance, validity or enforceability of the Guarantor's Security Documents have been obtained or made and remain in full force and effect and the Guarantor is not aware of any event or circumstance which could reasonably be expected adversely to affect the right of the Guarantor to hold and/or obtain renewal of any such consents, licences, approvals or authorisations; and

2.7     no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency which if adversely determined, might reasonably be expected to have a material adverse effect on the business or financial condition of the Guarantor have (to the best of the Guarantor's knowledge and belief) been started or threatened against the Guarantor; and

2.8     the entry into and performance of the Guarantor's Security Documents will not conflict with the constitutional documents of the Guarantor or any law or regulation or document applicable to, or binding on, the Guarantor or any of its assets; and

2.9     the Guarantor is not required to make any deduction or withholding from any payment which it may be obliged to make to the Holder under or pursuant to any of the Guarantor's Security Documents; and

2.10    It is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of any of the Guarantor's Security Documents that it be filed, recorded or enrolled with any court or other authority in any country or that any stamp, registration or similar tax be paid on or in relation to any of the Guarantor's Security Documents; and

2.11    the Guarantor is not in breach of, or default under, any agreement of any sort binding on it or on all or any part of its assets; and

2.12    the Guarantor is not aware of any material facts or circumstances which have not been disclosed to the Holder and which might, if disclosed, have adversely affected the decision of a person considering whether or not to make financial arrangments of the nature contemplated by the Note with the Company; and

2.13    the Guarantor has received a copy of the Note and approves of, and agrees to, the terms and conditions of the Note.

## 3    Guarantee and Indemnity

The Guarantor:

3.1    irrevocably and unconditionally guarantees the due and punctual observance and performance by the Company of all its obligations under the Finance Documents including, without limitation, the due and punctual payment of each and every part of the Indebtedness in accordance with the terms of the Finance Documents so that, if any of the Indebtedness is not paid when it is due and payable, whether on maturity or otherwise, the Guarantor will, immediately on demand, make such payment to the Holder in the manner specified by the Holder, together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment; and

3.2    agrees, as a separate and independent obligation, that, if any of the Indebtedness is not recoverable from the Guarantor under Clause 3.1 for any reason, the Guarantor will be liable as a principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable, and agrees to discharge its liability under this Clause 3.2 by making payment to the Holder immediately on demand together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment.

**4**     **Preservation of Guarantor's Liability**

4.1     This Guarantee and Indemnity is a continuing security for the full amount of the Indebtedness from time to time until the expiry of the Facility Period.

4.2     The Holder may without the Guarantor's consent and without notice to the Guarantor and without in any way releasing or reducing the Guarantor's Liabilities:

    4.2.1     amend, vary, novate, or replace any of the Finance Documents (other than the Guarantor's Security Documents); and/or

    4.2.2     agree with the Company to increase or reduce the amount of the Debt, or vary the terms and conditions for its repayment or prepayment (including, without limitation, the rate and/or method of calculation of interest payable on the Debt); and/or

    4.2.3     allow any time or other indulgence to any of the other Security Parties under or in connection with any of the Finance Documents; and/or

    4.2.4     renew, vary, release or refrain from enforcing any of the Finance Documents (other than the Guarantor's Security Documents); and/or

    4.2.5     compound with any of the other Security Parties; and/or

    4.2.6     enter into, renew, vary or terminate any other agreement or arrangement with any of the other Security Parties; and/or

    4.2.7     do or omit or neglect to do anything which might, but for this provision, operate to release or reduce the liability of the Guarantor under this Guarantee and Indemnity.

4.3     The Guarantor's Liabilities shall not be affected by:

    4.3.1     the absence of, or any defective, excessive or irregular exercise of, any of the powers of any of the other Security Parties; nor

    4.3.2     any security given or payment made to the Holder by any of the other Security Parties being avoided or reduced under any law (whether English or foreign) relating to bankruptcy or insolvency or analogous circumstance in force from time to time; nor

    4.3.3     any change in the constitution of the Guarantor or of any of the other Security Parties or of the Holder or the absorption of or amalgamation

by the Holder in or with any other entity or the acquisition of all or any part of the assets or undertaking of the Holder by any other entity; nor

4.3.4 the liquidation, administration, receivership, bankruptcy or insolvency of the Guarantor or any of the other Security Parties; nor

4.3.5 any of the Finance Documents (other than this Guarantee and Indemnity) being defective, void or unenforceable, or the failure of any other person to provide the Holder with any security, guarantee or indemnity envisaged by the Note; nor

4.3.6 any composition, assignment or arrangement being made by any of the other Security Parties with any of its creditors; nor

4.3.7 anything which would, but for this provision, have released or reduced the liability of the Guarantor to the Holder.

## 5   Preservation of Holder's Rights

5.1 This Guarantee and Indemnity is in addition to any other security, guarantee or indemnity now or in the future held by the Holder in respect of the Indebtedness, whether from the Company, the Guarantor or any other person, and shall not merge with, prejudice or be prejudiced by, any such security, guarantee or indemnity or any contractual or legal right of the Holder.

5.2 Any release, settlement, discharge or arrangement relating to the Guarantor's Liabilities shall be conditional on no payment, assurance or security received by the Holder in respect of the Indebtedness being avoided or reduced under any law (whether English or foreign) in force from time to time relating to bankruptcy, insolvency or any (in the opinion of the Holder) analogous circumstance, and, after any such avoidance or reduction, the Holder shall be entitled to exercise all of its rights, powers, discretions and remedies under or pursuant to the Guarantor's Security Documents and/or any other rights, powers, discretions or remedies which it would otherwise have been entitled to exercise, as if no release, settlement, discharge or arrangement had taken place.

5.3 Following the full payment of the Indebtedness, the Holder shall be entitled to retain the Guarantor's Security Documents until the Holder is satisfied in its discretion that it will not have to make any payment under any law referred to in Clause 5.2.

5.4 Until the expiry of the Facility Period the Guarantor shall not:

5.4.1   be entitled to participate in any sums received by the Holder in respect of any of the Indebtedness; nor

5.4.2   be entitled to participate in any security held by the Holder in respect of any of the Indebtedness nor stand in the place of, or be subrogated for, the Holder in respect of any such security; nor

5.4.3   take any step to enforce any claim against any of the other Security Parties (or their respective estates or effects), nor claim or exercise any right of set-off or counterclaim against any of the other Security Parties, nor make any claim in the bankruptcy or liquidation of any of the other Security Parties, in respect of any sums paid by the Guarantor to the Holder or in respect of any sum which includes the proceeds of realisation of any security held by the Holder under or pursuant to any of the Guarantor's Security Documents; nor

5.4.4   take any steps to enforce any other claim which it may have against any of the other Security Parties without the prior written consent of the Holder, and then only on such terms and subject to such conditions as the Holder may impose.

5.5   The Holder may, but shall not be obliged to, resort for its own benefit to any other means of payment at any time and in any order it thinks fit without releasing or reducing the Guarantor's Liabilities.

5.6   The Holder may enforce any of the Guarantor's Security Documents either before or after resorting to any other means of payment without entitling the Guarantor to any benefit from or share in any such other means of payment until the expiry of the Facility Period.

5.7   The Guarantor agrees that it is, and will throughout the Facility Period remain, a principal debtor in respect of the Guarantor's Liabilities.

5.8   No failure to exercise, nor any delay in exercising, on the part of the Holder, any right or remedy under the Guarantor's Security Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.  The rights and remedies provided in the Guarantor's Security Documents are cumulative and not exclusive of any rights or remedies provided by law.

**6**   **Undertakings**

6.1   The Guarantor shall pay to the Holder on demand on a full indemnity basis all costs and expenses incurred by the Holder in or about or incidental to the exercise by it of its rights under any of the Guarantor's Security Documents, together with twelve per cent (12%) interest on the amount demanded from the date of demand until the date of payment (being two per cent (2%) higher than the interest rate on the outstanding Debt agreed under the Note), both before and after judgment, which interest shall be compounded with the amount demanded at the end of such periods as the Holder may reasonably select.

6.2   The Guarantor has not taken, and will not take without the prior written consent of the Holder (and then only on such terms and subject to such conditions as the Holder may impose), any security from any of the other Security Parties in connection with this Guarantee and Indemnity, and any security taken by the Guarantor notwithstanding this Clause shall be held by the Guarantor in trust for the Holder absolutely as a continuing security for the Guarantor's Liabilities.

6.3   The Guarantor will observe and perform any and all covenants and undertakings in the Note whose observance and performance by the Guarantor the Company has undertaken to procure.

6.4   The Guarantor will not without the Holder's prior written consent:

6.4.1   create nor permit to arise any Encumbrance or other third party rights over any of its present or future assets or undertaking other than in favour of the Holder; nor

6.4.2   except in the ordinary course of business, incur any liability to any third party which is in the Holder's opinion of a substantial nature; nor

6.4.3   make any loan nor enter into any guarantee or indemnity nor otherwise voluntarily assume any actual or contingent liability in respect of any obligation of any other person; nor

6.4.4   permit any change in the legal or beneficial ownership of the Guarantor from that advised to the Holder at the date of this Guarantee and Indemnity.

6.5   The Company shall supply to the Holder as soon as the same become available, but in any event within 180 days after the end of each of its financial years, its audited financial statements for that financial year.   Each set of financial statements:

6.5.1    shall be certified by a director of the Guarantor as fairly representing its financial condition as at the date at which those financial statements were drawn up; and

6.5.2    shall be prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, the Guarantor Company notifies the Holder that there has been a change in GAAP, the accounting practices or reference periods and the Guarantor's Company's auditors deliver to the Holder:

(a)    a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared; and

(b)    sufficient information, in form and substance as may be reasonably required by the Holder, to enable the Holder to make an accurate comparison between the financial position indicated in those financial statements and that indicated in the Original Financial Statements.

6.6    The Company shall supply to the Holder:

6.6.1    all documents dispatched by the Company to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched; and

6.6.2    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any of the Security Parties and which might, if adversely determined, have a material adverse effect on the business or financial condition of any of the Security Parties; and

6.6.3    promptly, such further information regarding the financial condition, business and operations of any of the Security Parties as the Holder may reasonably request.

## 7    Payments

7.1    All amounts payable by the Guarantor under or pursuant to any of the Guarantor's Security Documents shall be paid to such accounts at such banks as the Holder may from time to time direct to the Guarantor in the relevant

currency in same day funds for immediate value. Payment shall be deemed to have been received on the date on which the Holder receives authenticated advice of receipt, unless that advice is received by the Holder on a day other than a Business Day or at a time of day (whether on a Business Day or not) when the Holder in its discretion considers that it is impossible or impracticable to utilise the amount received for value that same day, in which event the payment in question shall be deemed to have been received on the Business Day next following the date of receipt of advice by the Holder.

7.2    All payments to be made by the Guarantor pursuant to any of the Guarantor's Security Documents shall, subject only to Clause 7.3, be made free and clear of and without deduction for or on account of any taxes or other deductions, withholdings, restrictions, conditions, set-offs or counterclaims of any nature.

7.3    If at any time any law requires (or is interpreted to require) the Guarantor to make any deduction or withholding from any payment, or to change the rate or manner in which any required deduction or withholding is made, the Guarantor will promptly notify the Holder and, simultaneously with making that payment, will pay whatever additional amount (after taking into account any additional taxes on, or deductions or withholdings from, or restrictions or conditions on, that additional amount) is necessary to ensure that, after making the deduction or withholding, the Holder receives a net sum equal to the sum which it would have received had no deduction or withholding been made.

7.4    If at any time the Guarantor is required by law to make any deduction or withholding from any payment to be made by it pursuant to any of the Guarantor's Security Documents, the Guarantor will pay the amount required to be deducted or withheld to the relevant authority within the time allowed under the applicable law and will, no later than thirty days after making that payment, deliver to the Holder an original receipt issued by the relevant authority, or other evidence acceptable to the Holder, evidencing the payment to that authority of all amounts required to be deducted or withheld.

7.5    If the Guarantor pays any additional amount under Clause 7.3, and the Holder subsequently receives a refund or allowance from any tax authority which the Holder identifies as being referable to that increased amount so paid by the Guarantor, the Holder shall, as soon as reasonably practicable, pay to the Guarantor an amount equal to the amount of the refund or allowance received, if and to the extent that it may do so without prejudicing its right to retain that refund or allowance and without putting itself in any worse financial position than that in which it would have been had the relevant deduction or withholding not

been required to have been made. Nothing in this Clause 7.5 shall be interpreted as imposing any obligation on the Holder to apply for any refund or allowance nor as restricting in any way the manner in which the Holder organises its tax affairs, nor as imposing on the Holder any obligation to disclose to the Guarantor any information regarding its tax affairs or tax computations.

7.6 Any certificate or statement signed by an authorised signatory of the Holder purporting to show the amount of the Indebtedness or of the Guarantor's Liabilities (or any part of any of them) or any other amount referred to in any of the Finance Documents shall, save for manifest error or on any question of law, be conclusive evidence as against the Guarantor of that amount.

## 8    Currency

8.1 The Guarantor's liability under this Guarantee and Indemnity is to discharge the Indebtedness in the currency in which it is expressed to be payable (the **"Agreed Currency"**).

8.2 If at any time the Holder receives (including by way of set-off) any payment by or on behalf of the Guarantor in a currency other than the Agreed Currency, that payment shall take effect as a payment to the Holder of the amount in the Agreed Currency which the Holder is able to purchase (after deduction of any relevant costs) with the amount of the payment so received in accordance with its usual practice.

8.3 To the extent that any payment to the Holder (whether by the Guarantor or any other person and whether under any judgment or court order or otherwise) in a currency other than the Agreed Currency shall on actual conversion into the Agreed Currency fall short of the relevant amount of the Indebtedness expressed in the Agreed Currency, then the Guarantor as a separate and independent obligation will indemnify the Holder against the shortfall.

## 9    Application of Moneys

9.1 All sums which the Holder receives under or in connection with any of the Guarantor's Security Documents shall, unless otherwise agreed by the Holder or otherwise provided in the Notes, be applied by the Holder in or towards satisfaction, of the Guarantor's Liabilities, in such manner as may be deemed appropriate so as to eliminate the Debt of the Note.

**10    Partial Invalidity**

If, at any time, any provision of any of the Guarantor's Security Documents is or
becomes illegal, invalid or unenforceable in any respect under any law of any
jurisdiction, neither the legality, validity or enforceability of the remaining provisions
nor the legality, validity or enforceability of such provision under the law of any other
jurisdiction will in any way be affected or impaired.

**11    Further Assurance**

The Guarantor agrees that from time to time on the written request of the Holder it will
immediately execute and deliver to the Holder all further documents which the Holder
may require for the purpose of perfecting or protecting the security intended to be
created by the Guarantor's Security Documents.

**12    Miscellaneous**

12.1    All the covenants and agreements of the Guarantor in this Guarantee and
Indemnity shall bind the Guarantor and its successors and permitted assignees
and shall inure to the benefit of the Holder and its successors, transferees and
assignees.

