detention, and immediately to notify the Mortgagee in the same manner of the release of the Vessel; and

6.9     from time to time on request of the Mortgagee to produce to the Mortgagee written evidence satisfactory to the Mortgagee confirming that the master and crew of the Vessel have no claims for wages beyond the ordinary arrears and that the master has no claim for disbursements other than those properly incurred by him in the ordinary course of trading of the Vessel on the voyage then in progress; and

6.10    not during the Facility Period to sell, agree to sell, or otherwise dispose of, or agree to dispose of, the Vessel without the prior written consent of the Mortgagee; and

6.11    not during the Facility Period to change the name of the Vessel without the prior written consent of the Mortgagee; and

6.12    not during the Facility Period to lay the Vessel up without the prior written consent of the Mortgagee; and

6.13    in the event of any requisition or seizure of the Vessel, to take all lawful steps to recover possession of the Vessel as soon as it is entitled to do so; and

6.14    to give to the Mortgagee from time to time during the Facility Period on request such information as the Mortgagee may require with regard to the Vessel's employment, position and state of repair and, on the Mortgagee's request, to supply the Mortgagee with copies of all charterparties and other contracts of employment relating to the Vessel and copies of the Vessel's deck and engine logs; and

6.15    to comply with all requirements from time to time of the Vessel's classification society and to give to the Mortgagee from time to time during the Facility Period on request copies of all classification certificates of the Vessel and reports of surveys required by the Vessel's classification society (the Owner by its execution of this Mortgage irrevocably authorising the Mortgagee to obtain such information and documents from the Vessel's classification society as the Mortgagee may from time to time require), and to notify the Mortgagee immediately of any requirement or recommendation imposed by the Vessel's classification society; and

6.16    not during hostilities (whether or not a state of war shall formally have been declared and including, without limitation, any civil war) to permit the Vessel to be employed in carrying any goods which may be declared to be contraband of

war or which may render the Vessel liable to confiscation, seizure, detention or destruction, nor to permit the Vessel to enter any area which is declared a war zone by any governmental authority or by the Vessel's insurers unless that employment or voyage is either (a) consented to in advance and in writing by the underwriters of the Vessel's war risks insurances and fully covered by those insurances or (b) (to the extent not covered by those insurances) covered by additional insurance taken out by the Owner at the Owner's expense, which additional insurance shall be deemed to be part of the Insurances and of the Assigned Property; and

6.17    not without the prior written consent of the Mortgagee to let the Vessel on any demise charter or on any time charter, consecutive voyage charter or other contract of employment which (inclusive of any extension option) is capable of exceeding thirteen months nor to employ the Vessel in any way which might impair the security created by the Finance Documents; and

6.18    not without the prior written consent of the Mortgagee to enter into any agreement or arrangement for sharing the Earnings; and

6.19    duly to perform (unless prevented by force majeure), and to take all necessary steps to enforce the performance by charterers and shippers of, all charterparties and other contracts of employment and all bills of lading and other contracts relating to the Vessel; and

6.20    not after the occurrence of an Event of Default which is continuing to let the Vessel on charter or renew or extend any charter or other contract of employment of the Vessel, nor agree to do so, without the prior written consent of the Mortgagee; and

6.21    to pay and discharge when due from time to time all taxes, levies, duties, fines and penalties imposed on the Vessel or the Earnings, or on the Owner, its income, profits, capital gains or any of its property; and

6.22    not at any time during the Facility Period without the prior written consent of the Mortgagee (and then subject to such conditions as the Mortgagee may impose) to create nor grant nor permit to exist any Encumbrance over the Vessel or any of the Assigned Property; and

6.23    to notify the Mortgagee immediately the Owner becomes aware of any legal proceedings or arbitration involving the Vessel or the Owner where the amount claimed by any party (ignoring any counterclaim or defence of set-off) exceeds or may reasonably be expected to exceed the Threshold Amount; and

6.24 not without the prior written consent of the Mortgagee to put the Vessel into the possession of any person for the purpose of work or repairs estimated to cost more than the Threshold Amount (except for repairs the cost of which is recoverable under the Insurances and in respect of which the insurers have agreed to make payment in accordance with any applicable loss payable clause) unless that person shall have given an undertaking to the Mortgagee in such terms as the Mortgagee shall require not to exercise a lien on the Vessel for the cost of the work; and

6.25 to keep proper books of account in respect of the Vessel and the Earnings and as and when required by the Mortgagee to make such books available for inspection on behalf of the Mortgagee; and

6.26 to place and retain a certified copy of this Mortgage on board the Vessel and cause such certified copy of this Mortgage to be exhibited to any representative of the Mortgagee and to place and keep displayed on the Vessel a framed printed notice in plain type reading as follows:

<div align="center">

"**NOTICE OF MORTGAGE**

</div>

This Vessel is covered by a first preferred Mortgage to RAY CAPITAL INC. under authority of Title 21 of the Liberian Code of Laws of 1956 as amended.  Under the terms of the said Mortgage neither the Owner nor any Charterer nor the Master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than for crew's wages and salvage"; and

6.27 not without the prior written consent of the Mortgagee to appoint anyone other than Newlead Bulkers S.A. of the Republic of Liberia as commercial or technical managers of the Vessel, nor to terminate nor materially vary the arrangements for the commercial or technical management of the Vessel, nor to permit the commercial or technical management of the Vessel to be sub-contracted or delegated to any third party; and

6.28 to take all reasonable precautions to prevent any infringements of any anti drug legislation in any jurisdiction in which the Vessel shall trade and in particular (if the Vessel is to trade in the United States of America) to take all reasonable precautions to prevent any infringements of the Anti-Drug Abuse Act of 1986 of the United States of America; and

6.29 to comply, or procure that the operator of the Vessel will comply, with the International Management Code for the Safe Operation of Ships and for

Pollution Prevention adopted by the International Maritime Organisation (as the same may be amended from time to time) (the "**ISM Code**") or any replacement of the ISM Code and in particular, without limitation, to:

6.29.1   procure that the Vessel remains for the duration of the Facility Period subject to a safety management system developed and implemented in accordance with the ISM Code; and

6.29.2   maintain for the Vessel throughout the Facility Period a valid and current safety management certificate issued under paragraph 13.7 of the ISM Code ("**SMC**") and provide a copy to the Mortgagee; and

6.29.3   procure that the company responsible for the Vessel's compliance with the ISM Code under paragraph 1.1.2 of the ISM Code ("**ISM Company**") maintains throughout the Facility Period a valid and current Document of Compliance issued for the ISM Company under paragraph 13.2 of the ISM Code ("**DOC**") and provide a copy to the Mortgagee; and

6.29.4   notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the SMC of the Vessel or of the DOC of the ISM Company; and

6.30   to comply in relation to the Vessel with the International Ship and Port Facility Security Code adopted by the International Maritime Organisation (as the same may be amended from time to time) (the "**ISPS Code**") or any replacement of the ISPS Code and in particular, without limitation, to:

6.31   procure that the Vessel and the company responsible for the Vessel's compliance with the ISPS Code comply with the ISPS Code; and

6.32   maintain for the Vessel throughout the Facility Period a valid and current International Ship Security Certificate issued under the ISPS Code ("**ISSC**") and provide a copy to the Mortgagee; and

6.33   notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC; and

6.34   to comply in relation to the Vessel with Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997) (as the same may be amended from time to time) ("**Annex VI**") or any replacement of Annex VI and in particular, without limitation, to:

6.35     procure that the Vessel's master and crew are familiar with, and that the Vessel complies with, Annex VI; and

6.36     maintain for the Vessel throughout the Facility Period a valid and current International Air Pollution Prevention Certificate issued under Annex VI (**"IAPPC"**) and provide a copy to the Mortgagee; and

6.37     notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the IAPPC.

## 7     Mortgagee's Powers

7.1     If an Event of Default shall occur, and the Mortgagee shall demand payment of all or any part of the Indebtedness, the security constituted by this Mortgage shall become immediately enforceable and the Mortgagee shall be entitled to exercise all or any of the rights, powers, discretions and remedies vested in the Mortgagee by this Clause without any requirement for any court order or declaration that an Event of Default has occurred.  The Mortgagee's right to exercise those rights, powers, discretions and remedies shall be in addition to and without prejudice to all other rights, powers, discretions and remedies to which it may be entitled, whether by statute or otherwise including, without limitation, those conferred on the Mortgagee by Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended).  The Mortgagee shall be entitled to exercise its rights, powers, discretions and remedies despite any rule of law or equity to the contrary, and whether or not any previous default shall have been waived, and in particular without the limitations imposed by the law of any relevant jurisdiction.

7.2     In the circumstances described in Clause 7.1, the Mortgagee shall be entitled (but not obliged) to:

7.2.1     take possession of the Vessel wherever she may be; and/or

7.2.2     discharge the master and crew of the Vessel and employ a new master and crew; and/or

7.2.3     navigate the Vessel to such places as the Mortgagee may decide or detain or lay up the Vessel; and/or

7.2.4     in the name of the Mortgagee or the name of the Owner, demand, sue for, receive and give a good receipt for all sums due to the Owner in connection with the Vessel and, in the name of the Mortgagee or the name of the Owner or the name of the Vessel, commence such legal

proceedings as it may consider appropriate, or conduct the defence of any legal proceedings commenced against the Vessel or the Owner in its capacity as owner of the Vessel; and/or

7.2.5    sell or dispose of the Vessel either by private treaty or auction, on such terms as the Mortgagee shall think fit (including deferred payment terms and with or without the benefit of any charterparty or other contract of employment), with the power to make a loan on such terms as the Mortgagee may decide to any prospective purchaser to assist in the purchase of the Vessel, and the power to postpone any sale, without being liable for any loss caused by any such sale or the postponement of any such sale; and/or

7.2.6    replace or repair any part of the Vessel or alter her to suit the Mortgagee's requirements and put her through all appropriate surveys; and/or

7.2.7    employ agents, servants and others on such terms as the Mortgagee may in its discretion determine; and/or

7.2.8    charter or load the Vessel on such terms and for the carriage of such cargoes as the Mortgagee may in its discretion determine.

7.3    For the avoidance of doubt, if the Mortgagee takes any action or enters into or completes any transaction pursuant to Clause 7.2 after an Event of Default has been remedied, that action or transaction shall not be affected by the remedying of the Event of Default.

## 8    Ancillary Provisions

8.1    In connection with the exercise of its rights, powers, discretions and remedies under Clause 7 or otherwise as mortgagee of the Vessel, the Mortgagee shall have power to buy in, rescind or vary any contract for sale of the Vessel and generally to do all things in connection with the sale of the Vessel as it shall think fit.

8.2    On any sale of the Vessel by the Mortgagee, the purchaser shall not be bound to enquire whether the Mortgagee's power of sale has become exercisable or whether its exercise has become expedient, and the purchaser shall not be affected by any notice that the sale was or may have been irregular in any way. The receipt of the Mortgagee for any amounts paid to it shall be a complete discharge to the purchaser who shall not be concerned with the application of

the payment or be answerable for any misapplication.   As regards any purchaser, any such sale shall be deemed to be within the power of sale conferred on the Mortgagee by this Mortgage and at law and any remedy of the Owner in respect of any irregularity or impropriety shall be in damages only.

8.3    If the Mortgagee takes possession of the Vessel and until sale the Mortgagee shall be entitled to deal with the Vessel in all respects as if it were the owner of the Vessel.

8.4    The Mortgagee shall be entitled to recover from the Owner on demand all losses, expenses, payments and disbursements incurred by the Mortgagee in or about or incidental to the exercise by it of any of its rights, powers, discretions and remedies under Clause 7 or otherwise as mortgagee of the Vessel together with interest at the Default Rate.

8.5    No failure to exercise, nor any delay in exercising, on the part of the Mortgagee, any right or remedy under Clause 7 or otherwise as mortgagee of the Vessel shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.   The rights and remedies provided in this Mortgage are cumulative and not exclusive of any rights or remedies provided by law.

8.6    The Mortgagee may at any time and from time to time delegate to any person all or any of its rights, powers, discretions and remedies pursuant to the Finance Documents on such terms as the Mortgagee may consider appropriate (including the power to sub-delegate).

8.7    Every right, power, discretion and remedy conferred on the Mortgagee under or pursuant to the Finance Documents shall be cumulative and in addition to every other right, power, discretion or remedy to which the Mortgagee may at any time be entitled by law or in equity.   The Mortgagee may exercise each of its rights, powers, discretions and remedies as often and in such order as it deems appropriate.

8.8    Neither the Mortgagee nor any agent or employee of the Mortgagee shall be liable for any losses which may be incurred in or about the exercise of any of the rights, powers, discretions or remedies of the Mortgagee under or pursuant to this Mortgage, nor liable as mortgagee in possession for any loss on realisation or for any neglect or default of any nature for which a mortgagee in possession might otherwise be liable

9     **Receiver**

9.1    On and at any time after the occurrence of an Event of Default which is continuing the Mortgagee may (but shall not be obliged to) appoint any person to be receiver and/or manager of the Vessel and/or any of the Assigned Property.

9.2    The appointment of a receiver and/or manager by the Mortgagee may be made in writing under the hand of any authorised signatory of the Mortgagee.

9.3    The Mortgagee shall have the power to authorise any joint receiver and/or manager to exercise any or all of his powers independently of any other joint receiver and/or manager.

9.4    The Mortgagee may at any time and from time to time remove any receiver and/or manager from office and appoint a replacement.

9.5    The Mortgagee shall have the power from time to time to fix the remuneration of any receiver and/or manager on the basis of charging from time to time adopted by him or his firm and any receiver and/or manager shall not be limited to any maximum amount or rate specified by law.

9.6    Any receiver and/or manager appointed pursuant to this Clause shall be the agent of the Owner and the Owner shall be solely responsible for his acts and defaults and for the payment of his remuneration.

9.7    Any receiver and/or manager appointed pursuant to this Clause shall have all the powers conferred on receivers and/or managers by law without any restriction, whether imposed by law or otherwise.

9.8    Without limitation, any receiver and/or manager shall have power on behalf of the Owner (and at the Owner's expense) to do or omit to do anything which the Owner could do or omit to do in relation to the Vessel or any of the Assigned Property and may exercise all or any of the rights, powers, discretions and remedies conferred on the Mortgagee by the Finance Documents or at law.

9.9    No receiver and/or manager shall be liable as mortgagee in possession to account or be liable for any loss on realisation of, or any default of any nature in connection with, the Vessel or any of the Assigned Property or the exercise of any of the rights, powers, discretions and remedies vested in the receiver and/or manager by virtue of the Finance Documents or at law.

10   Application of Moneys

All amounts received by the Mortgagee arising from the exercise by the Mortgagee of its rights, powers, discretions and remedies under or pursuant to this Mortgage (including, without limitation, all amounts received by the Mortgagee in connection with the taking possession and/or sale of the Vessel, any chartering or other use of the Vessel by the Mortgagee, and any claims for damages or claims on any insurance received by the Mortgagee while in possession of or while chartering or using the Vessel) shall, unless otherwise agreed by the Mortgagee or otherwise expressly provided in the Note, be applied by the Mortgagee in or towards satisfaction of, or retention on account for, the Indebtedness in such manner as the Mortgagee may in its discretion determine.

11   Power of Attorney

11.1   The Owner by way of security irrevocably appoints the Mortgagee and any receiver and/or manager appointed by the Mortgagee severally to be its attorney (with unlimited power of substitution and delegation) with power (in the name of the Owner or otherwise) to do all acts which the Owner could do in connection with the Vessel or the Assigned Property including, without limitation, to execute and deliver a bill of sale transferring title in the Vessel to a third party and to give a good receipt for any purchase price.

11.2   The Mortgagee agrees that it will not exercise any of its powers as attorney of the Owner unless an Event of Default is continuing, but the exercise of any such powers by the Mortgagee shall not put any person dealing with the Mortgagee on enquiry as to whether an Event of Default is continuing and any such person shall not be affected by notice that no Event of Default is in fact continuing.

11.3   The exercise by the Mortgagee or by any receiver and/or manager of any of their powers as attorney of the Owner shall be conclusive evidence of their right to do so.

12   Partial Invalidity

If, at any time, any provision of this Mortgage is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

13    **Further Assurance**

The Owner agrees that from time to time on the written request of the Mortgagee it will immediately execute and deliver to the Mortgagee all further documents which the Mortgagee may require for the purpose of perfecting or protecting the security intended to be created by this Mortgage.

14    **Waiver of Rights as Surety**

14.1    The rights of the Mortgagee under this Mortgage, the security constituted by this Mortgage and the warranties, covenants and obligations of the Owner contained in this Mortgage shall not in any way be discharged, impaired or otherwise affected by:

14.1.1    any forbearance (whether as to payment or otherwise) or any time or other indulgence granted to any of the other Security Parties under or in connection with any of the Finance Documents;

14.1.2    any amendment, variation, novation or replacement of any of the other Finance Documents;

14.1.3    any failure of any of the Finance Documents to be legal, valid, binding and enforceable in relation to any of the other Security Parties for any reason;

14.1.4    the winding-up or dissolution of any of the other Security Parties;

14.1.5    the release (whether in whole or in part) of, or the entering into of any compromise or composition with, any of the other Security Parties; or

14.1.6    any other act, omission, thing or circumstance which would or might, but for this provision, operate to discharge, impair or otherwise affect the same.

14.2    Until the Indebtedness has been unconditionally and irrevocably paid and discharged in full, the Owner shall not by virtue of any payment made under this Mortgage on account of the Indebtedness or by virtue of any enforcement by the Mortgagee of its rights under, or the security constituted by, this Mortgage or by virtue of any relationship between or transaction involving, the Owner and any of the other Security Parties:

14.2.1   exercise any rights of subrogation in relation to any rights, security or moneys held or received or receivable by the Mortgagee or any other person; or

14.2.2   exercise any right of contribution from any of the other Security Parties under any of the Finance Documents; or

14.2.3   exercise any right of set-off or counterclaim against any of the other Security Parties; or

14.2.4   receive, claim or have the benefit of any payment, distribution, security or indemnity from any of the other Security Parties; or

14.2.5   unless so directed by the Mortgagee (when the Owner will prove in accordance with such directions), claim as a creditor of any of the other Security Parties in competition with the Mortgagee

and the Owner shall hold in trust for the Mortgagee and forthwith pay or transfer (as appropriate) to the Mortgagee any such payment (including an amount equal to any such set-off), distribution or benefit of such security, indemnity or claim in fact received by it.

## 15   Miscellaneous

15.1   In the event of there being any conflict between this Mortgage and the Note, the Note shall prevail.

15.2   All the covenants and agreements of the Owner in this Mortgage shall bind the Owner and its successors and permitted assignees and shall inure to the benefit of the Mortgagee and its successors, transferees and assignees.

15.3   The representations and warranties on the part of the Owner contained in this Mortgage shall survive the execution of this Mortgage and the registration of this Mortgage.

15.4   The rights of the Mortgagee under this Mortgage shall not be affected by any change in the constitution of the Owner or by the liquidation, bankruptcy or insolvency of the Owner.

15.5   No variation or amendment of this Mortgage shall be valid unless in writing and signed on behalf of the Owner and the Mortgagee.

16    **Discharge of Security**

16.1    Following the expiry of the Facility Period the Mortgagee will, at the cost of and on the request of the Owner, execute and deliver to the Owner a discharge of this Mortgage.

16.2    Any discharge, release or reassignment by the Mortgagee of any of the security constituted by, or any of the obligations of the Owner contained in, any of the Finance Documents shall be (and be deemed always to have been) void if any act (including, without limitation, any payment) as a result of which such discharge, release or reassignment was given or made is subsequently wholly or partially rescinded or avoided by operation of any law.

17    **Notices**

The provisions of clause 14 of the Guarantee shall apply (mutatis mutandis) to this Mortgage as if it were set out in full with references to this Mortgage substituted for references to the Guarantee.

18    **Counterparts**

This Mortgage may be executed in any number of counterparts, each of which shall be an original but which shall together constitute the same instrument.

19    **Law and Jurisdiction**

19.1    This Mortgage and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with the law of the Republic of Liberia.

19.2    For the exclusive benefit of the Mortgagee, the Owner irrevocably submits to the *in personam* jurisdiction of the English courts to settle any dispute (a) arising from or in connection with this Mortgage or (b) relating to any non-contractual obligations arising from or in connection with this Mortgage and that any proceedings may be brought in those courts.

19.3    Nothing contained in this Clause shall limit the right of the Mortgagee to commence any proceedings against the Owner in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Owner in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

19.4    The Mortgagee shall in addition have the right to arrest and take action against the Vessel and/or any other vessel for the time being belonging to the Owner wherever it or they may be, for which purpose the Owner irrevocably agrees that any claim form, notice, judgment or other legal process may be served on the Owner in the manner set out in Clause 19.6 or on the Vessel or on the master (or anyone acting as the master) of the Vessel or of the vessel against which the action is taken, which shall be deemed good service on the Owner, the Vessel or such other vessel for all purposes.

19.5    The Owner irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

19.6    Without prejudice to any other mode of service allowed under any relevant law, the Owner:

19.6.1    irrevocably appoints Holman Fenwick Willan International LLP, Friary Court, 65 Crutched Friars, London, EC3N 2AE as its agent for service of process in relation to any proceedings before the English courts; and

19.6.2    agrees that failure by a process agent to notify the Owner of the process will not invalidate the proceedings concerned.

**IN WITNESS** of which the Owner has executed this Mortgage by its duly authorised attorney-in-fact the day and year first before written.

NEWLEAD CASTELLANO LTD

By:    _____
        attorney-in-fact duly authorised

        MICHAIL S LIVANOS

## ACKNOWLEDGEMENT OF MORTGAGE

Hellenic Republic )
                  ) SS.:
Piraeus )

On this *16* day of October, 2014 before me personally appeared MICHAIL LIVANOS to me known and known to me to be the person who executed the foregoing instrument who being by me duly sworn did depose and say that he resides at 83 Alki Miaouliand Eleona Street, Piraeus , that he is an attorney in fact for Newlead Castellano Ltd that he signed his name thereto by order of the Board of Directors of the said corporation, and that the execution of the foregoing instrument is the act and deed of the said corporation.

Special Agent
CHRISTINA KA

EXHIBIT "A"

FORM OF NOTE AS EXECUTED

(SEE ATTACHED)

THIS NOTE AND THE SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET FORTH HEREIN.   NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE PURSUANT HERETO MAY BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER SUCH ACT.   THIS NOTE IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT CERTAIN EXCHANGE AGREEMENT, DATED DECEMBER 27, 2013, BY AND BETWEEN THE COMPANY AND THE HOLDER.

<div align="center">

**NEWLEAD HOLDINGS LTD.**
**Unsecured Convertible Note**

</div>

$6,000,000

December 27, 2013
Piraeus, Greece

NEWLEAD HOLDINGS LTD., a company organized under the laws of Bermuda (the "Company"), for value received, hereby promises to pay to Ray Capital Inc. a company established under the laws of the Mashall Islands with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands, or registered assigns (the "Holder"), the principal amount of US$6,000,000 (United States Dollars six million) (the "Principal").

This Note has been issued pursuant to an Exchange Agreement Dated December 27th, 2013 between the Company and *Tiger Capital Partners Ltd.* of Vanterpool Plaza, 2nd floor, Wickhams Cay I, Road Town, Tortola, British Virgin Islands (the "Exchange Agreement"). Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Exchange Agreement.

1.   **Payments.**

    (a)   Sixty dates hereof, the Company shall:

    (i)   pay US$6,000,000 (United States Dollars six million) by issuance of its common shares, par value $0.01 (the "Common Stock"), at the Stock Price (as defined below).

**Stock Price.** The number of shares of Common Stock shall be determined by dividing (i) the amount payable by, (ii) the Closing Price, as adjusted for any stock splits or stock dividends (the "Stock Price"). "Closing Price" means the average of the closing prices for the ten (10) trading days immediately prior to (but not including) the date of issuance of the shares, provided the Common Stock is then listed or quoted on the NASDAQ, OTC Bulletin Board or any other national securities exchange, market or trading or quotation facility (a "Trading Market").

