# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION
### IN ADMIRALTY

| | | |
|---|---|---|
| RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | CIVIL ACTION FILE NO. 16-093 |
| M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM* AND NEWLEAD CASTELLANO LTD. | ) ) ) ) ) ) ) ) ) | |
| Defendants | ) | |

## MOTION TO VACATE PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(4)(f)

Defendant NewLead Castellano Ltd., through its counsel, Ellis, Painter, Ratterree & Adams, LLP and Tisdale Law Offices, LLC (*pro hac vice* application pending), moves this Honorable Court to vacate the arrest and attachment of the M/V NEWLEAD CASTELLANO. As will be discussed more fully herein and in the accompanying Declaration of Michail Livanos (attached hereto as Exhibit A, hereinafter "Livanos Decl. ___") with attachments, there is no event of default by Defendant which would permit Plaintiffs to seize the Vessel because Plaintiffs admittedly failed to satisfy the warranty and/or condition precedent that was central to the agreement. Further, the Rule B maritime attachment should be vacated because the agreements Plaintiffs claim give rise to a maritime claim are non-maritime in nature. Moreover, a guarantee is not a maritime contract and thus those Rule B attachments of the vessel must fail.

Finally, in light of the admitted failure to satisfy the warranty and/or condition precedent in the contract before seizing Defendant's Vessel on an ex parte basis, Defendant moves for costs, fees, and other damages resulting from this wrongful arrest.

## FACTUAL AND PROCEDURAL BACKGROUND

### Parties

Plaintiffs Ray Capital, Inc. ("Ray Capital"), Oppenheim Capital Ltd. ("Oppenheim"), Cheyenne Holdings Ltd. ("Cheyenne"), and Labroy Shiptrade Limited ("Labroy")(collectively referred to as "Plaintiffs") are corporations organized under Marshall Islands law with a registered address in the Marshall Islands. (ECF No. ¶ 4).

Defendant *in rem* M/V NEWLEAD CASTELLANO ("Vessel") is a bulk carrier vessel and is currently under arrest within this Judicial District. Defendant Newlead Castellano Ltd. is the owner of the Vessel and is organized under foreign law. The shares of Newlead Castellano Ltd. are held by a wholly owned subsidiary of NewLead Holdings, Ltd. (hereinafter referred to as "NLH"). NLH is organized under foreign law.

### Facts

On or about December 11, 2013, NLH entered into a Settlement Agreement with non-party Tiger Capital Partners Ltd. ("Tiger Capital"), a British Virgin Islands company (the "Settlement Agreement"). The Settlement Agreement concerned a success fee sought by Tiger Capital in connection with acting as NLH's broker in business transactions NLH entered into with certain non-parties in the United States. These business transactions did not concern maritime obligations, transactions, or commerce, but rather NewLead's coal business. (Livanos Decl. ¶ 3). As part of the Settlement Agreement, NLH agreed to issue up to three (3) warrants totaling $20 million to Tiger Capital as its fee for facilitating the business transactions on NLH's

1604085.1

007923-000011

behalf.  The Settlement Agreement authorized Tiger Capital to assign the warrant(s) to a third party subject to the written consent of NLH.  (Livanos Decl. ¶ 4).

On or about December 27, 2013, NLH and Tiger Capital entered into an exchange agreement (the "Exchange Agreement").  Pursuant to the Exchange Agreement, NLH and Tiger Capital agreed that the warrants which were issued pursuant to the Settlement Agreement could be exchanged for unsecured convertible note(s), totaling the same $20 million.  The warrants issued pursuant to the Settlement Agreement were therefore cancelled and replaced by the unsecured convertible note(s).  (Livanos Decl. ¶ 5).   Neither the Settlement Agreement nor the Exchange Agreement between NLH and Tiger Capital concerned maritime services or obligations and did not concern maritime commerce in any way.  (Livanos Decl. ¶ 6).

The Exchange Agreement further authorized Tiger Capital to assign the unsecured convertible note(s), or part of said note(s), to one or more third parties.  (Livanos Decl. ¶ 7).  On December 27, 2013, Tiger Capital provided to NLH a Notice of Assignment of Convertible Promissory Note (the "Notice of Assignment").  The Notice of Assignment advised NLH that, in accordance with the Exchange Agreement, Tiger Capital assigned to Plaintiff Ray Capital its rights, title and interest to $6 million of the $20 million Convertible Promissory Note that NLH issued to Tiger Capital.  A copy of the Notice of Assignment is attached to the Livanos Declaration as Exhibit 1.  (Livanos Decl. ¶ 8).

