**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION
IN ADMIRALTY**

| | | |
|---|---|---|
| **RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED** | § § § § § | |
| **PLAINTIFFS** | § | **C.A. NO. 16-CV-093** |
| **V.** | § § | |
| **M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM*, AND NEWLEAD CASTELLANO LTD.** | § § § § § § § § § | |
| **DEFENDANTS** | § | |

**<u>FIRST AMENDED VERIFIED COMPLAINT</u>**

Plaintiffs, Ray Capital Inc. ("<u>Ray</u>"), Oppenheim Capital Ltd. ("<u>Oppenheim Capital</u>"), Cheyenne Holdings Ltd. ("<u>Cheyenne</u>") and Labroy Shiptrade Limited ("<u>Labroy</u>"), through undersigned counsel, as and for their First Amended Verified Complaint against M/V NEWLEAD CASTELLANO, her engines, appurtenances, tackle, apparel, etc., a Liberian-flagged bulk carrier vessel of approximately 180 meters in length, Official Number 9686338 (the "<u>Vessel</u>") *in rem*, and Newlead Castellano Ltd. ("<u>NC</u>") *in personam* and stating an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, respectfully allege and plead pursuant to Federal Rules of Civil Procedure 15(a)(1)(B):

## JURISDICTION AND VENUE

1.      This is an admiralty and maritime claim within the jurisdiction of the United States and this Honorable Court pursuant to 28 U.S.C. §1333 and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure ("F.R.Civ.P.").  This is an action to: (i) enforce maritime liens *in rem* against the Vessel, pursuant to priority ship mortgages; and (ii) to attach the property of NC, both pursuant to guarantees and ship mortgages granted by NC to secure certain promissory notes issued by NC's parent, non-party NewLead Holdings Ltd. ("NewLead") in favor of Plaintiffs.

2.      This claim is brought pursuant to, and in accordance with, the provisions of The Ship Mortgage Act, as amended, 46 U.S.C. §31301, *et seq.*, and under Fed.R.Civ.P. Supplemental Rules B and C of the Federal Rules of Civil Procedure, and Rules 24(a)(1) and (2).

3.      Venue is proper in this District pursuant to 28 U.S.C. §1391(c).

## IDENTITY OF PARTIES

4.      At all material times, Plaintiff Ray is and was a corporation organized under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

5.      At all material times, Plaintiff Oppenheim Capital is and was a corporation organized under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

80431766v1

6.    At all material times, Plaintiff Cheyenne is and was a corporation organized under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

7.    At all material times, Plaintiff Labroy is and was a corporation organized under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

8.    Upon information and belief, at all material times, Defendant NC is and was a Liberian company with a registered office at 80 Broad Street, Monrovia, Republic of Liberia.

9.    Upon information and belief, Defendant NC is a single asset company owning only the Vessel.

10.    Upon information and belief, NC is a wholly-owned subsidiary of NewLead established for the sole purpose of holding title to the Vessel.

11.    At all relevant times, the Vessel has been engaged in international commerce and owned by Defendant NC.  The Vessel is under arrest within the jurisdiction of this Court.

<u>Background</u>

12.    In mid-2014, Plaintiffs were each owed money by NewLead for various business activities.

13.    During this time, NewLead was pursuing a coal export business with Transasia Commodities Investment Limited ("<u>Transasia</u>") and was making various public representations about the status of this coal shipment business.

80431766v1

14.     Upon information and belief, NewLead is defending a multi-million dollar lawsuit in New York (the "New York Fraud Case") in which Transasia, as plaintiff, has alleged that NewLead and its subsidiaries and affiliates engaged in a series of frauds designed, *inter alia*, to influence the share price of NewLead.

15.     Upon information and belief, the New York Fraud Case allegations against NewLead far eclipse the value of the company, and it appears that NewLead is, at the very least, liable for millions of dollars in contract damages that NewLead simply cannot pay.

16.     In fact, NewLead has conceded to Plaintiffs that the company has no cash, a concession supported by NewLead's own financial statements.

17.     Moreover, the seriousness of these allegations strongly imply parallel criminal investigations, which threaten the functional demise of the company.

18.     The New York Fraud case, initiated on December 20, 2013, combined with other lawsuits against NewLead, appear to have precipitated a dramatic decline in NewLead's share price.  In an attempt to stanch this loss of value, NewLead engineered a series of reverse stock splits, but these did not halt the destruction of NewLead's share price.