12.2    The representations and warranties on the part of the Guarantor contained in
this Guarantee and Indemnity shall survive the execution of this Guarantee and
Indemnity.

12.3    No variation or amendment of this Guarantee and Indemnity shall be valid
unless in writing and signed on behalf of the Guarantor and the Holder.

12.4    A person who is not a party to this Guarantee and Indemnity has no right under
the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the
benefit of any term of this Guarantee and Indemnity.

**13    Notices**

13.1    **Communications in writing**   Any communication to be made under or in
connection with this Guarantee and Indemnity shall be made in writing and,
unless otherwise stated, may be made by fax or letter.

13.2    **Addresses** The address and fax number (and the department or officer, if any,
for whose attention the communication is to be made) of each party to this
Guarantee and Indemnity for any communication or document to be made or
delivered under or in connection with this Guarantee and Indemnity are:

13.2.1 In the case of the Guarantor, c/o NewLead Holdings Ltd., 83 Akti Miaouli & Fiessa, 185 38 Piraeus, Greece (fax no: +302130148019) marked for the attention of the Legal Department; and

13.2.2 In the case of the Holder, c/o Oppenheim Capital Ltd., 90 Kapodistriou Ave., N. Ionia, 14235, Athens, Greece (fax no: +30 210 275 4358) marked for the attention of Mr. Dimitrios Stavrianos,

or any substitute address, fax number, department or officer as either party may notify to the other by not less than five (5) Business Days' notice.

13.3 **Delivery**  Any communication or document made or delivered by one party to this Guarantee and Indemnity to the other under or in connection with this Guarantee and Indemnity will only be effective:

13.3.1 If by way of fax, when received in legible form; or

13.3.2 If by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause 13.2 (*Addresses*), if addressed to that department or officer.

Any communication or document to be made or delivered to the Holder will be effective only when actually received by the Holder.

Any communication or document which becomes effective, in accordance with this Clause 13.3, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

13.4 **English language**  Any notice given under or in connection with this Guarantee and Indemnity must be in English. All other documents provided under or in connection with this Guarantee and Indemnity must be:

13.4.1 in English; or

13.4.2 if not in English, and if so required by the Holder, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 14  Law and Jurisdiction

14.1 This Guarantee and Indemnity and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with English law.

14.2 For the exclusive benefit of the Holder, the Guarantor irrevocably agrees that the courts of England are to have exclusive jurisdiction to settle any dispute (a) arising from or in connection with this Guarantee and Indemnity or (b) relating to any non-contractual obligations arising from or in connection with this Guarantee and Indemnity and that any proceedings may be brought in those courts.

14.3 Nothing contained in this Clause shall limit the right of the Holder to commence any proceedings against the Guarantor in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Guarantor in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

14.4 The Guarantor irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

14.5 Without prejudice to any other mode of service allowed under any relevant law, the Guarantor:

14.5.1 irrevocably appoints Michael Livanos, 65 Rivington Crescent, Mill Hill, London, NW7 2LF, UK as its agent for service of process in relation to any proceedings before the English courts; and

14.5.2 agrees that failure by a process agent to notify the Guarantor of the process will not invalidate the proceedings concerned.

**IN WITNESS** of which this Guarantee and Indemnity has been duly executed and delivered as a deed the day and year first before written.

**SIGNED** and **DELIVERED**                )
as a **DEED**                                         )
by **NEWLEAD CASTELLANO LTD**    )
acting by Michail Livanos                     )
its duly authorised Attorney-in-fact    )
in the presence of: John Harry Webster )

DATED 16 October 2014

NEWLEAD CASTELLANO LTD

- to -

OPPENHEIM CAPITAL LTD

---

GUARANTEE AND INDEMNITY

---



**STEPHENSON HARWOOD**

## CONTENTS

Page

1   Definitions and Interpretation ....................................................................3

2   Representations and Warranties....................................................................5

3   Guarantee and Indemnity ...........................................................................6

4   Preservation of Guarantor's Liability............................................................7

5   Preservation of Holder's Rights ...................................................................8

6   Undertakings.............................................................................................10

7   Payments .................................................................................................12

8   Currency ..................................................................................................13

9   Set-Off .....................................................................................................14

10  Application of Moneys................................................................................14

11  Partial Invalidity .......................................................................................15

12  Further Assurance.....................................................................................15

13  Miscellaneous ..........................................................................................15

14  Notices.....................................................................................................15

15  Law and Jurisdiction .................................................................................15

**GUARANTEE AND INDEMNITY**

**Dated: 16 October 2014**

**BY:**

(1)     **NEWLEAD CASTELLANO LTD**, a company incorporated according to the law of the Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Guarantor"**)

**IN FAVOUR OF:**

(2)     **OPPENHEIM CAPITAL LTD.**, a corporation incorporated under the law of the Republic of the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the **"Holder"**).

**WHEREAS:**

(A)     NewLead Holdings Ltd., a company incorporated according to the law of Bermuda whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece (the **"Company"**) and the Holder have entered into a remuneration agreement dated 16 December 2013 pursuant to which the Company has agreed to pay to the Holder, as consideration for its services, a compensation fee of two million five hundred thousand Dollars ($2,500,000) in Company's common stock, which was settled with the issuance of 1,773,050 Company's shares on 16 December 2013 (the **"Success Shares"**).

(B)     The value of the Success Shares has dropped and the Holder has suffered a deficit of two million four hundred and ninety nine thousand nine hundred and fifty five Dollars and ninety eight cents ($2,499,955.98) (the **"Deficit"**).

(C)     To cover the Deficit, the Company has issued and the Holder has accepted an unsecured convertible note dated 4 August 2014 executed by the Company in favour the Holder (the **"Note"**) the outstanding amount of the debt being at the date hereof equal to two million five hundred and forty seven thousand nine hundred Dollars ($2,547,900) (the **"Debt"**).

(B)     As consideration for the Holder's agreement to accept the Note to cover the Deficit, the Company has agreed to procure that the Guarantor execute and deliver this Guarantee and Indemnity in favour of the Holder.

**THIS DEED WITNESSES** as follows:

1    **Definitions and Interpretation**

1.1    In this Guarantee and Indemnity:

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Piraeus and New York.

"**Dollars**" and "**$**" each means available and freely transferable and convertible funds in lawful currency of the United States of America.

"**Encumbrance**" means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Facility Period**" means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

"**Finance Documents**" means the Note, the Guarantor's Security Documents, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Holder and the Company.

"**GAAP**" means generally accepted accounting principles in IFRS.

"**Guarantor's Liabilities**" means all of the liabilities and obligations of the Guarantor to the Holder under or pursuant to this Guarantee and Indemnity, from time to time, whether in respect of principal, interest, costs or otherwise and whether present, future, actual or contingent.

"**Guarantor's Security Documents**" means this Guarantee and Indemnity and any and all documents which may at any time be executed by the Guarantor as security for the payment of all or any part of the Guarantor's Liabilities.

"**IFRS**" means International Financial Reporting Standards issued and/or adopted by the International Accounting Standards Board.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to the Holder under all or any of the Finance Documents.

"**Original Financial Statements**" means the audited consolidated financial statements of the Guarantor for the financial year ended 31 December 2013.

"**Security Parties**" means the parties to any of the Finance Documents (other than the Holder).

1.2   Unless otherwise specified in this Guarantee and Indemnity, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Guarantee and Indemnity.

1.3   In this Guarantee and Indemnity:

    1.3.1   words denoting the plural number include the singular and vice versa;

    1.3.2   words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

    1.3.3   references to Clauses are references to clauses of this Guarantee and Indemnity;

    1.3.4   references to this Guarantee and Indemnity include the recitals to this Guarantee and Indemnity;

    1.3.5   the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Guarantee and Indemnity;

    1.3.6   references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

    1.3.7   references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted; and

    1.3.8   references to the Holder include its successors, transferees and assignees.

**2      Representations and Warranties**

The Guarantor represents and warrants to the Holder at the date of this Guarantee and Indemnity and (by reference to the facts and circumstances then pertaining) on each day throughout the Facility Period that:

2.1     all representations and warranties given by the Company in the Note in respect of the Guarantor are and will remain correct and none of them is or will become misleading; and

2.2     the Guarantor is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation and has the power to own its assets and to carry on its business as it is being conducted; and

2.3     the Guarantor has the power to enter into and perform the Guarantor's Security Documents and has taken all necessary action to authorise its entry into and performance of the Guarantor's Security Documents; and

2.4     the Guarantor is not insolvent or in liquidation or administration or subject to any other formal or informal insolvency procedure, and no receiver, administrative receiver, administrator, liquidator, trustee or analogous officer has been appointed in respect of the Guarantor or all or any part of its assets; and

2.5     this Guarantee and Indemnity constitutes legal, valid, binding and enforceable obligations of the Guarantor and each of the other Guarantor's Security Documents will, when executed and delivered by the Guarantor, constitute legal, valid, binding and enforceable obligations of the Guarantor; and

2.6     all consents, licences, approvals and authorisations of, or registrations with or declarations to, any governmental authority, bureau or agency which may be required in connection with the entry into, performance, validity or enforceability of the Guarantor's Security Documents have been obtained or made and remain in full force and effect and the Guarantor is not aware of any event or circumstance which could reasonably be expected adversely to affect the right of the Guarantor to hold and/or obtain renewal of any such consents, licences, approvals or authorisations; and

2.7     no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency which if adversely determined, might reasonably be expected to have a material adverse effect on the business or financial condition

of the Guarantor have (to the best of the Guarantor's knowledge and belief) been started or threatened against the Guarantor; and

2.8     the entry into and performance of the Guarantor's Security Documents will not conflict with the constitutional documents of the Guarantor or any law or regulation or document applicable to, or binding on, the Guarantor or any of its assets; and

2.9     the Guarantor is not required to make any deduction or withholding from any payment which it may be obliged to make to the Holder under or pursuant to any of the Guarantor's Security Documents; and

2.10    It is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of any of the Guarantor's Security Documents that it be filed, recorded or enrolled with any court or other authority in any country or that any stamp, registration or similar tax be paid on or in relation to any of the Guarantor's Security Documents; and

2.11    the Guarantor is not in breach of, or default under, any agreement of any sort binding on it or on all or any part of its assets; and

2.12    the Guarantor is not aware of any material facts or circumstances which have not been disclosed to the Holder and which might, if disclosed, have adversely affected the decision of a person considering whether or not to make financial arrangments of the nature contemplated by the Note with the Company; and

2.13    the Guarantor has received a copy of the Note and approves of, and agrees to, the terms and conditions of the Note.

3      **Guarantee and Indemnity**

The Guarantor:

3.1     irrevocably and unconditionally guarantees the due and punctual observance and performance by the Company of all its obligations under the Finance Documents including, without limitation, the due and punctual payment of each and every part of the Indebtedness in accordance with the terms of the Finance Documents so that, if any of the Indebtedness is not paid when it is due and payable, whether on maturity or otherwise, the Guarantor will, immediately on demand, make such payment to the Holder in the manner specified by the Holder, together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment; and

3.2     agrees, as a separate and independent obligation, that, if any of the Indebtedness is not recoverable from the Guarantor under Clause 3.1 for any reason, the Guarantor will be liable as a principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable, and agrees to discharge its liability under this Clause 3.2 by making payment to the Holder immediately on demand together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment.

4       **Preservation of Guarantor's Liability**

4.1     This Guarantee and Indemnity is a continuing security for the full amount of the Indebtedness from time to time until the expiry of the Facility Period.

4.2     The Holder may without the Guarantor's consent and without notice to the Guarantor and without in any way releasing or reducing the Guarantor's Liabilities:

4.2.1   amend, vary, novate, or replace any of the Finance Documents (other than the Guarantor's Security Documents); and/or

4.2.2   agree with the Company to increase or reduce the amount of the Debt, or vary the terms and conditions for its repayment or prepayment (including, without limitation, the rate and/or method of calculation of interest payable on the Debt); and/or

4.2.3   allow any time or other indulgence to any of the other Security Parties under or in connection with any of the Finance Documents; and/or

4.2.4   renew, vary, release or refrain from enforcing any of the Finance Documents (other than the Guarantor's Security Documents); and/or

4.2.5   compound with any of the other Security Parties; and/or

4.2.6   enter into, renew, vary or terminate any other agreement or arrangement with any of the other Security Parties; and/or

4.2.7   do or omit or neglect to do anything which might, but for this provision, operate to release or reduce the liability of the Guarantor under this Guarantee and Indemnity.

4.3     The Guarantor's Liabilities shall not be affected by:

4.3.1   the absence of, or any defective, excessive or irregular exercise of, any of the powers of any of the other Security Parties; nor

4.3.2   any security given or payment made to the Holder by any of the other Security Parties being avoided or reduced under any law (whether English or foreign) relating to bankruptcy or insolvency or analogous circumstance in force from time to time; nor

4.3.3   any change in the constitution of the Guarantor or of any of the other Security Parties or of the Holder or the absorption of or amalgamation by the Holder in or with any other entity or the acquisition of all or any part of the assets or undertaking of the Holder by any other entity; nor

4.3.4   the liquidation, administration, receivership, bankruptcy or insolvency of the Guarantor or any of the other Security Parties; nor

4.3.5   any of the Finance Documents (other than this Guarantee and Indemnity) being defective, void or unenforceable, or the failure of any other person to provide the Holder with any security, guarantee or indemnity envisaged by the Note; nor

4.3.6   any composition, assignment or arrangement being made by any of the other Security Parties·with any of its creditors; nor

4.3.7   anything which would, but for this provision, have released or reduced the liability of the Guarantor to the Holder.

## 5   Preservation of Holder's Rights

5.1   This Guarantee and Indemnity is in addition to any other security, guarantee or indemnity now or in the future held by the Holder in respect of the Indebtedness, whether from the Company, the Guarantor or any other person, and shall not merge with, prejudice or be prejudiced by, any such security, guarantee or indemnity or any contractual or legal right of the Holder.

5.2   Any release, settlement, discharge or arrangement relating to the Guarantor's Liabilities shall be conditional on no payment, assurance or security received by the Holder in respect of the Indebtedness being avoided or reduced under any law (whether English or foreign) in force from time to time relating to bankruptcy, insolvency or any (in the opinion of the Holder) analogous circumstance, and, after any such avoidance or reduction, the Holder shall be entitled to exercise all of its rights, powers, discretions and remedies under or pursuant to the Guarantor's Security Documents and/or any other rights,

powers, discretions or remedies which it would otherwise have been entitled to exercise, as if no release, settlement, discharge or arrangement had taken place.

5.3 Following the full payment of the Indebtedness, the Holder shall be entitled to retain the Guarantor's Security Documents until the Holder is satisfied in its discretion that it will not have to make any payment under any law referred to in Clause 5.2.