<u>True up Amounts</u>. Commencing from the first annual anniversary of the Agreement and each succeeding anniversary (the "Measurement Dates"), for a Period of five (5) years from the date of execution of the Agreement, the Holder shall be entitled to recover the shortfall incurred in additional shares or cash or any combination at the Company's option. The True up Amounts are equal to the Principal less the Market Value (as defined below) of the shares issued or the cash paid as part of any Payments prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days after the Measurement Dates.

<u>Market Value</u>. Market Value with respect to the shares issued as part of the Principal, means the aggregate gross proceeds received by the Holder from one or more sales, as evidenced by brokerage statements for such sales; *provided, however,* that if the sale price is not reasonably related to the trading price on the sale date, such sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale.

(ii)     For a period of 5 years after the execution date of this Note, at the date when either, (i) all Common Stock being issued to the Holder under 1(a)(i) above, or (ii) all Common Stock being issued to the Holder under any True up Amounts (**As defined hereinabove**), are sold in full and the Holder is entitled to additional True up Amounts. The Company may elect to pay the additional True up Amounts by either (i) wire transfer of immediately available funds to an account designated in writing by the Holder, or (ii) issuance by the Company of its Common Stock at the Stock Price determined as of such date, or (iii) any combination thereof, at the sole option of the Company. The Holder will be entitled for as many additional True up Amounts are required to collect in total the Principal in cash either by the sale of Common Stock or by cash receipts by the Company. Six (6) months prior the lapse of the five (5) year period the Holder is entitled to request for an extension of the true-up period for an additional three (3) years by providing a written notice to the Company.

(b)     **Termination of Rights Under this Note**.  Immediately upon the payment of the Principal and/ or any applicable True up Amount due under this Note, this Note shall no longer be deemed outstanding and all rights with respect to this Note shall immediately cease and terminate, except only for the right of the Holder under clause 1(a)(ii) of this Note.

(c)     **Taxes or other Issuance Charges**.  The issuance of any shares of Common Stock in payment of this Note, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance.   The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

2

(d) <u>Holder Not a Stockholder</u>. The Holder shall not have, solely on account of such status as a holder of this Note, any rights of a stockholder of the Company, either at law or in equity, or any right to any notice of meetings of stockholders or of any other proceedings of the Company until such time as this Note has been paid in shares of Common Stock pursuant to Section 1(a), at which time the Holder shall be deemed to be the holder of record of Common Stock that has been issued, as applicable, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(e) **Fractional Shares**. No fractional shares of Common Stock shall be issued when paying this Note. In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up or down to the nearest whole share of Common Stock.

(f) **Payment in Common Stock or Cash**. Each Payment may be paid by the Company in cash or shares of its Common Stock, at its sole discretion; provided, however, that if the Common Stock is not then listed or quoted on a Trading Market (or a similar organization or agency succeeding to its functions of reporting prices), then the Company may not pay by issuing shares of its Common Stock.

2.      **Trading Market Limitations**. Unless permitted by the applicable rules and regulations of the principal securities market on which the Common Stock is then listed or traded, in no event shall the Company issue upon conversion of or otherwise pursuant to this Note and the other Notes issued pursuant to the Exchange Agreement more than the maximum number of shares of Common Stock that the Company can issue pursuant to any rule of the principal United States securities market on which the Common Stock is then traded (the "Maximum Share Amount"), which shall be 4.99% of the total shares outstanding on the Closing Date, subject to equitable adjustment from time to time for stock splits, stock dividends, combinations, capital reorganizations and similar events relating to the Common Stock occurring after the date hereof.

3.      **Ranking**. The Company, for itself, its successors and assigns, covenants and agrees, that the payment of the Principal of this Note is senior in right of payment to the payment of all existing and future Junior Debt (as defined below). "**Junior Debt**" shall mean all existing and future Indebtedness (as defined below), (B) Indebtedness (as defined below) incurred after the date hereof, solely as it relates to the Collateral, and (C) as otherwise agreed to by the Holder in writing. "**Indebtedness**" shall mean (x) any liability of the Company for borrowed money, (1) evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), including any given in connection with the acquisition of property, assets or service, or (2) for the payment of rent or other amounts relating to capitalized lease obligations; (y) any liability of others of the nature described in clause (1) which the Company has guaranteed or which is otherwise its legal liability; and (z) any modification, renewal, extension, replacement or refunding of any such liability described in clause (x) or (y); provided, that Indebtedness does not include unsecured trade credit.

(a)      The Company covenants and agrees to cause any current holder of Junior Debt and to cause any future holder of Junior Debt permitted to be incurred pursuant to this Note

3

to execute such subordination agreements, instruments or waivers as may be necessary to reflect the terms set forth herein.

(b)     Until the payment in full of all amounts of principal of this Note, and all other amounts owing under this Note, no payment may be made with respect to the principal of or other amounts owing with respect to any Junior Debt, or in respect of any redemption, retirement, purchase or other acquisition thereof, provided that the Company may pay scheduled interest thereon so long as no Event of Default shall have occurred and be continuing.

(c)     Upon any payment or distribution of the assets of the Company to creditors upon dissolution, total or partial liquidation or reorganization of, or similar proceeding, the Holder of the Note will be entitled to receive payment in full before any holder of Junior Debt is entitled to receive any payment.

4.     **Events of Default.**  The entire unpaid principal of this Note or any True up Amounts shall become and be immediately due and payable in cash or shares of Common Stock of the Company, in either case without any other notice or demand of any kind or any presentment or protest, if any one of the following events occurs and be continuing at the time of such demand (each such event, an "**Event of Default**"):

(a)     The Company's failure to pay any portion of the principal as provided in Section 1 hereof; or

(b)     (i) The commencement by the Company, or any subsidiary, of a voluntary case under 11 U.S.C. Section 101 *et. seq.* (the "Bankruptcy Code") or any foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or (ii) the consent by the Company, or any subsidiary, to the entry of an order for relief in an involuntary bankruptcy or similar case, or to the conversion of an involuntary case to a voluntary case, under any such law, or (iii) the consent by the Company, or any subsidiary, to the appointment of, or the taking of possession by, a receiver, trustee or other custodian for all or a substantial part of the Company's properties, or (iv) the making by the Company, or any subsidiary, of any assignment for the benefit of creditors, or (v) the admission by the Company, or any subsidiary, in writing of the Company's inability to pay the Company's debts as such debts become due, or (vi) the discontinuance of business, dissolution, winding up, liquidation or cessation of existence by or of the Company, or any subsidiary; or

(d)     (i) The entry by a court of competent jurisdiction a decree or order for relief with respect to the Company, or any subsidiary, in an involuntary case under the Bankruptcy Code or any applicable foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed or dismissed within 60 days of the entry thereof, or (ii) the entry by a court of a decree or order for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other person having similar powers over the Company or over all or a substantial part of its properties;

(f)     The Company materially breaches any covenant contained in the Exchange Agreement; or

4

The Company agrees that if it fails to timely make any payment due under this Note or upon the happening of any Event of Default, and fails to remedy the situation within a ten (10) day grace period, the outstanding principal, together with all other expenses, including, reasonable attorneys' fees, shall immediately become due and payable at the option of the Holder.   For purposes hereof, attorneys' fees shall include, without limitation, fees and disbursements for legal services incurred by the holder hereof in collecting or enforcing payment hereof whether or not suit is brought, and if suit is brought, then through all appellate actions. From and after any Event of Default, the interest rate of this Note shall be the highest rate permitted under applicable law.

5.   **Miscellaneous**.

(a)   The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; *provided, however*, that neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party.  Assignment of all or any portion of this Note in violation of this Section shall be null and void.  Nothing in this Note, expressed or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b)   Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in accordance with Section 11.5 of the Exchange Agreement.

(c)   Upon receipt of evidence satisfactory to the Company, of the loss, theft, destruction or mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the Holder thereof that this Note has been lost, stolen, destroyed or mutilated, together with an indemnity against any claim that may be made against the Company on account of such lost, stolen, destroyed or mutilated Note, and upon reimbursement of the Company's reasonable incidental expenses, the Company shall execute and deliver to the Holder a new Note of like date, tenor and denomination.

(d)   No course of dealing and no delay or omission on the part of the Holder or the Company in exercising any right or remedy shall operate as a waiver thereof or otherwise prejudice the Holder's or the Company's rights, powers or remedies, as the case may be.  No right, power or remedy conferred by this Note upon the Holder or the Company shall be exclusive of any other right, power or remedy referred to herein or now or hereafter available at law, in equity, by statute or otherwise, and all such remedies may be exercised singly or concurrently.  Any waiver must be in writing.

(e)   If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.  This Note may be amended only by a written instrument executed by the

Company and the Holder. Any amendment shall be endorsed upon this Note, and all future Holders shall be bound thereby.

(f)     If any date specified in this Note as a date for the making of any payment of principal or interest under this Note falls on a Saturday, Sunday or on a day that is a legal holiday in the State of New York, then the date for the making of that payment shall be the next subsequent day that is not a Saturday, Sunday or legal holiday.

(g)     This Note shall be governed by and construed in accordance with the laws of the New York City, without giving effect to principles governing conflicts of law.

(h)     The Company hereby irrevocably submits to the exclusive jurisdiction of any United States Federal court over any suit, action or proceeding arising out of or related to the Note. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; *provided* that service of process is effected upon the Company in the manner permitted by law.

(i)     The parties hereto agree that all monetary amounts set forth herein are referenced in United States dollars, unless otherwise stated.

*(Remainder of page left intentionally blank. Signature page to follow.)*

6

IN WITNESS WHEREOF, the Company has caused this Senior Secured Note to be executed and dated the day and year first above written.

NEWLEAD HOLDINGS LTD.

By: _____

Name: __MICHAEL____ZOLOTAS__

Title: __CEO_____

DATE 28 December 2013

NEWLEAD HOLDINGS LTD
Of Bermuda
-and-

RAY CAPITAL INC
Of The Republic of Marshall Islands

ADDENDUM NO. 1
to
the Unsecured Convertible Note dated 27th December 2013.

THIS ADDENDUM No. 1 is made on the 28th day of December 2013

BETWEEN

(1)  **NEWLEAD HOLDINGS LTD**, a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "Company"); and

(2)  **RAY CAPITAL INC.**, a corporation established in the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands (hereinafter called "Ray")

(each a Party and together with the Parties)

**WHEREAS**, Pursuant to an Unsecured Convertible Note dated 27th December 2013 between the Company and Ray (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied the "Note"), the Company promises to pay to Ray the principal amount of USD6,000,000 (United States Dollars six million) (hereinafter the "Principal Amount") under the terms and conditions set forth therein.

NOW THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree to amend the Note as follows:

1.  The Maturity Date of the Note is set one year after the execution date of the Note, being December 27th, 2014 (hereinafter the "Maturity Date").

2.  Clause 1(a)(i) of the Note is amended to read that the Note is to be paid by the Company *upon the Maturity Date*.

3.  Ray shall have the right from time to time and at any time during the period commencing from the date of execution of the Note and ending on the later of

the Maturity Date, to convert all or any part of the outstanding and unpaid Principal Amount of the Note into fully paid and non-assessable shares of Common Stock of the Company at the Stock Price.

4. The Closing Price definition is amended to *"the closing price of the trading day immediately prior to the date of issuance of the shares (the "Closing Price")"*.

5. The definition of the **True up Amounts** is amended in its entirety to read as follows *"For a period of five (5) years from the date of execution of the Note, Ray shall be entitled to recover the shortfall incurred in additional shares or cash or any combination at the Company's option. The True up Amounts are equal to the Principal Amount less the Market (as defined below) of the shares issued or the cash paid as part of any Payment prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days upon receipt of the request from Ray."*

6. The Note as amended by this Addendum represent the entire agreement among the parties hereto with respect to the subject matter hereof and supersede any prior expressions of intent or understanding with respect to this transaction and may be amended only by an instrument in writing executed by the party or parties to be bound or burdened thereby.

7. This Addendum shall in all respects be governed by, and construed in accordance with the internal laws of the State of New York.

IN WITNESS WHEREOF the presents have been duly executed the day and year first before written.

SIGNED by:                        )
M. ZOLOTAS                        )
for and on behalf of:             )
NEWLEAD HOLDINGS LTD              )
in the presence of:               )

2

ACKNOWLEDGED by:    )
D. TSOUVELEKAKIS    )
for and on behalf of:    )
RAY CAPITAL INC.    )
In the presence of:    )

EXHIBIT "B"

FORM OF GUARANTEE AS EXECUTED

(SEE ATTACHED)

DATED  16 October 2014

NEWLEAD CASTELLANO LTD

– to –

RAY CAPITAL INC.

GUARANTEE AND INDEMNITY



**STEPHENSON HARWOOD**

# CONTENTS

Page

1    Definitions and Interpretation ........................................................................3

2    Representations and Warranties.....................................................................5

3    Guarantee and Indemnity .............................................................................6

4    Preservation of Guarantor's Liability..............................................................7

5    Preservation of Holder's Rights .....................................................................8

6    Undertakings................................................................................................10

7    Payments .....................................................................................................12

8    Currency ......................................................................................................13

9    Set-Off.........................................................................................................14

10    Application of Moneys ................................................................................14

11    Partial Invalidity ........................................................................................15

12    Further Assurance.......................................................................................15

13    Miscellaneous ............................................................................................15

14    Notices.......................................................................................................15

15    Law and Jurisdiction ..................................................................................17

**GUARANTEE AND INDEMNITY**

Dated: 16 October 2014

BY:

(1)    **NEWLEAD CASTELLANO LTD**, a company incorporated according to the law of the Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Guarantor"**)

IN FAVOUR OF:

(2)    **RAY CAPITAL INC.**, a corporation incorporated under the law of the Republic of the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the **"Holder"**).

WHEREAS:

(A)    NewLead Holdings Ltd., a company incorporated according to the law of Bermuda whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece (the **"Company"**) and Tiger Capital Partners Ltd., of Vanterpool Plaza, 2nd floor, Wickhams Cay I. Road Town, Tortola, British Virgin Islands (**"Tiger"**), the holder of a warrant dated 11 December 2013 (the **"Warrant"**) issued pursuant to a settlement agreement dated 11 December 2013 made between the Company and Tiger, have entered into an exchange agreement dated 27 December 2013 (the **"Exchange Agreement"**) pursuant to which the Company and Tiger agreed (inter alia) (i) to exchange the Warrant for unsecured convertible notes of an aggregate amount equal to the warrant and (ii) that Tiger may, pursuant to the terms referred to therein, assign the unsecured convertible notes to one or more entities.

(B)    Pursuant to the Exchange Agreement, Tiger assigned to the Holder their right, title, interest and benefit of the amount of six million Dollars ($6,000,000) out of the total amount of twenty million Dollars ($20,000,000) in and under the Exchange Agreement and relevant notice of assignment was served to the Company on 27 December 2013.

(C)    Pursuant to the Exchange Agreement, the Company has issued and the Holder has accepted an unsecured convertible note dated 27 December 2013, as amended by an addendum thereto dated 28 December 2013, each executed by the Company in favour the Holder (together, the **"Note"**), the outstanding amount of the debt being at the date hereof equal to one million eight hundred and sixty one thousand four hundred and twelve Dollars ($1,861,412) (the **"Debt"**).

(D)     As consideration for the Holder's agreement to accept the Note pursuant to the Exchange Agreement, the Company has agreed to procure that the Guarantor execute and deliver this Guarantee and Indemnity in favour of the Holder.

**THIS DEED WITNESSES** as follows:

1       **Definitions and Interpretation**

1.1     In this Guarantee and Indemnity:

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Piraeus and New York.

"**Dollars**" and "**$**" each means available and freely transferable and convertible funds in lawful currency of the United States of America.

"**Encumbrance**" means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Facility Period**" means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

"**Finance Documents**" means the Note, the Guarantor's Security Documents, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Holder and the Company.

"**GAAP**" means generally accepted accounting principles in IFRS.

"**Guarantor's Liabilities**" means all of the liabilities and obligations of the Guarantor to the Holder under or pursuant to this Guarantee and Indemnity, from time to time, whether in respect of principal, interest, costs or otherwise and whether present, future, actual or contingent.

"**Guarantor's Security Documents**" means this Guarantee and Indemnity and any and all documents which may at any time be executed by the Guarantor as security for the payment of all or any part of the Guarantor's Liabilities.

"**IFRS**" means International Financial Reporting Standards issued and/or adopted by the International Accounting Standards Board.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to the Holder under all or any of the Finance Documents.

"**Original Financial Statements**" means the audited consolidated financial statements of the Guarantor for the financial year ended 31 December 2013.

"**Security Parties**" means the parties to any of the Finance Documents (other than the Holder).

1.2    Unless otherwise specified in this Guarantee and Indemnity, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Guarantee and Indemnity.

1.3    In this Guarantee and Indemnity:

    1.3.1    words denoting the plural number include the singular and vice versa;

    1.3.2    words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

    1.3.3    references to Clauses are references to clauses of this Guarantee and Indemnity;

    1.3.4    references to this Guarantee and Indemnity include the recitals to this Guarantee and Indemnity;

    1.3.5    the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Guarantee and Indemnity;

    1.3.6    references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

    1.3.7    references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted; and

    1.3.8    references to the Holder include its successors, transferees and assignees.

2      **Representations and Warranties**

The Guarantor represents and warrants to the Holder at the date of this Guarantee and Indemnity and (by reference to the facts and circumstances then pertaining) on each day throughout the Facility Period that:

2.1     all representations and warranties given by the Company in the Note in respect of the Guarantor are and will remain correct and none of them is or will become misleading;

2.2     the Guarantor is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation and has the power to own its assets and to carry on its business as it is being conducted; and

2.3     the Guarantor has the power to enter into and perform the Guarantor's Security Documents and has taken all necessary action to authorise its entry into and performance of the Guarantor's Security Documents;

2.4     the Guarantor is not insolvent or in liquidation or administration or subject to any other formal or informal insolvency procedure, and no receiver, administrative receiver, administrator, liquidator, trustee or analogous officer has been appointed in respect of the Guarantor or all or any part of its assets;

2.5     this Guarantee and Indemnity constitutes legal, valid, binding and enforceable obligations of the Guarantor and each of the other Guarantor's Security Documents will, when executed and delivered by the Guarantor, constitute legal, valid, binding and enforceable obligations of the Guarantor;

2.6     all consents, licences, approvals and authorisations of, or registrations with or declarations to, any governmental authority, bureau or agency which may be required in connection with the entry into, performance, validity or enforceability of the Guarantor's Security Documents have been obtained or made and remain in full force and effect and the Guarantor is not aware of any event or circumstance which could reasonably be expected adversely to affect the right of the Guarantor to hold and/or obtain renewal of any such consents, licences, approvals or authorisations;

2.7     no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency which if adversely determined, might reasonably be expected to have a material adverse effect on the business or financial condition of the Guarantor have (to the best of the Guarantor's knowledge and belief) been started or threatened against the Guarantor;

2.8     the entry into and performance of the Guarantor's Security Documents will not conflict with the constitutional documents of the Guarantor or any law or regulation or document applicable to, or binding on, the Guarantor or any of its assets;

2.9     the Guarantor is not required to make any deduction or withholding from any payment which it may be obliged to make to the Holder under or pursuant to any of the Guarantor's Security Documents;

2.10    it is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of any of the Guarantor's Security Documents that it be filed, recorded or enrolled with any court or other authority in any country or that any stamp, registration or similar tax be paid on or in relation to any of the Guarantor's Security Documents;

2.11    the Guarantor is not in breach of, or default under, any agreement of any sort binding on it or on all or any part of its assets;

2.12    the Guarantor is not aware of any material facts or circumstances which have not been disclosed to the Holder and which might, if disclosed, have adversely affected the decision of a person considering whether or not to make financial arrangments of the nature contemplated by the Note with the Company; and

2.13    the Guarantor has received a copy of the Note and approves of, and agrees to, the terms and conditions of the Note.

## 3       Guarantee and Indemnity

The Guarantor:

3.1     irrevocably and unconditionally guarantees the due and punctual observance and performance by the Company of all its obligations under the Finance Documents including, without limitation, the due and punctual payment of each and every part of the Indebtedness in accordance with the terms of the Finance Documents so that, if any of the Indebtedness is not paid when it is due and payable, whether on maturity or otherwise, the Guarantor will, immediately on demand, make such payment to the Holder in the manner specified by the Holder, together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment; and

3.2     agrees, as a separate and independent obligation, that, if any of the Indebtedness is not recoverable from the Guarantor under Clause 3.1 for any

reason, the Guarantor will be liable as a principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable, and agrees to discharge its liability under this Clause 3.2 by making payment to the Holder immediately on demand together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment.

4       **Preservation of Guarantor's Liability**

4.1     This Guarantee and Indemnity is a continuing security for the full amount of the Indebtedness from time to time until the expiry of the Facility Period.

4.2     The Holder may without the Guarantor's consent and without notice to the Guarantor and without in any way releasing or reducing the Guarantor's Liabilities:

        4.2.1   amend, vary, novate, or replace any of the Finance Documents (other than the Guarantor's Security Documents); and/or

        4.2.2   agree with the Company to increase or reduce the amount of the Debt, or vary the terms and conditions for its repayment or prepayment (including, without limitation, the rate and/or method of calculation of interest payable on the Debt); and/or

        4.2.3   allow any time or other indulgence to any of the other Security Parties under or in connection with any of the Finance Documents; and/or

        4.2.4   renew, vary, release or refrain from enforcing any of the Finance Documents (other than the Guarantor's Security Documents); and/or

        4.2.5   compound with any of the other Security Parties; and/or

        4.2.6   enter into, renew, vary or terminate any other agreement or arrangement with any of the other Security Parties; and/or

        4.2.7   do or omit or neglect to do anything which might, but for this provision, operate to release or reduce the liability of the Guarantor under this Guarantee and Indemnity.

4.3     The Guarantor's Liabilities shall not be affected by:

        4.3.1   the absence of, or any defective, excessive or irregular exercise of, any of the powers of any of the other Security Parties; nor

4.3.2    any security given or payment made to the Holder by any of the other Security Parties being avoided or reduced under any law (whether English or foreign) relating to bankruptcy or insolvency or analogous circumstance in force from time to time; nor

4.3.3    any change in the constitution of the Guarantor or of any of the other Security Parties or of the Holder or the absorption of or amalgamation by the Holder in or with any other entity or the acquisition of all or any part of the assets or undertaking of the Holder by any other entity; nor

4.3.4    the liquidation, administration, receivership, bankruptcy or insolvency of the Guarantor or any of the other Security Parties; nor

4.3.5    any of the Finance Documents (other than this Guarantee and Indemnity) being defective, void or unenforceable, or the failure of any other person to provide the Holder with any security, guarantee or indemnity envisaged by the Note; nor

4.3.6    any composition, assignment or arrangement being made by any of the other Security Parties with any of its creditors; nor

4.3.7    anything which would, but for this provision, have released or reduced the liability of the Guarantor to the Holder.

5    **Preservation of Holder's Rights**

5.1    This Guarantee and Indemnity is in addition to any other security, guarantee or indemnity now or in the future held by the Holder in respect of the Indebtedness, whether from the Company, the Guarantor or any other person, and shall not merge with, prejudice or be prejudiced by, any such security, guarantee or indemnity or any contractual or legal right of the Holder.

5.2    Any release, settlement, discharge or arrangement relating to the Guarantor's Liabilities shall be conditional on no payment, assurance or security received by the Holder in respect of the Indebtedness being avoided or reduced under any law (whether English or foreign) in force from time to time relating to bankruptcy, insolvency or any (in the opinion of the Holder) analogous circumstance, and, after any such avoidance or reduction, the Holder shall be entitled to exercise all of its rights, powers, discretions and remedies under or pursuant to the Guarantor's Security Documents and/or any other rights, powers, discretions or remedies which it would otherwise have been entitled to

exercise, as if no release, settlement, discharge or arrangement had taken place.