Also on December 27, 2013, pursuant to the Notice of Assignment, NLH issued an Unsecured Convertible Note to Ray Capital in the amount of $6 million (i.e., the "Note"). (Livanos Decl. ¶ 10).    Pursuant to the Note, NLH was authorized to pay Ray Capital through issuing shares of its common stock, which Ray Capital would then sell to reduce the outstanding obligations under the Note.  *Id.*  The Note was amended pursuant to four (4) separate addenda.

1604085.1

007923-000011

(Livanos Decl. ¶ 11). The first addendum to the Note was dated December 28, 2013 and, among other items, set the maturity date for the Note at December 27, 2014 ("Addendum #1"). Addendum #1 is to be governed by New York law and was signed both by NLH and Plaintiff Ray Capital. A copy of Addendum #1 is attached to the Livanos Declaration as Exhibit 3.

Over the next several months, Ray Capital sold shares of NLH's common stock, which is publicly traded in New York, to greatly reduce the outstanding obligation on the Note. (Livanos Decl. ¶ 13). Indeed, by October 2014, Ray Capital received over $4.1 million in cash through the sale of NLH's common stock, reducing the debt on the Note from $6 million to $1,861,412. *Id.* Following the execution of the Mortgage in October 2014, Ray Capital continued to sell shares of NLH's common stock, albeit at a slower rate. *Id.* As of February 2015, Ray Capital had received a total of $4,896,906.63 in cash through the sale of shares of NLH's common stock, leaving a balance of just over $1.1 million on the Note. *Id.*

Knowing that they would need more time to completely eliminate the outstanding debt, the parties began discussing a possible extension of the December 27, 2014 maturity date and, thereafter, agreed to extend the maturity date for an additional year. (Livanos Decl. ¶ 14). On March 3, 2015, the parties entered into a third addendum to the Note which, among other items, set forth the extended maturity date from December 27, 2014 to December 27, 2015 ("Addendum #3"). *Id.* Addendum #3 also is to be governed by New York law and was signed both by NLH and Ray Capital. A copy of Addendum #3 is attached to the Livanos Declaration as Exhibit 5.

NLH advised Ray Capital on numerous occasions that it would have difficulty in making a substantial cash payment based upon its cash flow limitations and, therefore, needed an assurance from Ray Capital that it would continue to sell its shares of common stock to

4

significantly reduce the outstanding balance due on the Note. (Livanos Decl. ¶ 15).   To that end,

Addendum #3 also obligated Ray Capital to sell up to 20% of the Monthly Dollar Volume (as

defined in Addendum #3) of NLH's common stock to further reduce the outstanding debt under

the Note.  Ray Capital warranted that it would do so monthly.   (Livanos Decl. ¶ 16).

> Addendum # 3 provides, in pertinent part:

> > That the Holder **agrees and warrants** that it shall sell up to twenty
> > percent (20%) of the Monthly Dollar Volume (as defined herein below) of
> > the Company's Common Stock per month to reduce the Company's
> > outstanding obligations owing to the Holder pursuant to the Note.
> > "Monthly Dollar Volume" means a dollar amount of the Company's
> > Common Stock which is traded in the US public markets in the relevant
> > month in which it is calculated (not including the amount of any shares of
> > the Company's Common Stock traded by the Holder).

(emphasis added).

In reliance on that warranty by Ray Capital, NLH agreed in Addendum #3 to pay any

remaining balance that existed on the maturity date in cash, knowing that if Ray Capital

complied with its contractual obligations to sell NLH's common stock, there would be little, if

any, balance left to be paid on the maturity date.  (Livanos Decl. ¶ 18).   In breach of the

warranty, from June 30, 2015 to the present, Ray Capital has not sold a single share of NLH's

common stock, in direct contravention of Addendum #3. (Livanos Decl. ¶ 20).     NLH      even

provided Ray Capital with the names of companies that were capable of facilitating the sale of

NLH's shares of common stock, but Ray Capital still failed to sell any of NLH's shares.