19.     Until approximately mid-2014, NewLead's shares were listed on the NASDAQ Global Select Market.  However, during 2014 NewLead stock declined 99.99% in value.

20.     During 2015, the previous year's precipitous share price decline continued unabated, declining a further 99.6% (in addition to the 2014 decline).

21.     Although it is traded "over the counter" and is hence a public company, NewLead is a holding company with no inherent value (when the Verified Complaint was filed, NewLead's share price was approximately $0.003 with a total market capitalization of approximately $22,000).

<u>The NewLead and NC Obligations to Plaintiffs</u>

22.     Prior to mid-2014, NewLead incurred various obligations to Plaintiffs that NewLead was unable to pay in cash.  NewLead sought to pay these obligations by issuing NewLead stock to Plaintiffs to satisfy the indebtedness.

23.     Unfortunately, the decline in the value of NewLead stock and NASDAQ de-listing, detailed above, greatly restricted the marketability of NewLead stock such that it was functionally worthless.

24.     With NewLead unable to pay Plaintiffs in shares, NewLead instead issued each Plaintiff a convertible promissory note pursuant to a series of exchange agreements.

25.     Accordingly, each Plaintiff now holds a promissory note, as amended (each a "<u>Note</u>" and together the "<u>Notes</u>") issued by NewLead.

26.     In sum, the Notes are:

    i.     a Note dated December 27, 2013 issued to Ray in the amount of USD $6,000,000 (the "<u>Ray Note</u>") (attached hereto as Exhibit 1 is a true and correct copy of the Ray Note and amendments);

80431766v1

    ii.    a Note dated August 4, 2014 issued to Oppenheim Capital in the amount of USD$2,499,955.98 (the "Oppenheim Capital Note") (attached hereto as Exhibit 2 is a true and correct copy of the Oppenheim Capital Note and amendments);

    iii.    a Note Dated September 12, 2014 issued to Cheyenne in the amount of USD $1,250,000 (the "Cheyenne Note") (attached hereto as Exhibit 3 is a true and correct copy of the Cheyenne Note and amendments); and

    iv.    a Note dated May 26, 2015 issued to Labroy in the amount of USD$1,215,000 (the "Labroy Note") (attached hereto as Exhibit 4 is a true and correct copy of the Labroy Note and amendments).

27.    Initially, each Note was, at NewLead's option, either: (i) convertible to equity in NewLead; or (ii) payable in cash.

28.    Ray reduced the indebtedness under the Ray Note by converting some of the debt to NewLead shares and selling them.  However, the decline in NewLead's share price, de-listing from NASDAQ, and eventual re-listing on the over-the-counter "grey sheets", ended for Plaintiffs and its numerous globally-known and reputable financial counterparties (banks and broker-dealers) any willingness and ability to transact in a compliant orderly liquid market for NewLead shares and so the remaining indebtedness could not be further reduced in this manner.

29.    Furthermore, even if the Plaintiffs were allowed, able and wanted to convert all or a portion of the Notes to NewLead shares to subsequently sell on the public market, there was no way to do so.

80431766v1

30.      Subsequent to the issuance of each Note, NewLead sought to amend each Note to, *inter alia*, make quarterly interest and principal payments due only at maturity and to extend the maturity date of each Note.

31.      In order to obtain these concessions from Plaintiffs, NewLead offered to make the final payments in cash only (with any conversion to equity at Plaintiffs' option) and to secure the Notes with a guarantee from NewLead's wholly-owned subsidiary, NC.

32.      Accordingly, each Note is secured by an October 16, 2014 Guarantee and Indemnity issued by NC (each, a "Guarantee and Indemnity") (attached hereto as Exhibit 5 are true and correct copies of each Guarantee and Indemnity issued to Ray, Oppenheim Capital, Cheyenne, and Labroy).

### The NC Guarantee and Indemnity

33.      Pursuant to each Guarantee and Indemnity, NC agreed that "it is, and will throughout the Facility Period remain, a principal debtor in respect of the Guarantor's Liabilities". Ex. 5, ¶5.7 (emphasis added).