5.4 Until the expiry of the Facility Period the Guarantor shall not:

5.4.1 be entitled to participate in any sums received by the Holder in respect of any of the Indebtedness; nor

5.4.2 be entitled to participate in any security held by the Holder in respect of any of the Indebtedness nor stand in the place of, or be subrogated for, the Holder in respect of any such security; nor

5.4.3 take any step to enforce any claim against any of the other Security Parties (or their respective estates or effects), nor claim or exercise any right of set-off or counterclaim against any of the other Security Parties, nor make any claim in the bankruptcy or liquidation of any of the other Security Parties, in respect of any sums paid by the Guarantor to the Holder or in respect of any sum which includes the proceeds of realisation of any security held by the Holder under or pursuant to any of the Guarantor's Security Documents; nor

5.4.4 take any steps to enforce any other claim which it may have against any of the other Security Parties without the prior written consent of the Holder, and then only on such terms and subject to such conditions as the Holder may impose.

5.5 The Holder may, but shall not be obliged to, resort for its own benefit to any other means of payment at any time and in any order it thinks fit without releasing or reducing the Guarantor's Liabilities.

5.6 The Holder may enforce any of the Guarantor's Security Documents either before or after resorting to any other means of payment without entitling the Guarantor to any benefit from or share in any such other means of payment until the expiry of the Facility Period.

5.7 The Guarantor agrees that it is, and will throughout the Facility Period remain, a principal debtor in respect of the Guarantor's Liabilities.

5.8     No failure to exercise, nor any delay in exercising, on the part of the Holder, any right or remedy under the Guarantor's Security Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Guarantor's Security Documents are cumulative and not exclusive of any rights or remedies provided by law.

## 6     Undertakings

6.1     The Guarantor shall pay to the Holder on demand on a full indemnity basis all costs and expenses incurred by the Holder in or about or incidental to the exercise by it of its rights under any of the Guarantor's Security Documents, together with twelve per cent (12%) interest on the amount demanded from the date of demand until the date of payment (being two per cent (2%) higher than the interest rate on the outstanding Debt agreed under the Note), both before and after judgment, which interest shall be compounded with the amount demanded at the end of such periods as the Holder may reasonably select.

6.2     The Guarantor has not taken, and will not take without the prior written consent of the Holder (and then only on such terms and subject to such conditions as the Holder may impose), any security from any of the other Security Parties in connection with this Guarantee and Indemnity, and any security taken by the Guarantor notwithstanding this Clause shall be held by the Guarantor in trust for the Holder absolutely as a continuing security for the Guarantor's Liabilities.

6.3     The Guarantor will observe and perform any and all covenants and undertakings in the Note whose observance and performance by the Guarantor the Company has undertaken to procure.

6.4     The Guarantor will not without the Holder's prior written consent:

6.4.1     create nor permit to arise any Encumbrance or other third party rights over any of its present or future assets or undertaking other than in favour of the Holder; nor

6.4.2     except in the ordinary course of business, incur any liability to any third party which is in the Holder's opinion of a substantial nature; nor

6.4.3     make any loan nor enter into any guarantee or indemnity nor otherwise voluntarily assume any actual or contingent liability in respect of any obligation of any other person; nor

6.4.4    permit any change in the legal or beneficial ownership of the Guarantor from that advised to the Holder at the date of this Guarantee and Indemnity.

6.5    The Guarantor shall supply to the Holder as soon as the same become available, but in any event within 180 days after the end of each of its financial years, its audited financial statements for that financial year.   Each set of financial statements:

6.6    shall be certified by a director of the Guarantor as fairly representing its financial condition as at the date at which those financial statements were drawn up; and

6.7    shall be prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, the Guarantor notifies the Holder that there has been a change in GAAP, the accounting practices or reference periods and the Guarantor's auditors deliver to the Holder:

(a)    a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared; and

(b)    sufficient information, in form and substance as may be reasonably required by the Holder, to enable the Holder to make an accurate comparison between the financial position indicated in those financial statements and that indicated in the Original Financial Statements.

6.8    The Guarantor shall supply to the Holder:

6.8.1    all documents dispatched by the Guarantor to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched; and

6.8.2    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any of the Security Parties and which might, if adversely determined, have a material adverse effect on the business or financial condition of any of the Security Parties; and

      6.8.3    promptly, such further information regarding the financial condition, business and operations of any of the Security Parties as the Holder may reasonably request.

## 7    Payments

7.1    All amounts payable by the Guarantor under or pursuant to any of the Guarantor's Security Documents shall be paid to such accounts at such banks as the Holder may from time to time direct to the Guarantor in the relevant currency in same day funds for immediate value. Payment shall be deemed to have been received on the date on which the Holder receives authenticated advice of receipt, unless that advice is received by the Holder on a day other than a Business Day or at a time of day (whether on a Business Day or not) when the Holder in its discretion considers that it is impossible or impracticable to utilise the amount received for value that same day, in which event the payment in question shall be deemed to have been received on the Business Day next following the date of receipt of advice by the Holder.

7.2    All payments to be made by the Guarantor pursuant to any of the Guarantor's Security Documents shall, subject only to Clause 7.3, be made free and clear of and without deduction for or on account of any taxes or other deductions, withholdings, restrictions, conditions, set-offs or counterclaims of any nature.

7.3    If at any time any law requires (or is interpreted to require) the Guarantor to make any deduction or withholding from any payment, or to change the rate or manner in which any required deduction or withholding is made, the Guarantor will promptly notify the Holder and, simultaneously with making that payment, will pay whatever additional amount (after taking into account any additional taxes on, or deductions or withholdings from, or restrictions or conditions on, that additional amount) is necessary to ensure that, after making the deduction or withholding, the Holder receives a net sum equal to the sum which it would have received had no deduction or withholding been made.

7.4    If at any time the Guarantor is required by law to make any deduction or withholding from any payment to be made by it pursuant to any of the Guarantor's Security Documents, the Guarantor will pay the amount required to be deducted or withheld to the relevant authority within the time allowed under the applicable law and will, no later than thirty days after making that payment, deliver to the Holder an original receipt issued by the relevant authority, or other evidence acceptable to the Holder, evidencing the payment to that authority of all amounts required to be deducted or withheld.

7.5    If the Guarantor pays any additional amount under Clause 7.3, and the Holder subsequently receives a refund or allowance from any tax authority which the Holder identifies as being referable to that increased amount so paid by the Guarantor, the Holder shall, as soon as reasonably practicable, pay to the Guarantor an amount equal to the amount of the refund or allowance received, if and to the extent that it may do so without prejudicing its right to retain that refund or allowance and without putting itself in any worse financial position than that in which it would have been had the relevant deduction or withholding not been required to have been made. Nothing in this Clause 7.5 shall be interpreted as imposing any obligation on the Holder to apply for any refund or allowance nor as restricting in any way the manner in which the Holder organises its tax affairs, nor as imposing on the Holder any obligation to disclose to the Guarantor any information regarding its tax affairs or tax computations.

7.6    Any certificate or statement signed by an authorised signatory of the Holder purporting to show the amount of the Indebtedness or of the Guarantor's Liabilities (or any part of any of them) or any other amount referred to in any of the Finance Documents shall, save for manifest error or on any question of law, be conclusive evidence as against the Guarantor of that amount.

## 8    Currency

8.1    The Guarantor's liability under this Guarantee and Indemnity is to discharge the Indebtedness in the currency in which it is expressed to be payable (the **"Agreed Currency"**).

8.2    If at any time the Holder receives (including by way of set-off) any payment by or on behalf of the Guarantor in a currency other than the Agreed Currency, that payment shall take effect as a payment to the Holder of the amount in the Agreed Currency which the Holder is able to purchase (after deduction of any relevant costs) with the amount of the payment so received in accordance with its usual practice.

8.3    To the extent that any payment to the Holder (whether by the Guarantor or any other person and whether under any judgment or court order or otherwise) in a currency other than the Agreed Currency shall on actual conversion into the Agreed Currency fall short of the relevant amount of the Indebtedness expressed in the Agreed Currency, then the Guarantor as a separate and independent obligation will indemnify the Holder against the shortfall.

9    **Set-Off**

9.1    The Guarantor irrevocably authorises the Holder at any time to set off without
notice any sums then due and payable by the Guarantor to the Holder under
this Guarantee and Indemnity (irrespective of the branch or office, currency or
place of payment) against any credit balance from time to time standing on any
account of the Guarantor (whether current or otherwise, whether or not subject
to notice and whether or not that credit balance is then due to the Guarantor)
with any branch of the Holder in or towards satisfaction of the Guarantor's
Liabilities and, in the name of the Holder or the Guarantor, to do all acts
(including, without limitation, purchasing or converting or exchanging any
currency) which may be required to effect such set-off.

9.2    Despite any term to the contrary in relation to any deposit or credit balance at
any time on any account of the Guarantor with the Holder, no such deposit or
credit balance shall be repayable or capable of being assigned, mortgaged,
charged or otherwise disposed of or dealt with by the Guarantor until the
Guarantor's Liabilities have been discharged in full, but the Holder may from
time to time permit the withdrawal of all or any part of any such deposit or
balance without affecting the continued application of this Clause.

10    **Application of Moneys**

10.1    All sums which the Holder receives under or in connection with any of the
Guarantor's Security Documents shall, unless otherwise agreed by the Holder or
otherwise provided in the Notes, be applied by the Holder in or towards
satisfaction, or by way of retention on account, of the Guarantor's Liabilities, in
such manner as the Holder may in its discretion determine.

10.2    The Holder may place any money received by it under or in connection with any
of the Guarantor's Security Documents to the credit of a suspense account on
such terms and subject to such conditions as the Holder may in its discretion
determine for so long as the Holder thinks fit without any obligation in the
meantime to apply that money in or towards discharge of the Indebtedness,
and, despite such payment, the Holder may claim against any of the other
Security Parties or prove in the bankruptcy, liquidation or insolvency of any of
the other Security Parties for the whole of the Indebtedness at the date of the
Holder's demand for payment pursuant to this Guarantee and Indemnity,
together with all interest, commission, charges and expenses accruing
subsequently.

11    **Partial Invalidity**

If, at any time, any provision of any of the Guarantor's Security Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

12    **Further Assurance**

The Guarantor agrees that from time to time on the written request of the Holder it will immediately execute and deliver to the Holder all further documents which the Holder may require for the purpose of perfecting or protecting the security intended to be created by the Guarantor's Security Documents.

13    **Miscellaneous**

13.1    All the covenants and agreements of the Guarantor in this Guarantee and Indemnity shall bind the Guarantor and its successors and permitted assignees and shall inure to the benefit of the Holder and its successors, transferees and assignees.

13.2    The representations and warranties on the part of the Guarantor contained in this Guarantee and Indemnity shall survive the execution of this Guarantee and Indemnity.

13.3    No variation or amendment of this Guarantee and Indemnity shall be valid unless in writing and signed on behalf of the Guarantor and the Holder.

13.4    A person who is not a party to this Guarantee and Indemnity has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Guarantee and Indemnity.

14    **Notices**

14.1    **Communications in writing**    Any communication to be made under or in connection with this Guarantee and Indemnity shall be made in writing and, unless otherwise stated, may be made by fax or letter.

14.2    **Addresses** The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Guarantee and Indemnity for any communication or document to be made or delivered under or in connection with this Guarantee and Indemnity are:

14.2.1 in the case of the Guarantor, c/o NewLead Holdings Ltd., 83 Akti Miaouli & Flessa, 185 38 Piraeus, Greece (fax no: +302130148039) marked for the attention of the Legal Department; and

14.2.2 in the case of the Holder, c/o Oppenheim Capital Ltd., 90 Kapodistriou Ave., N. Ionia, 14235, Athens, Greece (fax no: +30 210 275 4358) marked for the attention of Mr. Dimitrios Stavrianos,

or any substitute address, fax number, department or officer as either party may notify to the other by not less than five (5) Business Days' notice.

14.3 **Delivery**   Any communication or document made or delivered by one party to this Guarantee and Indemnity to the other under or in connection with this Guarantee and Indemnity will only be effective:

14.3.1 if by way of fax, when received in legible form; or

14.3.2 if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause ~~Error! Reference source not found.~~ *14.2* (*Addresses*), if addressed to that department or officer.

Any communication or document to be made or delivered to the Holder will be effective only when actually received by the Holder.

Any communication or document which becomes effective, in accordance with this Clause ~~Error! Reference source not found.,~~ *14.3* after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

14.4 **English language**   Any notice given under or in connection with this Guarantee and Indemnity must be in English. All other documents provided under or in connection with this Guarantee and Indemnity must be:

14.4.1 in English; or

14.4.2 if not in English, and if so required by the Holder, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

15   **Law and Jurisdiction**

15.1   This Guarantee and Indemnity and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with English law.

15.2   For the exclusive benefit of the Holder, the Guarantor irrevocably agrees that the courts of England are to have exclusive jurisdiction to settle any dispute (a) arising from or in connection with this Guarantee and Indemnity or (b) relating to any non-contractual obligations arising from or in connection with this Guarantee and Indemnity and that any proceedings may be brought in those courts.

15.3   Nothing contained in this Clause shall limit the right of the Holder to commence any proceedings against the Guarantor in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Guarantor in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

15.4   The Guarantor irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

15.5   Without prejudice to any other mode of service allowed under any relevant law, the Guarantor:

15.5.1   Irrevocably appoints Holman ~~Fenwick Willan International LLP,~~ Nominees Limited Friary Court, 65 Crutched Friars, London, EC3N 2AE as its agent for service of process in relation to any proceedings before the English courts; and

15.5.2   agrees that failure by a process agent to notify the Guarantor of the process will not invalidate the proceedings concerned.

**IN WITNESS** of which this Guarantee and Indemnity has been duly executed and delivered as a deed the day and year first before written.

**SIGNED** and **DELIVERED** )
as a **DEED** )
by **NEWLEAD CASTELLANO LTD** )
acting by MICHAIL  LIVANOS )
its duly authorised attorney in a -fact )
in the presence of: )

Antwella Monolis

STE HENSON HARWOOD LLP
ASTON BUILDING
t - LINON STR.& AKTI MIAOULI
PIRAEUS 185 36
VAT. NO. 9 9 8 7 1 1 1 5 6
TEL. 210 42 95 160

**<u>DATED 16 October 2014</u>**

**NEWLEAD CASTELLANO LTD**

**- to -**

**CHEYENNE HOLDING LTD.**

---

**GUARANTEE AND INDEMNITY**

---



**STEPHENSON HARWOOD**

\PIRAEUS\2532520.2

## CONTENTS

**Page**

1   Definitions and Interpretation ..............................................................................2

2   Representations and Warranties..........................................................................4

3   Guarantee and Indemnity ...................................................................................6

4   Preservation of Guarantor's Liability...................................................................6

5   Preservation of Holder's Rights ..........................................................................8

6   Undertakings.......................................................................................................9

7   Payments ..........................................................................................................11

8   Currency ...........................................................................................................13

9   Set-Off...............................................................................................................13

10  Application of Moneys.......................................................................................14

11  Partial Invalidity ...............................................................................................14

12  Further Assurance............................................................................................14

13  Miscellaneous ..................................................................................................15

14  Notices..............................................................................................................15

15  Law and Jurisdiction ........................................................................................15

**GUARANTEE AND INDEMNITY**

**Dated: 16 October 2014**

**BY:**

(1)   **NEWLEAD CASTELLANO LTD,** a company incorporated according to the law of the Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Guarantor"**)

**IN FAVOUR OF:**

(2)   **CHEYENNE HOLDING LTD.,** a corporation incorporated under the law of the Republic of the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the **"Holder"**).