5.3     Following the full payment of the Indebtedness, the Holder shall be entitled to retain the Guarantor's Security Documents until the Holder is satisfied in its discretion that it will not have to make any payment under any law referred to in Clause 5.2.

5.4     Until the expiry of the Facility Period the Guarantor shall not:

5.4.1   be entitled to participate in any sums received by the Holder in respect of any of the Indebtedness; nor

5.4.2   be entitled to participate in any security held by the Holder in respect of any of the Indebtedness nor stand in the place of, or be subrogated for, the Holder in respect of any such security; nor

5.4.3   take any step to enforce any claim against any of the other Security Parties (or their respective estates or effects), nor claim or exercise any right of set-off or counterclaim against any of the other Security Parties, nor make any claim in the bankruptcy or liquidation of any of the other Security Parties, in respect of any sums paid by the Guarantor to the Holder or in respect of any sum which includes the proceeds of realisation of any security held by the Holder under or pursuant to any of the Guarantor's Security Documents; nor

5.4.4   take any steps to enforce any other claim which it may have against any of the other Security Parties without the prior written consent of the Holder, and then only on such terms and subject to such conditions as the Holder may impose.

5.5     The Holder may, but shall not be obliged to, resort for its own benefit to any other means of payment at any time and in any order it thinks fit without releasing or reducing the Guarantor's Liabilities.

5.6     The Holder may enforce any of the Guarantor's Security Documents either before or after resorting to any other means of payment without entitling the Guarantor to any benefit from or share in any such other means of payment until the expiry of the Facility Period.

5.7     The Guarantor agrees that it is, and will throughout the Facility Period remain, a principal debtor in respect of the Guarantor's Liabilities.

5.8    No failure to exercise, nor any delay in exercising, on the part of the Holder, any right or remedy under the Guarantor's Security Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy.  The rights and remedies provided in the Guarantor's Security Documents are cumulative and not exclusive of any rights or remedies provided by law.

6    **Undertakings**

6.1    The Guarantor shall pay to the Holder on demand on a full indemnity basis all costs and expenses incurred by the Holder in or about or incidental to the exercise by it of its rights under any of the Guarantor's Security Documents, together with twelve per cent (12%) interest on the amount demanded from the date of demand until the date of payment (being two per cent (2%) higher than the interest rate on the outstanding Debt agreed under the Note), both before and after judgment, which interest shall be compounded with the amount demanded at the end of such periods as the Holder may reasonably select.

6.2    The Guarantor has not taken, and will not take without the prior written consent of the Holder (and then only on such terms and subject to such conditions as the Holder may impose), any security from any of the other Security Parties in connection with this Guarantee and Indemnity, and any security taken by the Guarantor notwithstanding this Clause shall be held by the Guarantor in trust for the Holder absolutely as a continuing security for the Guarantor's Liabilities.

6.3    The Guarantor will observe and perform any and all covenants and undertakings in the Note whose observance and performance by the Guarantor the Company has undertaken to procure.

6.4    The Guarantor will not without the Holder's prior written consent:

6.4.1    create nor permit to arise any Encumbrance or other third party rights over any of its present or future assets or undertaking other than in favour of the Holder; nor

6.4.2    except in the ordinary course of business, incur any liability to any third party which is in the Holder's opinion of a substantial nature; nor

6.4.3    make any loan nor enter into any guarantee or indemnity nor otherwise voluntarily assume any actual or contingent liability in respect of any obligation of any other person; nor

6.4.4    permit any change in the legal or beneficial ownership of the Guarantor from that advised to the Holder at the date of this Guarantee and Indemnity.

6.5    The Guarantor shall supply to the Holder as soon as the same become available, but in any event within 180 days after the end of each of its financial years, its audited financial statements for that financial year.  Each set of financial statements:

6.6    shall be certified by a director of the Guarantor as fairly representing its financial condition as at the date at which those financial statements were drawn up; and

6.7    shall be prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, the Guarantor notifies the Holder that there has been a change in GAAP, the accounting practices or reference periods and the Guarantor's auditors deliver to the Holder:

(a)    a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared; and

(b)    sufficient information, in form and substance as may be reasonably required by the Holder, to enable the Holder to make an accurate comparison between the financial position indicated in those financial statements and that indicated in the Original Financial Statements.

6.8    The Guarantor shall supply to the Holder:

6.8.1    all documents dispatched by the Guarantor to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched; and

6.8.2    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any of the Security Parties and which might, if adversely determined, have a material adverse effect on the business or financial condition of any of the Security Parties; and

6.8.3   promptly, such further information regarding the financial condition, business and operations of any of the Security Parties as the Holder may reasonably request.

## 7   Payments

7.1   All amounts payable by the Guarantor under or pursuant to any of the Guarantor's Security Documents shall be paid to such accounts at such banks as the Holder may from time to time direct to the Guarantor in the relevant currency in same day funds for immediate value.  Payment shall be deemed to have been received on the date on which the Holder receives authenticated advice of receipt, unless that advice is received by the Holder on a day other than a Business Day or at a time of day (whether on a Business Day or not) when the Holder in its discretion considers that it is impossible or impracticable to utilise the amount received for value that same day, in which event the payment in question shall be deemed to have been received on the Business Day next following the date of receipt of advice by the Holder.

7.2   All payments to be made by the Guarantor pursuant to any of the Guarantor's Security Documents shall, subject only to Clause 7.3, be made free and clear of and without deduction for or on account of any taxes or other deductions, withholdings, restrictions, conditions, set-offs or counterclaims of any nature.

7.3   If at any time any law requires (or is interpreted to require) the Guarantor to make any deduction or withholding from any payment, or to change the rate or manner in which any required deduction or withholding is made, the Guarantor will promptly notify the Holder and, simultaneously with making that payment, will pay whatever additional amount (after taking into account any additional taxes on, or deductions or withholdings from, or restrictions or conditions on, that additional amount) is necessary to ensure that, after making the deduction or withholding, the Holder receives a net sum equal to the sum which it would have received had no deduction or withholding been made.

7.4   If at any time the Guarantor is required by law to make any deduction or withholding from any payment to be made by it pursuant to any of the Guarantor's Security Documents, the Guarantor will pay the amount required to be deducted or withheld to the relevant authority within the time allowed under the applicable law and will, no later than thirty days after making that payment, deliver to the Holder an original receipt issued by the relevant authority, or other evidence acceptable to the Holder, evidencing the payment to that authority of all amounts required to be deducted or withheld.

7.5     If the Guarantor pays any additional amount under Clause 7.3, and the Holder subsequently receives a refund or allowance from any tax authority which the Holder identifies as being referable to that increased amount so paid by the Guarantor, the Holder shall, as soon as reasonably practicable, pay to the Guarantor an amount equal to the amount of the refund or allowance received, if and to the extent that it may do so without prejudicing its right to retain that refund or allowance and without putting itself in any worse financial position than that in which it would have been had the relevant deduction or withholding not been required to have been made. Nothing in this Clause 7.5 shall be interpreted as imposing any obligation on the Holder to apply for any refund or allowance nor as restricting in any way the manner in which the Holder organises its tax affairs, nor as imposing on the Holder any obligation to disclose to the Guarantor any information regarding its tax affairs or tax computations.

7.6     Any certificate or statement signed by an authorised signatory of the Holder purporting to show the amount of the Indebtedness or of the Guarantor's Liabilities (or any part of any of them) or any other amount referred to in any of the Finance Documents shall, save for manifest error or on any question of law, be conclusive evidence as against the Guarantor of that amount.

8     Currency

8.1     The Guarantor's liability under this Guarantee and Indemnity is to discharge the Indebtedness in the currency in which it is expressed to be payable (the **"Agreed Currency"**).

8.2     If at any time the Holder receives (including by way of set-off) any payment by or on behalf of the Guarantor in a currency other than the Agreed Currency, that payment shall take effect as a payment to the Holder of the amount in the Agreed Currency which the Holder is able to purchase (after deduction of any relevant costs) with the amount of the payment so received in accordance with its usual practice.

8.3     To the extent that any payment to the Holder (whether by the Guarantor or any other person and whether under any judgment or court order or otherwise) in a currency other than the Agreed Currency shall on actual conversion into the Agreed Currency fall short of the relevant amount of the Indebtedness expressed in the Agreed Currency, then the Guarantor as a separate and independent obligation will indemnify the Holder against the shortfall.

9     **Set-Off**

9.1    The Guarantor irrevocably authorises the Holder at any time to set off without notice any sums then due and payable by the Guarantor to the Holder under this Guarantee and Indemnity (irrespective of the branch or office, currency or place of payment) against any credit balance from time to time standing on any account of the Guarantor (whether current or otherwise, whether or not subject to notice and whether or not that credit balance is then due to the Guarantor) with any branch of the Holder in or towards satisfaction of the Guarantor's Liabilities and, in the name of the Holder or the Guarantor, to do all acts (including, without limitation, purchasing or converting or exchanging any currency) which may be required to effect such set-off.

9.2    Despite any term to the contrary in relation to any deposit or credit balance at any time on any account of the Guarantor with the Holder, no such deposit or credit balance shall be repayable or capable of being assigned, mortgaged, charged or otherwise disposed of or dealt with by the Guarantor until the Guarantor's Liabilities have been discharged in full, but the Holder may from time to time permit the withdrawal of all or any part of any such deposit or balance without affecting the continued application of this Clause.

10    **Application of Moneys**

10.1    All sums which the Holder receives under or in connection with any of the Guarantor's Security Documents shall, unless otherwise agreed by the Holder or otherwise provided in the Notes, be applied by the Holder in or towards satisfaction, or by way of retention on account, of the Guarantor's Liabilities, in such manner as the Holder may in its discretion determine.

10.2    The Holder may place any money received by it under or in connection with any of the Guarantor's Security Documents to the credit of a suspense account on such terms and subject to such conditions as the Holder may in its discretion determine for so long as the Holder thinks fit without any obligation in the meantime to apply that money in or towards discharge of the Indebtedness, and, despite such payment, the Holder may claim against any of the other Security Parties or prove in the bankruptcy, liquidation or insolvency of any of the other Security Parties for the whole of the Indebtedness at the date of the Holder's demand for payment pursuant to this Guarantee and Indemnity, together with all interest, commission, charges and expenses accruing subsequently.

11     **Partial Invalidity**

If, at any time, any provision of any of the Guarantor's Security Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

12     **Further Assurance**

The Guarantor agrees that from time to time on the written request of the Holder it will immediately execute and deliver to the Holder all further documents which the Holder may require for the purpose of perfecting or protecting the security intended to be created by the Guarantor's Security Documents.

13     **Miscellaneous**

13.1    All the covenants and agreements of the Guarantor in this Guarantee and Indemnity shall bind the Guarantor and its successors and permitted assignees and shall inure to the benefit of the Holder and its successors, transferees and assignees.

13.2    The representations and warranties on the part of the Guarantor contained in this Guarantee and Indemnity shall survive the execution of this Guarantee and Indemnity.

13.3    No variation or amendment of this Guarantee and Indemnity shall be valid unless in writing and signed on behalf of the Guarantor and the Holder.

13.4    A person who is not a party to this Guarantee and Indemnity has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Guarantee and Indemnity.

14     **Notices**

14.1    **Communications in writing**     Any communication to be made under or in connection with this Guarantee and Indemnity shall be made in writing and, unless otherwise stated, may be made by fax or letter.

14.2    **Addresses** The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Guarantee and Indemnity for any communication or document to be made or delivered under or in connection with this Guarantee and Indemnity are:

14.2.1 in the case of the Guarantor, c/o NewLead Holdings Ltd., 83 Akti Miaouli & Flessa, 185 38 Piraeus, Greece (fax no: +302130148039) marked for the attention of the Legal Department; and

14.2.2 in the case of the Holder, c/o Oppenheim Capital Ltd., 90 Kapodistriou Ave., N. Ionia, 14235, Athens, Greece (fax no: +30 210 275 4358) marked for the attention of Mr. Dimitrios Stavrianos,

or any substitute address, fax number, department or officer as either party may notify to the other by not less than five (5) Business Days' notice.

14.3   **Delivery**   Any communication or document made or delivered by one party to this Guarantee and Indemnity to the other under or in connection with this Guarantee and Indemnity will only be effective:

14.3.1 if by way of fax, when received in legible form; or

14.3.2 if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause 14.2 (*Addresses*), if addressed to that department or officer.

Any communication or document to be made or delivered to the Holder will be effective only when actually received by the Holder.

Any communication or document which becomes effective, in accordance with this Clause 14.3, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

14.4   **English language**   Any notice given under or in connection with this Guarantee and Indemnity must be in English.  All other documents provided under or in connection with this Guarantee and Indemnity must be:

14.4.1 in English; or

14.4.2 if not in English, and if so required by the Holder, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

15    Law and Jurisdiction

15.1    This Guarantee and Indemnity and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with English law.

15.2    For the exclusive benefit of the Holder, the Guarantor irrevocably agrees that the courts of England are to have exclusive jurisdiction to settle any dispute (a) arising from or in connection with this Guarantee and Indemnity or (b) relating to any non-contractual obligations arising from or in connection with this Guarantee and Indemnity and that any proceedings may be brought in those courts.

15.3    Nothing contained in this Clause shall limit the right of the Holder to commence any proceedings against the Guarantor in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Guarantor in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

15.4    The Guarantor irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

15.5    Without prejudice to any other mode of service allowed under any relevant law, the Guarantor:

15.5.1    irrevocably appoints Holman ~~Fenwick Willan International LLP,~~ _Nominees Limited_ Friary Court, 65 Crutched Friars, London, EC3N 2AE as its agent for service of process in relation to any proceedings before the English courts; and

15.5.2    agrees that failure by a process agent to notify the Guarantor of the process will not invalidate the proceedings concerned.

**IN WITNESS** of which this Guarantee and Indemnity has been duly executed and delivered as a deed the day and year first before written.

**SIGNED** and **DELIVERED**                          )
as a **DEED**                                        )
by **NEWLEAD CASTELLANO LTD**                        )
acting by MICHAIL LIVANOS                            )
its duly authorised attorney-in-fact                 )
In the presence of:                                  )

STEPHENSON HARWOOD LLP
ARISTON BUILDING
2 FILELLINON STR.& AKTI MIAOULI
PIRAEUS 185 36
VAT. NO. 9 9 8 7 1 1 1 5 6
TEL. 210 42 95 160



# THE REPUBLIC OF LIBERIA
## LIBERIA MARITIME AUTHORITY

99 Park Avenue, Suite 1830
New York, NY, 10016, USA
Tel: +1 212 697 3434
Fax: +1 212 697 5655
E-mail: registrations@liscr.com
Website: www.liscr.com

## OFFICE OF THE DEPUTY COMMISSIONER
## OF MARITIME AFFAIRS OF THE
## REPUBLIC OF LIBERIA

16  Day, October  Month, 2014  Year

Received for record at  9  h  11  m AM , E.D.S.T.

Recorded in BOOK  PM 66  at PAGE  769

Name of Vessel : NEWLEAD CASTELLANO

Official Number : 16618

GIVEN under my hand and seal this
16th day of October, 2014.



Yvonne Clinton
Deputy Commissioner
Maritime Affairs

**DATED 16 October 2014**

NEWLEAD CASTELLANO LTD

– and –

OPPENHEIM CAPITAL LTD.

**THIRD PREFERRED
LIBERIAN MORTGAGE
m.v. " NEWLEAD CASTELLANO"**



**STEPHENSON HARWOOD**

# CONTENTS

| | | Page |
|---|---|---|
| 1 | Definitions and Interpretation | 3 |
| 2 | Representations and Warranties | 6 |
| 3 | Covenant to Pay | 7 |
| 4 | Mortgage and Amount Secured | 7 |
| 5 | Insurance | 9 |
| 6 | Operation and Maintenance | 14 |
| 7 | Mortgagee's Powers | 20 |
| 8 | Ancillary Provisions | 21 |
| 9 | Receiver | 22 |
| 10 | Application of Moneys | 23 |
| 11 | Power of Attorney | 24 |
| 12 | Partial Invalidity | 24 |
| 13 | Further Assurance | 24 |
| 14 | Waiver of Rights as Surety | 24 |
| 15 | Miscellaneous | 26 |
| 16 | Discharge of Security | 26 |
| 17 | Notices | 27 |
| 18 | Counterparts | 27 |
| 19 | Law and Jurisdiction | 27 |

**THIRD PREFERRED MORTGAGE**

**Dated: 16 October 2014**

**BY:**

(1)   **NEWLEAD CASTELLANO LTD**, a company incorporated according to the law of the Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Owner"**)

**IN FAVOUR OF:**

(2)   **OPPENHEIM CAPITAL LTD.**, a corporation incorporated under the law of the Republic of the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the **"Mortgagee"**).

**WHEREAS:**

(A)   NewLead Holdings Ltd., a company incorporated according to the law of Bermuda whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece (the **"Company"**) and the Mortgagee have entered into a remuneration agreement dated 16 December 2013 pursuant to which the Company has agreed to pay to the Mortgagee, as consideration for its services, a compensation fee of two million five hundred thousand Dollars ($2,500,000) in Company's common stock, which was settled with the issuance of 1,773,050 Company's shares on 16 December 2013 (the **"Success Shares"**).

(B)   The value of the Success Shares has dropped and the Mortgagee has suffered a deficit of two million four hundred and ninety nine thousand nine hundred and fifty five Dollars and ninety eight cents ($2,499,955.98) (the **"Deficit"**).

(C)   To cover the Deficit, the Company has issued and the Mortgagee has accepted an unsecured convertible note dated 4 August 2014, executed by the Company in favour the Mortgagee (the **"Note"**) (a copy of which in the form executed is attached to this Mortgage as Exhibit "A" and shall be read together with this Mortgage), the outstanding amount of the debt being at the date hereof equal to two million five hundred and forty seven thousand nine hundred Dollars ($2,547,900) (the **"Debt"**).

(D)   In consideration of the Mortgagee's agreement to accept the Note to cover the Deficit, the Owner has executed and delivered in favour of the Mortgagee a guarantee and indemnity dated 16 October 2014 (the **"Guarantee"**) (a copy of which in the form executed is attached to this Mortgage as Exhibit "B" and shall be read together with this

Mortgage) in respect of the obligations of the Company under the Finance Documents and has agreed to execute and register in favour of the Mortgagee this Third Preferred Mortgage on the Vessel under and pursuant to Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended) and all other applicable laws of the Republic of Liberia, as security for the payment of the Indebtedness.

(E)     A first preferred mortgage on the Vessel (the "**RC Mortgage**") dated 16 October 2014 and recorded on 16 October 2014 in Book PM 66 Page 169 has been entered into by the Owner in favour of Ray Capital Inc., of the Republic of the Marshall Islands (in its capacity as beneficiary of the RC Mortgage and of any coordination or subordination agreement with the Mortgagee in relation to the RC Mortgage, the "**RC Mortgagee**").

(F)     A second preferred mortgage on the Vessel (the "**Cheyenne Mortgage**" and together with the RC Mortgage, the "**Prior Mortgages**" and each a "**Prior Mortgage**") dated 16 October 2014 and recorded on 16 October 2014 in Book PM 66 Page 175 has been entered into by the Owner in favour of Cheyenne Holding Ltd., of the Republic of the Marshall Islands (in its capacity as beneficiary of the Cheyenne Mortgage and of any coordination or subordination agreement with the Mortgagee in relation to the Cheyenne Mortgage (the "**Cheyenne Mortgagee**" and together with the RC Mortgagee, the "**Prior Mortgagees**" and each a "**Prior Mortgagee**")

(G)     The Owner is, subject to the Prior Mortgages, the legal and beneficial owner of the whole of the Vessel.

**THIS MORTGAGE WITNESSES as follows:**

**1       Definitions and Interpretation**

1.1     In this Mortgage:

"**Assigned Property**" means the Insurances, the Earnings and the Requisition Compensation.

"**Default Rate**" means interest at the rate of twelve per cent (12%) per annum.

"**Dollars**", "**$**" and "**USD**" denote the lawful currency of the United States of America.

"**Earnings**" means all hires, freights, pool income and other sums payable to or for the account of the Owner in respect of the Vessel including (without limitation) all remuneration for salvage and towage services, demurrage and detention moneys, contributions in general average, compensation in respect of any requisition for hire, and damages and other payments (whether awarded by

any court or arbitral tribunal or by agreement or otherwise) for breach, termination or variation of any contract for the operation, employment or use of the Vessel.

"Encumbrance" means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"Event of Default" means any of the events or circumstances set out in clause 4 of the Note.

"Facility Period" means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

"Finance Documents" means the Note, the Guarantee, this Mortgage, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Mortgagee and the Company.

"Indebtedness" means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable by the Owner to the Mortgagee under all or any of the Finance Documents.

"Insurances" means all policies and contracts of insurance (including all entries in protection and indemnity or war risks associations) which are from time to time taken out or entered into in respect of or in connection with the Vessel or her increased value or the Earnings and (where the context permits) all benefits under such contracts and policies, including all claims of any nature and returns of premium.

"Mortgagees' Insurances" means all policies and contracts of mortgagees' interest insurance, mortgagees' additional perils (oil pollution) insurance and any other insurance from time to time taken out by the Mortgagee in relation to the Vessel.

"Obligatory Insurances" means the insurances and entries referred to in Clause 5.1 and, where applicable, those referred to in Clauses 5.2, 5.5 and/or 6.16.

"**Requisition Compensation**" means all compensation or other money which may from time to time be payable to the Owner as a result of the Vessel being requisitioned for title or in any other way compulsorily acquired (other than by way of requisition for hire).

"**Security Parties**" means the parties to any of the Finance Documents (other than the Mortgagee).

"**Threshold Amount**" means two hundred and fifty thousand Dollars ($250,000) or its equivalent in any other currency.

"**Total Loss**" means:

(i)     an actual, constructive, arranged, agreed or compromised total loss of the Vessel; or

(ii)    the requisition for title or other compulsory acquisition of the Vessel by any government or other competent authority (otherwise than by way of requisition for hire); or

(iii)   the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture of the Vessel (not falling within (ii) above), unless the Vessel is released and returned to the possession of the Owner within thirty (30) days after the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture in question.

"**Vessel**" means the motor vessel "NEWLEAD CASTELLANO" registered in the ownership of the Owner under the flag of the Republic of Liberia with Official Number 16618, IMO Number 9686338 and the following registered dimensions and tonnages:

> length: 179.91
> breadth: 30
> depth: 14.8
> gross tonnage: 23857
> net tonnage: 11326

together with all her engines, machinery, boats, tackle, outfit, fuels, spares, consumable and other stores, belongings and appurtenances, whether on board or ashore, including any which may in the future be put on board or may in the future be intended to be used for the Vessel if on shore.

1.2    Unless otherwise specified in this Mortgage, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Mortgage.

1.3    In this Mortgage:

   1.3.1    words denoting the plural number include the singular and vice versa;

   1.3.2    words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

   1.3.3    references to Clauses are references to clauses of this Mortgage;

   1.3.4    references to this Mortgage include the recitals to this Mortgage;

   1.3.5    the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Mortgage;

   1.3.6    references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

   1.3.7    references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted;

   1.3.8    an Event of Default is "continuing" if it has not been waived; and

   1.3.9    references to the Mortgagee include its successors, transferees and assignees.

## 2    Representations and Warranties

The Owner represents and warrants to the Mortgagee that:

2.1    it is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of this Mortgage that it be filed, recorded or enrolled with any governmental authority or agency or stamped with any stamp or similar transaction tax, except for the recording of this Mortgage with the Deputy Commissioner of Maritime Affairs of the Republic of Liberia in New York; and

2.2 It is, subject to the Prior Mortgages, the sole legal and beneficial owner of the Vessel and (with the exception of the Prior Mortgages and this Mortgage) the Vessel is free from any Encumbrance and is not under arrest or in the possession of any person (other than her master and crew) who may become entitled to assert a maritime or possessory lien on her; and

2.3 the Vessel is insured and classed in accordance with the requirements of this Mortgage.