(Livanos Decl. ¶ 21).    The names of these companies were Toledo Advisors LLC and YP

Holdings LLC.  (Livanos Decl. ¶ 22).  It is the understanding of NLH that Ray Capital never

even contacted these companies to explore selling the shares.    *Id.*  Had Ray Capital sold the

NLH shares on a monthly basis beginning on or about June 30, 2015, as it had done during the

two years prior, Ray Capital would have received approximately $ 300,000.  (Livanos Decl. ¶

22). The reason why Plaintiff Ray Capital has not received that money is because it unilaterally decided not to sell the shares.

Solely because of Ray Capital's failure to sell shares of NLH's common stock (as required by Addendum #3), NLH was unable to pay the remaining balance due on the maturity date. (Livanos Decl. ¶ 23). In anticipation of the Maturity Date, NLH wrote to Ray Capital on or about December 7, 2015 and proposed a fifth addendum to the Note that would further extend the Maturity Date. (Livanos Decl. ¶ 24). Ray Capital ignored that proposal until three (3) days before the Maturity Date, when it refused any further extensions and demanded payment in full, in cash, of $1,612,119.19 on December 27, 2015. This is contrary to the prior course of dealings between the parties. *Id.* This is also contrary to the express representations of the Director of Ray Capital, Dimitrios Tsouvelekakis. (Livanos Decl. ¶ 27).

On or about December 29, 2015, despite failing to abide by its promise to sell NLH's shares (as required by Addendum #3), Ray Capital notified NLH that NLH failed to make the demanded payment by December 27, 2015, and alleged that such failure constituted an Event of Default, as defined in the Note. (Livanos Decl. ¶ 25). Ray Capital gave NLH until January 7, 2016 to remedy the default. *Id.* Ray Capital also sent the notice of the default to Defendant NewLead Castellano Ltd., the mortgagor under the Mortgage. *Id.*

As of this date, Ray Capital has breached its warranty to sell NLH's stock pursuant to Addendum #3, and consequently, NLH has been unable to pay the $1,612,119.19 that Ray Capital claims is due in full. (Livanos Decl. ¶ 26). As discussed above, on numerous occasions, Plaintiffs' director in charge of these negotiations, Dimitris Tsouvelekakis, confirmed both to NLH's CEO, Michael Zolotas and its former CFO Antonios Bertsos, that he would agree to extend the Maturity Date of the Notes until the Notes were fully satisfied by the sale of NLH's

6

common shares. (Livanos Decl. ¶ 27).   This is precisely what Plaintiffs have done on all prior occasions. *Id.*

Defendant NLH also entered into three other promissory notes with Plaintiffs Oppenheim Capital, Cheyenne, and Labroy.   None of these three notes relate to maritime services or obligations.   (Livanos Decl. ¶ 28).     The Oppenheim, Cheyenne, and Labroy Notes and mortgages are current and to date, there is no default.  No events of default have been triggered under those notes.  (Livanos Decl. ¶ 29).  The breaches alleged by Plaintiffs are not listed as "events of default" under the note.  (Ex. 2 to Livanos Decl., pp. 4-5).   Defendant NewLead Castellano Ltd. also entered into guarantees with all four Plaintiffs, which are referenced and attached to the Plaintiffs' Complaint.  (Livanos Decl. ¶ 30).    None of these four guarantees relate to maritime services or obligations but, rather, are guarantees of the non-maritime Notes. *Id.*  Moreover, NewLead Castellano, Ltd. only agreed to guarantee the payment obligations, nothing more.  *Id.*  Each of the guarantees was secured by the issuance of a mortgage against the Vessel to each Plaintiff.  The mortgages are attached to the Plaintiffs' Complaint.

Throughout the duration of the notes, guarantees, mortgages, and addenda, Plaintiffs have been well aware of the need for Defendant to be able to meet its obligations by Plaintiffs selling shares of NLH.  (Livanos Decl. ¶ 31).  Not only is this a well-known reality of the shipping business today, but it was clearly evidenced in the agreements, communications, and course of dealings between all parties.