34.      Each Guarantee and Indemnity secures NewLead's payment obligations.

35.      Each Guarantee and Indemnity provides:

The Guarantor:

> Irrevocably and unconditionally guarantees the due and punctual observance and performance by the Company of all its obligations under the Finance Documents including, without limitation, the due and punctual payment of each and every part of the Indebtedness in accordance with the terms of the Finance Documents so that, if any of the Indebtedness is not paid when it is due and payable, whether on maturity or otherwise, the Guarantor will, immediately on demand, make such payment to the Holder in the manner

7

specified by the Holder, together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment; and

Agrees, as a separate and independent obligation, that, if any of the Indebtedness is not recoverable from the Guarantor under Clause 3.1 for any reason, the Guarantor will be liable as a principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable, and agrees to discharge its liability under this Clause 3.2 by making payment to the Holder immediately on demand together with interest on the amount demanded at the rate accruing on the same under the Note from the date of demand until the date of payment, both before and after judgment.

Ex. 5, ¶¶3.1 – 3.2.

36.    Each Guarantee and Indemnity contains a number of undertakings, including that:

The Guarantor will not without the Holder's prior written consent:

Create nor permit to arise any Encumbrance or other third party rights over any of its present or future assets or undertaking other than in favor of Holder; nor

Except in the ordinary course of business, incur any liability to any third party which is in the Holder's opinion of a substantial nature . . .

Id., ¶¶6.4 – 6.4.2.

37.    Each Guarantee and Indemnity also provides:

The Guarantor shall supply to the Holder as soon as the same become available, but in any event within 180 days after the end of each of its financial years, its audited financial statements for that financial year . . .

Id., ¶6.5.

38.    Each Guarantee and Indemnity also states:

The Guarantor shall supply to the Holder:

All documents dispatched by the Guarantor to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched . . .

Ex. 5, ¶6.8.

8

39.     NC secured each Guarantee and Indemnity by, *inter alia*, issuing a mortgage over the Vessel to each Plaintiff for the respective amounts owed (each, a "Mortgage" and together the "Mortgages") (attached hereto as Exhibit 6 is a true and correct copy of each Mortgage issued to Ray, Oppenheim Capital, Cheyenne, and Labroy).

40.     The Mortgages are governed by Liberian law.  However, Plaintiffs retained their right to bring suit in any other court of competent jurisdiction and the right to arrest the Vessel wherever it may be found.  Ex. 6, ¶19.1 – 19.4.

41.     Each Mortgage states:

The Owner agrees in accordance with the Guarantee to guarantee and indemnify the Mortgagee in respect of the Company's obligations to repay the Debt, to pay interest on the Debt and to pay all other sums at any time due to the Mortgagee under or pursuant to the Finance Documents.

Id., ¶3.

42.     Each Mortgage further provides:

In consideration of the premises, the Owner has granted, conveyed, mortgaged, transferred, set over and confirmed, and by this Mortgage grants, conveys, mortgages, transfers, sets over and confirms, to the Mortgagee the whole of the Vessel TO HAVE AND TO HOLD the same unto the Mortgagee forever on the terms and subject to the conditions of this Mortgage for the enforcement of the payment to the Mortgagee of the Indebtedness.

Id., ¶4.1 (emphasis in original).

43.     Each Mortgage also provides:

The Owner covenants with the Mortgagee:

To keep the Vessel seaworthy and in a state of complete repair . . .

Ex. 6, ¶6.1.

9

44.     The Mortgages each require NC "to cause the Vessel to be released from arrest or detention as quickly as possible, and in any event within fourteen days from the date of arrest or detention . . .". Id., ¶6.8.

45.     The Mortgages also require NC not "to employ the Vessel in any way which might impair the security interest created by the Finance Documents". Id., ¶6.17.

46.     The Mortgages also oblige NC "to notify the Mortgagee immediately [if] the Owner becomes aware of any legal proceedings or arbitration involving the Vessel or the Owner where the amount claimed by any party . . . exceeds [$250,000]". Id., ¶6.23.

47.     Because NewLead is little more than a hollow shell facing serious civil (and likely criminal) penalties, the only cognizable security held by Plaintiffs are the Mortgages.

48.     The Mortgages are maritime contracts.

49.     The Mortgages are duly and validly registered with the Vessel's flag state, Liberia, as evidenced by the Liberian Certificate of Ownership and Encumbrance (the "COE"), which shows no other registered liens (attached hereto as Exhibit 7 is a true and correct copy of the COE).