**WHEREAS:**

(A)   NewLead Holdings Ltd., a company incorporated according to the law of Bermuda whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece (the **"Company"**) has issued and the Holder has accepted, in consideration of payment by the Holder of the amount of one million two hundred and fifty thousand Dollars ($1,250,000), an unsecured convertible note dated 12 September 2014, executed by the Company in favour the Holder (the **"Note"**), the outstanding amount of the debt being at the date hereof equal to one million nine thousand three hundred and fifteen Dollars ($1,009,315) (the **"Debt"**).

(B)   As consideration for the Holder's agreement to accept the Note, the Company has agreed to procure that the Guarantor execute and deliver this Guarantee and Indemnity in favour of the Holder.

**THIS DEED WITNESSES** as follows:

1     **Definitions and Interpretation**

1.1   In this Guarantee and Indemnity:

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Piraeus and New York.

"**Dollars**" and "**$**" each means available and freely transferable and convertible funds in lawful currency of the United States of America.

"**Encumbrance**" means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Facility Period**" means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

"**Finance Documents**" means the Note, the Guarantor's Security Documents, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Holder and the Company.

"**GAAP**" means generally accepted accounting principles in IFRS.

"**Guarantor's Liabilities**" means all of the liabilities and obligations of the Guarantor to the Holder under or pursuant to this Guarantee and Indemnity, from time to time, whether in respect of principal, interest, costs or otherwise and whether present, future, actual or contingent.

"**Guarantor's Security Documents**" means this Guarantee and Indemnity and any and all documents which may at any time be executed by the Guarantor as security for the payment of all or any part of the Guarantor's Liabilities.

"**IFRS**" means International Financial Reporting Standards issued and/or adopted by the International Accounting Standards Board.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to the Holder under all or any of the Finance Documents.

"**Original Financial Statements**" means the audited consolidated financial statements of the Guarantor for the financial year ended 31 December 2013.

"**Security Parties**" means the parties to any of the Finance Documents (other than the Holder).

1.2     Unless otherwise specified in this Guarantee and Indemnity, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Guarantee and Indemnity.

1.3     In this Guarantee and Indemnity:

    1.3.1    words denoting the plural number include the singular and vice versa;

    1.3.2    words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

    1.3.3    references to Clauses are references to clauses of this Guarantee and Indemnity;

    1.3.4    references to this Guarantee and Indemnity include the recitals to this Guarantee and Indemnity;

    1.3.5    the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Guarantee and Indemnity;

    1.3.6    references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

    1.3.7    references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted; and

    1.3.8    references to the Holder include its successors, transferees and assignees.

## 2   Representations and Warranties

The Guarantor represents and warrants to the Holder at the date of this Guarantee and Indemnity and (by reference to the facts and circumstances then pertaining) on each day throughout the Facility Period that:

2.1     all representations and warranties given by the Company in the Note in respect of the Guarantor are and will remain correct and none of them is or will become misleading; and

2.2     the Guarantor is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation and has the power to own its assets and to carry on its business as it is being conducted; and

2.3     the Guarantor has the power to enter into and perform the Guarantor's Security Documents and has taken all necessary action to authorise its entry into and performance of the Guarantor's Security Documents; and

2.4     the Guarantor is not insolvent or in liquidation or administration or subject to any other formal or informal insolvency procedure, and no receiver, administrative receiver, administrator, liquidator, trustee or analogous officer has been appointed in respect of the Guarantor or all or any part of its assets; and

2.5     this Guarantee and Indemnity constitutes legal, valid, binding and enforceable obligations of the Guarantor and each of the other Guarantor's Security Documents will, when executed and delivered by the Guarantor, constitute legal, valid, binding and enforceable obligations of the Guarantor; and

2.6     all consents, licences, approvals and authorisations of, or registrations with or declarations to, any governmental authority, bureau or agency which may be required in connection with the entry into, performance, validity or enforceability of the Guarantor's Security Documents have been obtained or made and remain in full force and effect and the Guarantor is not aware of any event or circumstance which could reasonably be expected adversely to affect the right of the Guarantor to hold and/or obtain renewal of any such consents, licences, approvals or authorisations; and

2.7     no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency which if adversely determined, might reasonably be expected to have a material adverse effect on the business or financial condition of the Guarantor have (to the best of the Guarantor's knowledge and belief) been started or threatened against the Guarantor; and

2.8     the entry into and performance of the Guarantor's Security Documents will not conflict with the constitutional documents of the Guarantor or any law or regulation or document applicable to, or binding on, the Guarantor or any of its assets; and

2.9     the Guarantor is not required to make any deduction or withholding from any payment which it may be obliged to make to the Holder under or pursuant to any of the Guarantor's Security Documents; and

2.10    it is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of any of the Guarantor's Security Documents that it be filed, recorded or enrolled with any court or other authority in any country or that any

stamp, registration or similar tax be paid on or in relation to any of the Guarantor's Security Documents; and

2.11    the Guarantor is not in breach of, or default under, any agreement of any sort binding on it or on all or any part of its assets; and

2.12    the Guarantor is not aware of any material facts or circumstances which have not been disclosed to the Holder and which might, if disclosed, have adversely affected the decision of a person considering whether or not to make financial arrangments of the nature contemplated by the Note with the Company; and

2.13    the Guarantor has received a copy of the Note and approves of, and agrees to, the terms and conditions of the Note.

3       **Guarantee and Indemnity**

The Guarantor:

3.1     irrevocably and unconditionally guarantees the due and punctual observance and performance by the Company of all its obligations under the Finance Documents including, without limitation, the due and punctual payment of each and every part of the Indebtedness in accordance with the terms of the Finance Documents so that, if any of the Indebtedness is not paid when it is due and payable, whether on maturity or otherwise, the Guarantor will, immediately on demand, make such payment to the Holder in the manner specified by the Holder, together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment; and

3.2     agrees, as a separate and independent obligation, that, if any of the Indebtedness is not recoverable from the Guarantor under Clause 3.1 for any reason, the Guarantor will be liable as a principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable, and agrees to discharge its liability under this Clause 3.2 by making payment to the Holder immediately on demand together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment.

4       **Preservation of Guarantor's Liability**

4.1     This Guarantee and Indemnity is a continuing security for the full amount of the Indebtedness from time to time until the expiry of the Facility Period.

4.2     The Holder may without the Guarantor's consent and without notice to the Guarantor and without in any way releasing or reducing the Guarantor's Liabilities:

    4.2.1    amend, vary, novate, or replace any of the Finance Documents (other than the Guarantor's Security Documents); and/or

    4.2.2    agree with the Company to increase or reduce the amount of the Debt, or vary the terms and conditions for its repayment or prepayment (including, without limitation, the rate and/or method of calculation of interest payable on the Debt); and/or

    4.2.3    allow any time or other indulgence to any of the other Security Parties under or in connection with any of the Finance Documents; and/or

    4.2.4    renew, vary, release or refrain from enforcing any of the Finance Documents (other than the Guarantor's Security Documents); and/or

    4.2.5    compound with any of the other Security Parties; and/or

    4.2.6    enter into, renew, vary or terminate any other agreement or arrangement with any of the other Security Parties; and/or

    4.2.7    do or omit or neglect to do anything which might, but for this provision, operate to release or reduce the liability of the Guarantor under this Guarantee and Indemnity.

4.3     The Guarantor's Liabilities shall not be affected by:

    4.3.1    the absence of, or any defective, excessive or irregular exercise of, any of the powers of any of the other Security Parties; nor

    4.3.2    any security given or payment made to the Holder by any of the other Security Parties being avoided or reduced under any law (whether English or foreign) relating to bankruptcy or insolvency or analogous circumstance in force from time to time; nor

    4.3.3    any change in the constitution of the Guarantor or of any of the other Security Parties or of the Holder or the absorption of or amalgamation by the Holder in or with any other entity or the acquisition of all or any part of the assets or undertaking of the Holder by any other entity; nor

    4.3.4    the liquidation, administration, receivership, bankruptcy or insolvency of the Guarantor or any of the other Security Parties; nor

4.3.5    any of the Finance Documents (other than this Guarantee and Indemnity) being defective, void or unenforceable, or the failure of any other person to provide the Holder with any security, guarantee or indemnity envisaged by the Note; nor

4.3.6    any composition, assignment or arrangement being made by any of the other Security Parties with any of its creditors; nor

4.3.7    anything which would, but for this provision, have released or reduced the liability of the Guarantor to the Holder.

5        **Preservation of Holder's Rights**

5.1      This Guarantee and Indemnity is in addition to any other security, guarantee or indemnity now or in the future held by the Holder in respect of the Indebtedness, whether from the Company, the Guarantor or any other person, and shall not merge with, prejudice or be prejudiced by, any such security, guarantee or indemnity or any contractual or legal right of the Holder.

5.2      Any release, settlement, discharge or arrangement relating to the Guarantor's Liabilities shall be conditional on no payment, assurance or security received by the Holder in respect of the Indebtedness being avoided or reduced under any law (whether English or foreign) in force from time to time relating to bankruptcy, insolvency or any (in the opinion of the Holder) analogous circumstance, and, after any such avoidance or reduction, the Holder shall be entitled to exercise all of its rights, powers, discretions and remedies under or pursuant to the Guarantor's Security Documents and/or any other rights, powers, discretions or remedies which it would otherwise have been entitled to exercise, as if no release, settlement, discharge or arrangement had taken place.

5.3      Following the full payment of the Indebtedness, the Holder shall be entitled to retain the Guarantor's Security Documents until the Holder is satisfied in its discretion that it will not have to make any payment under any law referred to in Clause 5.2.

5.4      Until the expiry of the Facility Period the Guarantor shall not:

5.4.1    be entitled to participate in any sums received by the Holder in respect of any of the Indebtedness; nor

5.4.2   be entitled to participate in any security held by the Holder in respect of any of the Indebtedness nor stand in the place of, or be subrogated for, the Holder in respect of any such security; nor

5.4.3   take any step to enforce any claim against any of the other Security Parties (or their respective estates or effects), nor claim or exercise any right of set-off or counterclaim against any of the other Security Parties, nor make any claim in the bankruptcy or liquidation of any of the other Security Parties, in respect of any sums paid by the Guarantor to the Holder or in respect of any sum which includes the proceeds of realisation of any security held by the Holder under or pursuant to any of the Guarantor's Security Documents; nor

5.4.4   take any steps to enforce any other claim which it may have against any of the other Security Parties without the prior written consent of the Holder, and then only on such terms and subject to such conditions as the Holder may impose.

5.5   The Holder may, but shall not be obliged to, resort for its own benefit to any other means of payment at any time and in any order it thinks fit without releasing or reducing the Guarantor's Liabilities.

5.6   The Holder may enforce any of the Guarantor's Security Documents either before or after resorting to any other means of payment without entitling the Guarantor to any benefit from or share in any such other means of payment until the expiry of the Facility Period.

5.7   The Guarantor agrees that it is, and will throughout the Facility Period remain, a principal debtor in respect of the Guarantor's Liabilities.

5.8   No failure to exercise, nor any delay in exercising, on the part of the Holder, any right or remedy under the Guarantor's Security Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Guarantor's Security Documents are cumulative and not exclusive of any rights or remedies provided by law.

6   **Undertakings**

6.1   The Guarantor shall pay to the Holder on demand on a full indemnity basis all costs and expenses incurred by the Holder in or about or incidental to the exercise by it of its rights under any of the Guarantor's Security Documents,

together with twelve per cent (12%) interest on the amount demanded from the date of demand until the date of payment (being two per cent (2%) higher than the interest rate on the outstanding Debt agreed under the Note), both before and after judgment, which interest shall be compounded with the amount demanded at the end of such periods as the Holder may reasonably select.

6.2     The Guarantor has not taken, and will not take without the prior written consent of the Holder (and then only on such terms and subject to such conditions as the Holder may impose), any security from any of the other Security Parties in connection with this Guarantee and Indemnity, and any security taken by the Guarantor notwithstanding this Clause shall be held by the Guarantor in trust for the Holder absolutely as a continuing security for the Guarantor's Liabilities.

6.3     The Guarantor will observe and perform any and all covenants and undertakings in the Note whose observance and performance by the Guarantor the Company has undertaken to procure.

6.4     The Guarantor will not without the Holder's prior written consent:

6.4.1     create nor permit to arise any Encumbrance or other third party rights over any of its present or future assets or undertaking other than in favour of the Holder; nor

6.4.2     except in the ordinary course of business, incur any liability to any third party which is in the Holder's opinion of a substantial nature; nor

6.4.3     make any loan nor enter into any guarantee or indemnity nor otherwise voluntarily assume any actual or contingent liability in respect of any obligation of any other person; nor

6.4.4     permit any change in the legal or beneficial ownership of the Guarantor from that advised to the Holder at the date of this Guarantee and Indemnity.

6.5     The Guarantor shall supply to the Holder as soon as the same become available, but in any event within 180 days after the end of each of its financial years, its audited financial statements for that financial year.     Each set of financial statements:

6.6     shall be certified by a director of the Guarantor as fairly representing its financial condition as at the date at which those financial statements were drawn up; and

6.7    shall be prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, the Guarantor notifies the Holder that there has been a change in GAAP, the accounting practices or reference periods and the Guarantor's auditors deliver to the Holder:

    (a)    a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared; and

    (b)    sufficient information, in form and substance as may be reasonably required by the Holder, to enable the Holder to make an accurate comparison between the financial position indicated in those financial statements and that indicated in the Original Financial Statements.

6.8    The Guarantor shall supply to the Holder:

6.8.1    all documents dispatched by the Guarantor to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched; and

6.8.2    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any of the Security Parties and which might, if adversely determined, have a material adverse effect on the business or financial condition of any of the Security Parties; and

6.8.3    promptly, such further information regarding the financial condition, business and operations of any of the Security Parties as the Holder may reasonably request.

# 7    Payments

7.1    All amounts payable by the Guarantor under or pursuant to any of the Guarantor's Security Documents shall be paid to such accounts at such banks as the Holder may from time to time direct to the Guarantor in the relevant currency in same day funds for immediate value. Payment shall be deemed to have been received on the date on which the Holder receives authenticated advice of receipt, unless that advice is received by the Holder on a day other

than a Business Day or at a time of day (whether on a Business Day or not) when the Holder in its discretion considers that it is impossible or impracticable to utilise the amount received for value that same day, in which event the payment in question shall be deemed to have been received on the Business Day next following the date of receipt of advice by the Holder.