## 3   Covenant to Pay

The Owner agrees in accordance with the Guarantee to guarantee and indemnify the Mortgagee in respect of the Company's obligations to repay the Debt, to pay interest on the Debt and to pay all other sums at any time due to the Mortgagee under or pursuant to the Finance Documents.

## 4   Mortgage and Amount Secured

4.1 In consideration of the premises, the Owner has granted, conveyed, mortgaged, transferred, set over and confirmed, and by this Mortgage grants, conveys, mortgages, transfers, sets over and confirms, to the Mortgagee the whole of the Vessel **TO HAVE AND TO HOLD** the same unto the Mortgagee forever on the terms and subject to the conditions of this Mortgage for the enforcement of the payment to the Mortgagee of the Indebtedness, and in order to secure the performance and observance of, and compliance with, the covenants, terms and conditions contained in this Mortgage and in the other Finance Documents **PROVIDED ONLY,** and the conditions of this Mortgage are such that, if the Owner shall pay, or cause to be paid, the Indebtedness to the Mortgagee as and when the Indebtedness shall become due and payable in accordance with this Mortgage, the Guarantee and the Note, and shall perform, observe and comply with all the covenants, terms and conditions by it and on its part to be performed, observed and complied with contained, expressed or implied in the Finance Documents, then this Third Preferred Mortgage and the rights granted by it shall cease, determine and be void but otherwise shall remain in full force and effect.

4.2 The Owner agrees with the Mortgagee that the Vessel is to be held by the Owner subject to the further covenants, conditions, provisions, terms and uses set out in this Mortgage.

4.3    It is not intended that this Mortgage shall cover property other than the Vessel as that term is used in Section 106 of Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended).

4.4    For the purposes of recording this Third Preferred Mortgage as required by Chapter 3, Title 21 of the Liberian Code of Laws of 1956 (as amended) the total amount secured by this Mortgage is two million five hundred and forty seven thousand nine hundred Dollars ($2,547,900) plus interest, expenses and performance of Mortgage covenants. The discharge amount is the same as the total amount. Notwithstanding the foregoing, for property other than the Vessel, if any should be determined to be covered by this Mortgage, the discharge amount is 0.01% of the total amount.

4.5    The Owner shall pay to the Mortgagee promptly on the Mortgagee's written demand the amount of all costs and expenses (including legal fees) incurred by the Mortgagee in connection with the enforcement of, or the preservation of any rights under, any Finance Document including (without limitation) any losses, costs and expenses which the Mortgagee may from time to time sustain, incur or become liable for by reason of the Mortgagee being mortgagee of the Vessel and/or a lender to the Owner, or by reason of the Mortgagee being deemed by any court or authority to be an operator or controller, or in any way concerned in the operation or control, of the Vessel.

4.6    The Owner shall pay to the Mortgagee promptly on the Mortgagee's written demand the amount of all sums which the Mortgagee may pay or become actually or contingently liable for on account of the Owner in connection with the Vessel (whether alone or jointly or jointly and severally with any other person) including (without limitation) all sums which the Mortgagee may pay or guarantees which it may give in respect of the Insurances, any expenses incurred by the Mortgagee in connection with the maintenance or repair of the Vessel or in discharging any lien, bond or other claim relating in any way to the Vessel, and any sums which the Mortgagee may pay or guarantees which it may give to procure the release of the Vessel from arrest or detention.

4.7    Notwithstanding anything to the contrary contained in this Mortgage, it is intended that nothing in this Mortgage shall waive the preferred status of this Mortgage and that, if any provision of this Mortgage shall be construed as waiving the preferred status of this Mortgage, then such provision shall to that extent be void and of no effect.

4.8    The Owner shall comply with all the requirements and formalities under the Liberian Code of Laws of 1956 (as amended) and any other applicable

legislation of the Republic of Liberia necessary to perfect this Mortgage as a valid and enforceable third preferred lien upon the Vessel (ranking after only the first preferred lien and the second preferred lien of the Prior Mortgages) and shall furnish to the Mortgagee from time to time such evidence as the Mortgagee may reasonably request to satisfy itself with respect to the Owner's compliance with the provisions of this Clause.

4.9     The security constituted by this Mortgage shall be continuing and shall not be satisfied by any intermediate payment or satisfaction until the Indebtedness shall have been paid in full and the Mortgagee shall be under no further actual or contingent liability to any third party in relation to the Vessel, the Assigned Property or any other matter referred to in the Finance Documents.   The security constituted by this Mortgage shall be in addition to any other security now or in the future held by the Mortgagee for or in respect of the Indebtedness, and shall not merge with or prejudice or be prejudiced by any such security or any other contractual or legal rights of the Mortgagee nor be affected by any irregularity, defect or informality or by any release, exchange or variation of any such security.

5     **Insurance**

5.1     The Owner covenants to ensure at its own expense throughout the Facility Period that:

5.1.1     the Vessel remains insured against fire and all usual marine risks (including excess risks) and war risks on an agreed value basis for an amount which is the greater from time to time of (a) her full market value and (b) an amount which equals one hundred and twenty per cent (120%) of the amount of the Debt then outstanding; and

5.1.2     the Vessel remains entered in a protection and indemnity association in both protection and indemnity classes, or remains otherwise insured against protection and indemnity risks and liabilities (including, without limitation, protection and indemnity war risks); and

5.1.3     the Vessel remains insured against oil pollution caused by the Vessel for such amounts as the Mortgagee may from time to time approve unless that risk is covered to the satisfaction of the Mortgagee by the Vessel's protection and indemnity entry or insurance.

5.2     The Mortgagee agrees that, if and for so long as the Vessel may be laid up with the approval of the Mortgagee, the Owner may at its own expense take out port risk insurance on the Vessel in place of hull and machinery insurance.

5.3     The Owner undertakes to place the Obligatory Insurances in such markets, in such currency, on such terms and conditions, and with such brokers, underwriters and associations as the Mortgagee shall have previously approved in writing.   The Owner shall not alter the terms of any of the Obligatory Insurances nor allow any person to be co-assured under any of the Obligatory Insurances without the prior written consent of the Mortgagee, and will supply the Mortgagee from time to time on request with such information as the Mortgagee may in its discretion require with regard to the Obligatory Insurances and the brokers, underwriters or associations through or with which the Obligatory Insurances are placed. The Owner shall reimburse the Mortgagee on demand for all costs and expenses incurred by the Mortgagee in obtaining from time to time a report on the adequacy of the Obligatory Insurances from an insurance adviser instructed by the Mortgagee.

5.4     The Owner undertakes duly and punctually to pay all premiums, calls and contributions, and all other sums at any time payable in connection with the Obligatory Insurances, and, at its own expense, to arrange and provide any guarantees from time to time required by any protection and indemnity or war risks association.  From time to time at the Mortgagee's request, the Owner will provide the Mortgagee with evidence satisfactory to the Mortgagee that such premiums, calls, contributions and other sums have been duly and punctually paid; that any such guarantees have been duly given; and that all declarations and notices required by the terms of any of the Obligatory Insurances to be made or given by or on behalf of the Owner to brokers, underwriters or associations have been duly and punctually made or given.

5.5     The Owner will comply in all respects with all terms and conditions of the Obligatory Insurances and will make all such declarations to brokers, underwriters and associations as may be required to enable the Vessel to operate in accordance with the terms and conditions of the Obligatory Insurances.  The Owner will not do, nor permit to be done, any act, nor make, nor permit to be made, any omission, as a result of which any of the Obligatory Insurances may become liable to be suspended, cancelled or avoided, or may become unenforceable, or as a result of which any sums payable under or in connection with any of the Obligatory Insurances may be reduced or become liable to be repaid or rescinded in whole or in part.  In particular, but without limitation, the Owner will not permit the Vessel to be employed other than in

conformity with the Obligatory Insurances without first taking out additional insurance cover in respect of that employment in all respects to the satisfaction of the Mortgagee, and the Owner will promptly notify the Mortgagee of any new requirement imposed by any broker, underwriter or association in relation to any of the Obligatory Insurances.

5.6     The Owner will, no later than fourteen days (or, in the case of war risks, no later than seven days), before the expiry of any of the Obligatory Insurances renew them and shall immediately give the Mortgagee such details of those renewals as the Mortgagee may require.

5.7     The Mortgagee shall be at liberty to take out Mortgagees' Insurances in relation to the Vessel for such amounts and on such terms and conditions as the Mortgagee may from time to time decide, and the Owner shall from time to time on demand reimburse the Mortgagee for all costs, premiums and expenses paid or incurred by the Mortgagee in connection with any Mortgagees' Insurances.

5.8     The Owner shall deliver to the Mortgagee certified copies (and, subject to the rights of the Prior Mortgagees and if required by the Mortgagee, the originals) of all policies, certificates of entry and other documents relating to the Insurances (including, without limitation, receipts for premiums, calls or contributions) and shall procure that letters of undertaking in such form as the Mortgagee may approve shall be issued to the Mortgagee by the brokers through which the Insurances are placed (or, in the case of protection and indemnity or war risks associations, by their managers). If the Vessel is at any time during the Facility Period insured under any form of fleet cover, the Owner shall procure that those letters of undertaking contain confirmation that the brokers, underwriters or association (as the case may be) will not set off claims relating to the Vessel against premiums, calls or contributions in respect of any other vessel or other insurance, and that the insurance cover of the Vessel will not be cancelled by reason of non-payment of premiums, calls or contributions relating to any other vessel or other insurance.  Failing receipt of those confirmations, the Owner will instruct the brokers, underwriters or association concerned to issue a separate policy or certificate for the Vessel in the sole name of the Owner or of the Owner's brokers as agents for the Owner.

5.9     The Owner shall promptly provide the Mortgagee with full information regarding any casualty or other accident or damage to the Vessel.

5.10    The Owner agrees that, on and at any time after the occurrence of an Event of Default which is continuing, the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to collect, sue for, recover and give a good

discharge for all claims in respect of any of the Insurances; to pay collecting brokers the customary commission on all sums collected in respect of those claims; to compromise all such claims or refer them to arbitration or any other form of judicial or non-judicial determination; and otherwise to deal with such claims in such manner as the Mortgagee shall in its discretion think fit.

5.11   Whether or not an Event of Default shall have occurred or be continuing, the proceeds of any claim under any of the Insurances in respect of a Total Loss shall, subject to the rights of the Prior Mortgagees, be paid to the Mortgagee and applied by the Mortgagee in accordance with Clause 10.

5.12   In the event of any claim in respect of any of the Insurances (other than in respect of a Total Loss), if the Owner shall fail to reach agreement with any of the brokers, underwriters or associations for the immediate restoration of the Vessel, or for payment to third parties, within such time as the Mortgagee may stipulate, the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to require payment to itself.   In the event of any dispute arising between the Owner and any broker, underwriter or association with respect to any obligation to make any payment to the Owner or to the Mortgagee under or in connection with any of the Insurances, or with respect to the amount of any such payment, the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to settle that dispute directly with the broker, underwriter or association concerned.   Any such settlement shall be binding on the Owner.

5.13   The Mortgagee agrees that any amounts which may become due under any protection and indemnity entry or insurance shall be paid to the Owner to reimburse the Owner for, and in discharge of, the loss, damage or expense in respect of which they shall have become due, unless, at the time the amount in question becomes due, an Event of Default is continuing, in which event the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to receive the amounts in question and to apply them either in reduction of the Indebtedness or, at the option of the Mortgagee, to the discharge of the liability in respect of which they were paid.

5.14   The Owner shall not settle, compromise or abandon any claim under or in connection with any of the Insurances (other than a claim of less than the Threshold Amount arising other than from a Total Loss) without the prior written consent of the Mortgagee.

5.15   If the Owner fails to effect or keep in force the Obligatory Insurances, the Mortgagee may (but shall not be obliged to) effect and/or keep in force such

insurances on the Vessel and such entries in protection and indemnity or war risks associations as the Mortgagee in its discretion considers desirable, and the Mortgagee may (but shall not be obliged to) pay any unpaid premiums, calls or contributions. The Owner will reimburse the Mortgagee from time to time on demand for all such premiums, calls or contributions paid by the Mortgagee, together with interest at the Default Rate from the date of payment by the Mortgagee until the date of reimbursement.

5.16    The Owner shall comply strictly with the requirements of any legislation relating to pollution or protection of the environment which may from time to time be applicable to the Vessel in any jurisdiction in which the Vessel shall trade and in particular the Owner shall comply strictly with the requirements of the United States Oil Pollution Act 1990 (the "**Act**") if the Vessel is to trade in the United States of America and Exclusive Economic Zone (as defined in the Act). Before any such trade is commenced and during the entire period during which such trade is carried on, the Owner shall:

5.16.1    pay any additional premiums required to maintain protection and indemnity cover for oil pollution up to the limit available to the Owner for the Vessel in the market; and

5.16.2    make all such quarterly or other voyage declarations as may from time to time be required by the Vessel's protection and indemnity association in order to maintain such cover, and promptly deliver to the Mortgagee copies of such declarations; and

5.16.3    submit the Vessel to such additional periodic, classification, structural or other surveys which may be required by the Vessel's protection and indemnity insurers to maintain cover for such trade and promptly deliver to the Mortgagee copies of reports made in respect of such surveys; and

5.16.4    implement any recommendations contained in the reports issued following the surveys referred to in Clause 5.16.3 within the relevant time limits, and provide evidence satisfactory to the Mortgagee that the protection and indemnity insurers are satisfied that this has been done; and

5.16.5    in addition to the foregoing (if such trade is in the United States of America and Exclusive Economic Zone):

(aa)    obtain and retain a certificate of financial responsibility under the Act in form and substance satisfactory to the United States Coast

Guard and provide the Mortgagee with evidence of the same; and

(bb)    procure that the protection and indemnity insurances do not contain a US Trading Exclusion Clause or any other analogous provision and provide the Mortgagee with evidence that this is so; and

(cc)    comply strictly with any operational or structural regulations issued from time to time by any relevant authorities under the Act so that at all times the Vessel falls within the provisions which limit strict liability under the Act for oil pollution.

## 6       Operation and Maintenance

The Owner covenants with the Mortgagee:

6.1     to keep the Vessel seaworthy and in a state of complete repair and in compliance with the requirements from time to time of all applicable laws, conventions and regulations and of her insurers; and

6.2     to maintain the registration of the Vessel under the flag of the Republic of Liberia; to effect and maintain the recording of this Mortgage with the Deputy Commissioner of Maritime Affairs of the Republic of Liberia in New York; and not cause nor permit to be done any act or omission as a result of which that registration or that recording might be defeated or imperilled; and

6.3     to maintain the Vessel in a condition entitling the Vessel to the highest class applicable to vessels of her type with a classification society approved by the Mortgagee free of recommendations and qualifications; and

6.4     to comply with all laws, conventions and regulations applicable to the Owner or to the Vessel and to carry on board the Vessel all certificates and other documents which may from time to time be required to evidence such compliance; and

6.5     not without the prior written consent of the Mortgagee to make, nor permit nor cause to be made, any material change in the structure, type or speed of the Vessel; and

6.6     to procure that all repairs to the Vessel or replacements of parts or equipment of the Vessel are effected in such a way as not to diminish the value of the Vessel and with replacement parts or equipment the property of the Owner and

free of all Encumbrances (other than the Prior Mortgages and this Mortgage); and

6.7 to permit the Mortgagee and all persons appointed by the Mortgagee to board the Vessel from time to time during the Facility Period to inspect the Vessel's state and condition and, if the Vessel shall not be in a state and condition which complies with the requirements of this Mortgage, to effect such repairs as shall in the opinion of the Mortgagee be desirable to ensure such compliance, without prejudice to the Mortgagee's other rights under or pursuant to this Mortgage; and

6.8 immediately to notify the Mortgagee of any arrest or detention of the Vessel, and to cause the Vessel to be released from arrest or detention as quickly as possible, and in any event within fourteen days from the date of arrest or detention, and immediately to notify the Mortgagee in the same manner of the release of the Vessel; and

6.9 from time to time on request of the Mortgagee to produce to the Mortgagee written evidence satisfactory to the Mortgagee confirming that the master and crew of the Vessel have no claims for wages beyond the ordinary arrears and that the master has no claim for disbursements other than those properly incurred by him in the ordinary course of trading of the Vessel on the voyage then in progress; and

6.10 not during the Facility Period to sell, agree to sell, or otherwise dispose of, or agree to dispose of, the Vessel without the prior written consent of the Mortgagee; and

6.11 not during the Facility Period to change the name of the Vessel without the prior written consent of the Mortgagee; and

6.12 not during the Facility Period to lay the Vessel up without the prior written consent of the Mortgagee; and

6.13 in the event of any requisition or seizure of the Vessel, to take all lawful steps to recover possession of the Vessel as soon as it is entitled to do so; and

6.14 to give to the Mortgagee from time to time during the Facility Period on request such information as the Mortgagee may require with regard to the Vessel's employment, position and state of repair and, on the Mortgagee's request, to supply the Mortgagee with copies of all charterparties and other contracts of employment relating to the Vessel and copies of the Vessel's deck and engine logs; and

6.15     to comply with all requirements from time to time of the Vessel's classification society and to give to the Mortgagee from time to time during the Facility Period on request copies of all classification certificates of the Vessel and reports of surveys required by the Vessel's classification society (the Owner by its execution of this Mortgage irrevocably authorising the Mortgagee to obtain such information and documents from the Vessel's classification society as the Mortgagee may from time to time require), and to notify the Mortgagee immediately of any requirement or recommendation imposed by the Vessel's classification society; and

6.16     not during hostilities (whether or not a state of war shall formally have been declared and including, without limitation, any civil war) to permit the Vessel to be employed in carrying any goods which may be declared to be contraband of war or which may render the Vessel liable to confiscation, seizure, detention or destruction, nor to permit the Vessel to enter any area which is declared a war zone by any governmental authority or by the Vessel's insurers unless that employment or voyage is either (a) consented to in advance and in writing by the underwriters of the Vessel's war risks insurances and fully covered by those insurances or (b) (to the extent not covered by those insurances) covered by additional insurance taken out by the Owner at the Owner's expense, which additional insurance shall be deemed to be part of the Insurances and of the Assigned Property; and

6.17     not without the prior written consent of the Mortgagee to let the Vessel on any demise charter or on any time charter, consecutive voyage charter or other contract of employment which (inclusive of any extension option) is capable of exceeding thirteen months nor to employ the Vessel in any way which might impair the security created by the Finance Documents; and

6.18     not without the prior written consent of the Mortgagee to enter into any agreement or arrangement for sharing the Earnings; and

6.19     duly to perform (unless prevented by force majeure), and to take all necessary steps to enforce the performance by charterers and shippers of, all charterparties and other contracts of employment and all bills of lading and other contracts relating to the Vessel; and

6.20     not after the occurrence of an Event of Default which is continuing to let the Vessel on charter or renew or extend any charter or other contract of employment of the Vessel, nor agree to do so, without the prior written consent of the Mortgagee; and

6.21   to pay and discharge when due from time to time all taxes, levies, duties, fines and penalties imposed on the Vessel or the Earnings, or on the Owner, its income, profits, capital gains or any of its property; and

6.22   not at any time during the Facility Period without the prior written consent of the Mortgagee (and then subject to such conditions as the Mortgagee may impose) to create nor grant nor permit to exist any Encumbrance over the Vessel or any of the Assigned Property; and

6.23   to notify the Mortgagee immediately the Owner becomes aware of any legal proceedings or arbitration involving the Vessel or the Owner where the amount claimed by any party (ignoring any counterclaim or defence of set-off) exceeds or may reasonably be expected to exceed the Threshold Amount; and

6.24   not without the prior written consent of the Mortgagee to put the Vessel into the possession of any person for the purpose of work or repairs estimated to cost more than the Threshold Amount (except for repairs the cost of which is recoverable under the Insurances and in respect of which the Insurers have agreed to make payment in accordance with any applicable loss payable clause) unless that person shall have given an undertaking to the Mortgagee in such terms as the Mortgagee shall require not to exercise a lien on the Vessel for the cost of the work; and

6.25   to keep proper books of account in respect of the Vessel and the Earnings and as and when required by the Mortgagee to make such books available for inspection on behalf of the Mortgagee; and

6.26   to place and retain a certified copy of this Mortgage on board the Vessel and cause such certified copy of this Mortgage to be exhibited to any representative of the Mortgagee and to place and keep displayed on the Vessel a framed printed notice in plain type reading as follows:

### "NOTICE OF MORTGAGE

This Vessel is covered by a third preferred Mortgage to OPPENHEIM CAPITAL LTD. under authority of Title 21 of the Liberian Code of Laws of 1956 as amended.  Under the terms of the said Mortgage neither the Owner nor any Charterer nor the Master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than for crew's wages and salvage"; and

6.27   not without the prior written consent of the Mortgagee to appoint anyone other than Newlead Bulkers S.A. of the Republic of Liberia as commercial or technical

managers of the Vessel, nor to terminate nor materially vary the arrangements for the commercial or technical management of the Vessel, nor to permit the commercial or technical management of the Vessel to be sub-contracted or delegated to any third party; and

6.28    to take all reasonable precautions to prevent any infringements of any anti drug legislation in any jurisdiction in which the Vessel shall trade and in particular (if the Vessel is to trade in the United States of America) to take all reasonable precautions to prevent any infringements of the Anti-Drug Abuse Act of 1986 of the United States of America; and

6.29    to comply, or procure that the operator of the Vessel will comply, with the International Management Code for the Safe Operation of Ships and for Pollution Prevention adopted by the International Maritime Organisation (as the same may be amended from time to time) (the **"ISM Code"**) or any replacement of the ISM Code and in particular, without limitation, to:

    6.29.1    procure that the Vessel remains for the duration of the Facility Period subject to a safety management system developed and implemented in accordance with the ISM Code; and

    6.29.2    maintain for the Vessel throughout the Facility Period a valid and current safety management certificate issued under paragraph 13.7 of the ISM Code (**"SMC"**) and provide a copy to the Mortgagee; and

    6.29.3    procure that the company responsible for the Vessel's compliance with the ISM Code under paragraph 1.1.2 of the ISM Code (**"ISM Company"**) maintains throughout the Facility Period a valid and current Document of Compliance issued for the ISM Company under paragraph 13.2 of the ISM Code (**"DOC"**) and provide a copy to the Mortgagee; and

    6.29.4    notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the SMC of the Vessel or of the DOC of the ISM Company; and

6.30    to comply in relation to the Vessel with the International Ship and Port Facility Security Code adopted by the International Maritime Organisation (as the same may be amended from time to time) (the **"ISPS Code"**) or any replacement of the ISPS Code and in particular, without limitation, to:

    6.31    procure that the Vessel and the company responsible for the Vessel's compliance with the ISPS Code comply with the ISPS Code; and

6.32    maintain for the Vessel throughout the Facility Period a valid and current International Ship Security Certificate issued under the ISPS Code (**"ISSC"**) and provide a copy to the Mortgagee; and

6.33    notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC; and

6.34   to comply in relation to the Vessel with Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997) (as the same may be amended from time to time) (**"Annex VI"**) or any replacement of Annex VI and in particular, without limitation, to:

6.35    procure that the Vessel's master and crew are familiar with, and that the Vessel complies with, Annex VI; and

6.36    maintain for the Vessel throughout the Facility Period a valid and current International Air Pollution Prevention Certificate issued under Annex VI (**"IAPPC"**) and provide a copy to the Mortgagee; and

6.37    notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the IAPPC.



## 7 Mortgagee's Powers

7.1 If an Event of Default shall occur, and the Mortgagee shall demand payment of all or any part of the Indebtedness, the security constituted by this Mortgage shall become immediately enforceable and the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to exercise all or any of the rights, powers, discretions and remedies vested in the Mortgagee by this Clause without any requirement for any court order or declaration that an Event of Default has occurred. The Mortgagee's right to exercise those rights, powers, discretions and remedies shall be in addition to and without prejudice to all other rights, powers, discretions and remedies to which it may be entitled, whether by statute or otherwise including, without limitation, those conferred on the Mortgagee by Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended). The Mortgagee shall be entitled to exercise its rights, powers, discretions and remedies despite any rule of law or equity to the contrary, and whether or not any previous default shall have been waived, and in particular without the limitations imposed by the law of any relevant jurisdiction.