On April 19, 2016, Plaintiffs Ray Capital, Oppenheim, Cheyenne, and Labroy commenced this action with the filing of their Verified Complaint against the Defendant Vessel and its owner NewLead Castellano Ltd. (ECF No. 1).  On that same day, this Court issued a Warrant for Arrest for the M/V NEWLEAD CASTELLANO (ECF No. 9) and the Vessel was

arrested by the United States Marshal for the Southern District of Georgia. (ECF. No. 12). On that same day, this Court also entered an Order authorizing issuance of process of maritime attachment and garnishment pursuant to Supplement Admiralty Rule B. (ECF No. 10). Now, Defendant respectfully requests a prompt hearing because the arrest and the attachment are improper and should be vacated. Defendants should be awarded their costs and legal fees as well as the damages they have suffered due to the wrongful arrest and attachment of the vessel.

## LEGAL STANDARD

Rule B(1)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule B") provides, in pertinent part: "If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property--up to the amount sued for--in the hands of garnishees named in the process." Fed. R. Civ. P. Adm. Supp. R. B.

Maritime attachment is designed to assure a defendant's appearance and to secure satisfaction if the suit is successful. *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion,* 773 F.2d 1528, 1535 (11th Cir. 1985)(citing *Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.,* 339 U.S. 684, 693, 70 S.Ct. 861, 867, 94 L.Ed. 1206 (1950)). The Rule provides a vehicle for serving process and obtaining "quasi in rem" jurisdiction over a defendant by attaching the defendant's goods and chattels, or credits and effects in the hands of garnishees ... if the defendant shall not be found within the district. *Oceanfocus Shipping Ltd. v. Naviera Humbolt, S.A.,* 962 F. Supp. 1481, 1483 (S.D. Fla. 1996) (quotation marks omitted) (citing *Teyseer Cement Co. v. Halla Maritime Corp.,* 794 F.2d 472, 477 (9th Cir.1986)).

8

Rule C(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule C") provides, in pertinent part: "An action in rem may be brought: (a) To enforce any maritime lien; (b) Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto." Fed. R. Civ. P. Adm. Supp. R. C(1)

As the Eleventh Circuit has recognized:

> Rule C(1)(a) is procedural and sets forth the means to file an *in rem* action to enforce a maritime lien. *Neapolitan Navigation, Ltd. v. Tracor Marine, Inc.*, 777 F.2d 1427, 1429 (11th Cir.1985). The requirements of Rule C are to be read literally, and a vessel is not considered to be within the court's *in rem* jurisdiction when the rule has not been complied with, absent an agreement between the parties to the contrary. *Nuta v. M/V Foutas Four*, 753 F.Supp. 352, 353-54 (S.D.Fla.1990). However, maritime liens are not created by Rule C. *Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 908 (4th Cir.1981). Instead, they are an aspect of substantive, rather than procedural maritime law. *Id.*

*Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla*, 966 F.2d 613, 615 (11th Cir. 1992).

Supplemental Admiralty Rule E(4)(f) provides that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed. R. Civ. P. Adm. Supp. R. E(4)(f); *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539-40 (4th Cir. 2013).

After receiving notice of a Supplemental Rule B attachment, the defendant is entitled to contest the attachment at a prompt hearing pursuant to Rule E(4)(f). To avoid vacatur of attachment, it is the **plaintiff's burden** to show that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the

1604085.1

007923-000011

attachment." *Vitol, S.A.,* at 708 F.3d at 541(emphasis added)(citing and quoting *Aqua Stoli v. Gardner Smith Pty. Ltd.,* 460 F.3d 434, 445 (2d Cir.2006))[1]; *McDermott Gulf Operating Co. v. Con–Dive, LLC,* No. 09–0206, 2009 WL 1537871, at *3 (S.D.Ala.2009) (slip op.) (citing *Aqua Stoli Shipping Ltd.,* 460 F.3d at 445), *aff'd.* 2010 WL 1225958 (11th Cir.2010) (unpublished); *Blue Marine Shipping SA de CV v. Gulmar Offshore Middle E. LLC,* No. 309CV555/MCR/MD, 2010 WL 1687737, at *4 (N.D. Fla. Apr. 26, 2010). If the plaintiff fails to meet these requirements, the court must vacate the attachment. *Aqua Stoli,* 460 F.3d at 445; *Blue Marine Shipping SA de CV v. Gulmar Offshore Middle E. LLC,* No. 309CV555/MCR/MD, 2010 WL 1687737, at *4 (N.D. Fla. Apr. 26, 2010).