**The Events of Default**

50.     The Ray Note, Addendum 3, provides that:

That the Company agrees that any amount of the Note, including the Principal and any accrued interest thereon and any True up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder. Failure to pay any amounts pursuant to this clause shall constitute an Event of Default under clause 4 of the Note as this has been amended by Addendum No. 1 and Addendum No. 2 and is further amended hereby or may be amended.

10

51.     The maturity date of the Ray Note was December 27, 2015.  Ex. 1, Addendum No. 3, ¶(c).

52.     NewLead failed to pay the Ray Note on December 27, 2015, and has not paid the Ray Note as of the date hereof.

53.     By letter dated December 29, 2015, Ray notified NewLead that it was in default, but NewLead failed to cure this default (the "<u>Ray Default Notice</u>").  Attached hereto as Exhibit 8 is a true and correct copy of the Ray Default Notice.

54.     Plaintiff Ray is owed, as of May 10, 2016, $1,671,671 under the Ray Note.

55.     NewLead's default under the Ray Note is a material breach of the Ray Note that entitles Ray to call on the Guarantee and Indemnity.

56.     By letter dated January 8, 2016, Ray notified NC that NewLead had defaulted under the Ray Note.  However, NC did not cure this breach.

57.     In addition to the failure to pay the Ray Note at maturity, NC has committed numerous additional defaults entitling Ray, Cheyenne, Oppenheim and Labroy to foreclose on the Vessel.

58.     NC has allowed significant debt to accumulate against the Vessel other than obligations that could be characterized as liabilities incurred during the ordinary course of business.

59.     Some of the debt that has been accumulated by the Vessel may prime the Mortgages, prejudicing Plaintiffs' security.

80431766v1

60.     Moreover, NC has failed to pay the crew on time, creating maritime liens that prime the Mortgages, and which imperil the continued operation of the Vessel.

61.     Moreover, some of these debts meet the definition of an "Encumbrance" in the Mortgages in that they are secured by maritime liens or other security interests.

62.     NC also undertook to provide Plaintiffs with copies of NC's audited financial statements.  However, NewLead has since advised that there are no audited financial statements limited to only NC.  Accordingly, other than through NewLead's unaudited representations as to the financial performance of NC, Plaintiffs are unable to determine the Vessel's performance (including the trade debts of the Vessel and any other amounts owed by NC).

63.     Unfortunately, NC has not provided Plaintiffs with copies of the documents provided to NewLead by NC pursuant to NewLead's role as the sole shareholder of NC.

64.     If NC fully performed under the Guarantee and Indemnity and related agreements Plaintiffs would be able to calculate the Vessel's actual performance by reference to NC's reports to its parent NewLead.

65.     In addition, upon information and belief, NC has not kept the vessel in a complete state of repair because NC lacks the cash flow to properly maintain the Vessel.

66.     NC's failure to provide audited financial statements also impairs Plaintiffs' ability to fully determine the extent to which the Vessel has accumulated debt that primes Plaintiffs' mortgages.

80431766v1

67.    Recently, Plaintiffs became aware that the Vessel would call in Savannah, Georgia, within the jurisdiction of this Honorable Court, to discharge a cargo of sugar.

68.    On Tuesday, April 19, 2016, pursuant to a Verified Complaint filed by Plaintiffs and an Order of arrest of the same date, the United States Marshal arrested the Vessel.  The Vessel was then turned over to a substitute custodian, National Maritime, Inc. ("NM").

### NC Has Abandoned the Vessel

69.    NC appears to have taken no action to secure the Vessel, care for her crew, or otherwise protect the Vessel while she is under arrest, and has now abandoned her to the Court and her creditors.

70.    Following the arrest, NM placed a watchman, Capt. Gerard LoPreiato, aboard the Vessel.  Capt.  LoPreiato is also an experienced mariner.

71.    While the Vessel was discharging, the crew informed Capt. LoPreiato that the crew has not been paid since January, 2016.

72.    The crew advised that they would stop work if they did not receive their outstanding pay.

73.    Moreover, shortly after the Vessel was taken into custody, a delivery of food and other consumables was commenced but halted, apparently due to payment issues.

74.    In order to keep the crew properly fed and supplied, and working with NM at all times, Plaintiff Ray arranged the victualing of the Vessel while under arrest.

13

75.     In order to allow the completion of discharge and otherwise protect the crew (who are wards of the Court), Plaintiff Ray, working with NM at all times, also paid the crew their outstanding wages for the month of March, 2016, arranging cash payment aboard for those that requested it and arranging a number of wire transfers to the home bank accounts of the crew.