7.2    All payments to be made by the Guarantor pursuant to any of the Guarantor's Security Documents shall, subject only to Clause 7.3, be made free and clear of and without deduction for or on account of any taxes or other deductions, withholdings, restrictions, conditions, set-offs or counterclaims of any nature.

7.3    If at any time any law requires (or is interpreted to require) the Guarantor to make any deduction or withholding from any payment, or to change the rate or manner in which any required deduction or withholding is made, the Guarantor will promptly notify the Holder and, simultaneously with making that payment, will pay whatever additional amount (after taking into account any additional taxes on, or deductions or withholdings from, or restrictions or conditions on, that additional amount) is necessary to ensure that, after making the deduction or withholding, the Holder receives a net sum equal to the sum which it would have received had no deduction or withholding been made.

7.4    If at any time the Guarantor is required by law to make any deduction or withholding from any payment to be made by it pursuant to any of the Guarantor's Security Documents, the Guarantor will pay the amount required to be deducted or withheld to the relevant authority within the time allowed under the applicable law and will, no later than thirty days after making that payment, deliver to the Holder an original receipt issued by the relevant authority, or other evidence acceptable to the Holder, evidencing the payment to that authority of all amounts required to be deducted or withheld.

7.5    If the Guarantor pays any additional amount under Clause 7.3, and the Holder subsequently receives a refund or allowance from any tax authority which the Holder identifies as being referable to that increased amount so paid by the Guarantor, the Holder shall, as soon as reasonably practicable, pay to the Guarantor an amount equal to the amount of the refund or allowance received, if and to the extent that it may do so without prejudicing its right to retain that refund or allowance and without putting itself in any worse financial position than that in which it would have been had the relevant deduction or withholding not been required to have been made.  Nothing in this Clause 7.5 shall be interpreted as imposing any obligation on the Holder to apply for any refund or allowance nor as restricting in any way the manner in which the Holder organises its tax affairs,

nor as imposing on the Holder any obligation to disclose to the Guarantor any information regarding its tax affairs or tax computations.

7.6 Any certificate or statement signed by an authorised signatory of the Holder purporting to show the amount of the Indebtedness or of the Guarantor's Liabilities (or any part of any of them) or any other amount referred to in any of the Finance Documents shall, save for manifest error or on any question of law, be conclusive evidence as against the Guarantor of that amount.

## 8 Currency

8.1 The Guarantor's liability under this Guarantee and Indemnity is to discharge the Indebtedness in the currency in which it is expressed to be payable (the **"Agreed Currency"**).

8.2 If at any time the Holder receives (including by way of set-off) any payment by or on behalf of the Guarantor in a currency other than the Agreed Currency, that payment shall take effect as a payment to the Holder of the amount in the Agreed Currency which the Holder is able to purchase (after deduction of any relevant costs) with the amount of the payment so received in accordance with its usual practice.

8.3 To the extent that any payment to the Holder (whether by the Guarantor or any other person and whether under any judgment or court order or otherwise) in a currency other than the Agreed Currency shall on actual conversion into the Agreed Currency fall short of the relevant amount of the Indebtedness expressed in the Agreed Currency, then the Guarantor as a separate and independent obligation will indemnify the Holder against the shortfall.

## 9 Set-Off

9.1 The Guarantor irrevocably authorises the Holder at any time to set off without notice any sums then due and payable by the Guarantor to the Holder under this Guarantee and Indemnity (irrespective of the branch or office, currency or place of payment) against any credit balance from time to time standing on any account of the Guarantor (whether current or otherwise, whether or not subject to notice and whether or not that credit balance is then due to the Guarantor) with any branch of the Holder in or towards satisfaction of the Guarantor's Liabilities and, in the name of the Holder or the Guarantor, to do all acts (including, without limitation, purchasing or converting or exchanging any currency) which may be required to effect such set-off.

9.2 Despite any term to the contrary in relation to any deposit or credit balance at any time on any account of the Guarantor with the Holder, no such deposit or credit balance shall be repayable or capable of being assigned, mortgaged, charged or otherwise disposed of or dealt with by the Guarantor until the Guarantor's Liabilities have been discharged in full, but the Holder may from time to time permit the withdrawal of all or any part of any such deposit or balance without affecting the continued application of this Clause.

## 10    Application of Moneys

10.1 All sums which the Holder receives under or in connection with any of the Guarantor's Security Documents shall, unless otherwise agreed by the Holder or otherwise provided in the Notes, be applied by the Holder in or towards satisfaction, or by way of retention on account, of the Guarantor's Liabilities, in such manner as the Holder may in its discretion determine.

10.2 The Holder may place any money received by it under or in connection with any of the Guarantor's Security Documents to the credit of a suspense account on such terms and subject to such conditions as the Holder may in its discretion determine for so long as the Holder thinks fit without any obligation in the meantime to apply that money in or towards discharge of the Indebtedness, and, despite such payment, the Holder may claim against any of the other Security Parties or prove in the bankruptcy, liquidation or insolvency of any of the other Security Parties for the whole of the Indebtedness at the date of the Holder's demand for payment pursuant to this Guarantee and Indemnity, together with all interest, commission, charges and expenses accruing subsequently.

## 11    Partial Invalidity

If, at any time, any provision of any of the Guarantor's Security Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 12    Further Assurance

The Guarantor agrees that from time to time on the written request of the Holder it will immediately execute and deliver to the Holder all further documents which the Holder may require for the purpose of perfecting or protecting the security intended to be created by the Guarantor's Security Documents.

13    **Miscellaneous**

13.1    All the covenants and agreements of the Guarantor in this Guarantee and Indemnity shall bind the Guarantor and its successors and permitted assignees and shall inure to the benefit of the Holder and its successors, transferees and assignees.

13.2    The representations and warranties on the part of the Guarantor contained in this Guarantee and Indemnity shall survive the execution of this Guarantee and Indemnity.

13.3    No variation or amendment of this Guarantee and Indemnity shall be valid unless in writing and signed on behalf of the Guarantor and the Holder.

13.4    A person who is not a party to this Guarantee and Indemnity has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Guarantee and Indemnity.

14    **Notices**

14.1    **Communications in writing**   Any communication to be made under or in connection with this Guarantee and Indemnity shall be made in writing and, unless otherwise stated, may be made by fax or letter.

14.2    **Addresses** The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Guarantee and Indemnity for any communication or document to be made or delivered under or in connection with this Guarantee and Indemnity are:

14.2.1   in the case of the Guarantor, c/o NewLead Holdings Ltd., 83 Akti Miaouli & Flessa, 185 38 Piraeus, Greece (fax no: +302130148039) marked for the attention of the Legal Department; and

14.2.2   in the case of the Holder, c/o Oppenheim Capital Ltd., 90 Kapodistriou Ave., N. Ionia, 14235, Athens, Greece (fax no: +30 210 275 4358) marked for the attention of Mr. Dimitrios Stavrianos,

or any substitute address, fax number, department or officer as either party may notify to the other by not less than five (5) Business Days' notice.

14.3    **Delivery** Any communication or document made or delivered by one party to this Guarantee and Indemnity to the other under or in connection with this Guarantee and Indemnity will only be effective:

14.3.1 if by way of fax, when received in legible form; or

14.3.2 if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause **Error! Reference source not found.** *14.9* (*Addresses*), if addressed to that department or officer.

Any communication or document to be made or delivered to the Holder will be effective only when actually received by the Holder.

Any communication or document which becomes effective, in accordance with this Clause **Error! Reference source not found.**, *14.3* after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

14.4 **English language**   Any notice given under or in connection with this Guarantee and Indemnity must be in English. All other documents provided under or in connection with this Guarantee and Indemnity must be:

14.4.1 in English; or

14.4.2 if not in English, and if so required by the Holder, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 15   Law and Jurisdiction

15.1 This Guarantee and Indemnity and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with English law.

15.2 For the exclusive benefit of the Holder, the Guarantor irrevocably agrees that the courts of England are to have exclusive jurisdiction to settle any dispute (a) arising from or in connection with this Guarantee and Indemnity or (b) relating to any non-contractual obligations arising from or in connection with this Guarantee and Indemnity and that any proceedings may be brought in those courts.

15.3 Nothing contained in this Clause shall limit the right of the Holder to commence any proceedings against the Guarantor in any other court of competent jurisdiction nor shall the commencement of any proceedings against the

Guarantor in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

15.4    The Guarantor irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

15.5    Without prejudice to any other mode of service allowed under any relevant law, the Guarantor:

Nominees limited                    MSL

15.5.1    irrevocably appoints Holman ~~Fenwick Willan International LLP,~~ Friary Court, 65 Crutched Friars, London, EC3N 2AE as its agent for service of process in relation to any proceedings before the English courts; and

15.5.2    agrees that failure by a process agent to notify the Guarantor of the process will not invalidate the proceedings concerned.

**IN WITNESS** of which this Guarantee and Indemnity has been duly executed and delivered as a deed the day and year first before written.

**SIGNED** and **DELIVERED**                 )
as a **DEED**                                )
by **NEWLEAD CASTELLANO LTD**                )
acting by MICHALL LIVANOS                     )
its duly authorised attorney -in- fact        )
in the presence of: Antonella Karalis.

STEPHENSON HARWOOD LLP
ARISTON BUILDING
2 FILELLINON STR.& AKTI MIAOULI
PIRAEUS 185 36
VAT. NO. 998 711 156
TEL. 210 42 95 160

**DATED  16 October 2014**

**NEWLEAD CASTELLANO LTD**

**- to -**

**RAY CAPITAL INC.**

---

**GUARANTEE AND INDEMNITY**

---



**STEPHENSON HARWOOD**

**CONTENTS**

Page

| 1 | Definitions and Interpretation ........................................................................3 |
| 2 | Representations and Warranties..................................................................,..5 |
| 3 | Guarantee and Indemnity ..............................................................................6 |
| 4 | Preservation of Guarantor's Liability.............................................................7 |
| 5 | Preservation of Holder's Rights .....................................................................8 |
| 6 | Undertakings................................................................................................10 |
| 7 | Payments ......................................................................................................12 |
| 8 | Currency .......................................................................................................13 |
| 9 | Set-Off...........................................................................................................14 |
| 10 | Application of Moneys...................................................................................14 |
| 11 | Partial Invalidity ..........................................................................................15 |
| 12 | Further Assurance........................................................................................15 |
| 13 | Miscellaneous...............................................................................................15 |
| 14 | Notices..........................................................................................................15 |
| 15 | Law and Jurisdiction ....................................................................................17 |

**GUARANTEE AND INDEMNITY**

**Dated: 16 October 2014**

**BY:**

(1)   **NEWLEAD CASTELLANO LTD**, a company incorporated according to the law of the Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Guarantor"**)

**IN FAVOUR OF:**

(2)   **RAY CAPITAL INC.**, a corporation incorporated under the law of the Republic of the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the **"Holder"**).

**WHEREAS:**

(A)   NewLead Holdings Ltd., a company incorporated according to the law of Bermuda whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece (the **"Company"**) and Tiger Capital Partners Ltd., of Vanterpool Plaza, 2nd floor, Wickhams Cay I. Road Town, Tortola, British Virgin Islands (**"Tiger"**), the holder of a warrant dated 11 December 2013 (the **"Warrant"**) issued pursuant to a settlement agreement dated 11 December 2013 made between the Company and Tiger, have entered into an exchange agreement dated 27 December 2013 (the **"Exchange Agreement"**) pursuant to which the Company and Tiger agreed (inter alia) (i) to exchange the Warrant for unsecured convertible notes of an aggregate amount equal to the warrant and (ii) that Tiger may, pursuant to the terms referred to therein, assign the unsecured convertible notes to one or more entities.

(B)   Pursuant to the Exchange Agreement, Tiger assigned to the Holder their right, title, interest and benefit of the amount of six million Dollars ($6,000,000) out of the total amount of twenty million Dollars ($20,000,000) in and under the Exchange Agreement and relevant notice of assignment was served to the Company on 27 December 2013.

(C)   Pursuant to the Exchange Agreement, the Company has issued and the Holder has accepted an unsecured convertible note dated 27 December 2013, as amended by an addendum thereto dated 28 December 2013, each executed by the Company in favour the Holder (together, the **"Note"**), the outstanding amount of the debt being at the date hereof equal to one million eight hundred and sixty one thousand four hundred and twelve Dollars ($1,861,412) (the **"Debt"**).

(D)   As consideration for the Holder's agreement to accept the Note pursuant to the Exchange Agreement, the Company has agreed to procure that the Guarantor execute and deliver this Guarantee and Indemnity in favour of the Holder.

**THIS DEED WITNESSES** as follows:

1   **Definitions and Interpretation**

1.1   In this Guarantee and Indemnity:

**"Business Day"** means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Piraeus and New York.

**"Dollars"** and **"$"** each means available and freely transferable and convertible funds in lawful currency of the United States of America.

**"Encumbrance"** means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**"Facility Period"** means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

**"Finance Documents"** means the Note, the Guarantor's Security Documents, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Holder and the Company.

**"GAAP"** means generally accepted accounting principles in IFRS.

**"Guarantor's Liabilities"** means all of the liabilities and obligations of the Guarantor to the Holder under or pursuant to this Guarantee and Indemnity, from time to time, whether in respect of principal, interest, costs or otherwise and whether present, future, actual or contingent.

**"Guarantor's Security Documents"** means this Guarantee and Indemnity and any and all documents which may at any time be executed by the Guarantor as security for the payment of all or any part of the Guarantor's Liabilities.

**"IFRS"** means International Financial Reporting Standards issued and/or adopted by the International Accounting Standards Board.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to the Holder under all or any of the Finance Documents.

"**Original Financial Statements**" means the audited consolidated financial statements of the Guarantor for the financial year ended 31 December 2013.

"**Security Parties**" means the parties to any of the Finance Documents (other than the Holder).

1.2   Unless otherwise specified in this Guarantee and Indemnity, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Guarantee and Indemnity.

1.3   In this Guarantee and Indemnity:

1.3.1   words denoting the plural number include the singular and vice versa;

1.3.2   words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

1.3.3   references to Clauses are references to clauses of this Guarantee and Indemnity;

1.3.4   references to this Guarantee and Indemnity include the recitals to this Guarantee and Indemnity;

1.3.5   the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Guarantee and Indemnity;

1.3.6   references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

1.3.7   references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted; and

1.3.8   references to the Holder include its successors, transferees and assignees.