7.2 In the circumstances described in Clause 7.1, the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled (but not obliged) to:

7.2.1 take possession of the Vessel wherever she may be; and/or

7.2.2 discharge the master and crew of the Vessel and employ a new master and crew; and/or

7.2.3 navigate the Vessel to such places as the Mortgagee may decide or detain or lay up the Vessel; and/or

7.2.4 in the name of the Mortgagee or the name of the Owner, demand, sue for, receive and give a good receipt for all sums due to the Owner in connection with the Vessel and, in the name of the Mortgagee or the name of the Owner or the name of the Vessel, commence such legal proceedings as it may consider appropriate, or conduct the defence of any legal proceedings commenced against the Vessel or the Owner in its capacity as owner of the Vessel; and/or

7.2.5 sell or dispose of the Vessel either by private treaty or auction, on such terms as the Mortgagee shall think fit (including deferred payment terms and with or without the benefit of any charterparty or other contract of employment), with the power to make a loan on such terms as the Mortgagee may decide to any prospective purchaser to assist in the

purchase of the Vessel, and the power to postpone any sale, without being liable for any loss caused by any such sale or the postponement of any such sale; and/or

7.2.6 replace or repair any part of the Vessel or alter her to suit the Mortgagee's requirements and put her through all appropriate surveys; and/or

7.2.7 employ agents, servants and others on such terms as the Mortgagee may in its discretion determine; and/or

7.2.8 charter or load the Vessel on such terms and for the carriage of such cargoes as the Mortgagee may in its discretion determine.

7.3 For the avoidance of doubt, if the Mortgagee takes any action or enters into or completes any transaction pursuant to Clause 7.2 after an Event of Default has been remedied, that action or transaction shall not be affected by the remedying of the Event of Default.

## 8 Ancillary Provisions

8.1 In connection with the exercise of its rights, powers, discretions and remedies under Clause 7 or otherwise as mortgagee of the Vessel, the Mortgagee shall have power to buy in, rescind or vary any contract for sale of the Vessel and generally to do all things in connection with the sale of the Vessel as it shall think fit.

8.2 On any sale of the Vessel by the Mortgagee, the purchaser shall not be bound to enquire whether the Mortgagee's power of sale has become exercisable or whether its exercise has become expedient, and the purchaser shall not be affected by any notice that the sale was or may have been irregular in any way. The receipt of the Mortgagee for any amounts paid to it shall be a complete discharge to the purchaser who shall not be concerned with the application of the payment or be answerable for any misapplication. As regards any purchaser, any such sale shall be deemed to be within the power of sale conferred on the Mortgagee by this Mortgage and at law and any remedy of the Owner in respect of any irregularity or impropriety shall be in damages only.

8.3 If the Mortgagee takes possession of the Vessel and until sale the Mortgagee shall be entitled to deal with the Vessel in all respects as if it were the owner of the Vessel.

8.4     The Mortgagee shall be entitled to recover from the Owner on demand all losses, expenses, payments and disbursements incurred by the Mortgagee in or about or incidental to the exercise by it of any of its rights, powers, discretions and remedies under Clause 7 or otherwise as mortgagee of the Vessel together with interest at the Default Rate.

8.5     No failure to exercise, nor any delay in exercising, on the part of the Mortgagee, any right or remedy under Clause 7 or otherwise as mortgagee of the Vessel shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Mortgage are cumulative and not exclusive of any rights or remedies provided by law.

8.6     The Mortgagee may at any time and from time to time delegate to any person all or any of its rights, powers, discretions and remedies pursuant to the Finance Documents on such terms as the Mortgagee may consider appropriate (including the power to sub-delegate).

8.7     Every right, power, discretion and remedy conferred on the Mortgagee under or pursuant to the Finance Documents shall be cumulative and in addition to every other right, power, discretion or remedy to which the Mortgagee may at any time be entitled by law or in equity. The Mortgagee may exercise each of its rights, powers, discretions and remedies as often and in such order as it deems appropriate.

8.8     Neither the Mortgagee nor any agent or employee of the Mortgagee shall be liable for any losses which may be incurred in or about the exercise of any of the rights, powers, discretions or remedies of the Mortgagee under or pursuant to this Mortgage, nor liable as mortgagee in possession for any loss on realisation or for any neglect or default of any nature for which a mortgagee in possession might otherwise be liable.

9       **Receiver**

9.1     On and at any time after the occurrence of an Event of Default which is continuing the Mortgagee may (but shall not be obliged to), subject to the rights of the Prior Mortgagees, appoint any person to be receiver and/or manager of the Vessel and/or any of the Assigned Property.

9.2     The appointment of a receiver and/or manager by the Mortgagee may be made in writing under the hand of any authorised signatory of the Mortgagee.

9.3 The Mortgagee shall have the power to authorise any joint receiver and/or manager to exercise any or all of his powers independently of any other joint receiver and/or manager.

9.4 The Mortgagee may at any time and from time to time remove any receiver and/or manager from office and appoint a replacement.

9.5 The Mortgagee shall have the power from time to time to fix the remuneration of any receiver and/or manager on the basis of charging from time to time adopted by him or his firm and any receiver and/or manager shall not be limited to any maximum amount or rate specified by law.

9.6 Any receiver and/or manager appointed pursuant to this Clause shall be the agent of the Owner and the Owner shall be solely responsible for his acts and defaults and for the payment of his remuneration.

9.7 Any receiver and/or manager appointed pursuant to this Clause shall have all the powers conferred on receivers and/or managers by law without any restriction, whether imposed by law or otherwise.

9.8 Without limitation, any receiver and/or manager shall have power on behalf of the Owner (and at the Owner's expense) to do or omit to do anything which the Owner could do or omit to do in relation to the Vessel or any of the Assigned Property and may exercise all or any of the rights, powers, discretions and remedies conferred on the Mortgagee by the Finance Documents or at law.

9.9 No receiver and/or manager shall be liable as mortgagee in possession to account or be liable for any loss on realisation of, or any default of any nature in connection with, the Vessel or any of the Assigned Property or the exercise of any of the rights, powers, discretions and remedies vested in the receiver and/or manager by virtue of the Finance Documents or at law.

## 10    Application of Moneys

All amounts received by the Mortgagee arising from the exercise by the Mortgagee of its rights, powers, discretions and remedies under or pursuant to this Mortgage (including, without limitation, all amounts received by the Mortgagee in connection with the taking possession and/or sale of the Vessel, any chartering or other use of the Vessel by the Mortgagee, and any claims for damages or claims on any insurance received by the Mortgagee while in possession of or while chartering or using the Vessel) shall, unless otherwise agreed by the Mortgagee or otherwise expressly provided in the Note, be applied by the Mortgagee, subject to the rights of the Prior

Mortgagees, in or towards satisfaction of, or retention on account for, the Indebtedness in such manner as the Mortgagee may in its discretion determine.

11    **Power of Attorney**

11.1    The Owner by way of security, subject to the rights of the Prior Mortgagees, irrevocably appoints the Mortgagee and any receiver and/or manager appointed by the Mortgagee severally to be its attorney (with unlimited power of substitution and delegation) with power (in the name of the Owner or otherwise) to do all acts which the Owner could do in connection with the Vessel or the Assigned Property including, without limitation, to execute and deliver a bill of sale transferring title in the Vessel to a third party and to give a good receipt for any purchase price.

11.2    The Mortgagee agrees that it will not exercise any of its powers as attorney of the Owner unless an Event of Default is continuing, but the exercise of any such powers by the Mortgagee shall not put any person dealing with the Mortgagee on enquiry as to whether an Event of Default is continuing and any such person shall not be affected by notice that no Event of Default is in fact continuing.

11.3    The exercise by the Mortgagee or by any receiver and/or manager of any of their powers as attorney of the Owner shall be conclusive evidence of their right to do so.

12    **Partial Invalidity**

If, at any time, any provision of this Mortgage is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

13    **Further Assurance**

The Owner agrees that from time to time on the written request of the Mortgagee it will immediately execute and deliver to the Mortgagee all further documents which the Mortgagee may require for the purpose of perfecting or protecting the security intended to be created by this Mortgage.

14    **Waiver of Rights as Surety**

14.1    The rights of the Mortgagee under this Mortgage, the security constituted by this Mortgage and the warranties, covenants and obligations of the Owner

contained in this Mortgage shall not in any way be discharged, impaired or otherwise affected by:

14.1.1 any forbearance (whether as to payment or otherwise) or any time or other indulgence granted to any of the other Security Parties under or in connection with any of the Finance Documents;

14.1.2 any amendment, variation, novation or replacement of any of the other Finance Documents;

14.1.3 any failure of any of the Finance Documents to be legal, valid, binding and enforceable in relation to any of the other Security Parties for any reason;

14.1.4 the winding-up or dissolution of any of the other Security Parties;

14.1.5 the release (whether in whole or in part) of, or the entering into of any compromise or composition with, any of the other Security Parties; or

14.1.6 any other act, omission, thing or circumstance which would or might, but for this provision, operate to discharge, impair or otherwise affect the same.

14.2 Until the Indebtedness has been unconditionally and irrevocably paid and discharged in full, the Owner shall not by virtue of any payment made under this Mortgage on account of the Indebtedness or by virtue of any enforcement by the Mortgagee of its rights under, or the security constituted by, this Mortgage or by virtue of any relationship between or transaction involving, the Owner and any of the other Security Parties:

14.2.1 exercise any rights of subrogation in relation to any rights, security or moneys held or received or receivable by the Mortgagee or any other person; or

14.2.2 exercise any right of contribution from any of the other Security Parties under any of the Finance Documents; or

14.2.3 exercise any right of set-off or counterclaim against any of the other Security Parties; or

14.2.4 receive, claim or have the benefit of any payment, distribution, security or indemnity from any of the other Security Parties; or

14.2.5 unless so directed by the Mortgagee (when the Owner will prove in accordance with such directions), claim as a creditor of any of the other Security Parties in competition with the Mortgagee

and the Owner shall hold in trust for the Mortgagee and forthwith pay or transfer (as appropriate) to the Mortgagee any such payment (including an amount equal to any such set-off), distribution or benefit of such security, indemnity or claim in fact received by it.

## 15    Miscellaneous

15.1 In the event of there being any conflict between this Mortgage and the Note, the Note shall prevail.

15.2 All the covenants and agreements of the Owner in this Mortgage shall bind the Owner and its successors and permitted assignees and shall inure to the benefit of the Mortgagee and its successors, transferees and assignees.

15.3 The representations and warranties on the part of the Owner contained in this Mortgage shall survive the execution of this Mortgage and the registration of this Mortgage.

15.4 The rights of the Mortgagee under this Mortgage shall not be affected by any change in the constitution of the Owner or by the liquidation, bankruptcy or insolvency of the Owner.

15.5 No variation or amendment of this Mortgage shall be valid unless in writing and signed on behalf of the Owner and the Mortgagee.

## 16    Discharge of Security

16.1 Following the expiry of the Facility Period the Mortgagee will, at the cost of and on the request of the Owner, execute and deliver to the Owner a discharge of this Mortgage.

16.2 Any discharge, release or reassignment by the Mortgagee of any of the security constituted by, or any of the obligations of the Owner contained in, any of the Finance Documents shall be (and be deemed always to have been) void if any act (including, without limitation, any payment) as a result of which such discharge, release or reassignment was given or made is subsequently wholly or partially rescinded or avoided by operation of any law.

17      **Notices**

The provisions of clause 14 of the Guarantee shall apply (mutatis mutandis) to this Mortgage as if it were set out in full with references to this Mortgage substituted for references to the Guarantee.

18      **Counterparts**

This Mortgage may be executed in any number of counterparts, each of which shall be an original but which shall together constitute the same instrument.

19      **Law and Jurisdiction**

19.1      This Mortgage and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with the law of the Republic of Liberia.

19.2      For the exclusive benefit of the Mortgagee, the Owner irrevocably submits to the *in personam* jurisdiction of the English courts to settle any dispute (a) arising from or in connection with this Mortgage or (b) relating to any non-contractual obligations arising from or in connection with this Mortgage and that any proceedings may be brought in those courts.

19.3      Nothing contained in this Clause shall limit the right of the Mortgagee to commence any proceedings against the Owner in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Owner in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

19.4      The Mortgagee shall in addition have the right to arrest and take action against the Vessel and/or any other vessel for the time being belonging to the Owner wherever it or they may be, for which purpose the Owner irrevocably agrees that any claim form, notice, judgment or other legal process may be served on the Owner in the manner set out in Clause 19.6 or on the Vessel or on the master (or anyone acting as the master) of the Vessel or of the vessel against which the action is taken, which shall be deemed good service on the Owner, the Vessel or such other vessel for all purposes.

19.5      The Owner irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in

any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

19.6   Without prejudice to any other mode of service allowed under any relevant law, the Owner:

    19.6.1   irrevocably appoints Holman Fenwick Willan International LLP, Friary Court, 65 Crutched Friars, London, EC3N 2AE as its agent for service of process in relation to any proceedings before the English courts; and

    19.6.2   agrees that failure by a process agent to notify the Owner of the process will not invalidate the proceedings concerned.

**IN WITNESS** of which the Owner has executed this Mortgage by its duly authorised attorney-in-fact the day and year first before written.

**NEWLEAD CASTELLANO LTD.**

By: _____

    attorney-in-fact duly authorised

        MICHAEL S. LIVANOS

## ACKNOWLEDGEMENT OF MORTGAGE

Hellenic Republic                            )
                                             ) SS.:
Piraeus                                      )

On this _16_ day of _October_ , 2014     before me personally appeared _MICHAIL LIVANOS_     to me known and known to me to be the person who executed the foregoing instrument who being by me duly sworn did depose and say that he resides at _83/ΕΗ Miaouli and Flena Street, Piraeus_, that he is an attorney in fact for Newlead Castellano Ltd that he signed his name thereto by order of the Board of Directors of the said corporation, and that the execution of the foregoing instrument is the act and deed of the said corporation.

_[signature]_

Special Agent
_CHRISTINA KA____

EXHIBIT "A"

FORM OF NOTE AS EXECUTED

(SEE ATTACHED)

THIS NOTE AND THE SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET FORTH HEREIN. NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE PURSUANT HERETO MAY BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER SUCH ACT. THIS NOTE IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT CERTAIN EXCHANGE AGREEMENT, DATED AUGUST 1, 2014, BY AND BETWEEN THE COMPANY AND THE HOLDER.

<div align="center">

NEWLEAD HOLDINGS LTD.
Unsecured Convertible Note
(the "Note")

</div>

US $2,499,955.98

August 4, 2014
Piraeus, Greece

NEWLEAD HOLDINGS LTD., a company organized under the laws of Bermuda (the "Company"), for value received, hereby promises to pay to *Oppenheim Capital Ltd* of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro.MH96960, Republic of the Marshall Islands or registered assigns (the "Holder"), the principal amount of USD2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight) together with any interest as set forth herein (the "Principal") on August 4, 2016, (the "Maturity Date"), and to pay interest from the date hereof on the unpaid principal balance at a rate equal to ten percent (10%) per annum, computed daily and on the basis of the actual number of days elapsed and a year of 365 days. Any accrued and unpaid interest on the Note shall be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

This Note has been issued pursuant to an Exchange Agreement dated August 4, 2014 between the Company and *the Holder* (the "Exchange Agreement"). Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Exchange Agreement.

1. **Payments.**

    (a) The Company shall:

    (i)     pay the Principal or any amount thereof by issuance of its common shares, (the "Common Stock"), at the Stock Price (as defined below) on the Maturity Date.

**Stock Price.** The number of shares of Common Stock shall be determined by dividing (i) the amount payable by, (ii) the Closing Price, as adjusted for any stock splits or stock dividends (the "Stock Price"). "Closing Price" means the closing price the trading date immediately prior to (but not including) the date of issuance of the shares, provided the Common Stock is then listed

or quoted on any national securities exchange, market or trading or quotation facility (a "**Trading Market**").

(ii)  From the date of execution of the Note and for a period of 5 years after the execution date of this Note (the "Measurement Dates"), at the date when either, (i) all Common Stock being issued to the Holder under 1(a)(i) above, or (ii) all Common Stock being issued to the Holder under any True up Amounts (As **defined hereinbelow**), are sold in full and the Holder is entitled to additional True up Amounts. The Company may elect to pay the additional True up Amounts by either (i) wire transfer of immediately available funds to an account designated in writing by the Holder, or (ii) issuance by the Company of its Common Stock at the Stock Price determined as of such date, or (iii) any combination thereof, at the sole option of the Company. The Holder will be entitled for as many additional True up Amounts are required to collect in total the Principal in cash either by the sale of Common Stock or by cash receipts by the Company. Six (6) months prior the lapse of the five (5) year period the Holder is entitled to request for an extension of the true-up period for an additional three (3) years by providing a written notice to the Company.

**True up Amounts**. The True up Amounts are equal to the Principal less the Market Value (as defined below) of the shares issued or the cash paid as part of any Payments prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days after the Measurement Dates.

**Market Value**. Market Value with respect to the shares issued as part of the Principal, means the aggregate gross proceeds received by the Holder from one or more sales, as evidenced by brokerage statements for such sales: *provided, however*, that if the sale price is not reasonably related to the trading price on the sale date, such sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale.

(b)  **Termination of Rights Under this Note**.  Immediately upon the payment of the Principal and/ or any applicable True up Amount due under this Note, this Note shall no longer be deemed outstanding and all rights with respect to this Note shall immediately cease and terminate, subject to clause 1(a)(ii) of this Note.

(c)  **Taxes or other Issuance Charges**.  The issuance of any shares of Common Stock in payment of this Note, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance.  The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(d)     **Holder Not a Stockholder**. The Holder shall not have, solely on account of such status as a holder of this Note, any rights of a stockholder of the Company, either at law or in equity, or any right to any notice of meetings of stockholders or of any other proceedings of the Company until such time as this Note has been paid in shares of Common Stock pursuant to Section 1(a), at which time the Holder shall be deemed to be the holder of record of Common Stock that has been issued, as applicable, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(e)     **Fractional Shares**. No fractional shares of Common Stock shall be issued when paying this Note. In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up or down to the nearest whole share of Common Stock.

(f)     **Payment in Common Stock or Cash**. Each Payment may be paid by the Company in cash or shares of its Common Stock, at its sole discretion; provided, however, that if the Common Stock is not then listed or quoted on a Trading Market (or a similar organization or agency succeeding to its functions of reporting prices), then the Company may not pay by issuing shares of its Common Stock.

(g)     The Company shall at all times reserve and keep available out of its authorised but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, fifty times the number of Common shares issuable from time to time upon such conversion and if at any time the number of authorised but unissued Common shares shall not be sufficient to effect the conversion of the Note, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorised but unissued Common Shares to such number of shares as shall be sufficient for such purpose.

2.     **Trading Market Limitations**. Unless permitted by the applicable rules and regulations of the principal securities market on which the Common Stock is then listed or traded, in no event shall the Company issue upon conversion of or otherwise pursuant to this Note and the other Notes issued pursuant to the Exchange Agreement more than the maximum number of shares of Common Stock that the Company can issue pursuant to any rule of the principal United States securities market on which the Common Stock is then traded (the "Maximum Share Amount"), which shall be 4.99% of the total shares outstanding on the Closing Date, subject to equitable adjustment from time to time for stock splits, stock dividends, combinations, capital reorganizations and similar events relating to the Common Stock occurring after the date hereof.

3.     **Ranking**. The Company, for itself, its successors and assigns, covenants and agrees, that the payment of the Principal of this Note is senior in right of payment to the payment of all existing and future Junior Debt (as defined below). "**Junior Debt**" shall mean all existing and future Indebtedness (as defined below), (B) Indebtedness (as defined below) incurred after the date hereof, solely as it relates to the Collateral, and (C) as otherwise agreed to by the Holder in writing. "**Indebtedness**" shall mean (x) any liability of the Company for borrowed money, (1) evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), including any given in connection with the acquisition

of property, assets or service, or (2) for the payment of rent or other amounts relating to capitalized lease obligations; (y) any liability of others of the nature described in clause (1) which the Company has guaranteed or which is otherwise its legal liability; and (z) any modification, renewal, extension, replacement or refunding of any such liability described in clause (x) or (y); provided, that Indebtedness does not include unsecured trade credit.

(a)     The Company covenants and agrees to cause any current holder of Junior Debt and to cause any future holder of Junior Debt permitted to be incurred pursuant to this Note to execute such subordination agreements, instruments or waivers as may be necessary to reflect the terms set forth herein.

(b)     Until the payment in full of all amounts of principal of this Note, and all other amounts owing under this Note, no payment may be made with respect to the principal of or other amounts owing with respect to any Junior Debt, or in respect of any redemption, retirement, purchase or other acquisition thereof, provided that the Company may pay scheduled interest thereon so long as no Event of Default shall have occurred and be continuing.

(c)     Upon any payment or distribution of the assets of the Company to creditors upon dissolution, total or partial liquidation or reorganization of, or similar proceeding, the Holder of the Note will be entitled to receive payment in full before any holder of Junior Debt is entitled to receive any payment.

4.     **Events of Default.**  The entire unpaid principal of this Note or any True up Amounts shall become and be immediately due and payable in cash or shares of Common Stock of the Company, in either case without any other notice or demand of any kind or any presentment or protest, if any one of the following events occurs and be continuing at the time of such demand (each such event, an "**Event of Default**"):

(a)     The Company's failure to pay any portion of the principal as provided in Section 1 hereof; or

(b)     (i) The commencement by the Company, or any subsidiary, of a voluntary case under 11 U.S.C. Section 101 *et. seq.* (the "Bankruptcy Code") or any foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or (ii) the consent by the Company, or any subsidiary, to the entry of an order for relief in an involuntary bankruptcy or similar case, or to the conversion of an involuntary case to a voluntary case, under any such law, or (iii) the consent by the Company, or any subsidiary, to the appointment of, or the taking of possession by, a receiver, trustee or other custodian for all or a substantial part of the Company's properties, or (iv) the making by the Company, or any subsidiary, of any assignment for the benefit of creditors, or (v) the admission by the Company, or any subsidiary, in writing of the Company's inability to pay the Company's debts as such debts become due, or (vi) the discontinuance of business, dissolution, winding up, liquidation or cessation of existence by or of the Company, or any subsidiary; or

(d)     (i) The entry by a court of competent jurisdiction a decree or order for relief with respect to the Company, or any subsidiary, in an involuntary case under the Bankruptcy Code or any applicable foreign, federal or state bankruptcy, insolvency or other

4

similar law now or hereafter in effect, which decree or order is not stayed or dismissed within 60 days of the entry thereof, or (ii) the entry by a court of a decree or order for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other person having similar powers over the Company or over all or a substantial part of its properties;

(f)     The Company materially breaches any covenant contained in the Exchange Agreement; or

The Company agrees that if it fails to timely make any payment due under this Note or upon the happening of any Event of Default, and fails to remedy the situation within a ten (10) day grace period, the outstanding principal, together with all other expenses, including, reasonable attorneys' fees, shall immediately become due and payable at the option of the Holder.   For purposes hereof, attorneys' fees shall include, without limitation, fees and disbursements for legal services incurred by the holder hereof in collecting or enforcing payment hereof whether or not suit is brought, and if suit is brought, then through all appellate actions. From and after any Event of Default, the interest rate of this Note shall be the highest rate permitted under applicable law.

5.     **Miscellaneous**.

(a)     The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; *provided, however,* that neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party.  Assignment of all or any portion of this Note in violation of this Section shall be null and void.  Nothing in this Note, expressed or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b)     Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in accordance with Section 11.5 of the Exchange Agreement.

(c)     Upon receipt of evidence satisfactory to the Company, of the loss, theft, destruction or mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the Holder thereof that this Note has been lost, stolen, destroyed or mutilated, together with an indemnity against any claim that may be made against the Company on account of such lost, stolen, destroyed or mutilated Note, and upon reimbursement of the Company's reasonable incidental expenses, the Company shall execute and deliver to the Holder a new Note of like date, tenor and denomination.