To restate a basic premise, to plead a prima facie admiralty case pursuant to Supplemental Rule E, "the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed.R.Civ.P. Adm. Supp. R. E(2)(a). The burden to show why continued attachment is proper is the plaintiff's to bear. *See Equatorial Marine Fuel Mgmt. Servs. Pte Ltd. v. MISC Berhad,* 591 F.3d 1208, 1210 (9th Cir. 2010).

## LEGAL ARGUMENT

1. **The Rule B maritime attachment should be vacated because the Notes and the Guarantees are not maritime contracts**

To proceed on a request for a Rule B writ of maritime attachment, the plaintiff must have a claim against the defendant that is cognizable in admiralty. *Flame S.A. v. Freight Bulk Pte. Ltd.,* 762 F.3d 352, 357 (4th Cir. 2014) (citing *Vitol, S.A. v. Primerose Shipping Co.,* 708 F.3d

---

[1] *Aqua Stoli* was overruled on other grounds by *Shipping Corp. of India v. Jaldhi Overseas Pte. Ltd.,* 585 F.3d 58 (2d Cir. 2009).

1604085.1

007923-000011

527, 533-34 (4th Cir. 2013)); *James v. M/V EAGLE EXP.*, No. CA 12-423-MJ-C, 2012 WL 3068791, at *8 (S.D. Ala. July 27, 2012)(vacating maritime attachment after finding that there was no maritime claim since the relevant contract was not maritime). The Notes and the Guarantees in this case are not maritime contracts. Therefore, the Rule B attachment should be vacated.

　　To determine whether a claim is cognizable in admiralty, "courts should look to the subject matter of the [relevant] contract and determine whether the services performed under the contract are maritime in nature." *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 612 (1991). This inquiry "depends upon ... the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 24 (2004) (quotation marks omitted). The Supreme Court has recognized that the fundamental interest giving rise to maritime jurisdiction is "the protection of maritime commerce." *Id.* at 25.

　　The promissory notes and guarantees which form the basis for Plaintiffs' Rule B attachment are non-maritime in nature. The transaction which underlies these notes and guarantees is a settlement agreement between NLH and non-party Tiger Capital concerning a success fee owed by NLH to Tiger in relation to NLH's coal business. An exchange agreement existed between NLH and Tiger which provided that the warrants could be exchanged for unsecured convertible notes and that the notes could be assigned by Tiger Capital. (Livanos Decl. ¶ 5). Tiger Capital assigned $6 million of the note to Plaintiff Ray Capital by an assignment notice. (Livanos Decl. ¶ 8). On December 27, 2013, pursuant to the Notice of Assignment, NLH issued an Unsecured Convertible Note to Ray Capital in the amount of $6

1604085.1

007923-000011

million.  (Livanos Decl. ¶ 10).  None of these agreements pertain in any way to maritime commerce.  (Livanos Decl. ¶ 6).

Defendant NewLead Castellano Ltd. also entered into guarantees with all four Plaintiffs, which are referenced and attached to the Plaintiffs' Complaint.  (Livanos Decl. ¶ 30).   None of these four guarantees relate to maritime services or obligations but, rather, guarantee payment of the non-maritime Notes.  *Id.*  Moreover, NewLead Castellano, Ltd. only agreed to guarantee the payment obligations, nothing more.  *Id.*

It is well settled that an agreement to act as a surety on a maritime contract[2] is not maritime in nature.  *C. Transp. Panamax, Ltd. v. Kremikovtzi Trade E.O.O.D.*, No. 07 CIV. 893 (LAP), 2008 WL 2546180, at *2 (S.D.N.Y. June 19, 2008) (internal citations omitted).  In order to be maritime, the guarantor must guarantee the performance of a maritime contract or obligation.  *Compagnie Francaise de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927) (L. Hand, J.). The *Kremikovtzi* case illustrates this principle clearly since it held that a guarantee to pay demurrage[3] was a maritime contract since the demurrage obligation arose under

---

[2] In this case, there is not even a reference to a maritime contract.  Rather, the agreements which are guaranteed are the non-maritime promissory notes.