76.     Upon information and belief, many of the crew are from the Philippines and the sole source of financial support for their families.

77.     It has also emerged that many of the crew are devout Catholics and that no services have been arranged by the Vessel owner.  Accordingly, Plaintiffs have also made arrangement for spiritual services and a shipboard visit by clergy each week.

78.     Plaintiffs have continued to monitor the food, fuel, water and wage situation aboard, all of which creates or threatens to create liens that might prime the registered security interests of Plaintiffs.

79.     By email dated May 10, 2016 from Spyros Theodoropoulos, NewLead's Vice-President for Claims and Risks Management (the "May 10, 2016 E-Mail"), NewLead advised that "the following amounts need to be settled immediately so that the [V]essel is maintained in a seaworthy state". Attached hereto as Exhibit 8 is a true and correct copy of the May 10, 2016 E-mail.

80.     As a review of the May 10, 2016 E-Mail shows, NC has admitted that:

a.   NC has failed, as of the date hereof, to pay $28,956.83 in insurance premiums.

14

b.  NC has failed, as of the date hereof, to pay $19,337.49 for the Vessel's communications systems.

c.  NC has failed, as of the date hereof, to pay $178,546.10 in wages due to crew employed through "Interorient Maritime DMCC", a company that supplies crew to the Vessel on a non-exclusive basis.

d.  NC has failed, as of the date hereof, to pay $53,101.07 in crew wages to non-Interorient supplied crew.

81.     NC's payment failures, by its own admission, threaten to render the Vessel "unseaworthy", a maritime law term of art that means that the Vessel cannot safely sail from her current location in the District unless these issues are rectified.

82.     However, NC and NewLead are either unwilling or unable to pay these amounts.

83.     Incredibly, NC and NewLead are asking the Court to make these payments, having asked the substitute custodian to advise the "sheriff" (presumably meaning the United States Marshal) of the above debts and the need to pay these alleged obligations (the amount sought does not, apparently, take into account the crew wage payments already made by Plaintiff Ray and discussed *supra*).

84.     The failure to pay insurance premiums when due is highly prejudicial to Plaintiffs because the insurance cover for the Vessel is pledged to Plaintiffs, so if the Vessel sinks or is damaged Plaintiff's claims are unsecured.

80431766v1

85.     The failure to pay insurance premiums also exposes the Vessel to potential third-party liability, which has the potential to create claims that prime Plaintiffs' mortgages.

86.     While it is not clear from the correspondence received from NC and NewLead, insurance cover normally includes liability for oil pollution.  To the extent that NC has failed to maintain this cover, or is threatening to withdraw it, this threatens not just Plaintiffs' claims but the well-being of the local environment.

87.     The failure to pay telecommunications charges is a particular concern because this renders the Vessel's communications equipment, including her emergency communication gear, unworkable.

88.     The failure to pay telecommunications charges also prevents the crew from contacting their families, a particular hardship for crew that are far from home and who have gone unpaid by NC for quite some time.

89.     NewLead and NC's failure to keep Plaintiffs advised of the financial situation of the Vessel means that the alleged debt of the Vessel summarized in the May 10, 2016 E-Mail is new information to Plaintiffs, but this evidence supports what Plaintiffs already suspected:  NC is essentially out of business.

90.     NC and NewLead have admitted that they cannot pay the amounts owed, or even a fraction of this debt.  Since the Mortgage provides that NC will "not after the occurrence of an Event of Default which is continuing to let the Vessel on charter . . ." (Ex. 6, ¶6.20) NC cannot employ the Vessel and she will accordingly continue to incur debt and costs that reduce her net value with every day that passes.

80431766v1

## **FIRST CAUSE OF ACTION**

F.R.Civ.P. Rule E Foreclosure of Maritime Lien *In Rem* Over M/V NEWLEAD CASTELLANO
Pursuant to the Ray Note

91.     Plaintiffs repeat and re-allege as if fully set forth herein the allegations set forth in paragraphs 1-90 above.

92.     Non-party NewLead has breached the Ray Note by, *inter alia*, failing to make the required payment on the Ray Note maturity date.

93.     NewLead's breach of the Ray Note entitles Plaintiff Ray to foreclose on the Vessel pursuant to the Guarantee and Indemnity given by NC, including the security provided by NC by way of the Mortgage and the maritime lien created thereby.