## 2    Representations and Warranties

The Guarantor represents and warrants to the Holder at the date of this Guarantee and Indemnity and (by reference to the facts and circumstances then pertaining) on each day throughout the Facility Period that:

2.1    all representations and warranties given by the Company in the Note in respect of the Guarantor are and will remain correct and none of them is or will become misleading;

2.2    the Guarantor is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation and has the power to own its assets and to carry on its business as it is being conducted; and

2.3    the Guarantor has the power to enter into and perform the Guarantor's Security Documents and has taken all necessary action to authorise its entry into and performance of the Guarantor's Security Documents;

2.4    the Guarantor is not insolvent or in liquidation or administration or subject to any other formal or informal insolvency procedure, and no receiver, administrative receiver, administrator, liquidator, trustee or analogous officer has been appointed in respect of the Guarantor or all or any part of its assets;

2.5    this Guarantee and Indemnity constitutes legal, valid, binding and enforceable obligations of the Guarantor and each of the other Guarantor's Security Documents will, when executed and delivered by the Guarantor, constitute legal, valid, binding and enforceable obligations of the Guarantor;

2.6    all consents, licences, approvals and authorisations of, or registrations with or declarations to, any governmental authority, bureau or agency which may be required in connection with the entry into, performance, validity or enforceability of the Guarantor's Security Documents have been obtained or made and remain in full force and effect and the Guarantor is not aware of any event or circumstance which could reasonably be expected adversely to affect the right of the Guarantor to hold and/or obtain renewal of any such consents, licences, approvals or authorisations;

2.7    no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency which if adversely determined, might reasonably be expected to have a material adverse effect on the business or financial condition of the Guarantor have (to the best of the Guarantor's knowledge and belief) been started or threatened against the Guarantor;

2.8     the entry into and performance of the Guarantor's Security Documents will not conflict with the constitutional documents of the Guarantor or any law or regulation or document applicable to, or binding on, the Guarantor or any of its assets;

2.9     the Guarantor is not required to make any deduction or withholding from any payment which it may be obliged to make to the Holder under or pursuant to any of the Guarantor's Security Documents;

2.10    it is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of any of the Guarantor's Security Documents that it be filed, recorded or enrolled with any court or other authority in any country or that any stamp, registration or similar tax be paid on or in relation to any of the Guarantor's Security Documents;

2.11    the Guarantor is not in breach of, or default under, any agreement of any sort binding on it or on all or any part of its assets;

2.12    the Guarantor is not aware of any material facts or circumstances which have not been disclosed to the Holder and which might, if disclosed, have adversely affected the decision of a person considering whether or not to make financial arrangments of the nature contemplated by the Note with the Company; and

2.13    the Guarantor has received a copy of the Note and approves of, and agrees to, the terms and conditions of the Note.

3       **Guarantee and Indemnity**

The Guarantor:

3.1     irrevocably and unconditionally guarantees the due and punctual observance and performance by the Company of all its obligations under the Finance Documents including, without limitation, the due and punctual payment of each and every part of the Indebtedness in accordance with the terms of the Finance Documents so that, if any of the Indebtedness is not paid when it is due and payable, whether on maturity or otherwise, the Guarantor will, immediately on demand, make such payment to the Holder in the manner specified by the Holder, together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment; and

3.2     agrees, as a separate and independent obligation, that, if any of the Indebtedness is not recoverable from the Guarantor under Clause 3.1 for any

reason, the Guarantor will be liable as a principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable, and agrees to discharge its liability under this Clause 3.2 by making payment to the Holder immediately on demand together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment.

4       **Preservation of Guarantor's Liability**

4.1     This Guarantee and Indemnity is a continuing security for the full amount of the Indebtedness from time to time until the expiry of the Facility Period.

4.2     The Holder may without the Guarantor's consent and without notice to the Guarantor and without in any way releasing or reducing the Guarantor's Liabilities:

    4.2.1     amend, vary, novate, or replace any of the Finance Documents (other than the Guarantor's Security Documents); and/or

    4.2.2     agree with the Company to increase or reduce the amount of the Debt, or vary the terms and conditions for its repayment or prepayment (including, without limitation, the rate and/or method of calculation of interest payable on the Debt); and/or

    4.2.3     allow any time or other indulgence to any of the other Security Parties under or in connection with any of the Finance Documents; and/or

    4.2.4     renew, vary, release or refrain from enforcing any of the Finance Documents (other than the Guarantor's Security Documents); and/or

    4.2.5     compound with any of the other Security Parties; and/or

    4.2.6     enter into, renew, vary or terminate any other agreement or arrangement with any of the other Security Parties; and/or

    4.2.7     do or omit or neglect to do anything which might, but for this provision, operate to release or reduce the liability of the Guarantor under this Guarantee and Indemnity.

4.3     The Guarantor's Liabilities shall not be affected by:

    4.3.1     the absence of, or any defective, excessive or irregular exercise of, any of the powers of any of the other Security Parties; nor

4.3.2   any security given or payment made to the Holder by any of the other Security Parties being avoided or reduced under any law (whether English or foreign) relating to bankruptcy or insolvency or analogous circumstance in force from time to time; nor

4.3.3   any change in the constitution of the Guarantor or of any of the other Security Parties or of the Holder or the absorption of or amalgamation by the Holder in or with any other entity or the acquisition of all or any part of the assets or undertaking of the Holder by any other entity; nor

4.3.4   the liquidation, administration, receivership, bankruptcy or insolvency of the Guarantor or any of the other Security Parties; nor

4.3.5   any of the Finance Documents (other than this Guarantee and Indemnity) being defective, void or unenforceable, or the failure of any other person to provide the Holder with any security, guarantee or indemnity envisaged by the Note; nor

4.3.6   any composition, assignment or arrangement being made by any of the other Security Parties with any of its creditors; nor

4.3.7   anything which would, but for this provision, have released or reduced the liability of the Guarantor to the Holder.

## 5   Preservation of Holder's Rights

5.1   This Guarantee and Indemnity is in addition to any other security, guarantee or indemnity now or in the future held by the Holder in respect of the Indebtedness, whether from the Company, the Guarantor or any other person, and shall not merge with, prejudice or be prejudiced by, any such security, guarantee or indemnity or any contractual or legal right of the Holder.

5.2   Any release, settlement, discharge or arrangement relating to the Guarantor's Liabilities shall be conditional on no payment, assurance or security received by the Holder in respect of the Indebtedness being avoided or reduced under any law (whether English or foreign) in force from time to time relating to bankruptcy, insolvency or any (in the opinion of the Holder) analogous circumstance, and, after any such avoidance or reduction, the Holder shall be entitled to exercise all of its rights, powers, discretions and remedies under or pursuant to the Guarantor's Security Documents and/or any other rights, powers, discretions or remedies which it would otherwise have been entitled to

exercise, as if no release, settlement, discharge or arrangement had taken place.

5.3 Following the full payment of the Indebtedness, the Holder shall be entitled to retain the Guarantor's Security Documents until the Holder is satisfied in its discretion that it will not have to make any payment under any law referred to in Clause 5.2.

5.4 Until the expiry of the Facility Period the Guarantor shall not:

5.4.1 be entitled to participate in any sums received by the Holder in respect of any of the Indebtedness; nor

5.4.2 be entitled to participate in any security held by the Holder in respect of any of the Indebtedness nor stand in the place of, or be subrogated for, the Holder in respect of any such security; nor

5.4.3 take any step to enforce any claim against any of the other Security Parties (or their respective estates or effects), nor claim or exercise any right of set-off or counterclaim against any of the other Security Parties, nor make any claim in the bankruptcy or liquidation of any of the other Security Parties, in respect of any sums paid by the Guarantor to the Holder or in respect of any sum which includes the proceeds of realisation of any security held by the Holder under or pursuant to any of the Guarantor's Security Documents; nor

5.4.4 take any steps to enforce any other claim which it may have against any of the other Security Parties without the prior written consent of the Holder, and then only on such terms and subject to such conditions as the Holder may impose.

5.5 The Holder may, but shall not be obliged to, resort for its own benefit to any other means of payment at any time and in any order it thinks fit without releasing or reducing the Guarantor's Liabilities.

5.6 The Holder may enforce any of the Guarantor's Security Documents either before or after resorting to any other means of payment without entitling the Guarantor to any benefit from or share in any such other means of payment until the expiry of the Facility Period.

5.7 The Guarantor agrees that it is, and will throughout the Facility Period remain, a principal debtor in respect of the Guarantor's Liabilities.

5.8     No failure to exercise, nor any delay in exercising, on the part of the Holder, any right or remedy under the Guarantor's Security Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Guarantor's Security Documents are cumulative and not exclusive of any rights or remedies provided by law.

## 6     Undertakings

6.1     The Guarantor shall pay to the Holder on demand on a full indemnity basis all costs and expenses incurred by the Holder in or about or incidental to the exercise by it of its rights under any of the Guarantor's Security Documents, together with twelve per cent (12%) interest on the amount demanded from the date of demand until the date of payment (being two per cent (2%) higher than the interest rate on the outstanding Debt agreed under the Note), both before and after judgment, which interest shall be compounded with the amount demanded at the end of such periods as the Holder may reasonably select.

6.2     The Guarantor has not taken, and will not take without the prior written consent of the Holder (and then only on such terms and subject to such conditions as the Holder may impose), any security from any of the other Security Parties in connection with this Guarantee and Indemnity, and any security taken by the Guarantor notwithstanding this Clause shall be held by the Guarantor in trust for the Holder absolutely as a continuing security for the Guarantor's Liabilities.

6.3     The Guarantor will observe and perform any and all covenants and undertakings in the Note whose observance and performance by the Guarantor the Company has undertaken to procure.

6.4     The Guarantor will not without the Holder's prior written consent:

6.4.1     create nor permit to arise any Encumbrance or other third party rights over any of its present or future assets or undertaking other than in favour of the Holder; nor

6.4.2     except in the ordinary course of business, incur any liability to any third party which is in the Holder's opinion of a substantial nature; nor

6.4.3     make any loan nor enter into any guarantee or indemnity nor otherwise voluntarily assume any actual or contingent liability in respect of any obligation of any other person; nor

6.4.4    permit any change in the legal or beneficial ownership of the Guarantor from that advised to the Holder at the date of this Guarantee and Indemnity.

6.5    The Guarantor shall supply to the Holder as soon as the same become available, but in any event within 180 days after the end of each of its financial years, its audited financial statements for that financial year.   Each set of financial statements:

6.6    shall be certified by a director of the Guarantor as fairly representing its financial condition as at the date at which those financial statements were drawn up; and

6.7    shall be prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, the Guarantor notifies the Holder that there has been a change in GAAP, the accounting practices or reference periods and the Guarantor's auditors deliver to the Holder:

(a)    a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared; and

(b)    sufficient information, in form and substance as may be reasonably required by the Holder, to enable the Holder to make an accurate comparison between the financial position indicated in those financial statements and that indicated in the Original Financial Statements.

6.8    The Guarantor shall supply to the Holder:

6.8.1    all documents dispatched by the Guarantor to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched; and

6.8.2    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any of the Security Parties and which might, if adversely determined, have a material adverse effect on the business or financial condition of any of the Security Parties; and

6.8.3   promptly, such further information regarding the financial condition, business and operations of any of the Security Parties as the Holder may reasonably request.

## 7   Payments

7.1   All amounts payable by the Guarantor under or pursuant to any of the Guarantor's Security Documents shall be paid to such accounts at such banks as the Holder may from time to time direct to the Guarantor in the relevant currency in same day funds for immediate value.  Payment shall be deemed to have been received on the date on which the Holder receives authenticated advice of receipt, unless that advice is received by the Holder on a day other than a Business Day or at a time of day (whether on a Business Day or not) when the Holder in its discretion considers that it is impossible or impracticable to utilise the amount received for value that same day, in which event the payment in question shall be deemed to have been received on the Business Day next following the date of receipt of advice by the Holder.

7.2   All payments to be made by the Guarantor pursuant to any of the Guarantor's Security Documents shall, subject only to Clause 7.3, be made free and clear of and without deduction for or on account of any taxes or other deductions, withholdings, restrictions, conditions, set-offs or counterclaims of any nature.

7.3   If at any time any law requires (or is interpreted to require) the Guarantor to make any deduction or withholding from any payment, or to change the rate or manner in which any required deduction or withholding is made, the Guarantor will promptly notify the Holder and, simultaneously with making that payment, will pay whatever additional amount (after taking into account any additional taxes on, or deductions or withholdings from, or restrictions or conditions on, that additional amount) is necessary to ensure that, after making the deduction or withholding, the Holder receives a net sum equal to the sum which it would have received had no deduction or withholding been made.

7.4   If at any time the Guarantor is required by law to make any deduction or withholding from any payment to be made by it pursuant to any of the Guarantor's Security Documents, the Guarantor will pay the amount required to be deducted or withheld to the relevant authority within the time allowed under the applicable law and will, no later than thirty days after making that payment, deliver to the Holder an original receipt issued by the relevant authority, or other evidence acceptable to the Holder, evidencing the payment to that authority of all amounts required to be deducted or withheld.

7.5     If the Guarantor pays any additional amount under Clause 7.3, and the Holder subsequently receives a refund or allowance from any tax authority which the Holder identifies as being referable to that increased amount so paid by the Guarantor, the Holder shall, as soon as reasonably practicable, pay to the Guarantor an amount equal to the amount of the refund or allowance received, if and to the extent that it may do so without prejudicing its right to retain that refund or allowance and without putting itself in any worse financial position than that in which it would have been had the relevant deduction or withholding not been required to have been made.  Nothing in this Clause 7.5 shall be interpreted as imposing an obligation on the Holder to apply for any refund or allowance nor as restricting in any way the manner in which the Holder organises its tax affairs, nor as imposing on the Holder any obligation to disclose to the Guarantor any information regarding its tax affairs or tax computations.

7.6     Any certificate or statement signed by an authorised signatory of the Holder purporting to show the amount of the Indebtedness or of the Guarantor's Liabilities (or any part of any of them) or any other amount referred to in any of the Finance Documents shall, save for manifest error or on any question of law, be conclusive evidence as against the Guarantor of that amount.

8     **Currency**

8.1     The Guarantor's liability under this Guarantee and Indemnity is to discharge the Indebtedness in the currency in which it is expressed to be payable (the **"Agreed Currency"**).

8.2     If at any time the Holder receives (including by way of set-off) any payment by or on behalf of the Guarantor in a currency other than the Agreed Currency, that payment shall take effect as a payment to the Holder of the amount in the Agreed Currency which the Holder is able to purchase (after deduction of any relevant costs) with the amount of the payment so received in accordance with its usual practice.

8.3     To the extent that any payment to the Holder (whether by the Guarantor or any other person and whether under any judgment or court order or otherwise) in a currency other than the Agreed Currency shall on actual conversion into the Agreed Currency fall short of the relevant amount of the Indebtedness expressed in the Agreed Currency, then the Guarantor as a separate and independent obligation will indemnify the Holder against the shortfall.

9      **Set-Off**

9.1    The Guarantor irrevocably authorises the Holder at any time to set off without notice any sums then due and payable by the Guarantor to the Holder under this Guarantee and Indemnity (irrespective of the branch or office, currency or place of payment) against any credit balance from time to time standing on any account of the Guarantor (whether current or otherwise, whether or not subject to notice and whether or not that credit balance is then due to the Guarantor) with any branch of the Holder in or towards satisfaction of the Guarantor's Liabilities and, in the name of the Holder or the Guarantor, to do all acts (including, without limitation, purchasing or converting or exchanging any currency) which may be required to effect such set-off.