(d)     No course of dealing and no delay or omission on the part of the Holder or the Company in exercising any right or remedy shall operate as a waiver thereof or otherwise prejudice the Holder's or the Company's rights, powers or remedies, as the case may be.  No right, power or remedy conferred by this Note upon the Holder or the Company shall be exclusive of any other right, power or remedy referred to herein or now or hereafter available at

law, in equity, by statute or otherwise, and all such remedies may be exercised singly or concurrently. Any waiver must be in writing.

(e)     If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms. This Note may be amended only by a written instrument executed by the Company and the Holder. Any amendment shall be endorsed upon this Note, and all future Holders shall be bound thereby.

(f)     If any date specified in this Note as a date for the making of any payment of principal or interest under this Note falls on a Saturday, Sunday or on a day that is a legal holiday in the State of New York, then the date for the making of that payment shall be the next subsequent day that is not a Saturday, Sunday or legal holiday.

(g)     This Note shall be governed by and construed in accordance with the laws of the New York City, without giving effect to principles governing conflicts of law.

(h)     The Company hereby irrevocably submits to the exclusive jurisdiction of any United States Federal court over any suit, action or proceeding arising out of or related to the Note. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment: *provided* that service of process is effected upon the Company in the manner permitted by law.

(i)     The parties hereto agree that all monetary amounts set forth herein are referenced in United States dollars, unless otherwise stated.

*(Remainder of page left intentionally blank. Signature page to follow.)*

IN WITNESS WHEREOF, the Company has caused this Senior Secured Note to be executed and dated the day and year first above written.

NEWLEAD HOLDINGS LTD.

By: _____

Name:   Michael S. Zolotas

Title:   Chairman & CEO

EXHIBIT "B"

FORM OF GUARANTEE AS EXECUTED


(SEE ATTACHED)

**DATED 16 October 2014**


**NEWLEAD CASTELLANO LTD**

**- to -**

**OPPENHEIM CAPITAL LTD**


---

**GUARANTEE AND INDEMNITY**

---



**STEPHENSON HARWOOD**

## CONTENTS

Page

1    Definitions and Interpretation ...........................................................................3

2    Representations and Warranties........................................................................5

3    Guarantee and Indemnity ..................................................................................6

4    Preservation of Guarantor's Liability.................................................................7

5    Preservation of Holder's Rights ........................................................................8

6    Undertakings.....................................................................................................10

7    Payments ..........................................................................................................12

8    Currency ...........................................................................................................13

9    Set-Off...............................................................................................................14

10   Application of Moneys......................................................................................14

11   Partial Invalidity ...............................................................................................15

12   Further Assurance............................................................................................15

13   Miscellaneous...................................................................................................15

14   Notices...............................................................................................................15

15   Law and Jurisdiction ........................................................................................15

GUARANTEE AND INDEMNITY

Dated: 16 October 2014

BY:

(1)  **NEWLEAD CASTELLANO LTD**, a company incorporated according to the law of the
     Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic
     of Liberia (the "**Guarantor**")

IN FAVOUR OF:

(2)  **OPPENHEIM CAPITAL LTD.**, a corporation incorporated under the law of the Republic
     of the Marshall Islands whose registered address is at Trust Company Complex,
     Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the "**Holder**").

WHEREAS:

(A)  NewLead Holdings Ltd., a company incorporated according to the law of Bermuda
     whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12,
     Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece
     (the "**Company**") and the Holder have entered into a remuneration agreement dated
     16 December 2013 pursuant to which the Company has agreed to pay to the Holder, as
     consideration for its services, a compensation fee of two million five hundred thousand
     Dollars ($2,500,000) in Company's common stock, which was settled with the issuance
     of 1,773,050 Company's shares on 16 December 2013 (the "**Success Shares**").

(B)  The value of the Success Shares has dropped and the Holder has suffered a deficit of
     two million four hundred and ninety nine thousand nine hundred and fifty five Dollars
     and ninety eight cents ($2,499,955.98) (the "**Deficit**").

(C)  To cover the Deficit, the Company has issued and the Holder has accepted an
     unsecured convertible note dated 4 August 2014 executed by the Company in favour
     the Holder (the "**Note**") the outstanding amount of the debt being at the date hereof
     equal to two million five hundred and forty seven thousand nine hundred Dollars
     ($2,547,900) (the "**Debt**").

(B)  As consideration for the Holder's agreement to accept the Note to cover the Deficit, the
     Company has agreed to procure that the Guarantor execute and deliver this Guarantee
     and Indemnity in favour of the Holder.

**THIS DEED WITNESSES** as follows:

1    **Definitions and Interpretation**

1.1    In this Guarantee and Indemnity:

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London, Piraeus and New York.

"**Dollars**" and "**$**" each means available and freely transferable and convertible funds in lawful currency of the United States of America.

"**Encumbrance**" means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Facility Period**" means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

"**Finance Documents**" means the Note, the Guarantor's Security Documents, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Holder and the Company.

"**GAAP**" means generally accepted accounting principles in IFRS.

"**Guarantor's Liabilities**" means all of the liabilities and obligations of the Guarantor to the Holder under or pursuant to this Guarantee and Indemnity, from time to time, whether in respect of principal, interest, costs or otherwise and whether present, future, actual or contingent.

"**Guarantor's Security Documents**" means this Guarantee and Indemnity and any and all documents which may at any time be executed by the Guarantor as security for the payment of all or any part of the Guarantor's Liabilities.

"**IFRS**" means International Financial Reporting Standards issued and/or adopted by the International Accounting Standards Board.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable to the Holder under all or any of the Finance Documents.

"**Original Financial Statements**" means the audited consolidated financial statements of the Guarantor for the financial year ended 31 December 2013.

"**Security Parties**" means the parties to any of the Finance Documents (other than the Holder).

1.2 Unless otherwise specified in this Guarantee and Indemnity, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Guarantee and Indemnity.

1.3 In this Guarantee and Indemnity:

1.3.1 words denoting the plural number include the singular and vice versa;

1.3.2 words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

1.3.3 references to Clauses are references to clauses of this Guarantee and Indemnity;

1.3.4 references to this Guarantee and Indemnity include the recitals to this Guarantee and Indemnity;

1.3.5 the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Guarantee and Indemnity;

1.3.6 references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

1.3.7 references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted; and

1.3.8 references to the Holder include its successors, transferees and assignees.

2    **Representations and Warranties**

The Guarantor represents and warrants to the Holder at the date of this Guarantee and Indemnity and (by reference to the facts and circumstances then pertaining) on each day throughout the Facility Period that:

2.1    all representations and warranties given by the Company in the Note in respect of the Guarantor are and will remain correct and none of them is or will become misleading; and

2.2    the Guarantor is a corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation and has the power to own its assets and to carry on its business as it is being conducted; and

2.3    the Guarantor has the power to enter into and perform the Guarantor's Security Documents and has taken all necessary action to authorise its entry into and performance of the Guarantor's Security Documents; and

2.4    the Guarantor is not insolvent or in liquidation or administration or subject to any other formal or informal insolvency procedure, and no receiver, administrative receiver, administrator, liquidator, trustee or analogous officer has been appointed in respect of the Guarantor or all or any part of its assets; and

2.5    this Guarantee and Indemnity constitutes legal, valid, binding and enforceable obligations of the Guarantor and each of the other Guarantor's Security Documents will, when executed and delivered by the Guarantor, constitute legal, valid, binding and enforceable obligations of the Guarantor; and

2.6    all consents, licences, approvals and authorisations of, or registrations with or declarations to, any governmental authority, bureau or agency which may be required in connection with the entry into, performance, validity or enforceability of the Guarantor's Security Documents have been obtained or made and remain in full force and effect and the Guarantor is not aware of any event or circumstance which could reasonably be expected adversely to affect the right of the Guarantor to hold and/or obtain renewal of any such consents, licences, approvals or authorisations; and

2.7    no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency which if adversely determined, might reasonably be expected to have a material adverse effect on the business or financial condition

of the Guarantor have (to the best of the Guarantor's knowledge and belief) been started or threatened against the Guarantor; and

2.8     the entry into and performance of the Guarantor's Security Documents will not conflict with the constitutional documents of the Guarantor or any law or regulation or document applicable to, or binding on, the Guarantor or any of its assets; and

2.9     the Guarantor is not required to make any deduction or withholding from any payment which it may be obliged to make to the Holder under or pursuant to any of the Guarantor's Security Documents; and

2.10    it is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of any of the Guarantor's Security Documents that it be filed, recorded or enrolled with any court or other authority in any country or that any stamp, registration or similar tax be paid on or in relation to any of the Guarantor's Security Documents; and

2.11    the Guarantor is not in breach of, or default under, any agreement of any sort binding on it or on all or any part of its assets; and

2.12    the Guarantor is not aware of any material facts or circumstances which have not been disclosed to the Holder and which might, if disclosed, have adversely affected the decision of a person considering whether or not to make financial arrangments of the nature contemplated by the Note with the Company; and

2.13    the Guarantor has received a copy of the Note and approves of, and agrees to, the terms and conditions of the Note.

3       **Guarantee and Indemnity**

The Guarantor:

3.1     irrevocably and unconditionally guarantees the due and punctual observance and performance by the Company of all its obligations under the Finance Documents including, without limitation, the due and punctual payment of each and every part of the Indebtedness in accordance with the terms of the Finance Documents so that, if any of the Indebtedness is not paid when it is due and payable, whether on maturity or otherwise, the Guarantor will, immediately on demand, make such payment to the Holder in the manner specified by the Holder, together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment; and

3.2     agrees, as a separate and independent obligation, that, if any of the Indebtedness is not recoverable from the Guarantor under Clause 3.1 for any reason, the Guarantor will be liable as a principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable, and agrees to discharge its liability under this Clause 3.2 by making payment to the Holder immediately on demand together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment.

4       **Preservation of Guarantor's Liability**

4.1     This Guarantee and Indemnity is a continuing security for the full amount of the Indebtedness from time to time until the expiry of the Facility Period.

4.2     The Holder may without the Guarantor's consent and without notice to the Guarantor and without in any way releasing or reducing the Guarantor's Liabilities:

    4.2.1   amend, vary, novate, or replace any of the Finance Documents (other than the Guarantor's Security Documents); and/or

    4.2.2   agree with the Company to increase or reduce the amount of the Debt, or vary the terms and conditions for its repayment or prepayment (including, without limitation, the rate and/or method of calculation of interest payable on the Debt); and/or

    4.2.3   allow any time or other indulgence to any of the other Security Parties under or in connection with any of the Finance Documents; and/or

    4.2.4   renew, vary, release or refrain from enforcing any of the Finance Documents (other than the Guarantor's Security Documents); and/or

    4.2.5   compound with any of the other Security Parties; and/or

    4.2.6   enter into, renew, vary or terminate any other agreement or arrangement with any of the other Security Parties; and/or

    4.2.7   do or omit or neglect to do anything which might, but for this provision, operate to release or reduce the liability of the Guarantor under this Guarantee and Indemnity.

4.3     The Guarantor's Liabilities shall not be affected by:

4.3.1    the absence of, or any defective, excessive or irregular exercise of, any of the powers of any of the other Security Parties; nor

4.3.2    any security given or payment made to the Holder by any of the other Security Parties being avoided or reduced under any law (whether English or foreign) relating to bankruptcy or insolvency or analogous circumstance in force from time to time; nor

4.3.3    any change in the constitution of the Guarantor or of any of the other Security Parties or of the Holder or the absorption of or amalgamation by the Holder in or with any other entity or the acquisition of all or any part of the assets or undertaking of the Holder by any other entity; nor

4.3.4    the liquidation, administration, receivership, bankruptcy or insolvency of the Guarantor or any of the other Security Parties; nor

4.3.5    any of the Finance Documents (other than this Guarantee and Indemnity) being defective, void or unenforceable, or the failure of any other person to provide the Holder with any security, guarantee or indemnity envisaged by the Note; nor

4.3.6    any composition, assignment or arrangement being made by any of the other Security Parties with any of its creditors; nor

4.3.7    anything which would, but for this provision, have released or reduced the liability of the Guarantor to the Holder.

## 5    Preservation of Holder's Rights

5.1    This Guarantee and Indemnity is in addition to any other security, guarantee or indemnity now or in the future held by the Holder in respect of the Indebtedness, whether from the Company, the Guarantor or any other person, and shall not merge with, prejudice or be prejudiced by, any such security, guarantee or indemnity or any contractual or legal right of the Holder.

5.2    Any release, settlement, discharge or arrangement relating to the Guarantor's Liabilities shall be conditional on no payment, assurance or security received by the Holder in respect of the Indebtedness being avoided or reduced under any law (whether English or foreign) in force from time to time relating to bankruptcy, insolvency or any (in the opinion of the Holder) analogous circumstance, and, after any such avoidance or reduction, the Holder shall be entitled to exercise all of its rights, powers, discretions and remedies under or pursuant to the Guarantor's Security Documents and/or any other rights,

powers, discretions or remedies which it would otherwise have been entitled to exercise, as if no release, settlement, discharge or arrangement had taken place.

5.3   Following the full payment of the Indebtedness, the Holder shall be entitled to retain the Guarantor's Security Documents until the Holder is satisfied in its discretion that it will not have to make any payment under any law referred to in Clause 5.2.

5.4   Until the expiry of the Facility Period the Guarantor shall not:

5.4.1   be entitled to participate in any sums received by the Holder in respect of any of the Indebtedness; nor

5.4.2   be entitled to participate in any security held by the Holder in respect of any of the Indebtedness nor stand in the place of, or be subrogated for, the Holder in respect of any such security; nor

5.4.3   take any step to enforce any claim against any of the other Security Parties (or their respective estates or effects), nor claim or exercise any right of set-off or counterclaim against any of the other Security Parties, nor make any claim in the bankruptcy or liquidation of any of the other Security Parties, in respect of any sums paid by the Guarantor to the Holder or in respect of any sum which includes the proceeds of realisation of any security held by the Holder under or pursuant to any of the Guarantor's Security Documents; nor

5.4.4   take any steps to enforce any other claim which it may have against any of the other Security Parties without the prior written consent of the Holder, and then only on such terms and subject to such conditions as the Holder may impose.

5.5   The Holder may, but shall not be obliged to, resort for its own benefit to any other means of payment at any time and in any order it thinks fit without releasing or reducing the Guarantor's Liabilities.

5.6   The Holder may enforce any of the Guarantor's Security Documents either before or after resorting to any other means of payment without entitling the Guarantor to any benefit from or share in any such other means of payment until the expiry of the Facility Period.

The Guarantor agrees that it is, and will throughout the Facility Period remain, a principal debtor in respect of the Guarantor's Liabilities.

5.8   No failure to exercise, nor any delay in exercising, on the part of the Holder, any right or remedy under the Guarantor's Security Documents shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in the Guarantor's Security Documents are cumulative and not exclusive of any rights or remedies provided by law.

6   **Undertakings**

6.1   The Guarantor shall pay to the Holder on demand on a full indemnity basis all costs and expenses incurred by the Holder in or about or incidental to the exercise by it of its rights under any of the Guarantor's Security Documents, together with twelve per cent (12%) interest on the amount demanded from the date of demand until the date of payment (being two per cent (2%) higher than the interest rate on the outstanding Debt agreed under the Note), both before and after judgment, which interest shall be compounded with the amount demanded at the end of such periods as the Holder may reasonably select.

6.2   The Guarantor has not taken, and will not take without the prior written consent of the Holder (and then only on such terms and subject to such conditions as the Holder may impose), any security from any of the other Security Parties in connection with this Guarantee and Indemnity, and any security taken by the Guarantor notwithstanding this Clause shall be held by the Guarantor in trust for the Holder absolutely as a continuing security for the Guarantor's Liabilities.

6.3   The Guarantor will observe and perform any and all covenants and undertakings in the Note whose observance and performance by the Guarantor the Company has undertaken to procure.

6.4   The Guarantor will not without the Holder's prior written consent:

6.4.1   create nor permit to arise any Encumbrance or other third party rights over any of its present or future assets or undertaking other than in favour of the Holder; nor

6.4.2   except in the ordinary course of business, incur any liability to any third party which is in the Holder's opinion of a substantial nature; nor

6.4.3   make any loan nor enter into any guarantee or indemnity nor otherwise voluntarily assume any actual or contingent liability in respect of any obligation of any other person; nor

6.4.4    permit any change in the legal or beneficial ownership of the Guarantor from that advised to the Holder at the date of this Guarantee and Indemnity.

6.5    The Guarantor shall supply to the Holder as soon as the same become available, but in any event within 180 days after the end of each of its financial years, its audited financial statements for that financial year.   Each set of financial statements:

6.6    shall be certified by a director of the Guarantor as fairly representing its financial condition as at the date at which those financial statements were drawn up; and

6.7    shall be prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements unless, in relation to any set of financial statements, the Guarantor notifies the Holder that there has been a change in GAAP, the accounting practices or reference periods and the Guarantor's auditors deliver to the Holder:

(a)    a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the Original Financial Statements were prepared; and

(b)    sufficient information, in form and substance as may be reasonably required by the Holder, to enable the Holder to make an accurate comparison between the financial position indicated in those financial statements and that indicated in the Original Financial Statements.

6.8    The Guarantor shall supply to the Holder:

6.8.1    all documents dispatched by the Guarantor to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched; and

6.8.2    promptly upon becoming aware of them, details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any of the Security Parties and which might, if adversely determined, have a material adverse effect on the business or financial condition of any of the Security Parties; and

6.8.3     promptly, such further information regarding the financial condition, business and operations of any of the Security Parties as the Holder may reasonably request.

## 7    Payments

7.1     All amounts payable by the Guarantor under or pursuant to any of the Guarantor's Security Documents shall be paid to such accounts at such banks as the Holder may from time to time direct to the Guarantor in the relevant currency in same day funds for immediate value. Payment shall be deemed to have been received on the date on which the Holder receives authenticated advice of receipt, unless that advice is received by the Holder on a day other than a Business Day or at a time of day (whether on a Business Day or not) when the Holder in its discretion considers that it is impossible or impracticable to utilise the amount received for value that same day, in which event the payment in question shall be deemed to have been received on the Business Day next following the date of receipt of advice by the Holder.

7.2     All payments to be made by the Guarantor pursuant to any of the Guarantor's Security Documents shall, subject only to Clause 7.3, be made free and clear of and without deduction for or on account of any taxes or other deductions, withholdings, restrictions, conditions, set-offs or counterclaims of any nature.

7.3     If at any time any law requires (or is interpreted to require) the Guarantor to make any deduction or withholding from any payment, or to change the rate or manner in which any required deduction or withholding is made, the Guarantor will promptly notify the Holder and, simultaneously with making that payment, will pay whatever additional amount (after taking into account any additional taxes on, or deductions or withholdings from, or restrictions or conditions on, that additional amount) is necessary to ensure that, after making the deduction or withholding, the Holder receives a net sum equal to the sum which it would have received had no deduction or withholding been made.

7.4     If at any time the Guarantor is required by law to make any deduction or withholding from any payment to be made by it pursuant to any of the Guarantor's Security Documents, the Guarantor will pay the amount required to be deducted or withheld to the relevant authority within the time allowed under the applicable law and will, no later than thirty days after making that payment, deliver to the Holder an original receipt issued by the relevant authority, or other evidence acceptable to the Holder, evidencing the payment to that authority of all amounts required to be deducted or withheld.

7.5   If the Guarantor pays any additional amount under Clause 7.3, and the Holder subsequently receives a refund or allowance from any tax authority which the Holder identifies as being referable to that increased amount so paid by the Guarantor, the Holder shall, as soon as reasonably practicable, pay to the Guarantor an amount equal to the amount of the refund or allowance received, if and to the extent that it may do so without prejudicing its right to retain that refund or allowance and without putting itself in any worse financial position than that in which it would have been had the relevant deduction or withholding not been required to have been made.  Nothing in this Clause 7.5 shall be interpreted as imposing any obligation on the Holder to apply for any refund or allowance nor as restricting in any way the manner in which the Holder organises its tax affairs, nor as imposing on the Holder any obligation to disclose to the Guarantor any information regarding its tax affairs or tax computations.

7.6   Any certificate or statement signed by an authorised signatory of the Holder purporting to show the amount of the Indebtedness or of the Guarantor's Liabilities (or any part of any of them) or any other amount referred to in any of the Finance Documents shall, save for manifest error or on any question of law, be conclusive evidence as against the Guarantor of that amount.

## 8   Currency

8.1   The Guarantor's liability under this Guarantee and Indemnity is to discharge the Indebtedness in the currency in which it is expressed to be payable (the "Agreed Currency").

8.2   If at any time the Holder receives (including by way of set-off) any payment by or on behalf of the Guarantor in a currency other than the Agreed Currency, that payment shall take effect as a payment to the Holder of the amount in the Agreed Currency which the Holder is able to purchase (after deduction of any relevant costs) with the amount of the payment so received in accordance with its usual practice.

8.3   To the extent that any payment to the Holder (whether by the Guarantor or any other person and whether under any judgment or court order or otherwise) in a currency other than the Agreed Currency shall on actual conversion into the Agreed Currency fall short of the relevant amount of the Indebtedness expressed in the Agreed Currency, then the Guarantor as a separate and independent obligation will indemnify the Holder against the shortfall.

9       **Set-Off**

9.1     The Guarantor irrevocably authorises the Holder at any time to set off without notice any sums then due and payable by the Guarantor to the Holder under this Guarantee and Indemnity (irrespective of the branch or office, currency or place of payment) against any credit balance from time to time standing on any account of the Guarantor (whether current or otherwise, whether or not subject to notice and whether or not that credit balance is then due to the Guarantor) with any branch of the Holder in or towards satisfaction of the Guarantor's Liabilities and, in the name of the Holder or the Guarantor, to do all acts (including, without limitation, purchasing or converting or exchanging any currency) which may be required to effect such set-off.

9.2     Despite any term to the contrary in relation to any deposit or credit balance at any time on any account of the Guarantor with the Holder, no such deposit or credit balance shall be repayable or capable of being assigned, mortgaged, charged or otherwise disposed of or dealt with by the Guarantor until the Guarantor's Liabilities have been discharged in full, but the Holder may from time to time permit the withdrawal of all or any part of any such deposit or balance without affecting the continued application of this Clause.

10      **Application of Moneys**

10.1    All sums which the Holder receives under or in connection with any of the Guarantor's Security Documents shall, unless otherwise agreed by the Holder or otherwise provided in the Notes, be applied by the Holder in or towards satisfaction, or by way of retention on account, of the Guarantor's Liabilities, in such manner as the Holder may in its discretion determine.

10.2    The Holder may place any money received by it under or in connection with any of the Guarantor's Security Documents to the credit of a suspense account on such terms and subject to such conditions as the Holder may in its discretion determine for so long as the Holder thinks fit without any obligation in the meantime to apply that money in or towards discharge of the Indebtedness, and, despite such payment, the Holder may claim against any of the other Security Parties or prove in the bankruptcy, liquidation or insolvency of any of the other Security Parties for the whole of the Indebtedness at the date of the Holder's demand for payment pursuant to this Guarantee and Indemnity, together with all interest, commission, charges and expenses accruing subsequently.

11    **Partial Invalidity**

If, at any time, any provision of any of the Guarantor's Security Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

12    **Further Assurance**

The Guarantor agrees that from time to time on the written request of the Holder it will immediately execute and deliver to the Holder all further documents which the Holder may require for the purpose of perfecting or protecting the security intended to be created by the Guarantor's Security Documents.

13    **Miscellaneous**

13.1    All the covenants and agreements of the Guarantor in this Guarantee and Indemnity shall bind the Guarantor and its successors and permitted assignees and shall inure to the benefit of the Holder and its successors, transferees and assignees.

13.2    The representations and warranties on the part of the Guarantor contained in this Guarantee and Indemnity shall survive the execution of this Guarantee and Indemnity.