[3] In maritime law, the term "demurrage" applies to "[l]iquidated damages owned by a charterer to a shipowner for the charterer's failure to load or unload cargo by the agreed time." *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 735 n.5 (4th Cir. 2015)(citing *Black's Law Dictionary* 498 (9th ed.2009)); *Carrier Credit Servs., Inc. v. Tropical Distributors Ctr., Inc.*, No. 3:03-CV-954-J-25HTS, 2005 WL 3500456, at *4 n. 4 (M.D. Fla. Dec. 21, 2005).

1604085.1

007923-000011

the charter party, which is a quintessential maritime contract.  There are no maritime obligations at issue in the case at bar.

The guarantees between Defendant NewLead Castellano Ltd. and the Plaintiffs provide that NewLead Castellano Ltd. guarantees the due and punctual observance of all obligations under the **Finance Documents** including the due and punctual payment of each and every part of the indebtedness in accordance with the terms of the Finance Documents.  (Exhibit 5 to ECF No. 1).  "Finance Documents" are defined on page 3 of the guarantee as the "Note, the Guarantor's Security Documents, any other document which may at any time be executed by any person as security for the payment of all or any part of the Indebtedness and any other document designated as such by the Holder and the Company."  No maritime obligations are referenced in this language.  Essentially, NewLead Castellano Ltd. is guaranteeing the repayment of debt, as set forth in the note with addenda.

Merely agreeing to act as a surety "to pay damages for another's breach of a maritime charter is not a maritime contract." *Fednav, Ltd. v. Isoramar, S.A.,* 925 F.2d 599, 601 (2d Cir.1991) (internal citations omitted). The reason is that a covenant to pay damages neither involves maritime services nor maritime transactions. *Id.*; *Roswell Navigation v. Poseidon Marine Consultants, Inc.,* No. CIV. A. 95-2902, 1997 WL 680576, at *2 (E.D. La. Oct. 31, 1997) (internal citations omitted); *see also* Schoenbaum, *Admiralty & Maritime Law,* § 3–10 (1994) (surety agreement is not held to be an admiralty contract, since obligation of surety is only to pay damages in the event of liability on the underlying contract; but guaranty to fully perform a maritime contract does give rise to an admiralty claim). Where a guarantee is an agreement to pay money if another party fails to meet an obligation, the guarantee is not a

1604085.1

007923-000011

maritime contract, and the Court does not have admiralty jurisdiction over the claim. *Roswell Navigation*, 1997 WL 680576, at \*2-3. The case at bar presents this precise situation.

Courts within this Circuit have also recognized this rule. If a defendant guarantees only that it will make required payments in the event of the principal's default, then the agreements are merely ones of surety and not subject to admiralty rules or procedures. *Unitas Fin. Ltd. v. Di Gregorio Navegacao Ltda.*, 1999 A.M.C. 2936, 1999 WL 1427721, at \*1 (S.D. Fla. Mar. 26, 1999), *aff'd in part, rev'd in part sub nom. Unitas Fin. Ltd. v. Di Gregorio Navegacoa Ltda*, 213 F.3d 647, 2000 WL 492022 (11th Cir. 2000), *for text, see Unitas Fin. Ltd. v. Di Gregorio Navegacao Ltda.*, No. 99-10262, 2000 WL 35795068 (11th Cir. Apr. 10, 2000).

Likewise, an action to enforce a *settlement agreement* cannot be heard in admiralty even where the underlying dispute was brought in admiralty. *D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, 756 F.3d 151, 159 (2d Cir. 2014) (citing *Fednav, Ltd. v. Isoramar, S.A.*, 925 F.2d 599, 601 (2d Cir.1991); *Pac. Sur. Co. v. Leatham & Smith Towing & Wrecking Co.*, 151 F. 440, 443 (7th Cir.1907) (cited in dicta in *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961)). The reasoning of this line of cases is that an agreement to pay damages "neither involves maritime service nor maritime transactions." *Id.* Thus, an agreement to pay to resolve a maritime claim is not itself a maritime contract and does not confer admiralty jurisdiction. The problem for Plaintiffs in this case is that the settlement agreement between Tiger Capital and NLH and the promissory notes between NLH and the Plaintiffs do not relate to maritime services or transactions. The guarantees only obligate the guarantor to pay money relating to non-maritime debts, not to perform a maritime obligation. The attachment must be vacated to the extent that it relies upon the promissory notes and/or the guarantees.