94.     Specifically, Plaintiff Ray is entitled to foreclose its maritime mortgage lien pursuant to the Maritime Lien Act and the Ship Mortgage Act, 46 U.S.C. §31301, *et seq.*

95.     The current amount due and payable under the Ray Note is $1, 671,671, exclusive of interest, costs, fees and expenses, all of which are also recoverable pursuant to the terms of the Ray Note, the Guarantee and Indemnity, and the Mortgage.

96.     Plaintiff Ray has duly performed all of its obligations to NewLead under the terms of the Ray Note.

97.     Plaintiff Ray agrees to hold harmless and indemnify the U.S. Marshal and all his deputies from any liability as a result of seizing the aforesaid property.

80431766v1

## SECOND CAUSE OF ACTION

Foreclosure of Maritime Lien *In Rem* Over M/V NEWLEAD CASTELLANO for Breach of
Preferred Ship Mortgages Pursuant to F.R.Civ.P. Rule E

98.     Plaintiffs repeat and re-allege as if fully set forth herein the allegations set forth in
Paragraphs 1-97 above.

99.     Upon information and belief, Defendant NC has breached the terms of the
Mortgages by failing to keep the Vessel in a state of complete repair.

100.    NC has also breached the Mortgages in numerous ways more fully described above
and exposed by the May 10, 2016 E-Mail, but including (1) the failure to keep the Vessel
seaworthy; (2) the failure to comply with applicable conventions, in this case the Maritime Labor
Convention; (3) to maintain the Vessel's insurance and protection and indemnity cover.

101.    In addition, the failure to pay the Vessel's communications costs will, if this cost is
not paid by Plaintiffs, result in the Vessel failing to comply with the International Management
Code for the Safe Operation of Ships and with the International Ship and Port Facility Security
Code, both of which are also breaches of the Mortgages.

102.    Defendant NC has also breached the terms of the Mortgages by failing to obtain
the release of the Vessel from arrest within 14 days, further imperiling Plaintiffs' security.

103.    Defendant NC has also breached the terms of the Mortgages by allowing the
creation of liens that threaten to prime the Mortgages.

80431766v1

104.   As a result of the above-described defaults under the Mortgages, Plaintiffs are entitled to foreclose their maritime mortgage liens pursuant to the Maritime Lien Act and the Ship Mortgage Act, 46 U.S.C. 313 *et seq.*

105.   The current amount due and payable under the Notes is $7,209,133, exclusive of interest, costs, fees and expenses, all of which are also recoverable pursuant to the terms of the Guarantee and Indemnity and the Mortgage.

106.   Plaintiffs have duly performed all of their obligations to NewLead under the terms of the Notes.

107.   Plaintiffs agree to hold harmless and indemnify the U.S. Marshal and all his deputies from any liability as a result of seizing the aforesaid property.

## THIRD CAUSE OF ACTION

Foreclosure of Maritime Lien *In Rem* Over M/V NEWLEAD CASTELLANO
for Unpaid Crew Wages

108.   Plaintiff Ray repeats and re-alleges as if fully set forth herein the allegations set forth in Paragraphs 1-107 above.

109.   Upon the discovery that crew wages were in serious arrears, and that the crew was threatening to stop work if they were not paid, Plaintiff Ray took immediate steps to arrange the payment of crew wages for the month of March, 2016 (February and April wages remain unpaid).

110.   In total, Plaintiff Ray made crew wage payments of $48,876.93, consisting of $15,109 paid aboard the Vessel in cash and the balance wired to the home bank accounts of the crew so that the funds could be accessed by their dependent families.

80431766v1

111. Each of these crew wage payments was documented by a receipt, release and assignment agreement, such that Ray is the assignee of these claims.

112. Accordingly, NL and the Vessel are liable to Ray for an additional $48,876.93 in crew wages, plus the costs of arranging such payment aboard the Vessel.

## FOURTH CAUSE OF ACTION

### Attachment of M/V NEWLEAD CASTELLANO for Breach of Contract
### Pursuant to F.R.Civ.P. Rule B

113. Plaintiffs repeat and re-allege as if fully set forth herein the allegations set forth in Paragraphs 1-112 above.

114. In addition to the *in rem* maritime liens created by the Mortgages, NC is also liable to Plaintiffs *in personam* for breach of maritime contract and hence Plaintiffs are also entitled to attach NC's property located in this judicial district.