9.2    Despite any term to the contrary in relation to any deposit or credit balance at any time on any account of the Guarantor with the Holder, no such deposit or credit balance shall be repayable or capable of being assigned, mortgaged, charged or otherwise disposed of or dealt with by the Guarantor until the Guarantor's Liabilities have been discharged in full, but the Holder may from time to time permit the withdrawal of all or any part of any such deposit or balance without affecting the continued application of this Clause.

10     **Application of Moneys**

10.1   All sums which the Holder receives under or in connection with any of the Guarantor's Security Documents shall, unless otherwise agreed by the Holder or otherwise provided in the Notes, be applied by the Holder in or towards satisfaction, or by way of retention on account, of the Guarantor's Liabilities, in such manner as the Holder may in its discretion determine.

10.2   The Holder may place any money received by it under or in connection with any of the Guarantor's Security Documents to the credit of a suspense account on such terms and subject to such conditions as the Holder may in its discretion determine for so long as the Holder thinks fit without any obligation in the meantime to apply that money in or towards discharge of the Indebtedness, and, despite such payment, the Holder may claim against any of the other Security Parties or prove in the bankruptcy, liquidation or insolvency of any of the other Security Parties for the whole of the Indebtedness at the date of the Holder's demand for payment pursuant to this Guarantee and Indemnity, together with all interest, commission, charges and expenses accruing subsequently.

**11      Partial Invalidity**

If, at any time, any provision of any of the Guarantor's Security Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**12      Further Assurance**

The Guarantor agrees that from time to time on the written request of the Holder it will immediately execute and deliver to the Holder all further documents which the Holder may require for the purpose of perfecting or protecting the security intended to be created by the Guarantor's Security Documents.

**13      Miscellaneous**

13.1      All the covenants and agreements of the Guarantor in this Guarantee and Indemnity shall bind the Guarantor and its successors and permitted assignees and shall inure to the benefit of the Holder and its successors, transferees and assignees.

13.2      The representations and warranties on the part of the Guarantor contained in this Guarantee and Indemnity shall survive the execution of this Guarantee and Indemnity.

13.3      No variation or amendment of this Guarantee and Indemnity shall be valid unless in writing and signed on behalf of the Guarantor and the Holder.

13.4      A person who is not a party to this Guarantee and Indemnity has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Guarantee and Indemnity.

**14      Notices**

14.1      **Communications in writing**   Any communication to be made under or in connection with this Guarantee and Indemnity shall be made in writing and, unless otherwise stated, may be made by fax or letter.

14.2      **Addresses** The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Guarantee and Indemnity for any communication or document to be made or delivered under or in connection with this Guarantee and Indemnity are:

14.2.1 In the case of the Guarantor, c/o NewLead Holdings Ltd., 83 Akti Miaouli & Flessa, 185 38 Piraeus, Greece (fax no: +302130148039) marked for the attention of the Legal Department; and

14.2.2 In the case of the Holder, c/o Oppenheim Capital Ltd., 90 Kapodistriou Ave., N. Ionia, 14235, Athens, Greece (fax no: +30 210 275 4358) marked for the attention of Mr. Dimitrios Stavrianos,

or any substitute address, fax number, department or officer as either party may notify to the other by not less than five (5) Business Days' notice.

14.3   **Delivery**   Any communication or document made or delivered by one party to this Guarantee and Indemnity to the other under or in connection with this Guarantee and Indemnity will only be effective:

14.3.1 If by way of fax, when received in legible form; or

14.3.2 If by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause 14.2 (*Addresses*), if addressed to that department or officer.

Any communication or document to be made or delivered to the Holder will be effective only when actually received by the Holder.

Any communication or document which becomes effective, in accordance with this Clause 14.3, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

14.4   **English language**   Any notice given under or in connection with this Guarantee and Indemnity must be in English.   All other documents provided under or in connection with this Guarantee and Indemnity must be:

14.4.1 In English; or

14.4.2 If not in English, and if so required by the Holder, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 15    Law and Jurisdiction

15.1    This Guarantee and Indemnity and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with English law.

15.2    For the exclusive benefit of the Holder, the Guarantor irrevocably agrees that the courts of England are to have exclusive jurisdiction to settle any dispute (a) arising from or in connection with this Guarantee and Indemnity or (b) relating to any non-contractual obligations arising from or in connection with this Guarantee and Indemnity and that any proceedings may be brought in those courts.

15.3    Nothing contained in this Clause shall limit the right of the Holder to commence any proceedings against the Guarantor in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Guarantor in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

15.4    The Guarantor irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

15.5    Without prejudice to any other mode of service allowed under any relevant law, the Guarantor:

15.5.1    Irrevocably appoints Holman ~~Fenwick Willan International LLP,~~ _Nominees dirrrted_ Friary Court, 65 Crutched Friars, London, EC3N 2AE as its agent for service of process in relation to any proceedings before the English courts; and

15.5.2    agrees that failure by a process agent to notify the Guarantor of the process will not invalidate the proceedings concerned.

**IN WITNESS** of which this Guarantee and Indemnity has been duly executed and delivered as a deed the day and year first before written.

| | |
|---|---|
| **SIGNED** and **DELIVERED** as a **DEED** by **NEWLEAD CASTELLANO LTD** acting by MICHAIL LIVANOS its duly authorised attorney-in-fact in the presence of: | ) ) ) ) ) ) |

Antonella Coralis

STEPHENSON HARWOOD LLP
ARISTON BUILDING
2 FILELLINON STR.& AKTI MIAOULI
PIRAEUS 185 36
VAT. NO. 998711156
TEL. 210 42 95 180

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED | § § § § § | |
| PLAINTIFFS | § | C.A. NO. _____ |
| V. | § § | |
| M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM*, AND NEWLEAD CASTELLANO LTD. | § § § § § § § § | |
| DEFENDANTS | § § | |

**VERIFIED COMPLAINT**

EXHIBIT "6"

**DATED  16 October 2014**

**NEWLEAD CASTELLANO LTD**

**- and -**

**RAY CAPITAL INC.**

---

**FIRST PREFERRED
LIBERIAN MORTGAGE
m.v. " NEWLEAD CASTELLANO"**

---



**STEPHENSON HARWOOD**

# CONTENTS

| | | Page |
|---|---|---|
| 1 | Definitions and Interpretation | 3 |
| 2 | Representations and Warranties | 6 |
| 3 | Covenant to Pay | 7 |
| 4 | Mortgage and Amount Secured | 7 |
| 5 | Insurance | 9 |
| 6 | Operation and Maintenance | 14 |
| 7 | Mortgagee's Powers | 19 |
| 8 | Ancillary Provisions | 20 |
| 9 | Receiver | 22 |
| 10 | Application of Moneys | 23 |
| 11 | Power of Attorney | 23 |
| 12 | Partial Invalidity | 23 |
| 13 | Further Assurance | 24 |
| 14 | Waiver of Rights as Surety | 24 |
| 15 | Miscellaneous | 25 |
| 16 | Discharge of Security | 26 |
| 17 | Notices | 26 |
| 18 | Counterparts | 26 |
| 19 | Law and Jurisdiction | 26 |

FIRST PREFERRED MORTGAGE

Dated: 16 October 2014

BY:

(1)     **NEWLEAD CASTELLANO LTD**, a company incorporated according to the law of the Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Owner"**)

IN FAVOUR OF:

(2)     **RAY CAPITAL INC.**, a corporation incorporated under the law of the Republic of the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the **"Mortgagee"**).

WHEREAS:

(A)     NewLead Holdings Ltd., a company incorporated according to the law of Bermuda whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece (the **"Company"**) and Tiger Capital Partners Ltd., of Vanterpool Plaza, 2nd floor, Wickhams Cay I, Road Town, Tortola, British Virgin Islands (**"Tiger"**), the holder of a warrant dated 11 December 2013 (the **"Warrant"**) issued pursuant to a settlement agreement dated 11 December 2013 made between the Company and Tiger, have entered into an exchange agreement dated 27 December 2013 (the **"Exchange Agreement"**) pursuant to which the Company and Tiger agreed (inter alia) (i) to exchange the Warrant for unsecured convertible notes of an aggregate amount equal to the warrant and (ii) that Tiger may, pursuant to the terms referred to therein, assign the unsecured convertible notes to one or more entities.

(B)     Pursuant to the Exchange Agreement, Tiger assigned to the Mortgagee their right, title, interest and benefit of the amount of six million Dollars ($6,000,000) out of the total amount of twenty million Dollars ($20,000,000) in and under the Exchange Agreement and relevant notice of assignment was served to the Company on 27 December 2013.

(C)     Pursuant to the Exchange Agreement, the Company has issued and the Mortgagee has accepted an unsecured convertible note dated 27 December 2013, as amended by an addendum thereto dated 28 December 2013, each executed by the Company in favour the Mortgagee (together, the **"Note"**) (a copy of which in the form executed is attached to this Mortgage as Exhibit "A" and shall be read together with this Mortgage), the outstanding amount of the debt being at the date hereof equal to one million eight

hundred and sixty one thousand four hundred and twelve Dollars ($1,861,412) (the "**Debt**").

(D)    In consideration of the Mortgagee's agreement to accept the Note pursuant to the Exchange Agreement, the Owner has executed and delivered in favour of the Mortgagee a guarantee and indemnity dated 16 October 2014 (the "**Guarantee**") (a copy of which in the form executed is attached to this Mortgage as Exhibit "B" and shall be read together with this Mortgage) in respect of the obligations of the Company under the Finance Documents and has agreed to execute and register in favour of the Mortgagee this First Preferred Mortgage on the Vessel under and pursuant to Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended) and all other applicable laws of the Republic of Liberia, as security for the payment of the Indebtedness.

(E)    The Owner is the legal and beneficial owner of the whole of the Vessel.

**THIS MORTGAGE WITNESSES** as follows:

**1**    **Definitions and Interpretation**

1.1    In this Mortgage:

"**Assigned Property**" means the Insurances, the Earnings and the Requisition Compensation.

"**Default Rate**" means interest at the rate of twelve per cent (12%) per annum.

"**Dollars**", "**$**" and "**USD**" denote the lawful currency of the United States of America.

"**Earnings**" means all hires, freights, pool income and other sums payable to or for the account of the Owner in respect of the Vessel including (without limitation) all remuneration for salvage and towage services, demurrage and detention moneys, contributions in general average, compensation in respect of any requisition for hire, and damages and other payments (whether awarded by any court or arbitral tribunal or by agreement or otherwise) for breach, termination or variation of any contract for the operation, employment or use of the Vessel.

"**Encumbrance**" means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect

"**Event of Default**" means any of the events or circumstances set out in clause 4 of the Note.

"**Facility Period**" means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

"**Finance Documents**" means the Note, the Guarantee, this Mortgage, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Mortgagee and the Company.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable by the Owner to the Mortgagee under all or any of the Finance Documents.

"**Insurances**" means all policies and contracts of insurance (including all entries in protection and indemnity or war risks associations) which are from time to time taken out or entered into in respect of or in connection with the Vessel or her increased value or the Earnings and (where the context permits) all benefits under such contracts and policies, including all claims of any nature and returns of premium.

"**Mortgagees' Insurances**" means all policies and contracts of mortgagees' interest insurance, mortgagees' additional perils (oil pollution) insurance and any other insurance from time to time taken out by the Mortgagee in relation to the Vessel.

"**Obligatory Insurances**" means the insurances and entries referred to in Clause 5.1 and, where applicable, those referred to in Clauses 5.2, 5.5 and/or 6.16.

"**Requisition Compensation**" means all compensation or other money which may from time to time be payable to the Owner as a result of the Vessel being requisitioned for title or in any other way compulsorily acquired (other than by way of requisition for hire).

"**Security Parties**" means the parties to any of the Finance Documents (other than the Mortgagee).

"**Threshold Amount**" means two hundred and fifty thousand Dollars ($250,000) or its equivalent in any other currency.

"**Total Loss**" means:

(i)     an actual, constructive, arranged, agreed or compromised total loss of the Vessel; or

(ii)    the requisition for title or other compulsory acquisition of the Vessel by any government or other competent authority (otherwise than by way of requisition for hire); or

(iii)   the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture of the Vessel (not falling within (ii) above), unless the Vessel is released and returned to the possession of the Owner within thirty (30) days after the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture in question.

"**Vessel**" means the motor vessel "NEWLEAD CASTELLANO" registered in the ownership of the Owner under the flag of the Republic of Liberia with Official Number 16618, IMO Number 9686338 and the following registered dimensions and tonnages:

        length: 179.91
        breadth: 30
        depth: 14.8
        gross tonnage: 23857
        net tonnage: 11326

together with all her engines, machinery, boats, tackle, outfit, fuels, spares, consumable and other stores, belongings and appurtenances, whether on board or ashore, including any which may in the future be put on board or may in the future be intended to be used for the Vessel if on shore.

1.2     Unless otherwise specified in this Mortgage, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Mortgage.

1.3     In this Mortgage:

        1.3.1   words denoting the plural number include the singular and vice versa;

1.3.2     words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

1.3.3     references to Clauses are references to clauses of this Mortgage;

1.3.4     references to this Mortgage include the recitals to this Mortgage;

1.3.5     the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Mortgage;

1.3.6     references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

1.3.7     references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted;

1.3.8     an Event of Default is "continuing" if it has not been waived; and

1.3.9     references to the Mortgagee include its successors, transferees and assignees.

## 2    Representations and Warranties

The Owner represents and warrants to the Mortgagee that:

2.1     it is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of this Mortgage that it be filed, recorded or enrolled with any governmental authority or agency or stamped with any stamp or similar transaction tax, except for the recording of this Mortgage with the Deputy Commissioner of Maritime Affairs of the Republic of Liberia in New York; and

2.2     it is the sole legal and beneficial owner of the Vessel and (with the exception of this Mortgage) the Vessel is free from any Encumbrance and is not under arrest or in the possession of any person (other than her master and crew) who may become entitled to assert a maritime or possessory lien on her; and

2.3     the Vessel is insured and classed in accordance with the requirements of this Mortgage.

3       **Covenant to Pay**

The Owner agrees in accordance with the Guarantee to guarantee and indemnify the Mortgagee in respect of the Company's obligations to repay the Debt, to pay interest on the Debt and to pay all other sums at any time due to the Mortgagee under or pursuant to the Finance Documents.

4       **Mortgage and Amount Secured**

4.1     In consideration of the premises, the Owner has granted, conveyed, mortgaged, transferred, set over and confirmed, and by this Mortgage grants, conveys, mortgages, transfers, sets over and confirms, to the Mortgagee the whole of the Vessel **TO HAVE AND TO HOLD** the same unto the Mortgagee forever on the terms and subject to the conditions of this Mortgage for the enforcement of the payment to the Mortgagee of the Indebtedness, and in order to secure the performance and observance of, and compliance with, the covenants, terms and conditions contained in this Mortgage and in the other Finance Documents **PROVIDED ONLY**, and the conditions of this Mortgage are such that, if the Owner shall pay, or cause to be paid, the Indebtedness to the Mortgagee as and when the Indebtedness shall become due and payable in accordance with this Mortgage, the Guarantee and the Note, and shall perform, observe and comply with all the covenants, terms and conditions by it and on its part to be performed, observed and complied with contained, expressed or implied in the Finance Documents, then this First Preferred Mortgage and the rights granted by it shall cease, determine and be void but otherwise shall remain in full force and effect.