13.3    No variation or amendment of this Guarantee and Indemnity shall be valid unless in writing and signed on behalf of the Guarantor and the Holder.

13.4    A person who is not a party to this Guarantee and Indemnity has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Guarantee and Indemnity.

14    **Notices**

14.1    **Communications in writing**    Any communication to be made under or in connection with this Guarantee and Indemnity shall be made in writing and, unless otherwise stated, may be made by fax or letter.

14.2    **Addresses** The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Guarantee and Indemnity for any communication or document to be made or delivered under or in connection with this Guarantee and Indemnity are:

15

14.2.1 in the case of the Guarantor, c/o NewLead Holdings Ltd., 83 Akti Miaouli & Flessa, 185 38 Piraeus, Greece (fax no: +302130148039) marked for the attention of the Legal Department; and

14.2.2 in the case of the Holder, c/o Oppenheim Capital Ltd., 90 Kapodistriou Ave., N. Ionia, 14235, Athens, Greece (fax no: +30 210 275 4358) marked for the attention of Mr. Dimitrios Stavrianos,

or any substitute address, fax number, department or officer as either party may notify to the other by not less than five (5) Business Days' notice.

14.3 **Delivery**   Any communication or document made or delivered by one party to this Guarantee and Indemnity to the other under or in connection with this Guarantee and Indemnity will only be effective:

14.3.1 if by way of fax, when received in legible form; or

14.3.2 if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address;

and, if a particular department or officer is specified as part of its address details provided under Clause ~~Error!  Reference  source  not  found.~~ 14.2 (*Addresses*), if addressed to that department or officer.

Any communication or document to be made or delivered to the Holder will be effective only when actually received by the Holder.

Any communication or document which becomes effective, in accordance with this Clause ~~Error! Reference source not found.,~~ 14.3 after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

14.4 **English language**   Any notice given under or in connection with this Guarantee and Indemnity must be in English. All other documents provided under or in connection with this Guarantee and Indemnity must be:

14.4.1 in English; or

14.4.2 if not in English, and if so required by the Holder, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

15    **Law and Jurisdiction**

15.1    This Guarantee and Indemnity and any non-contractual obligations arising from or in connection with it shall in all respects be governed by and interpreted in accordance with English law.

15.2    For the exclusive benefit of the Holder, the Guarantor irrevocably agrees that the courts of England are to have exclusive jurisdiction to settle any dispute (a) arising from or in connection with this Guarantee and Indemnity or (b) relating to any non-contractual obligations arising from or in connection with this Guarantee and Indemnity and that any proceedings may be brought in those courts.

15.3    Nothing contained in this Clause shall limit the right of the Holder to commence any proceedings against the Guarantor in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Guarantor in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

15.4    The Guarantor irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

15.5    Without prejudice to any other mode of service allowed under any relevant law, the Guarantor:

15.5.1    irrevocably appoints Holman ~~Fenwick Willan International LLP~~, *Nominees Limited* Friary Court, 65 Crutched Friars, London, EC3N 2AE as its agent for service of process in relation to any proceedings before the English courts; and

15.5.2    agrees that failure by a process agent to notify the Guarantor of the process will not invalidate the proceedings concerned.

**IN WITNESS** of which this Guarantee and Indemnity has been duly executed and delivered as a deed the day and year first before written.

SIGNED and **DELIVERED**                )
as a **DEED**                           )
by  **NEWLEAD CASTELLANO LTD**          )
acting by MICHAIL LIVANOS               )
its duly authorised attorney-in-fact    )
in the presence of:                     )

Andrella Corelis

HARWOOD LLP
ON BUILDING
STR.& AKTI MIAOULI
PIRAEUS 18536
VAT. NO. 9 9 8 7 1 1 1 5 6
TEL. 210 42 95 160

**DATED** 26 June 2015

**NEWLEAD CASTELLANO LTD**

**- and -**

**LABROY SHIPTRADE LIMITED**

---

**FOURTH PREFERRED
LIBERIAN MORTGAGE
m.v. "NEWLEAD CASTELLANO"**

---



**STEPHENSON HARWOOD**

# CONTENTS

Page

1    Definitions and Interpretation .............................................................................. 2

2    Representations and Warranties ........................................................................... 5

3    Covenant to Pay ................................................................................................... 6

4    Mortgage and Amount Secured .......................................................................... 6

5    Insurance .............................................................................................................. 8

6    Operation and Maintenance ...............................................................................13

7    Mortgagee's Powers...........................................................................................19

8    Ancillary Provisions ...........................................................................................20

9    Receiver ..............................................................................................................21

10   Application of Moneys ........................................................................................22

11   Power of Attorney ..............................................................................................23

12   Partial Invalidity.................................................................................................23

13   Further Assurance ..............................................................................................23

14   Waiver of Rights as Surety .................................................................................23

15   Miscellaneous .....................................................................................................25

16   Discharge of Security..........................................................................................25

17   Notices ................................................................................................................26

18   Counterparts .......................................................................................................26

19   Law and Jurisdiction ..........................................................................................26

**FOURTH PREFERRED MORTGAGE**

Dated: 26 June 2015

**BY:**

(1)   **NEWLEAD CASTELLANO LTD**, a company incorporated according to the law of the Republic of Liberia whose registered address is at 80 Broad Street, Monrovia, Republic of Liberia (the **"Owner"**)

**IN FAVOUR OF:**

(2)   **LABROY SHIPTRADE LIMITED**, a corporation incorporated under the law of the Republic of the Marshall Islands whose registered address is at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960 (the **"Mortgagee"**).

**WHEREAS:**

(A)   NewLead Holdings Ltd., a company incorporated according to the law of Bermuda whose registered office is at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece (the **"Company"**) has issued and the Mortgagee has accepted in consideration of payment by the Mortgagee to the Company of the amount of an unsecured convertible note dated 26 May 2015, executed by the Company in favour the Mortgagee (the **"Note"**) (a copy of which in the form executed is attached to this Mortgage as Exhibit "A" and shall be read together with this Mortgage), the outstanding amount of the debt being at the date hereof equal to one million two hundred and fifteen thousand Dollars ($1,215,000) (the **"Debt"**).

(B)   In consideration of the Mortgagee's agreement to accept the Note, the Owner has executed and delivered in favour of the Mortgagee a guarantee and indemnity dated 16 June 2015 (the **"Guarantee"**) (a copy of which in the form executed is attached to this Mortgage as Exhibit "B" and shall be read together with this Mortgage) in respect of the obligations of the Company under the Finance Documents and has agreed to execute and register in favour of the Mortgagee this Fourth Preferred Mortgage on the Vessel under and pursuant to Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended) and all other applicable laws of the Republic of Liberia, as security for the payment of the Indebtedness.

(C)   A first preferred mortgage on the Vessel (the **"RC Mortgage"**) dated 16 October 2014 and recorded on 16 October 2014 at 9:11 AM, E.D.S.T. in Book PM 66 Page 769 has been entered into by the Owner in favour of Ray Capital Inc., of the Republic of the

Marshall Islands (in its capacity as beneficiary of the RC Mortgage and of any coordination or subordination agreement with the Mortgagee in relation to the RC Mortgage, the **"RC Mortgagee"**).

(D)    A second preferred mortgage on the Vessel (the **"Cheyenne Mortgage"**) dated 16 October 2014 and recorded on 16 October 2014 at 9:12 AM, E.D.S.T. in Book PM 66 Page 775 has been entered into by the Owner in favour of Cheyenne Holding Ltd., of the Republic of the Marshall Islands (in its capacity as beneficiary of the Cheyenne Mortgage and of any coordination or subordination agreement with the Mortgagee in relation to the Cheyenne Mortgage (the **"Cheyenne Mortgagee"**).

(E)    A third preferred mortgage on the Vessel (the **"Oppenheim Mortgage"**) dated 16 October 2014 and recorded on 16 October 2014 at 9:13 AM, E.D.S.T. in Book PM 66 Page 776 has been entered into by the Owner in favour of Oppenheim Capital Ltd., of the Republic of the Marshall Islands (in its capacity as beneficiary of the Oppenheim Mortgage and of any coordination or subordination agreement with the Mortgagee in relation to the Oppenheim Mortgage (the **"Oppenheim Mortgagee"** and, together with the RC Mortgagee and the Cheyenne Mortgagee, the **"Prior Mortgagees"** and each a **"Prior Mortgagee"**)

(F)    The Owner is, subject to the Prior Mortgages, the legal and beneficial owner of the whole of the Vessel.

**THIS MORTGAGE WITNESSES** as follows:

**1    Definitions and Interpretation**

    1.1    In this Mortgage:

        **"Assigned Property"** means the Insurances, the Earnings and the Requisition Compensation.

        **"Default Rate"** means interest at the rate of twelve per cent (12%) per annum.

        **"Dollars"**, **"$"** and **"USD"** denote the lawful currency of the United States of America.

        **"Earnings"** means all hires, freights, pool income and other sums payable to or for the account of the Owner in respect of the Vessel including (without limitation) all remuneration for salvage and towage services, demurrage and detention moneys, contributions in general average, compensation in respect of any requisition for hire, and damages and other payments (whether awarded by any court or arbitral tribunal or by agreement or otherwise) for breach,

termination or variation of any contract for the operation, employment or use of the Vessel.

"**Encumbrance**" means a mortgage, charge, assignment, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Event of Default**" means any of the events or circumstances set out in clause 7 of the Note.

"**Facility Period**" means the period beginning on the date of the Note and ending on the date when the whole of the Indebtedness has been paid in full and the Security Parties have ceased to be under any further actual or contingent liability under or in connection with any of the Finance Documents.

"**Finance Documents**" means the Note, the Guarantee, this Mortgage, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Mortgagee and the Company.

"**Indebtedness**" means the aggregate from time to time of: the amount of the Debt outstanding; all accrued and unpaid interest on the Debt; and all other sums of any nature (together with all accrued and unpaid interest on any of those sums) payable by the Owner to the Mortgagee under all or any of the Finance Documents.

"**Insurances**" means all policies and contracts of insurance (including all entries in protection and indemnity or war risks associations) which are from time to time taken out or entered into in respect of or in connection with the Vessel or her increased value or the Earnings and (where the context permits) all benefits under such contracts and policies, including all claims of any nature and returns of premium.

"**Mortgagees' Insurances**" means all policies and contracts of mortgagees' interest insurance, mortgagees' additional perils (oil pollution) insurance and any other insurance from time to time taken out by the Mortgagee in relation to the Vessel.

"**Obligatory Insurances**" means the insurances and entries referred to in Clause 5.1 and, where applicable, those referred to in Clauses 5.2, 5.5 and/or 6.16.

**"Requisition Compensation"** means all compensation or other money which may from time to time be payable to the Owner as a result of the Vessel being requisitioned for title or in any other way compulsorily acquired (other than by way of requisition for hire).

**"Security Parties"** means the parties to any of the Finance Documents (other than the Mortgagee).

**"Threshold Amount"** means two hundred and fifty thousand Dollars ($250,000) or its equivalent in any other currency.

**"Total Loss"** means:

(i)     an actual, constructive, arranged, agreed or compromised total loss of the Vessel; or

(ii)    the requisition for title or other compulsory acquisition of the Vessel by any government or other competent authority (otherwise than by way of requisition for hire); or

(iii)   the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture of the Vessel (not falling within (ii) above), unless the Vessel is released and returned to the possession of the Owner within thirty (30) days after the capture, seizure, arrest, detention, hijacking, theft, condemnation as prize, confiscation or forfeiture in question.

**"Vessel"** means the motor vessel "NEWLEAD CASTELLANO" registered in the ownership of the Owner under the flag of the Republic of Liberia with Official Number 16618, IMO Number 9686338 and the following registered dimensions and tonnages:

> length:   179.91 M
> breadth:  30.00 M
> depth:    14.80 M
> gross tonnage: 23857
> net tonnage: 11326

together with all her engines, machinery, boats, tackle, outfit, fuels, spares, consumable and other stores, belongings and appurtenances, whether on board or ashore, including any which may in the future be put on board or may in the future be intended to be used for the Vessel if on shore.

1.2     Unless otherwise specified in this Mortgage, or unless the context otherwise requires, all words and expressions defined in the Note shall have the same meaning when used in this Mortgage.

1.3     In this Mortgage:

1.3.1   words denoting the plural number include the singular and vice versa;

1.3.2   words denoting persons include corporations, partnerships, associations of persons (whether incorporated or not) or governmental or quasi-governmental bodies or authorities and vice versa;

1.3.3   references to Clauses are references to clauses of this Mortgage;

1.3.4   references to this Mortgage include the recitals to this Mortgage;

1.3.5   the headings and contents page(s) are for the purpose of reference only, have no legal or other significance, and shall be ignored in the interpretation of this Mortgage;

1.3.6   references to any document (including, without limitation, to any of the Finance Documents) are, unless the context otherwise requires, references to that document as amended, supplemented, novated or replaced from time to time;

1.3.7   references to statutes or provisions of statutes are references to those statutes, or those provisions, as from time to time amended, replaced or re-enacted;

1.3.8   an Event of Default is "continuing" if it has not been waived and has exceeded a period of five business days; and

1.3.9   references to the Mortgagee include its successors, transferees and assignees.

## 2     Representations and Warranties

The Owner represents and warrants to the Mortgagee that:

2.1     it is not necessary to ensure the legality, validity, enforceability or admissibility in evidence of this Mortgage that it be filed, recorded or enrolled with any governmental authority or agency or stamped with any stamp or similar transaction tax, except for the recording of this Mortgage with the Deputy Commissioner of Maritime Affairs of the Republic of Liberia in New York; and

2.2     It is, subject to the Prior Mortgages, the sole legal and beneficial owner of the Vessel and (with the exception of the Prior Mortgages and this Mortgage) the Vessel is free from any Encumbrance and is not under arrest or in the possession of any person (other than her master and crew) who may become entitled to assert a maritime or possessory lien on her; and

2.3     the Vessel is insured and classed in accordance with the requirements of this Mortgage.

## 3     Covenant to Pay

The Owner agrees in accordance with the Guarantee to guarantee and indemnify the Mortgagee in respect of the Company's obligations to repay the Debt, to pay interest on the Debt and to pay all other sums at any time due to the Mortgagee under or pursuant to the Finance Documents.

## 4     Mortgage and Amount Secured

4.1     In consideration of the premises, the Owner has granted, conveyed, mortgaged, transferred, set over and confirmed, and by this Mortgage grants, conveys, mortgages, transfers, sets over and confirms, to the Mortgagee the whole of the Vessel **TO HAVE AND TO HOLD** the same unto the Mortgagee forever on the terms and subject to the conditions of this Mortgage for the enforcement of the payment to the Mortgagee of the Indebtedness, and in order to secure the performance and observance of, and compliance with, the covenants, terms and conditions contained in this Mortgage and in the other Finance Documents **PROVIDED ONLY**, and the conditions of this Mortgage are such that, if the Owner shall pay, or cause to be paid, the Indebtedness to the Mortgagee as and when the Indebtedness shall become due and payable in accordance with this Mortgage, the Guarantee and the Note, and shall perform, observe and comply with all the covenants, terms and conditions by it and on its part to be performed, observed and complied with contained, expressed or implied in the Finance Documents, then this Fourth Preferred Mortgage and the rights granted by it shall cease, determine and be void but otherwise shall remain in full force and effect.

4.2     The Owner agrees with the Mortgagee that the Vessel is to be held by the Owner subject to the further covenants, conditions, provisions, terms and uses set out in this Mortgage.

4.3     It is not intended that this Mortgage shall cover property other than the Vessel as that term is used in Section 106 of Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended).

4.4     For the purposes of recording this Fourth Preferred Mortgage as required by Chapter 3, Title 21 of the Liberian Code of Laws of 1956 (as amended) the total amount secured by this Mortgage is one million two hundred and fifteen thousand Dollars ($1,215,000) plus interest, expenses and performance of Mortgage covenants. The discharge amount is the same as the total amount.

4.5     The Owner shall pay to the Mortgagee promptly on the Mortgagee's written demand the amount of all costs and expenses (including legal fees) incurred by the Mortgagee in connection with the enforcement of, or the preservation of any rights under, any Finance Document including (without limitation) any losses, costs and expenses which the Mortgagee may from time to time sustain, incur or become liable for by reason of the Mortgagee being mortgagee of the Vessel and/or a lender to the Owner, or by reason of the Mortgagee being deemed by any court or authority to be an operator or controller, or in any way concerned in the operation or control, of the Vessel.

4.6     The Owner shall pay to the Mortgagee promptly on the Mortgagee's written demand the amount of all sums which the Mortgagee may pay or become actually or contingently liable for on account of the Owner in connection with the Vessel (whether alone or jointly or jointly and severally with any other person) including (without limitation) all sums which the Mortgagee may pay or guarantees which it may give in respect of the Insurances, any expenses incurred by the Mortgagee in connection with the maintenance or repair of the Vessel or in discharging any lien, bond or other claim relating in any way to the Vessel, and any sums which the Mortgagee may pay or guarantees which it may give to procure the release of the Vessel from arrest or detention.

4.7     Notwithstanding anything to the contrary contained in this Mortgage, it is intended that nothing in this Mortgage shall waive the preferred status of this Mortgage and that, if any provision of this Mortgage shall be construed as waiving the preferred status of this Mortgage, then such provision shall to that extent be void and of no effect.

4.8     The Owner shall comply with all the requirements and formalities under the Liberian Code of Laws of 1956 (as amended) and any other applicable legislation of the Republic of Liberia necessary to perfect this Mortgage as a valid and enforceable fourth preferred lien upon the Vessel (ranking after only all of the Prior Mortgages) and shall furnish to the Mortgagee from time to time

such evidence as the Mortgagee may reasonably request to satisfy itself with respect to the Owner's compliance with the provisions of this Clause.

4.9 The security constituted by this Mortgage shall be continuing and shall not be satisfied by any intermediate payment or satisfaction until the Indebtedness shall have been paid in full and the Mortgagee shall be under no further actual or contingent liability to any third party in relation to the Vessel, the Assigned Property or any other matter referred to in the Finance Documents.  The security constituted by this Mortgage shall be in addition to any other security now or in the future held by the Mortgagee for or in respect of the Indebtedness, and shall not merge with or prejudice or be prejudiced by any such security or any other contractual or legal rights of the Mortgagee nor be affected by any irregularity, defect or informality or by any release, exchange or variation of any such security.

## 5    Insurance

5.1 The Owner covenants to ensure at its own expense throughout the Facility Period that:

5.1.1 the Vessel remains insured against fire and all usual marine risks (including excess risks) and war risks on an agreed value basis for an amount which is the greater from time to time of (a) her full market value and (b) an amount which equals one hundred and twenty per cent (120%) of the amount of the Debt then outstanding; and

5.1.2 the Vessel remains entered in a protection and indemnity association in both protection and indemnity classes, or remains otherwise insured against protection and indemnity risks and liabilities (including, without limitation, protection and indemnity war risks); and

5.1.3 the Vessel remains insured against oil pollution caused by the Vessel for such amounts as the Mortgagee may from time to time approve unless that risk is covered to the satisfaction of the Mortgagee by the Vessel's protection and indemnity entry or insurance.

5.2 The Mortgagee agrees that, if and for so long as the Vessel may be laid up with the approval of the Mortgagee, the Owner may at its own expense take out port risk insurance on the Vessel in place of hull and machinery insurance.

5.3 The Owner undertakes to place the Obligatory Insurances in such markets, in such currency, on such terms and conditions, and with such reputable  and "A"

class brokers, underwriters and associations appointed by the Owner, as may from time to time be approved by the Mortgagee in writing. The Owner shall not alter the terms of any of the Obligatory Insurances nor allow any person to be co-assured under any of the Obligatory Insurances without the prior written consent of the Mortgagee, and will supply the Mortgagee from time to time on request with such information as the Mortgagee may in its discretion require with regard to the Obligatory Insurances and the brokers, underwriters or associations through or with which the Obligatory Insurances are placed. The Owner shall reimburse the Mortgagee on demand for all costs and expenses incurred by the Mortgagee in obtaining from time to time a report on the adequacy of the Obligatory Insurances from an insurance adviser instructed by the Mortgagee.

5.4     The Owner undertakes duly and punctually to pay all premiums, calls and contributions, and all other sums at any time payable in connection with the Obligatory Insurances, and, at its own expense, to arrange and provide any guarantees from time to time required by any protection and indemnity or war risks association. From time to time at the Mortgagee's request, the Owner will provide the Mortgagee with evidence satisfactory to the Mortgagee that such premiums, calls, contributions and other sums have been duly and punctually paid; that any such guarantees have been duly given; and that all declarations and notices required by the terms of any of the Obligatory Insurances to be made or given by or on behalf of the Owner to brokers, underwriters or associations have been duly and punctually made or given.

5.5     The Owner will comply in all respects with all terms and conditions of the Obligatory Insurances and will make all such declarations to brokers, underwriters and associations as may be required to enable the Vessel to operate in accordance with the terms and conditions of the Obligatory Insurances. The Owner will not do, nor permit to be done, any act, nor make, nor permit to be made, any omission, as a result of which any of the Obligatory Insurances may become liable to be suspended, cancelled or avoided, or may become unenforceable, or as a result of which any sums payable under or in connection with any of the Obligatory Insurances may be reduced or become liable to be repaid or rescinded in whole or in part. In particular, but without limitation, the Owner will not permit the Vessel to be employed other than in conformity with the Obligatory Insurances without first taking out additional insurance cover in respect of that employment in all respects to the satisfaction of the Mortgagee, and the Owner will promptly notify the Mortgagee of any new requirement imposed by any broker, underwriter or association in relation to any of the Obligatory Insurances.

5.6     The Owner will, no later than fourteen days (or, in the case of war risks, no later than seven days), before the expiry of any of the Obligatory Insurances renew them and shall notify before the renewal date the Mortgagee such details of those proposed renewal terms as the Mortgagee may require.

5.7     The Mortgagee shall be at liberty to take out Mortgagees' Insurances in relation to the Vessel for such amounts and on such terms and conditions as the Mortgagee may from time to time decide, and the Owner shall from time to time on demand reimburse the Mortgagee for all costs, premiums and expenses paid or incurred by the Mortgagee in connection with any Mortgagees' Insurances.

5.8     The Owner shall deliver to the Mortgagee certified copies (and, subject to the rights of the Prior Mortgagees and if required by the Mortgagee, the originals) of all policies, certificates of entry and other documents relating to the Insurances (including, without limitation, receipts for premiums, calls or contributions) and shall procure that letters of undertaking in such form as the Mortgagee may approve shall be issued to the Mortgagee by the brokers through which the Insurances are placed (or, in the case of protection and indemnity or war risks associations, by their managers). If the Vessel is at any time during the Facility Period insured under any form of fleet cover, the Owner shall procure that those letters of undertaking contain confirmation that the brokers, underwriters or association (as the case may be) will not set off claims relating to the Vessel against premiums, calls or contributions in respect of any other vessel or other insurance, and that the insurance cover of the Vessel will not be cancelled by reason of non-payment of premiums, calls or contributions relating to any other vessel or other insurance.  Failing receipt of those confirmations, the Owner will instruct the brokers, underwriters or association concerned to issue a separate policy or certificate for the Vessel in the sole name of the Owner or of the Owner's brokers as agents for the Owner.

5.9     The Owner shall promptly provide the Mortgagee with full information regarding any casualty or other accident or damage to the Vessel.

5.10    The Owner agrees that, on and at any time after the occurrence of an Event of Default which is continuing, the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to collect, sue for, recover and give a good discharge for all claims in respect of any of the Insurances; to pay collecting brokers the customary commission on all sums collected in respect of those claims; to compromise all such claims or refer them to arbitration or any other form of judicial or non-judicial determination; and otherwise to deal with such claims in such manner as the Mortgagee shall in its discretion think fit.

5.11    Whether or not an Event of Default shall have occurred or be continuing, the proceeds of any claim under any of the Insurances in respect of a Total Loss shall, subject to the rights of the Prior Mortgagees, be paid to the Mortgagee and applied by the Mortgagee in accordance with Clause 10.