2. **Since there is no event of default under the Labroy, Oppenheimer, and Cheyenne Notes, these Plaintiffs had no right to arrest the Vessel.**

The Labroy, Oppenheimer, and Cheyenne Notes are current and there is no default. *See* (Livanos Decl. ¶ 29). Therefore, these Plaintiffs have no right to foreclose on the mortgages and no right to arrest the Vessel. At paragraphs 46-55 of the Verified Complaint, Plaintiffs allege several, insignificant breaches which do not affect Plaintiffs' security interest in the Vessel and do not trigger an event of default under the mortgage. None of the facts alleged in paragraphs 46-55 would constitute an event of default under the note. (Ex. 2 to Livanos Decl., pp. 4-5). Additionally, these bald allegations are unsupported by any evidence. Labroy, Oppenheimer, and Cheyenne had no right to arrest the Vessel and did so in bad faith since there is no event of default under those agreements.

3. **Because Plaintiff Ray Capital failed to sell the shares of NLH to pay down the Promissory Note as required by Addendum # 3, Plaintiff has failed to satisfy a warranty**

Addendum # 3 dated March provided:

> That the Holder **agrees and warrants** that it shall sell up to twenty percent (20%) of the Monthly Dollar Volume (as defined herein below) of the Company's Common Stock per month to reduce the Company's outstanding obligations owing to the Holder pursuant to the Note. "Monthly Dollar Volume" means a dollar amount of the Company's Common Stock which is traded in the US public markets in the relevant month in which it is calculated (not including the amount of any shares of the Company's Common Stock traded by the Holder).

(emphasis added).

Plaintiff Ray Capital's apparent excuse for its failure to sell the shares in accordance with Addendum # 3 is that NLH's share price was low at the time Plaintiffs filed their Complaint on April 19, 2016. (ECF No. 1, ¶ 35). However, this ignores the prior course of dealing between the parties and the ample opportunity Ray Capital had to sell the shares. (Livanos Decl. ¶¶ 14, 23). Most importantly, Plaintiff Ray Capital provide no excuse for its failure sell the shares in

accordance with the clear warranty under this Addendum during the nine (9) months prior to filing this suit.

New York State law governs the Addendum. (Livanos Decl. ¶ 15). New York State law provides that "[a] condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,* 636 N.Y.S.2d 734, 737 (N.Y.1995) (quoting Calamari & Perillo, *Contracts* § 11–2, at 438 [3d ed.])). Under New York law, failure to satisfy a condition precedent is a valid defense to payment of an instrument such as a note. *See Citicorp Int'l Trading Co. v. W. Oil & Ref. Co.,* 790 F. Supp. 428, 434 (S.D.N.Y. 1992)(citing *Long IslandTrust Co. v. International Inst. for Packaging Educ., Ltd.,* 38 N.Y.2d 493, 496, 381 N.Y.S.2d 445, 447, 344 N.E.2d 377 (1976)).

Addendum # 3 warrants that Plaintiff shall sell up to 20% of the monthly dollar value of the NLH common stock per month to reduce the outstanding obligations under the Note. The communications, numerous addenda, and express language of the agreement all indicate that Ray Capital was required to sell these shares because the current market conditions do not permit cash payments to pay down the note. Indeed, Ray Capital did previously sell the shares in accordance with the agreement to pay down approximately $4.1 million of the $6 million. For some unknown reason, Ray Capital decided not to sell the shares and instead opted to demand a cash payment. Because the clear language of the Addendum indicates that Ray Capital warranted that it shall sell the shares, this was a central part of the bargain, and it was a condition precedent to foreclose on the mortgage. Therefore, Ray Capital had no right to foreclose on the mortgage and arrest the Vessel. Even if the Court does not hold that the warranty to sell the NLH shares was a condition precedent, this warranty was still a central aspect of the transaction

16

as both parties understood it. Plaintiff's failure to satisfy it prevents it from foreclosing on the Note.