115. Upon information and belief, Defendant NC has breached the terms of the Mortgages by failing to keep the Vessel in a state of complete repair.

116. NC has also breached the Mortgages in numerous ways more fully described above and exposed by the May 10, 2016 E-Mail, but including (1) the failure to keep the Vessel seaworthy; (2) the failure to comply with applicable conventions, in this case the Maritime Labor Convention; (3) to maintain the Vessel's insurance and protection and indemnity cover.

117. In addition, the failure to pay the Vessel's communications costs will, if this cost is not paid by Plaintiffs, result in the Vessel failing to comply with the International Management

80431766v1

Code for the Safe Operation of Ships and with the International Ship and Port Facility Security Code, both of which are also breaches of the Mortgages.

118.    Defendant NC has also breached the terms of the Mortgages by failing to obtain the release of the Vessel from arrest within 14 days, further imperiling Plaintiffs' security.

119.    Defendant NC has also breached the terms of the Mortgages by allowing the creation of liens that threaten to prime the Mortgages.

120.    The current amount due and payable under the Notes is $7,209,133, exclusive of interest, costs, fees and expenses, all of which are also recoverable pursuant to the terms of the Guarantee and Indemnity and the Mortgage.

121.    Plaintiffs have duly performed all of their obligations to NewLead under the terms of the Notes.

122.    Plaintiff agrees to hold harmless and indemnify the U.S. Marshal and all his deputies from any liability as a result of seizing the aforesaid property.

123.    Plaintiff is entitled to judgment *in personam* against NewLead in an amount in excess of $7,209,133 together with interest, costs, expenses and attorneys' fees.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully request:

A.    That process of arrest, in due form of law, according to the course and practice of this Honorable Court in causes of Admiralty and Maritime Jurisdiction within the meaning of the Constitution of the United States and Rule 9(h) of the Federal Rules of Civil Procedure, may issue against the Vessel M/V NEWLEAD CASTELLANO and her engines, tackle, apparel, etc., and all

other necessaries and equipment belonging and appurtenant thereto, as provided in F.R.Civ.P. Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims, and that all persons claiming any interest in the Vessel may be cited to appear and answer the matters aforesaid, and that the Vessel, her engine, tackle, apparel, etc., and all other necessaries belonging and appurtenant thereto, may be seized, condemned and sold to pay the demands and claims aforesaid, with interest, costs, expenses and attorneys' fees, and to pay other amounts required to be paid by the Defendant NC to Plaintiffs under the Notes and the Guarantee and Indemnity agreements and secured by the Mortgages, together with interest, costs, expenses and attorneys' fees, and that Plaintiffs have such other and further relief as in law and justice they may be entitled to receive; and

B.     That process of attachment, in due form of law, according to the course and practice of this Honorable Court in causes of Admiralty and Maritime Jurisdiction within the meaning of the Constitution of the United States and Rule 9(h) of the Federal Rules of Civil Procedure, may issue against the assets of Defendant NC that may be found within this judicial district, to wit the Vessel M/V NEWLEAD CASTELLANO and her engines, tackle, apparel, etc., and all other necessaries and equipment belonging and appurtenant thereto, as provided in F.R.Civ.P. Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and that all persons claiming any interest in the Vessel may be cited to appear and answer the matters aforesaid, and that the Vessel, her engine, tackle, apparel, etc., and all other necessaries belonging and appurtenant thereto, may be seized, condemned and sold to pay the demands and claims aforesaid, with interest, costs, expenses and attorneys' fees, and to pay other amounts required to be paid by Defendant NC to Plaintiffs under the Notes, Guarantee and Indemnity agreements and

22

the Mortgages, together with interest, costs, expenses and attorneys' fees, and that Plaintiffs may have such other and further relief as in law and justice they may be entitled to receive; and

C.      That the Mortgages granted by NC may be declared to be valid and subsisting liens upon the Vessel, her engines, tackle, apparel, etc., and all other equipment and necessaries belonging and appurtenant thereto, which is prior and superior to the interest, liens or claims or any and all persons, firms or corporations whatsoever; and

D.      That it may be decreed that any and all persons, firms and corporations claiming any interest in the Vessel are forever barred and foreclosed from all rights or equities for redemption or claim of, in or to the mortgaged Vessel, her engines tackle, apparel, etc., and all other necessaries and equipment belonging and appurtenant thereto and every part thereof; and