4.2     The Owner agrees with the Mortgagee that the Vessel is to be held by the Owner subject to the further covenants, conditions, provisions, terms and uses set out in this Mortgage.

4.3     It is not intended that this Mortgage shall cover property other than the Vessel as that term is used in Section 106 of Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended).

4.4     For the purposes of recording this First Preferred Mortgage as required by Chapter 3, Title 21 of the Liberian Code of Laws of 1956 (as amended) the total amount secured by this Mortgage is one million eight hundred and sixty one thousand four hundred and twelve Dollars ($1,861,412) plus interest, expenses and performance of Mortgage covenants. The discharge amount is the same as the total amount. Notwithstanding the foregoing, for property other than the

Vessel, if any should be determined to be covered by this Mortgage, the discharge amount is 0.01% of the total amount.

4.5 The Owner shall pay to the Mortgagee promptly on the Mortgagee's written demand the amount of all costs and expenses (including legal fees) incurred by the Mortgagee in connection with the enforcement of, or the preservation of any rights under, any Finance Document including (without limitation) any losses, costs and expenses which the Mortgagee may from time to time sustain, incur or become liable for by reason of the Mortgagee being mortgagee of the Vessel and/or a lender to the Owner, or by reason of the Mortgagee being deemed by any court or authority to be an operator or controller, or in any way concerned in the operation or control, of the Vessel.

4.6 The Owner shall pay to the Mortgagee promptly on the Mortgagee's written demand the amount of all sums which the Mortgagee may pay or become actually or contingently liable for on account of the Owner in connection with the Vessel (whether alone or jointly or jointly and severally with any other person) including (without limitation) all sums which the Mortgagee may pay or guarantees which it may give in respect of the Insurances, any expenses incurred by the Mortgagee in connection with the maintenance or repair of the Vessel or in discharging any lien, bond or other claim relating in any way to the Vessel, and any sums which the Mortgagee may pay or guarantees which it may give to procure the release of the Vessel from arrest or detention.

4.7 Notwithstanding anything to the contrary contained in this Mortgage, it is intended that nothing in this Mortgage shall waive the preferred status of this Mortgage and that, if any provision of this Mortgage shall be construed as waiving the preferred status of this Mortgage, then such provision shall to that extent be void and of no effect.

4.8 The Owner shall comply with all the requirements and formalities under the Liberian Code of Laws of 1956 (as amended) and any other applicable legislation of the Republic of Liberia necessary to perfect this Mortgage as a valid and enforceable first preferred lien upon the Vessel and shall furnish to the Mortgagee from time to time such evidence as the Mortgagee may reasonably request to satisfy itself with respect to the Owner's compliance with the provisions of this Clause.

4.9 The security constituted by this Mortgage shall be continuing and shall not be satisfied by any intermediate payment or satisfaction until the Indebtedness shall have been paid in full and the Mortgagee shall be under no further actual or contingent liability to any third party in relation to the Vessel, the Assigned

Property or any other matter referred to in the Finance Documents. The security constituted by this Mortgage shall be in addition to any other security now or in the future held by the Mortgagee for or in respect of the Indebtedness, and shall not merge with or prejudice or be prejudiced by any such security or any other contractual or legal rights of the Mortgagee nor be affected by any irregularity, defect or informality or by any release, exchange or variation of any such security.

5    Insurance

5.1    The Owner covenants to ensure at its own expense throughout the Facility Period that:

5.1.1    the Vessel remains insured against fire and all usual marine risks (including excess risks) and war risks on an agreed value basis for an amount which is the greater from time to time of (a) her full market value and (b) an amount which equals one hundred and twenty per cent (120%) of the amount of the Debt then outstanding; and

5.1.2    the Vessel remains entered in a protection and indemnity association in both protection and indemnity classes, or remains otherwise insured against protection and indemnity risks and liabilities (including, without limitation, protection and indemnity war risks); and

5.1.3    the Vessel remains insured against oil pollution caused by the Vessel for such amounts as the Mortgagee may from time to time approve unless that risk is covered to the satisfaction of the Mortgagee by the Vessel's protection and indemnity entry or insurance.

5.2    The Mortgagee agrees that, if and for so long as the Vessel may be laid up with the approval of the Mortgagee, the Owner may at its own expense take out port risk insurance on the Vessel in place of hull and machinery insurance.

5.3    The Owner undertakes to place the Obligatory Insurances in such markets, in such currency, on such terms and conditions, and with such brokers, underwriters and associations as the Mortgagee shall have previously approved in writing. The Owner shall not alter the terms of any of the Obligatory Insurances nor allow any person to be co-assured under any of the Obligatory Insurances without the prior written consent of the Mortgagee, and will supply the Mortgagee from time to time on request with such information as the Mortgagee may in its discretion require with regard to the Obligatory Insurances and the brokers, underwriters or associations through or with which the

Obligatory Insurances are placed. The Owner shall reimburse the Mortgagee on demand for all costs and expenses incurred by the Mortgagee in obtaining from time to time a report on the adequacy of the Obligatory Insurances from an insurance adviser instructed by the Mortgagee.

5.4    The Owner undertakes duly and punctually to pay all premiums, calls and contributions, and all other sums at any time payable in connection with the Obligatory Insurances, and, at its own expense, to arrange and provide any guarantees from time to time required by any protection and indemnity or war risks association. From time to time at the Mortgagee's request, the Owner will provide the Mortgagee with evidence satisfactory to the Mortgagee that such premiums, calls, contributions and other sums have been duly and punctually paid; that any such guarantees have been duly given; and that all declarations and notices required by the terms of any of the Obligatory Insurances to be made or given by or on behalf of the Owner to brokers, underwriters or associations have been duly and punctually made or given.

5.5    The Owner will comply in all respects with all terms and conditions of the Obligatory Insurances and will make all such declarations to brokers, underwriters and associations as may be required to enable the Vessel to operate in accordance with the terms and conditions of the Obligatory Insurances. The Owner will not do, nor permit to be done, any act, nor make, nor permit to be made, any omission, as a result of which any of the Obligatory Insurances may become liable to be suspended, cancelled or avoided, or may become unenforceable, or as a result of which any sums payable under or in connection with any of the Obligatory Insurances may be reduced or become liable to be repaid or rescinded in whole or in part. In particular, but without limitation, the Owner will not permit the Vessel to be employed other than in conformity with the Obligatory Insurances without first taking out additional insurance cover in respect of that employment in all respects to the satisfaction of the Mortgagee, and the Owner will promptly notify the Mortgagee of any new requirement imposed by any broker, underwriter or association in relation to any of the Obligatory Insurances.

5.6    The Owner will, no later than fourteen days (or, in the case of war risks, no later than seven days), before the expiry of any of the Obligatory Insurances renew them and shall immediately give the Mortgagee such details of those renewals as the Mortgagee may require.

5.7    The Mortgagee shall be at liberty to take out Mortgagees Insurances in relation to the Vessel for such amounts and on such terms and conditions as the

Mortgagee may from time to time decide, and the Owner shall from time to time on demand reimburse the Mortgagee for all costs, premiums and expenses paid or incurred by the Mortgagee in connection with any Mortgagees' Insurances.

5.8 The Owner shall deliver to the Mortgagee certified copies (and, if required by the Mortgagee, the originals) of all policies, certificates of entry and other documents relating to the Insurances (including, without limitation, receipts for premiums, calls or contributions) and shall procure that letters of undertaking in such form as the Mortgagee may approve shall be issued to the Mortgagee by the brokers through which the Insurances are placed (or, in the case of protection and indemnity or war risks associations, by their managers). If the Vessel is at any time during the Facility Period insured under any form of fleet cover, the Owner shall procure that those letters of undertaking contain confirmation that the brokers, underwriters or association (as the case may be) will not set off claims relating to the Vessel against premiums, calls or contributions in respect of any other vessel or other insurance, and that the insurance cover of the Vessel will not be cancelled by reason of non-payment of premiums, calls or contributions relating to any other vessel or other insurance. Failing receipt of those confirmations, the Owner will instruct the brokers, underwriters or association concerned to issue a separate policy or certificate for the Vessel in the sole name of the Owner or of the Owner's brokers as agents for the Owner.

5.9 The Owner shall promptly provide the Mortgagee with full information regarding any casualty or other accident or damage to the Vessel.

5.10 The Owner agrees that, on and at any time after the occurrence of an Event of Default which is continuing, the Mortgagee shall be entitled to collect, sue for, recover and give a good discharge for all claims in respect of any of the Insurances; to pay collecting brokers the customary commission on all sums collected in respect of those claims; to compromise all such claims or refer them to arbitration or any other form of judicial or non-judicial determination; and otherwise to deal with such claims in such manner as the Mortgagee shall in its discretion think fit.

5.11 Whether or not an Event of Default shall have occurred or be continuing, the proceeds of any claim under any of the Insurances in respect of a Total Loss shall be paid to the Mortgagee and applied by the Mortgagee in accordance with Clause 10.

5.12 In the event of any claim in respect of any of the Insurances (other than in respect of a Total Loss), if the Owner shall fail to reach agreement with any of

the brokers, underwriters or associations for the immediate restoration of the Vessel, or for payment to third parties, within such time as the Mortgagee may stipulate, the Mortgagee shall be entitled to require payment to itself. In the event of any dispute arising between the Owner and any broker, underwriter or association with respect to any obligation to make any payment to the Owner or to the Mortgagee under or in connection with any of the Insurances, or with respect to the amount of any such payment, the Mortgagee shall be entitled to settle that dispute directly with the broker, underwriter or association concerned. Any such settlement shall be binding on the Owner.

5.13    The Mortgagee agrees that any amounts which may become due under any protection and indemnity entry or insurance shall be paid to the Owner to reimburse the Owner for, and in discharge of, the loss, damage or expense in respect of which they shall have become due, unless, at the time the amount in question becomes due, an Event of Default is continuing, in which event the Mortgagee shall be entitled to receive the amounts in question and to apply them either in reduction of the Indebtedness or, at the option of the Mortgagee, to the discharge of the liability in respect of which they were paid.

5.14    The Owner shall not settle, compromise or abandon any claim under or in connection with any of the Insurances (other than a claim of less than the Threshold Amount arising other than from a Total Loss) without the prior written consent of the Mortgagee.

5.15    If the Owner fails to effect or keep in force the Obligatory Insurances, the Mortgagee may (but shall not be obliged to) effect and/or keep in force such insurances on the Vessel and such entries in protection and indemnity or war risks associations as the Mortgagee in its discretion considers desirable, and the Mortgagee may (but shall not be obliged to) pay any unpaid premiums, calls or contributions. The Owner will reimburse the Mortgagee from time to time on demand for all such premiums, calls or contributions paid by the Mortgagee, together with interest at the Default Rate from the date of payment by the Mortgagee until the date of reimbursement.

5.16    The Owner shall comply strictly with the requirements of any legislation relating to pollution or protection of the environment which may from time to time be applicable to the Vessel in any jurisdiction in which the Vessel shall trade and in particular the Owner shall comply strictly with the requirements of the United States Oil Pollution Act 1990 (the "**Act**") if the Vessel is to trade in the United States of America and Exclusive Economic Zone (as defined in the Act). Before

any such trade is commenced and during the entire period during which such trade is carried on, the Owner shall:

5.16.1 pay any additional premiums required to maintain protection and indemnity cover for oil pollution up to the limit available to the Owner for the Vessel in the market; and

5.16.2 make all such quarterly or other voyage declarations as may from time to time be required by the Vessel's protection and indemnity association in order to maintain such cover, and promptly deliver to the Mortgagee copies of such declarations; and

5.16.3 submit the Vessel to such additional periodic, classification, structural or other surveys which may be required by the Vessel's protection and indemnity insurers to maintain cover for such trade and promptly deliver to the Mortgagee copies of reports made in respect of such surveys; and

5.16.4 implement any recommendations contained in the reports issued following the surveys referred to in Clause 5.16.3 within the relevant time limits, and provide evidence satisfactory to the Mortgagee that the protection and indemnity insurers are satisfied that this has been done; and

5.16.5 in addition to the foregoing (if such trade is in the United States of America and Exclusive Economic Zone):

(aa) obtain and retain a certificate of financial responsibility under the Act in form and substance satisfactory to the United States Coast Guard and provide the Mortgagee with evidence of the same; and

(bb) procure that the protection and indemnity insurances do not contain a US Trading Exclusion Clause or any other analogous provision and provide the Mortgagee with evidence that this is so; and

(cc) comply strictly with any operational or structural regulations issued from time to time by any relevant authorities under the Act so that at all times the Vessel falls within the provisions which limit strict liability under the Act for oil pollution.

6       **Operation and Maintenance**

The Owner covenants with the Mortgagee:

6.1     to keep the Vessel seaworthy and in a state of complete repair and in compliance with the requirements from time to time of all applicable laws, conventions and regulations and of her insurers; and

6.2     to maintain the registration of the Vessel under the flag of the Republic of Liberia; to effect and maintain the recording of this Mortgage with the Deputy Commissioner of Maritime Affairs of the Republic of Liberia in New York; and not cause nor permit to be done any act or omission as a result of which that registration or that recording might be defeated or imperilled; and

6.3     to maintain the Vessel in a condition entitling the Vessel to the highest class applicable to vessels of her type with a classification society approved by the Mortgagee free of recommendations and qualifications; and

6.4     to comply with all laws, conventions and regulations applicable to the Owner or to the Vessel and to carry on board the Vessel all certificates and other documents which may from time to time be required to evidence such compliance; and

6.5     not without the prior written consent of the Mortgagee to make, nor permit nor cause to be made, any material change in the structure, type or speed of the Vessel; and

6.6     to procure that all repairs to the Vessel or replacements of parts or equipment of the Vessel are effected in such a way as not to diminish the value of the Vessel and with replacement parts or equipment the property of the Owner and free of all Encumbrances (other than this Mortgage); and

6.7     to permit the Mortgagee and all persons appointed by the Mortgagee to board the Vessel from time to time during the Facility Period to inspect the Vessel's state and condition and, if the Vessel shall not be in a state and condition which complies with the requirements of this Mortgage, to effect such repairs as shall in the opinion of the Mortgagee be desirable to ensure such compliance, without prejudice to the Mortgagee's other rights under or pursuant to this Mortgage; and

6.8     immediately to notify the Mortgagee of any arrest or detention of the Vessel, and to cause the Vessel to be released from arrest or detention as quickly as possible, and in any event within fourteen days from the date of arrest or