5.12    In the event of any claim in respect of any of the Insurances (other than in respect of a Total Loss), if the Owner shall fail to reach agreement with any of the brokers, underwriters or associations for the immediate restoration of the Vessel, or for payment to third parties, within such time as the Mortgagee may stipulate, the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to require payment to itself.   In the event of any dispute arising between the Owner and any broker, underwriter or association with respect to any obligation to make any payment to the Owner or to the Mortgagee under or in connection with any of the Insurances, or with respect to the amount of any such payment, the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to settle that dispute directly with the broker, underwriter or association concerned.   Any such settlement shall be binding on the Owner.

5.13    The Mortgagee agrees that any amounts which may become due under any protection and indemnity entry or insurance shall be paid to the Owner to reimburse the Owner for, and in discharge of, the loss, damage or expense in respect of which they shall have become due, unless, at the time the amount in question becomes due, an Event of Default is continuing, in which event the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to receive the amounts in question and to apply them either in reduction of the Indebtedness or, at the option of the Mortgagee, to the discharge of the liability in respect of which they were paid.

5.14    The Owner shall not settle, compromise or abandon any claim under or in connection with any of the Insurances (other than a claim of less than the Threshold Amount arising other than from a Total Loss) without the prior written consent of the Mortgagee.

5.15    If the Owner fails to effect or keep in force the Obligatory Insurances, the Mortgagee may (but shall not be obliged to) effect and/or keep in force such insurances on the Vessel and such entries in protection and indemnity or war risks associations as the Mortgagee in its discretion considers desirable, and the Mortgagee may (but shall not be obliged to) pay any unpaid premiums, calls or contributions.   The Owner will reimburse the Mortgagee from time to time on demand for all such premiums, calls or contributions paid by the Mortgagee,

together with interest at the Default Rate from the date of payment by the Mortgagee until the date of reimbursement.

5.16   The Owner shall comply strictly with the requirements of any legislation relating to pollution or protection of the environment which may from time to time be applicable to the Vessel in any jurisdiction in which the Vessel shall trade and in particular the Owner shall comply strictly with the requirements of the United States Oil Pollution Act 1990 (the "**Act**") if the Vessel is to trade in the United States of America and Exclusive Economic Zone (as defined in the Act). Before any such trade is commenced and during the entire period during which such trade is carried on, the Owner shall:

5.16.1   pay any additional premiums required to maintain protection and indemnity cover for oil pollution up to the limit available to the Owner for the Vessel in the market; and

5.16.2   make all such quarterly or other voyage declarations as may from time to time be required by the Vessel's protection and indemnity association in order to maintain such cover, and promptly deliver to the Mortgagee copies of such declarations; and

5.16.3   submit the Vessel to such additional periodic, classification, structural or other surveys which may be required by the Vessel's protection and indemnity insurers to maintain cover for such trade and promptly deliver to the Mortgagee copies of reports made in respect of such surveys; and

5.16.4   implement any recommendations contained in the reports issued following the surveys referred to in Clause 5.16.3 within the relevant time limits, and provide evidence satisfactory to the Mortgagee that the protection and indemnity insurers are satisfied that this has been done; and

5.16.5   in addition to the foregoing (if such trade is in the United States of America and Exclusive Economic Zone):

(aa)   obtain and retain a certificate of financial responsibility under the Act in form and substance satisfactory to the United States Coast Guard and provide the Mortgagee with evidence of the same; and

(bb)   procure that the protection and indemnity insurances do not contain a US Trading Exclusion Clause or any other analogous

provision and provide the Mortgagee with evidence that this is so; and

(cc) comply strictly with any operational or structural regulations issued from time to time by any relevant authorities under the Act so that at all times the Vessel falls within the provisions which limit strict liability under the Act for oil pollution.

## 6 Operation and Maintenance

The Owner covenants with the Mortgagee:

6.1 to keep the Vessel seaworthy and in a state of complete repair and in compliance with the requirements from time to time of all applicable laws, conventions and regulations and of her insurers; and

6.2 to maintain the registration of the Vessel under the flag of the Republic of Liberia; to effect and maintain the recording of this Mortgage with the Deputy Commissioner of Maritime Affairs of the Republic of Liberia in New York; and not cause nor permit to be done any act or omission as a result of which that registration or that recording might be defeated or imperilled; and

6.3 to maintain the Vessel in a condition entitling the Vessel to the highest class applicable to vessels of her type with a classification society approved by the Mortgagee free of recommendations and qualifications; and

6.4 to comply with all laws, conventions and regulations applicable to the Owner or to the Vessel and to carry on board the Vessel all certificates and other documents which may from time to time be required to evidence such compliance; and

6.5 not without the prior written consent of the Mortgagee to make, nor permit nor cause to be made, any material change in the structure, type or speed of the Vessel; and

6.6 to procure that all repairs to the Vessel or replacements of parts or equipment of the Vessel are effected in such a way as not to diminish the value of the Vessel and with replacement parts or equipment the property of the Owner and free of all Encumbrances (other than the Prior Mortgages and this Mortgage); and

6.7 to permit the Mortgagee and all persons (maximum number of three) appointed by the Mortgagee to board the Vessel from time to time during the Facility

Period to inspect the Vessel's state and condition and, if the Vessel shall not be in a state and condition which complies with the requirements of this Mortgage, to effect such repairs as shall in the opinion of the Mortgagee be desirable to ensure such compliance, without prejudice to the Mortgagee's other rights under or pursuant to this Mortgage; and

6.8     immediately to notify the Mortgagee of any arrest or detention of the Vessel, and to cause the Vessel to be released from arrest or detention as quickly as possible, and in any event within fourteen days from the date of arrest or detention, and immediately to notify the Mortgagee in the same manner of the release of the Vessel; and

6.9     from time to time on request of the Mortgagee to produce to the Mortgagee written evidence satisfactory to the Mortgagee confirming that the master and crew of the Vessel have no claims for wages beyond the ordinary arrears and that the master has no claim for disbursements other than those properly incurred by him in the ordinary course of trading of the Vessel on the voyage then in progress; and

6.10    not during the Facility Period to sell, agree to sell, or otherwise dispose of, or agree to dispose of, the Vessel without the prior written consent of the Mortgagee, which shall not be unreasonably withheld, provided that the sale price will be in excess of the total amounts secured by all outstanding mortgages including related interest and costs, notwithstanding anything in contrary herein, the proceeds of such sale shall be used in priority for the extinction of all the Mortgages; and

6.11    not during the Facility Period to change the name of the Vessel without the prior written consent of the Mortgagee, which shall not be unreasonably withheld; and

6.12    not during the Facility Period to lay the Vessel up without the prior written consent of the Mortgagee, which shall not be unreasonably withheld; and

6.13    in the event of any requisition or seizure of the Vessel, to take all lawful steps to recover possession of the Vessel as soon as it is entitled to do so; and

6.14    to give to the Mortgagee from time to time during the Facility Period on request such information as the Mortgagee may require with regard to the Vessel's employment, position and state of repair and, on the Mortgagee's request, to supply the Mortgagee with copies of all charterparties which may exceed a period of 12 months; and

6.15    to comply with all requirements from time to time of the Vessel's classification society and to give to the Mortgagee from time to time during the Facility Period on request copies of all classification certificates of the Vessel and reports of surveys required by the Vessel's classification society (the Owner by its execution of this Mortgage irrevocably authorising the Mortgagee to obtain such information and documents from the Vessel's classification society as the Mortgagee may from time to time require), and to notify the Mortgagee from to time to time of any requirement or recommendation imposed by the Vessel's classification society; and

6.16    not during hostilities (whether or not a state of war shall formally have been declared and including, without limitation, any civil war) to permit the Vessel to be employed in carrying any goods which may be declared to be contraband of war or which may render the Vessel liable to confiscation, seizure, detention or destruction, nor to permit the Vessel to enter any area which is declared a war zone by any governmental authority or by the Vessel's insurers unless that employment or voyage is either (a) consented to in advance and in writing by the underwriters of the Vessel's war risks insurances and fully covered by those insurances or (b) (to the extent not covered by those insurances) covered by additional insurance taken out by the Owner at the Owner's expense, which additional insurance shall be deemed to be part of the Insurances and of the Assigned Property; and

6.17    not without the prior written consent of the Mortgagee to let the Vessel on any demise charter or on any time charter, consecutive voyage charter or other contract of employment which (inclusive of any extension option) is capable of exceeding thirteen months nor to employ the Vessel in any way which might impair the security created by the Finance Documents; and

6.18    not without the prior written consent of the Mortgagee to enter into any agreement or arrangement for sharing the Earnings; and

6.19    duly to perform (unless prevented by force majeure), and to take all necessary steps to enforce the performance by charterers and shippers of, all charterparties and other contracts of employment and all bills of lading and other contracts relating to the Vessel; and

6.20    not after the occurrence of an Event of Default which is continuing to let the Vessel on charter or renew or extend any charter or other contract of employment of the Vessel, nor agree to do so, without the prior written consent of the Mortgagee; and

6.21 to pay and discharge when due from time to time all taxes, levies, duties, fines and penalties imposed on the Vessel or the Earnings, or on the Owner, its income, profits, capital gains or any of its property; and

6.22 not at any time during the Facility Period without the prior written consent of the Mortgagee (and then subject to such conditions as the Mortgagee may impose) to create nor grant nor permit to exist any Encumbrance over the Vessel or any of the Assigned Property; and

6.23 to notify the Mortgagee immediately the Owner becomes aware of any legal proceedings or arbitration involving the Vessel or the Owner where the amount claimed by any party (ignoring any counterclaim or defence of set-off) exceeds or may reasonably be expected to exceed the Threshold Amount; and

6.24 not without the prior written consent of the Mortgagee to put the Vessel into the possession of any person for the purpose of work or repairs estimated to cost more than the Threshold Amount (except for repairs the cost of which is recoverable under the Insurances and in respect of which the insurers have agreed to make payment in accordance with any applicable loss payable clause) unless that person shall have given an undertaking to the Mortgagee in such terms as the Mortgagee shall require not to exercise a lien on the Vessel for the cost of the work; and

6.25 to keep proper books of account in respect of the Vessel and the Earnings and as and when required by the Mortgagee to make such books available for inspection on behalf of the Mortgagee; and

6.26 to place and retain a certified copy of this Mortgage on board the Vessel and cause such certified copy of this Mortgage to be exhibited to any representative of the Mortgagee and to place and keep displayed on the Vessel a framed printed notice in plain type reading as follows:

### "**NOTICE OF MORTGAGE**

This Vessel is covered by a fourth preferred Mortgage to LABROY SHIPTRADE LIMITED under authority of Title 21 of the Liberian Code of Laws of 1956 as amended. Under the terms of the said Mortgage neither the Owner nor any Charterer nor the Master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than for crew's wages and salvage"; and

6.27 not without the prior written consent of the Mortgagee to appoint anyone other than Newlead Bulkers S.A. of the Republic of Liberia as commercial or technical

managers of the Vessel, nor to terminate nor materially vary the arrangements for the commercial or technical management of the Vessel, nor to permit the commercial or technical management of the Vessel to be sub-contracted or delegated to any third party; and

6.28    to take all reasonable precautions to prevent any infringements of any anti drug legislation in any jurisdiction in which the Vessel shall trade and in particular (if the Vessel is to trade in the United States of America) to take all reasonable precautions to prevent any infringements of the Anti-Drug Abuse Act of 1986 of the United States of America; and

6.29    to comply, or procure that the operator of the Vessel will comply, with the International Management Code for the Safe Operation of Ships and for Pollution Prevention adopted by the International Maritime Organisation (as the same may be amended from time to time) (the **"ISM Code"**) or any replacement of the ISM Code and in particular, without limitation, to:

6.29.1    procure that the Vessel remains for the duration of the Facility Period subject to a safety management system developed and implemented in accordance with the ISM Code; and

6.29.2    maintain for the Vessel throughout the Facility Period a valid and current safety management certificate issued under paragraph 13.7 of the ISM Code (**"SMC"**) and provide a copy to the Mortgagee; and

6.29.3    procure that the company responsible for the Vessel's compliance with the ISM Code under paragraph 1.1.2 of the ISM Code (**"ISM Company"**) maintains throughout the Facility Period a valid and current Document of Compliance issued for the ISM Company under paragraph 13.2 of the ISM Code (**"DOC"**) and provide a copy to the Mortgagee; and

6.29.4 notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the SMC of the Vessel or of the DOC of the ISM Company; and

6.30    to comply in relation to the Vessel with the International Ship and Port Facility Security Code adopted by the International Maritime Organisation (as the same may be amended from time to time) (the **"ISPS Code"**) or any replacement of the ISPS Code and in particular, without limitation, to:

6.31    procure that the Vessel and the company responsible for the Vessel's compliance with the ISPS Code comply with the ISPS Code; and

6.32     maintain for the Vessel throughout the Facility Period a valid and current International Ship Security Certificate issued under the ISPS Code (**"ISSC"**) and provide a copy to the Mortgagee; and

6.33     notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC; and

6.34     to comply in relation to the Vessel with Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997) (as the same may be amended from time to time) (**"Annex VI"**) or any replacement of Annex VI and in particular, without limitation, to:

6.35     procure that the Vessel's master and crew are familiar with, and that the Vessel complies with, Annex VI; and

6.36     maintain for the Vessel throughout the Facility Period a valid and current International Air Pollution Prevention Certificate issued under Annex VI (**"IAPPC"**) and provide a copy to the Mortgagee; and

6.37     notify the Mortgagee immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the IAPPC.

**7**     **Mortgagee's Powers**

7.1     If an Event of Default shall occur, and the Mortgagee shall demand payment of all or any part of the Indebtedness, the security constituted by this Mortgage shall become immediately enforceable and the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled to exercise all or any of the rights, powers, discretions and remedies vested in the Mortgagee by this Clause without any requirement for any court order or declaration that an Event of Default has occurred.  The Mortgagee's right to exercise those rights, powers, discretions and remedies shall be in addition to and without prejudice to all other rights, powers, discretions and remedies to which it may be entitled, whether by statute or otherwise including, without limitation, those conferred on the Mortgagee by Chapter 3 of Title 21 of the Liberian Code of Laws of 1956 (as amended).   The Mortgagee shall be entitled to exercise its rights, powers, discretions and remedies despite any rule of law or equity to the contrary, and whether or not any previous default shall have been waived, and in particular without the limitations imposed by the law of any relevant jurisdiction.

7.2     In the circumstances described in Clause 7.1, the Mortgagee shall, subject to the rights of the Prior Mortgagees, be entitled (but not obliged) to:

7.2.1     take possession of the Vessel wherever she may be; and/or

7.2.2     discharge the master and crew of the Vessel and employ a new master and crew; and/or

7.2.3     navigate the Vessel to such places as the Mortgagee may decide or detain or lay up the Vessel; and/or

7.2.4     in the name of the Mortgagee or the name of the Owner, demand, sue for, receive and give a good receipt for all sums due to the Owner in connection with the Vessel and, in the name of the Mortgagee or the name of the Owner or the name of the Vessel, commence such legal proceedings as it may consider appropriate, or conduct the defence of any legal proceedings commenced against the Vessel or the Owner in its capacity as owner of the Vessel; and/or

7.2.5     sell or dispose of the Vessel either by private treaty or auction, on such terms as the Mortgagee shall think fit (including deferred payment terms and with or without the benefit of any charterparty or other contract of employment), with the power to make a loan on such terms as the Mortgagee may decide to any prospective purchaser to assist in the

purchase of the Vessel, and the power to postpone any sale, without being liable for any loss caused by any such sale or the postponement of any such sale; and/or

7.2.6    replace or repair any part of the Vessel or alter her to suit the Mortgagee's requirements and put her through all appropriate surveys; and/or

7.2.7    employ agents, servants and others on such terms as the Mortgagee may in its discretion determine; and/or

7.2.8    charter or load the Vessel on such terms and for the carriage of such cargoes as the Mortgagee may in its discretion determine.

7.3    For the avoidance of doubt, if the Mortgagee takes any action or enters into or completes any transaction pursuant to Clause 7.2 after an Event of Default has been remedied, that action or transaction shall not be affected by the remedying of the Event of Default.

8    **Ancillary Provisions**

8.1    In connection with the exercise of its rights, powers, discretions and remedies under Clause 7 or otherwise as mortgagee of the Vessel, the Mortgagee shall have power to buy in, rescind or vary any contract for sale of the Vessel and generally to do all things in connection with the sale of the Vessel as it shall think fit.

8.2    On any sale of the Vessel by the Mortgagee, the purchaser shall not be bound to enquire whether the Mortgagee's power of sale has become exercisable or whether its exercise has become expedient, and the purchaser shall not be affected by any notice that the sale was or may have been irregular in any way. The receipt of the Mortgagee for any amounts paid to it shall be a complete discharge to the purchaser who shall not be concerned with the application of the payment or be answerable for any misapplication.   As regards any purchaser, any such sale shall be deemed to be within the power of sale conferred on the Mortgagee by this Mortgage and at law and any remedy of the Owner in respect of any irregularity or impropriety shall be in damages only.

8.3    If the Mortgagee takes possession of the Vessel and until sale the Mortgagee shall be entitled to deal with the Vessel in all respects as if it were the owner of the Vessel.

8.4 The Mortgagee shall be entitled to recover from the Owner on demand all losses, expenses, payments and disbursements incurred by the Mortgagee in or about or incidental to the exercise by it of any of its rights, powers, discretions and remedies under Clause 7 or otherwise as mortgagee of the Vessel together with interest at the Default Rate.

8.5 No failure to exercise, nor any delay in exercising, on the part of the Mortgagee, any right or remedy under Clause 7 or otherwise as mortgagee of the Vessel shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Mortgage are cumulative and not exclusive of any rights or remedies provided by law.

8.6 The Mortgagee may at any time and from time to time delegate to any person all or any of its rights, powers, discretions and remedies pursuant to the Finance Documents on such terms as the Mortgagee may consider appropriate (including the power to sub-delegate).

8.7 Every right, power, discretion and remedy conferred on the Mortgagee under or pursuant to the Finance Documents shall be cumulative and in addition to every other right, power, discretion or remedy to which the Mortgagee may at any time be entitled by law or in equity. The Mortgagee may exercise each of its rights, powers, discretions and remedies as often and in such order as it deems appropriate.

8.8 Neither the Mortgagee nor any agent or employee of the Mortgagee shall be liable for any losses which may be incurred in or about the exercise of any of the rights, powers, discretions or remedies of the Mortgagee under or pursuant to this Mortgage, nor liable as mortgagee in possession for any loss on realisation or for any neglect or default of any nature for which a mortgagee in possession might otherwise be liable.

## 9    Receiver

9.1 On and at any time after the occurrence of an Event of Default which is continuing the Mortgagee may (but shall not be obliged to), subject to the rights of the Prior Mortgagees, appoint any person to be receiver and/or manager of the Vessel and/or any of the Assigned Property.

9.2 The appointment of a receiver and/or manager by the Mortgagee may be made in writing under the hand of any authorised signatory of the Mortgagee.

9.3     The Mortgagee shall have the power to authorise any joint receiver and/or manager to exercise any or all of his powers independently of any other joint receiver and/or manager.

9.4     The Mortgagee may at any time and from time to time remove any receiver and/or manager from office and appoint a replacement.

9.5     The Mortgagee shall have the power from time to time to fix the remuneration of any receiver and/or manager on the basis of charging from time to time adopted by him or his firm and any receiver and/or manager shall not be limited to any maximum amount or rate specified by law.

9.6     Any receiver and/or manager appointed pursuant to this Clause shall be the agent of the Owner and the Owner shall be solely responsible for his acts and defaults and for the payment of his remuneration.

9.7     Any receiver and/or manager appointed pursuant to this Clause shall have all the powers conferred on receivers and/or managers by law without any restriction, whether imposed by law or otherwise.

9.8     Without limitation, any receiver and/or manager shall have power on behalf of the Owner (and at the Owner's expense) to do or omit to do anything which the Owner could do or omit to do in relation to the Vessel or any of the Assigned Property and may exercise all or any of the rights, powers, discretions and remedies conferred on the Mortgagee by the Finance Documents or at law.

9.9     No receiver and/or manager shall be liable as mortgagee in possession to account or be liable for any loss on realisation of, or any default of any nature in connection with, the Vessel or any of the Assigned Property or the exercise of any of the rights, powers, discretions and remedies vested in the receiver and/or manager by virtue of the Finance Documents or at law.

## 10     Application of Moneys

All amounts received by the Mortgagee arising from the exercise by the Mortgagee of its rights, powers, discretions and remedies under or pursuant to this Mortgage (including, without limitation, all amounts received by the Mortgagee in connection with the taking possession and/or sale of the Vessel, any chartering or other use of the Vessel by the Mortgagee, and any claims for damages or claims on any insurance received by the Mortgagee while in possession of or while chartering or using the Vessel) shall, unless otherwise agreed by the Mortgagee or otherwise expressly provided in the Note, be applied by the Mortgagee, subject to the rights of the Prior

Mortgagees, in or towards satisfaction of, or retention on account for, the Indebtedness in such manner as the Mortgagee may in its discretion determine.

11  **Power of Attorney**

11.1  The Owner by way of security, subject to the rights of the Prior Mortgagees, irrevocably appoints the Mortgagee and any receiver and/or manager appointed by the Mortgagee severally to be its attorney (with unlimited power of substitution and delegation) with power (in the name of the Owner or otherwise) to do all acts which the Owner could do in connection with the Vessel or the Assigned Property including, without limitation, to execute and deliver a bill of sale transferring title in the Vessel to a third party and to give a good receipt for any purchase price.

11.2  The Mortgagee agrees that it will not exercise any of its powers as attorney of the Owner unless an Event of Default is continuing, but the exercise of any such powers by the Mortgagee shall not put any person dealing with the Mortgagee on enquiry as to whether an Event of Default is continuing.

11.3  The exercise by the Mortgagee or by any receiver and/or manager of any of their powers as attorney of the Owner shall be conclusive evidence of their right to do so.

12  **Partial Invalidity**

If, at any time, any provision of this Mortgage is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

13  **Further Assurance**

The Owner agrees that from time to time on the written request of the Mortgagee it will immediately execute and deliver to the Mortgagee all further documents which the Mortgagee may require for the purpose of perfecting or protecting the security intended to be created by this Mortgage.

14  **Waiver of Rights as Surety**

14.1  The rights of the Mortgagee under this Mortgage, the security constituted by this Mortgage and the warranties, covenants and obligations of the Owner

contained in this Mortgage shall not in any way be discharged, impaired or otherwise affected by:

14.1.1   any forbearance (whether as to payment or otherwise) or any time or other indulgence granted to any of the other Security Parties under or in connection with any of the Finance Documents;

14.1.2   any amendment, variation, novation or replacement of any of the other Finance Documents;

14.1.3   any failure of any of the Finance Documents to be legal, valid, binding and enforceable in relation to any of the other Security Parties for any reason;

14.1.4   the winding-up or dissolution of any of the other Security Parties;

14.1.5   the release (whether in whole or in part) of, or the entering into of any compromise or composition with, any of the other Security Parties; or

14.1.6   any other act, omission, thing or circumstance which would or might, but for this provision, operate to discharge, impair or otherwise affect the same.

14.2   Until the Indebtedness has been unconditionally and irrevocably paid and discharged in full, the Owner shall not by virtue of any payment made under this Mortgage on account of the Indebtedness or by virtue of any enforcement by the Mortgagee of its rights under, or the security constituted by, this Mortgage or by virtue of any relationship between or transaction involving, the Owner and any of the other Security Parties:

14.2.1   exercise any rights of subrogation in relation to any rights, security or moneys held or received or receivable by the Mortgagee or any other person; or

14.2.2   exercise any right of contribution from any of the other Security Parties under any of the Finance Documents; or

14.2.3   exercise any right of set-off or counterclaim against any of the other Security Parties; or

14.2.4   receive, claim or have the benefit of any payment, distribution, security or indemnity from any of the other Security Parties; or