### 4.    The arrest of the Vessel was wrongful

To recover for wrongful arrest of a vessel, there must be (1) no bona fide claim of a maritime lien on the vessel and (2) a showing of bad faith, malice, or gross negligence [on the part] of the offending party. *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 574-75 (5th Cir. 2015); *Frontera Fruit Co. v. Dowling,* 91 F.2d 293, 297 (5th Cir.1937) ("The gravamen of the right to recover damages for wrongful seizure or detention of vessels is the bad faith, malice, or gross negligence of the offending party.").

As established *supra*, none of the Plaintiffs have a colorable claim of a maritime lien against the M/V NEWLEAD CASTELLANO. Ray Capital's undisputed failure to sell the shares of NLH to pay down the balance of the Note as required by Addendum # 3 precludes it from foreclosing on the mortgage against the Vessel. No events of defaults have been triggered as to the mortgages to which Labroy, Oppenheim, and Cheyenne are parties. While Defendant recognizes that in certain circumstances, Rule B maritime attachments may be combined with Rule C arrests, the requirements of Rule B must be satisfied. Plaintiffs have failed to satisfy the requirement of Rule B that they have a prima facie maritime claim since the Notes and Guarantees are not maritime contracts. In sum, Plaintiffs have no right to arrest or attach the Vessel or the property aboard the Vessel and their actions demonstrate bad faith.

Rather than satisfy their obligations under the Addendum, Plaintiffs have seized Defendant's property on an ex parte basis and seek to bootstrap their invalid Rule B attachment to a defective Rule C arrest of the Vessel. It goes without saying that a mortgage holder cannot foreclose on the collateral without an event of default. In seizing Defendant's Vessel, Plaintiffs

ignored all of these requirements at a great expense to the Defendant. As such, Defendant seeks damages for wrongful arrest including, but not limited to: costs, attorney's fees, actual damages, and consequential damages. In it its reply, Defendant is prepared to submit an itemized statement setting forth its damages, so as to provide the Court with a current and as accurate of an accounting as possible.

## CONCLUSION

Plaintiffs have not demonstrated the existence of a prima facie maritime claim, as required by Rule B, since the contracts upon which they rely are not maritime. This requires vacatur of the maritime attachment. Plaintiff Ray Capital failed to sell shares of NLH, an express warranty under Addendum # 3. Thus, there is no event of default as to the Ray Capital Note and Ray Capital has no maritime lien. Plaintiffs Labroy, Oppenheim, and Cheyenne have no maritime lien because those Notes are not in default. Without maritime liens, there can be no vessel arrest under Rule C. This requires vacatur of the arrest. The M/V NEWLEAD CASTELLANO should therefore be permitted to sail forthwith.

The ex parte arrest and attachment orders were not obtained in good faith since Plaintiffs ignored their clear obligations under the agreement, attached without a maritime claim, and, without any evidence or factual support, claim breaches of the Oppenheim, Labroy, and Cheyenne Notes. Therefore, Defendant is entitled to damages for wrongful arrest as well as its costs and legal fees for having to make the within motion.

Dated this 3<u>rd</u> day of May, 2016.

           ELLIS, PAINTER, RATTERREE & ADAMS LLP

           <u>/s/Philip Thompson</u>
           ROBERT S. GLENN, Jr.
           Georgia Bar No. 297306
           <u>bglenn@epra-law.com</u>
           PHILIP THOMPSON
           Georgia Bar No. 963572
           <u>pthompson@epra-law.com</u>
           *Attorneys for Defendant*

Post Office Box 9946
Savannah, Georgia  31412
912-233-9700

1604085.1

007923-000011

CERTIFICATE OF SERVICE

This is to certify that I have this day served the following counsel of record with a true and correct copy of the foregoing document(s) as indicated below:

Todd M. Baiad
Bouhan Falligant, LLP
The Armstrong House
447 Bull Street (31401)
Post Office Box 2139
Savannah, Georgia 31402-2139
tmbaiad@bouhan.com

X        electronic delivery.

☐        via facsimile number:

☐        by hand delivery.

Dated this 3rd day of May, 2016.

ELLIS, PAINTER, RATTERREE & ADAMS LLP

/s/Philip Thompson
ROBERT S. GLENN, Jr.
Georgia Bar No. 297306
bglenn@epra-law.com
PHILIP THOMPSON
Georgia Bar No. 963572
pthompson@epra-law.com
*Attorneys for Defendant*

Post Office Box 9946
Savannah, Georgia  31412
912-233-9700

21