E.      That judgment be issued against the Vessel, M/V NEWLEAD CASTELLANO *in rem* in an amount in excess of the full amount due under the Notes and the Mortgages at the time the warrant of arrest is issued, plus interest, charges, costs, expenses and attorneys' fees, as well as any and all other amounts required to be paid or to be paid by NewLead to Plaintiffs under the Notes with interest and costs and expenses and fees, and that the Vessel be arrested under Supplemental Rule C of the Federal Rules of Civil Procedure to secure such claim, and further, that Plaintiffs reserve the right to proceed against NewLead, and any other party whether named in this lawsuit or not, for any deficiency that may remain due after applying the available proceeds of the sale of the mortgaged Vessel to the judgment herein and that Plaintiffs have such other and further relief as in law and justice it may be entitled to recover; and

F.      That judgment be issued against NC *in personam* in an amount in excess of the full amount due under the Notes, Guarantee and Indemnity agreements and the Mortgages at the time

80431766v1

the warrant of arrest is issued, plus interest, charges, costs, expenses and attorneys' fees, as well as any and all other amounts required to be paid or to be paid by Defendant NC to Plaintiff under the Notes, Guarantee and Indemnity agreements and the Mortgages together with interest and costs and expenses and fees, and that the Vessel be attached under Supplemental Rule B of the Federal Rules of Civil Procedure to secure such claim, and further, that Plaintiffs reserve the right to proceed against NewLead, and any other party whether named in this lawsuit or not, for any deficiency that may remain due after applying the available proceeds of the sale of the mortgaged Vessel to the judgment herein and that the Plaintiffs have such other and further relief as in law and justice they may be entitled to recover;

RESPECTFULLY SUBMITTED, this 12th day of May, 2016

BOUHAN FALLIGANT LLP

/s/ Todd M. Baiad
TODD M. BAIAD
Georgia Bar No. 031605
LUCAS D. BRADLEY
Georgia Bar No. 672136
*Attorneys for Plaintiffs*

Bouhan Falligant, LLP
The Armstrong House
447 Bull Street (31401)
Post Office Box 2139
Savannah, Georgia 31402-2139
(912) 232-7000 Telephone
(912) 233-0811 Facsimile

**Of Counsel**
(*Pro Hac Vice* Admission pending)
Neil A. Quartaro (NQ 9640)
Zachary Farley (Federal admission pending)
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
(212) 922-2200
nquartaro@wfw.com
zfarley@wfw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**
**IN ADMIRALTY**

| | | |
|---|---|---|
| **RAY CAPITAL INC., OPPENHEIM** | § | |
| **CAPITAL LTD, CHEYENNE** | § | |
| **HOLDINGS LTD. AND LABROY** | § | |
| **SHIPTRADE LIMITED** | § | |
| | § | |
| **PLAINTIFFS** | § | **C.A. NO. 16-CV-093** |
| **V.** | § | |
| | § | |
| **M/V NEWLEAD CASTELLANO,** | § | |
| **IMO NO. 9686338** | § | |
| **HER ENGINES, TACKLE,** | § | |
| **EQUIPMENT, FURNITURE,** | § | |
| **APPURTENANCES, ETC., *IN REM*,** | § | |
| **AND** | § | |
| **NEWLEAD CASTELLANO LTD.** | § | |
| | § | |
| **DEFENDANTS** | § | |

<u>**CERTIFICATE OF SERVICE**</u>

      This is to certify that we, the undersigned counsel of record, have on this day served all the

parties in this case in accordance with the notice of electronic filing ("NEF") that was generated

as a result of electronic filing in this Court.

      RESPECTFULLY SUBMITTED, this 12th day of May, 2016

                **BOUHAN FALLIGANT LLP**

                <u>/s/ Todd M. Baiad</u>
                TODD M. BAIAD
                Georgia Bar No. 031605
                LUCAS D. BRADLEY
                Georgia Bar No. 672136

                *Attorneys for Plaintiffs*

80431766v1

Bouhan Falligant, LLP
The Armstrong House
447 Bull Street (31401)
Post Office Box 2139
Savannah, Georgia 31402-2139
(912) 232-7000 Telephone
(912) 233-0811 Facsimile

**<u>Of Counsel</u>**
(*Pro Hac Vice* Admission pending)
Neil A. Quartaro (NQ 9640)
Zachary Farley (Federal admission pending)
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
(212) 922-2200
nquartaro@wfw.com
zfarley@wfw.com