**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**
**IN ADMIRALTY**

| | | |
|---|---|---|
| **RAY CAPITAL INC., OPPENHEIM** | § | |
| **CAPITAL LTD, CHEYENNE** | § | |
| **HOLDINGS LTD. AND LABROY** | § | |
| **SHIPTRADE LIMITED** | § | |
| | § | |
| **PLAINTIFFS** | § | **C.A. NO. 16-CV-093** |
| **V.** | § | |
| | § | |
| **M/V NEWLEAD CASTELLANO,** | § | |
| **IMO NO. 9686338** | § | |
| **HER ENGINES, TACKLE,** | § | |
| **EQUIPMENT, FURNITURE,** | § | |
| **APPURTENANCES, ETC., *IN REM*,** | § | |
| **AND** | § | |
| **NEWLEAD CASTELLANO LTD.** | § | |
| | § | |
| **DEFENDANTS** | § | |

**<u>FIRST AMENDED VERIFIED COMPLAINT</u>**

EXHIBIT "2"

THIS NOTE AND THE SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET FORTH HEREIN.   NEITHER THIS NOTE NOR THE SECURITIES ISSUABLE PURSUANT HERETO MAY BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER SUCH ACT.   THIS NOTE IS SUBJECT TO THE TERMS AND CONDITIONS OF THAT CERTAIN EXCHANGE AGREEMENT, DATED AUGUST 1, 2014, BY AND BETWEEN THE COMPANY AND THE HOLDER.

**NEWLEAD HOLDINGS LTD.**
**Unsecured Convertible Note**
**(the "Note")**

**US $2,499,955.98**                                             **August 4, 2014**
                                                                 **Piraeus, Greece**

**NEWLEAD HOLDINGS LTD.**, a company organized under the laws of Bermuda (the "Company"), for value received, hereby promises to pay to *Oppenheim Capital Ltd* of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Republic of the Marshall Islands or registered assigns (the "Holder"), the principal amount of USD2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight) together with any interest as set forth herein (the "Principal") on August 4, 2016, (the "Maturity Date"), and to pay interest from the date hereof on the unpaid principal balance at a rate equal to ten percent (10%) per annum, computed daily and on the basis of the actual number of days elapsed and a year of 365 days. Any accrued and unpaid interest on the Note shall be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

This Note has been issued pursuant to an Exchange Agreement dated August 4, 2014 between the Company and *the Holder* (the "Exchange Agreement"). Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Exchange Agreement.

1.   **Payments**.

    (a) The Company shall:

        (i)    pay the Principal or any amount thereof by issuance of its common shares, (the "**Common Stock**"), at the Stock Price (as defined below) on the Maturity Date.

**Stock Price**. The number of shares of Common Stock shall be determined by dividing (i) the amount payable by, (ii) the Closing Price, as adjusted for any stock splits or stock dividends (the "**Stock Price**"). "**Closing Price**" means the closing price the trading date immediately prior to (but not including) the date of issuance of the shares, provided the Common Stock is then listed

1

or quoted on any national securities exchange, market or trading or quotation facility (a "**Trading Market**").

        (ii)    From the date of execution of the Note and for a period of 5 years after the execution date of this Note (the "Measurement Dates"), at the date when either, (i) all Common Stock being issued to the Holder under 1(a)(i) above, or (ii) all Common Stock being issued to the Holder under any True up Amounts **(As defined hereinbelow)**, are sold in full and the Holder is entitled to additional True up Amounts. The Company may elect to pay the additional True up Amounts by either (i) wire transfer of immediately available funds to an account designated in writing by the Holder, or (ii) issuance by the Company of its Common Stock at the Stock Price determined as of such date, or (iii) any combination thereof, at the sole option of the Company. The Holder will be entitled for as many additional True up Amounts are required to collect in total the Principal in cash either by the sale of Common Stock or by cash receipts by the Company. Six (6) months prior the lapse of the five (5) year period the Holder is entitled to request for an extension of the true-up period for an additional three (3) years by providing a written notice to the Company.

**True up Amounts**. The True up Amounts are equal to the Principal less the Market Value (as defined below) of the shares issued or the cash paid as part of any Payments prior to such calculation date. The Company shall pay the True up Amounts no later than fifteen (15) days after the Measurement Dates.

**Market Value**. Market Value with respect to the shares issued as part of the Principal, means the aggregate gross proceeds received by the Holder from one or more sales, as evidenced by brokerage statements for such sales; *provided, however,* that if the sale price is not reasonably related to the trading price on the sale date, such sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale.

        (b)    **Termination of Rights Under this Note**. Immediately upon the payment of the Principal and/ or any applicable True up Amount due under this Note, this Note shall no longer be deemed outstanding and all rights with respect to this Note shall immediately cease and terminate, subject to clause 1(a)(ii) of this Note.

        (c)    **Taxes or other Issuance Charges**.   The issuance of any shares of Common Stock in payment of this Note, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance.   The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(d)     **Holder Not a Stockholder**.  The Holder shall not have, solely on account of such status as a holder of this Note, any rights of a stockholder of the Company, either at law or in equity, or any right to any notice of meetings of stockholders or of any other proceedings of the Company until such time as this Note has been paid in shares of Common Stock pursuant to Section 1(a), at which time the Holder shall be deemed to be the holder of record of Common Stock that has been issued, as applicable, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(e)     **Fractional Shares**.  No fractional shares of Common Stock shall be issued when paying this Note.  In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up or down to the nearest whole share of Common Stock.

(f)     **Payment in Common Stock or Cash**.  Each Payment may be paid by the Company in cash or shares of its Common Stock, at its sole discretion; provided, however, that if the Common Stock is not then listed or quoted on a Trading Market (or a similar organization or agency succeeding to its functions of reporting prices), then the Company may not pay by issuing shares of its Common Stock.

(g)     The Company shall at all times reserve and keep available out of its authorised but unissued shares of capital stock, solely for the purpose of effecting the conversion of the Note, fifty times the number of Common shares issuable from time to time upon such conversion and if at any time the number of authorised but unissued Common shares shall not be sufficient to effect the conversion of the Note, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorised but unissued Common Shares to such number of shares as shall be sufficient for such purpose.

2.     **Trading Market Limitations**.  Unless permitted by the applicable rules and regulations of the principal securities market on which the Common Stock is then listed or traded, in no event shall the Company issue upon conversion of or otherwise pursuant to this Note and the other Notes issued pursuant to the Exchange Agreement more than the maximum number of shares of Common Stock that the Company can issue pursuant to any rule of the principal United States securities market on which the Common Stock is then traded (the "Maximum Share Amount"), which shall be 4.99% of the total shares outstanding on the Closing Date, subject to equitable adjustment from time to time for stock splits, stock dividends, combinations, capital reorganizations and similar events relating to the Common Stock occurring after the date hereof.

3.     **Ranking**.  The Company, for itself, its successors and assigns, covenants and agrees, that the payment of the Principal of this Note is senior in right of payment to the payment of all existing and future Junior Debt (as defined below).  "**Junior Debt**" shall mean all existing and future Indebtedness (as defined below), (B) Indebtedness (as defined below) incurred after the date hereof, solely as it relates to the Collateral, and (C) as otherwise agreed to by the Holder in writing.  "**Indebtedness**" shall mean (x) any liability of the Company for borrowed money, (1) evidenced by a note, debenture, bond or other instrument of indebtedness (including, without limitation, a purchase money obligation), including any given in connection with the acquisition

3

of property, assets or service, or (2) for the payment of rent or other amounts relating to capitalized lease obligations; (y) any liability of others of the nature described in clause (1) which the Company has guaranteed or which is otherwise its legal liability; and (z) any modification, renewal, extension, replacement or refunding of any such liability described in clause (x) or (y); provided, that Indebtedness does not include unsecured trade credit.

(a)     The Company covenants and agrees to cause any current holder of Junior Debt and to cause any future holder of Junior Debt permitted to be incurred pursuant to this Note to execute such subordination agreements, instruments or waivers as may be necessary to reflect the terms set forth herein.

(b)     Until the payment in full of all amounts of principal of this Note, and all other amounts owing under this Note, no payment may be made with respect to the principal of or other amounts owing with respect to any Junior Debt, or in respect of any redemption, retirement, purchase or other acquisition thereof, provided that the Company may pay scheduled interest thereon so long as no Event of Default shall have occurred and be continuing.

(c)     Upon any payment or distribution of the assets of the Company to creditors upon dissolution, total or partial liquidation or reorganization of, or similar proceeding, the Holder of the Note will be entitled to receive payment in full before any holder of Junior Debt is entitled to receive any payment.

4.     **Events of Default**.  The entire unpaid principal of this Note or any True up Amounts shall become and be immediately due and payable in cash or shares of Common Stock of the Company, in either case without any other notice or demand of any kind or any presentment or protest, if any one of the following events occurs and be continuing at the time of such demand (each such event, an "**Event of Default**"):

(a)     The Company's failure to pay any portion of the principal as provided in Section 1 hereof; or

(b)     (i) The commencement by the Company, or any subsidiary, of a voluntary case under 11 U.S.C. Section 101 *et. seq.* (the "Bankruptcy Code") or any foreign, federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or (ii) the consent by the Company, or any subsidiary, to the entry of an order for relief in an involuntary bankruptcy or similar case, or to the conversion of an involuntary case to a voluntary case, under any such law, or (iii) the consent by the Company, or any subsidiary, to the appointment of, or the taking of possession by, a receiver, trustee or other custodian for all or a substantial part of the Company's properties, or (iv) the making by the Company, or any subsidiary, of any assignment for the benefit of creditors, or (v) the admission by the Company, or any subsidiary, in writing of the Company's inability to pay the Company's debts as such debts become due, or (vi) the discontinuance of business, dissolution, winding up, liquidation or cessation of existence by or of the Company, or any subsidiary; or

(d)     (i) The entry by a court of competent jurisdiction a decree or order for relief with respect to the Company, or any subsidiary, in an involuntary case under the Bankruptcy Code or any applicable foreign, federal or state bankruptcy, insolvency or other

similar law now or hereafter in effect, which decree or order is not stayed or dismissed within 60 days of the entry thereof, or (ii) the entry by a court of a decree or order for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other person having similar powers over the Company or over all or a substantial part of its properties;

(f)     The Company materially breaches any covenant contained in the Exchange Agreement; or

The Company agrees that if it fails to timely make any payment due under this Note or upon the happening of any Event of Default, and fails to remedy the situation within a ten (10) day grace period, the outstanding principal, together with all other expenses, including, reasonable attorneys' fees, shall immediately become due and payable at the option of the Holder.   For purposes hereof, attorneys' fees shall include, without limitation, fees and disbursements for legal services incurred by the holder hereof in collecting or enforcing payment hereof whether or not suit is brought, and if suit is brought, then through all appellate actions. From and after any Event of Default, the interest rate of this Note shall be the highest rate permitted under applicable law.

5.     **Miscellaneous.**

(a)     The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; *provided, however,* that neither party may assign any of its rights or obligations hereunder without the prior written consent of the other party.  Assignment of all or any portion of this Note in violation of this Section shall be null and void.  Nothing in this Note, expressed or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b)     Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in accordance with Section 11.5 of the Exchange Agreement.

(c)     Upon receipt of evidence satisfactory to the Company, of the loss, theft, destruction or mutilation of this Note (and upon surrender of this Note if mutilated), including an affidavit of the Holder thereof that this Note has been lost, stolen, destroyed or mutilated, together with an indemnity against any claim that may be made against the Company on account of such lost, stolen, destroyed or mutilated Note, and upon reimbursement of the Company's reasonable incidental expenses, the Company shall execute and deliver to the Holder a new Note of like date, tenor and denomination.

(d)     No course of dealing and no delay or omission on the part of the Holder or the Company in exercising any right or remedy shall operate as a waiver thereof or otherwise prejudice the Holder's or the Company's rights, powers or remedies, as the case may be.  No right, power or remedy conferred by this Note upon the Holder or the Company shall be exclusive of any other right, power or remedy referred to herein or now or hereafter available at

law, in equity, by statute or otherwise, and all such remedies may be exercised singly or concurrently. Any waiver must be in writing.

(e)     If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.  This Note may be amended only by a written instrument executed by the Company and the Holder. Any amendment shall be endorsed upon this Note, and all future Holders shall be bound thereby.

(f)     If any date specified in this Note as a date for the making of any payment of principal or interest under this Note falls on a Saturday, Sunday or on a day that is a legal holiday in the State of New York, then the date for the making of that payment shall be the next subsequent day that is not a Saturday, Sunday or legal holiday.

(g)     This Note shall be governed by and construed in accordance with the laws of the New York City, without giving effect to principles governing conflicts of law.

(h)     The Company hereby irrevocably submits to the exclusive jurisdiction of any United States Federal court over any suit, action or proceeding arising out of or related to the Note. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; *provided* that service of process is effected upon the Company in the manner permitted by law.

(i)     The parties hereto agree that all monetary amounts set forth herein are referenced in United States dollars, unless otherwise stated.

*(Remainder of page left intentionally blank. Signature page to follow.)*

6

**IN WITNESS WHEREOF**, the Company has caused this Senior Secured Note to be executed and dated the day and year first above written.

NEWLEAD HOLDINGS LTD.

By:

Name:   Michael S. Zolotas

Title:   Chairman & CEO

# EXCHANGE AGREEMENT

THIS EXCHANGE AGREEMENT (this "Agreement") is dated as of August 4th 2014, entered into and between:

1. NewLead Holdings Ltd., organized under the laws of Bermuda (the "Company"),

and

2. Oppenheim Capital Ltd. established under the laws of the Republic of the Marshall Islands (the "Holder").

*(Jointly the Parties and singly the Party)*

## Preliminary Statement

**WHEREAS**, the Company and the Holder have entered into a Remuneration Agreement dated December 16, 2013, whereby the Company has agreed to pay the Holder as consideration for its services, a a compensation fee of USD2,500,000 (United States Dollars two million five hundred thousand) in Company's common stock, (the "Remuneration").

**WHEREAS**, the Remuneration Fee was settled with the issuance of *1,773,050* Company's shares on December 16th, 2013 (hereinafter the "Success Shares").

**WHEREAS**, the current value of the Success Shares is USD44.02 (United States Dollars forty four and two) and the Holder has now suffered a deficit of USD2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight) (hereinafter the "Deficit").

**WHEREAS**, the Company desire to issue and the Holder desire to accept a 10% Convertible Note of the Company in the form attached hereto as Exhibit A, for the amount up to USD2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight), convertible into shares of common stock at terms and conditions as agreed therein (hereinafter the "Note") in exchange of the *Deficit*.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby agreed and acknowledged, the parties hereby agree as follows:

1. <u>Securities Exchange.</u>

    (a)    Upon the following terms and subject to the conditions contained herein, and in express reliance upon the representations, warranties, covenants, terms and conditions of this Agreement, the Note shall be executed at an even date of this Agreement

    (b)    The closing under this Agreement (the "Closing") shall take place at the Company's offices upon the satisfaction of each of the conditions set forth in Sections 4 and 5 hereof (the "Closing Date").



(c)     At the Closing, the Company shall deliver the original copy of the Note to the Company.

(d)     Upon fulfillment of the representations, conditions and warranties as set forth in this Agreement, the Remuneration Agreement shall be considered as null and void.

2.     Representations and Warranties of the Holder. The Holder represents and warrants to the Company as follows:The Holder is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization.

(b)     The Holder has the full power and authority to enter into this Agreement. This Agreement, when executed and delivered by the Holder, will constitute a valid and legally binding obligation of the Holder, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c)     The Holder understands and acknowledges that the Securities have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Holder is aware that the Company is under no obligation to effect any such registration with respect to the Securities or to file for or comply with any exemption from registration. The Holder has not been formed solely for the purpose of making this investment. The Holder is and will be acquiring the Securities for the Holder's own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Holder has no present intention of selling, granting any participation in, or otherwise distributing the same.

(d)     The Holder acknowledges that the Securities will contain a restrictive legend in substantially the following form:

> THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

(e)     The Holder has (i) been furnished with all information which it deems necessary to evaluate the merits and risks of the purchase of the Securities; (ii) had the opportunity to ask questions concerning the Securities; (iii) had the opportunity to obtain any additional information it deems necessary to verify the accuracy of any information obtained concerning the Securities; and (4) such knowledge and experience in financial and business matters that it is able to evaluate the merits and risks of its investment in the Company and to make an informed investment decision relating thereto.

(f)     The Holder is not receiving the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar

2



media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(g)     The Holder owns and holds, beneficially and of record, the entire right, title, and interest in and to the Note free and clear of all rights and Encumbrances (as defined below). The Holder has full power and authority to transfer and dispose of the Note free and clear of any right or Encumbrance other than restrictions under the Securities Act and applicable state securities laws. Other than the transactions contemplated by this Agreement, there is no outstanding vote, plan, pending proposal, or other right of any person to acquire the Note. "Encumbrances" shall mean any security or other property interest or right, claim, lien, pledge, option, charge, security interest, contingent or conditional sale, or other title claim or retention agreement, interest or other right or claim of third parties, whether perfected or not perfected, voluntarily incurred or arising by operation of law, and including any agreement (other than this Agreement) to grant or submit to any of the foregoing in the future.

(h)     Except as may be disclosed in any filings by the Holder with the Securities and Exchange Commission, Holder has not agreed to act with any other holder of any Company securities for the purpose of acquiring, holding, voting or disposing of the Securities purchased hereunder for purposes of Section 13(d) under the Securities and Exchange Act of 1934, as amended, and Holder is acting independently with respect to its investment in the Securities. The decision of the Holder to purchase Securities pursuant to this Agreement has been made by Holder independently of any other person and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of the Company or of its subsidiaries which may have been made or given by any other person or by any agent or employee of any other person, and no person or any of its agents or employees of such person shall have any liability to Holder (or any other person) relating to or arising from any such information, materials, statements or opinions.

(i)     The Holder understands that the exemption of this transaction from registration under applicable federal and state securities laws is dependent on the accuracy of the foregoing representations and warranties.

**3.**     **Representations and Warranties of the Company.** The Company represents and warrants to the Holder as follows:The Company is a corporation duly organized, validly existing and in good standing under the laws of Bermuda and has all the requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted.

(b)     The Company has the full power and authority to enter into this Agreement. This Agreement, when executed and delivered by the Company, will constitute a valid and legally binding obligation of the Company, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c)     The Securities, when issued, sold and delivered in accordance with the terms hereof and for the consideration expressed herein, will be duly and validly issued, fully paid and non-assessable, and based in part upon the accuracy of the representation and warranties of the Holder in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

(d)     None of the execution, delivery and performance by the Company of this Agreement and compliance with the terms and provisions hereof or the consummation of the transactions contemplated

3



hereby will (i) contravene any applicable provision of any applicable law of any governmental authority[1], (ii) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any lien upon any of the property or assets of the Company pursuant to, the terms of any material indenture, loan agreement, lease agreement, mortgage or deed of trust, or any other contractual obligation to which the Company is a party or by which it or any of its property or assets is bound or (iii) violate any provision of the organization documents of the Company, except in the case of clauses (i) and (ii), for any such violations, conflicts, breaches, or defaults or any liens, charges, or encumbrances which would not have a Material Adverse Effect. For purposes of this Agreement, "Material Adverse Effect" shall mean any material adverse effect on the business, operations, properties, prospects, or financial condition of the Company and its subsidiaries and/or any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its obligations under this Agreement in any material respect.

(e)     The delivery and issuance of the Securities in accordance with the terms of and in reliance on the accuracy of Holder's representations and warranties set forth in this Agreement will be exempt from the registration requirements of the Securities Act.

4.     <u>Conditions Precedent to the Obligation of the Company to Issue the Securities.</u>

The obligation hereunder of the Company to issue and deliver the Securities to the Holder is subject to the satisfaction or waiver, at or before the Closing Date, of each of the conditions set forth below. These conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion.

(a)     The Holder shall have executed and delivered this Agreement.

(b)     The Holder shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by such Holder at or prior to the Closing Date.

(c)     Each of the representations and warranties of the Holder in this Agreement shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of the date when made and as of the Closing Date as though made at that time, except for representations and warranties that are expressly made as of a particular date, which shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of such date.

5.     <u>Conditions Precedent to the Obligation of the Holder to Accept the Securities.</u> The obligation hereunder of the Holder to accept the Securities is subject to the satisfaction or waiver, at or before the Closing Date, of each of the conditions set forth below. These conditions are for Holder's sole benefit and may be waived by Holder at any time in its sole discretion.

(a)     The Company shall have executed and delivered this Agreement.

(b)     The Company shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date.

(c)     Each of the representations and warranties of the Company in this Agreement shall be true and correct in all material respects (except for those representations and warranties that are qualified

---

4



by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date when made and as of the Closing Date as though made at that time, except for representations and warranties that speak as of a particular date, which shall be true and correct in all material respects (except for those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of such date.

6.    Value of Securities.

(a)    Upon the earlier of (i) the date of the final sale of all of the Securities by the Holder and (ii) the five years anniversary of this Agreement (either such date, the "Measurement Date"), if the aggregate gross proceeds from the sale of the Securities by the Holder is less than USD2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight) (any such deficit referred to herein as the "True-Up Amount") as evidenced by brokerage statements for such sales; *provided, however,* that if the sale price is not reasonably related to the trading price on the sale date, such sale shall be deemed to have occurred at the highest price at which shares of Common Stock were traded on such date of sale, then the Company shall pay the True-Up Amount to the Holder, in cash, shares of Common Stock or a combination thereof, at the Company's sole option, by no later than fifteen (15) days after the Measurement Date. If the True-Up Amount is to be paid in shares of Common Stock, then the per share price of such shares shall be equal to the Closing Price (as defined below), as adjusted for any stock splits or stock dividends. Notwithstanding the foregoing, if the True-Up Amount is to be paid in shares of Common Stock, in no event shall the aggregate number of shares of Common Stock issued pursuant to this Agreement exceed 4.99% of the Company's shares of Common Stock outstanding at the time of such issuance. The Holder shall notify the Company immediately in writing of the date of final sale of all of the Securities by the Holder. "Closing Price," means the closing price for the trading day immediately prior to (but not including) the Measurement Date, provided the Common Stock is then listed or quoted on any national securities exchange, market or trading or quotation facility (a "Trading Market").

(b)    If the Company elects to pay the True-Up Amount in shares of Common Stock pursuant to Section 6(a), the Holder shall be deemed to be the holder of record of the shares of Common Stock to be issued as of the Measurement Date, notwithstanding that the transfer books of the Company shall then be closed or certificates representing such shares of Common Stock shall not then have been actually delivered to the Holder.

(c)    The issuance of any shares of Common Stock in payment of the True-Up Amount, and the delivery of certificates or other instruments representing the same, shall be made without charge to the Holder for any tax or other charge in respect of such issuance.  The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate or instrument in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate or instrument unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

(d)    No fractional shares of Common Stock shall be issued when paying the True-Up Amount.  In lieu thereof, the shares of Common Stock otherwise issuable shall be rounded up or down to the nearest whole share of Common Stock.

7.    Release.  Upon receipt of the Securities, the Holder agrees and acknowledges that:  (a) all outstanding indebtedness (including, without limitation, for principal, interest and fees) and other liabilities and obligations of the Holder under, or relating to, the Remuneration Agreement shall be deemed to be and shall be paid and satisfied in full and automatically irrevocably discharged, terminated and released; (b) all liens, security interests, pledges, charges, mortgages, claims or other encumbrances granted to or held by Holder (whether held for such party's own benefit and/or the benefit of another party) in any property shall

5

be automatically forever and irrevocably satisfied, released and discharged; and (c) the Remuneration Agreement shall automatically terminate and be of no further force or effect other than those provisions therein that specifically survive termination.

8.   Fees and Expenses. Each party shall pay the fees and expenses of its advisors, counsel, accountants and other experts, if any, and all other expenses, incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. Indemnification.

(a)   The Company hereby agrees to indemnify and hold harmless the Holder and its officers, directors, shareholders, members, managers, employees, agents and attorneys against any and all losses, claims, damages, liabilities and reasonable expenses (collectively "Claims") incurred by each such person in connection with defending or investigating any such Claims, whether or not resulting in any liability to such person, to which any such indemnified party may become subject, insofar as such Claims arise out of or are based upon any breach of any representation, warranty, covenant or agreement made by the Company in this Agreement.

(b)   The Holder hereby agrees to indemnify and hold harmless the Company and its officers, directors, shareholders, members, managers, employees, agents and attorneys against any and all Claims incurred by each such person in connection with defending or investigating any such Claims, whether or not resulting in any liability to such person, to which any such indemnified party may become subject, insofar as such Claims arise out of or are based upon any breach of any representation, warranty, covenant or agreement made by such Holder in this Agreement.

10.   Governing Law; Consent to Jurisdiction.  This Agreement shall be governed by and construed in accordance with the laws of New York, without giving effect to principles governing conflicts of law. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The Company agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon the Company and may be enforced in any court to the jurisdiction of which the Company is subject by a suit upon such judgment; provided that service of process is effected upon the Company in the manner permitted by law.

11.   Notices. All notices and other communications provided for or permitted hereunder shall be made in writing by hand delivery, express overnight courier, registered first class mail, or telecopier (provided that any notice sent by telecopier shall be confirmed by other means pursuant to this Section 11), initially to the address set forth below, and thereafter at such other address, notice of which is given in accordance with the provisions of this Section 11.

(a)   if to the Company:

NewLead Holdings Ltd.
83 Akti Miaouli & Flessa Str.
Piraeus Greece 185 38
Attention: Chief Executive Officer
Tel. No.: +30 213 014 8000
Fax No.: +30 213 014 8019

(b)   if to the Holder:

Oppenheim Capital Ltd.
90 Kapodistriou Ave.



N. Ionia, 14235
Athens, GREECE

Tel: +30 211 311 1111

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; when receipt is acknowledged, if telecopied; or when actually received or refused if sent by other means.

12.    Entire Agreement.  This Agreement constitutes the entire understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior and/or contemporaneous oral or written proposals or agreements relating thereto all of which are merged herein.  This Agreement may not be amended or any provision hereof waived in whole or in part, except by a written amendment signed by all of the parties hereto.

13.    Counterparts.  This Agreement may be executed by facsimile signature and in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7



IN WITNESS WHEREOF, this Agreement was duly executed on the date first written above.

NewLead Holdings Ltd.

By: _____

Name: Michael Zolotas

Title: CEO

Oppenheim Capital Ltd.

By: _____

Name: D. TSOUVELEKAKIS

Title: ATTORNEY

8

This Addendum no. 1 (hereinafter the "**Addendum**") is made on March 16, 2015

**BETWEEN:**

(1) **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**");

-and-

(2) **OPPENHEIM CAPITAL LTD.,** a corporation established under the laws of the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter referred to as "**Oppenheim**").

*(Jointly the Parties, singly the Party)*

**RECITALS**

**WHEREAS,** Pursuant to an Unsecured Convertible Note dated 4th August 2014 (the "**Note**") issued to Oppenheim pursuant to an Exchange Agreement dated August 4th, 2014 entered into and between the Company and Oppenheim (hereinafter called as the same is hereby and as the same may from time to time be further amended, supplemented or varied, the "**Agreement**", together with the Note, the "**Security Agreements**"), the Company promises to pay to Oppenheim the principal amount of USD 2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight cents) (hereinafter the "**Principal Amount**") under the terms and conditions set forth therein.

**WHEREAS,** under the Note dated 4th August 2014 any accrued and unpaid interest on the Note shall be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree as follows:

1. To waive the requirement for any accrued and unpaid interest on the Note to be due and payable in quarterly installments concluding with the final installments on the Maturity Date.

2. That any accrued and unpaid interest on the Note to be paid by the Company on the Maturity Date.

3. That Oppenheim agrees and warrants that it shall sell up to twenty percent (20%) of the Monthly Dollar Volume (as defined herein below) of the Company's Common Stock per month. "Monthly Dollar Volume" means a dollar amount of the Company's Common Stock which is traded in the US public markets in the relevant month in which it is calculated (not including the amount of any shares of the Company's Common Stock traded by Oppenheim).

4. The Agreement as amended by this Addendum represent the entire agreement among the parties hereto with respect to the subject matter hereof and supersede any prior expressions of intent or understanding with respect to this transaction and may be amended only by an instrument in writing executed by the party or parties to be bound or burdened thereby.

5. This Addendum shall be governed by and construed by and interpreted in accordance with the internal laws of the state of New York.

**(SIGNATURE PAGE FOLLOWS)**

**IN WITNESS WHEREOF**, the Parties have hereunto set their hands and affixed their seals as of the day and year first above written.


**NEWLEAD HOLDINGS LTD.**

By: _____

Name: Michail S. Zolotas

Title: CEO/ Chairman


**OPPENHEIM CAPITAL LTD.**

By: _____

Name: D. TSOUVELEKAKIS

Title: ATTORNEY

**Remuneration Agreement**
**(the "Agreement")**

Dated 16th December 2013

This Agreement is entered into and between:

1) NewLead Holdings Ltd, a Bermuda Corporation, with its registered office at Canon's Court, 22, Victoria Street, Hamilton HM12, Bermuda, and with a Greek office at 83, Akti Miaouli Street, Piraeus 185 38, Greece, (hereinafter the "Company") and

2) Oppenheim Capital Ltd., a company duly established under the laws of the Marshall Islands (hereinafter "Oppenheim").

(together the Parties, each a Party)

**Introduction**

**WHEREAS**, the Company concluded a business transaction relating to the acquisition of two mines, namely the "Viking" and the "Marrowbone" mines, and a wash plant, all situated in Kentucky, USA (the "Assets").

**WHEREAS**, pursuant to an Engagement Letter dated April 4th, 2013, entered into and between the Company and Oppenheim, Oppenheim was engaged to act as the Company's financial advisor and to this end it managed to obtain a financial offer for the acquisition of the Assets.

**WHEREAS**, in consideration for the services rendered, the Parties have agreed to a compensation fee consisting of (a) USD500,000 (United States Dollars five hundred thousand) in cash, (the "Funds") and (b) a warrant up to the amount of USD1,800,000 (United States Dollars one million eight hundred thousand) (the "Warrant", together with the Funds, the "Remuneration")

**WHEREAS**, the Company offered to Oppenheim in full and final settlement of the Remuneration USD2,500,000 (United States Dollars two million five hundred thousand) worth of shares of common stock of the Company (the "Remuneration Shares").

**NOW, THEREFORE**, the Parties hereto hereby agree as follows:

1. Oppenheim accepts the offer of the Company to receive in full and final settlement of the Remuneration, the Remuneration Shares.

2. The Company hereby agrees to issue the Remuneration Shares to Oppenheim and/ or its nominated assignees.

3. Subject to the terms and conditions hereof, the number of shares to be issued shall be determined by dividing USD2,500,000 (United States Dollars two million five hundred thousand) by the closing price of the last trading day prior the execution date of this Agreement (the "Stock Price").

4. Oppenheim and/or its nominated assignee(s) hereby represent and warrant to the Company that:

a. is a duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, and all necessary corporate or other entity action.

b. is not a U.S. person ("U.S. person") as that term is defined in Regulation S of the Securities Act.

c. the execution, delivery and performance of this Agreement have been duly authorized and constitute valid and legal.

d. has (1) been furnished with all information which it deems necessary to evaluate the merits and risks of the purchase of the Remuneration Shares; (2) had the opportunity to ask questions concerning the Remuneration Shares; (3) has had the opportunity to obtain any additional information it deems necessary to verify the accuracy of any information obtained concerning the Remuneration Shares; and (4) such knowledge and experience in financial and business matters that it is able to evaluate the merits and risks of purchasing the Remuneration Shares and to make an informed investment decision relating thereto.

e. is not receiving the Remuneration Shares as a result of any advertisement, article, notice or other communication regarding the Remuneration Shares published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

f. understands that the exemption of this transaction from registration under applicable U.S. Securities Laws is dependent on the accuracy of the foregoing representations and warranties and indemnifies the Company and the Company from any damages resulting from any inaccuracy therein.

5. As of the one year anniversary of the Closing date or such earlier date that Oppenheim and/or its nominated assignees liquidate the Remuneration Shares and their market value is less than the aggregate of USD2,500,000 (such deficit, the "True-Up Amount"), then the Company shall pay the True-Up Amount to Oppenheim and/or its nominated assignees, in shares of Common Stock by no later than ten (10) business days after the date that the Remuneration Shares have been liquidated. The per share price of such shares shall be equal to the Stock Price.

6. Notices. All communications, notices, requests, consents or demands given or required under this Agreement shall be in writing and shall be deemed to have been duly given when delivered to, or received by prepaid registered or certified mail or recognized overnight courier addressed to, or upon receipt of a facsimile sent to, the party for whom intended, at the address set forth opposite such party's name on the signature page.

7. This Agreement and any instruments to be executed hereunder, set forth the entire understanding of the parties hereto with respect to its subject matter, and supersede all other understandings. No waiver of any provision of this Agreement shall be deemed to be a waiver of the same or any other provision in any other instance. Failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of its rights under such provision.

(Signature Page to follow)



2

SIGNED, SEALED and DELIVERED as a DEED )
By )
for and on behalf of )
**Oppenheim Capital Ltd.** )
in the presence of: )

D. TSOUVELEKALIS - DIRECTOR          16/12/13

OPPENHEIM CAPITAL LTD

SIGNED, SEALED and DELIVERED as a DEED )
By Michael Zolotas, CEO / Director )
for and on behalf of )
**NEWLEAD HOLDINGS LTD of Bermuda** )
in the presence of: )

3

DATE: 14 September 7 July 2015

NEWLEAD HOLDINGS LTD.
Of Bermuda

-and-

OPPENHEIM CAPITAL LTD.
Of the Republic of the Marshall Islands

ADDENDUM No. 2

to

the Unsecured Convertible Note dated 4th August 2014.
In the amount of USD2,499,955.98 (United States Dollars two million four hundred ninety nine
thousand nine hundred fifty five and ninety eight cents)

THIS ADDENDUM No. 2 is made on this 147th day of July September 2015,

**BETWEEN:**

(1)     **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the "**Company**"); and

(2)     **OPPENHEIM CAPITAL LTD.,** a corporation established under the laws of the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter referred to as "**OPPENHEIM**" or "**Holder**");

*(Jointly the "Parties", singly the "Party").*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note or previous Addendum(s).*

**WHEREAS,** Pursuant to an Unsecured Convertible Note dated 4th August 2014 as amended by an Addendum No.1 dated March 16, 2015, issued by the Company to OPPENHEIM (hereinafter called as the same as has been and as may from time to time be further amended, supplemented or varied the "**Note**"), the Company promises to pay to OPPENHEIM the principal amount of USD 2,499,955.98 (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight cents) (hereinafter the "**Principal Amount**") under the terms and conditions set forth therein.

**WHEREAS,** in consideration of the payment of the Note, a Third Preferred Liberian Mortgage m.v. "NEWLEAD CASTELLANO" has been issued between NEWLEAD CASTELLANO LTD and OPPENHEIM dated 16 October 2014 (the "**Mortgage**"), pursuant to which "Events of Default" shall mean any events or circumstances set out in clause 4 of the Note as amended by this Addendum.

**WHEREAS, the Maturity Date of the Note is 4 August 2016.**

**WHEREAS,** pursuant to the Note, the Company shall at all times reserve and keep available out of its authorised but unissued shares of its Common Stock, available fifty times the number of Common shares that are actually issuable upon conversion of the Note.

**WHEREAS,** pursuant to Addendum No. 1 of the Note dated March 16th 2015 (the "**Addendum No. 1**"), the parties agreed as follows:
-    To waive the requirements for any accrued and unpaid interest of the Note to be due and payable in quarterly instalments concluding with the final instalments on the Maturity Date.
-    That any accrued and unpaid interest on the Note to be paid by the Company on the Maturity Date.

2

- That Oppenheim agrees and warrants that its shall sell up to twenty percent (20%) of the Monthly Dollar Value (as defined herein below) of the Company's Common Stock per month. "Monthly Dollar Volume" means a dollar amount of the Company's Common Stock which is traded in the U.S. public markets in the relevant month in which it is calculated (not including the amount of shares of the Company's Common Stock traded by Oppenheim).

**NOW THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree to amend the Note as follows:

1. To waive the Company's obligation to reserve fifty times the number of Common shares that are actually issuable upon conversion of the Note, such waiver being effective as from the date of execution of the Note.

2. That the Company as from the date hereof, shall at its discretion reserve, but always keep available out of its authorized but unissued shares of capital stock, such shares of Common Stock as shall from time to time be sufficient to effect any conversions of this Note.

3. To amend Clause 1 of the Note (Payments) such that any and all Payments effected on the Maturity Date are to be due in cash and not in stock. Specifically, the Company Agrees that:

   a. Any amount of the Note, including the Principal and any accrued unpaid interest thereon and any True-up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder. Failure to pay any amounts pursuant to this clause shall constitute an Event of Default under clause 4 of the Note as ~~this has been amended by addendum No. 1 and is further~~ amended hereby or may be ~~further~~ amended from time to time.

   b. ~~As of the date hereof, at an Event of Default pursuant to clause 4 of the Note, the entire unpaid Principal and accrued interest of the Note and any True-up Amounts shall shall become due and payable immediately in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder.~~ [Comment [e1]: THIS IS A REPETITION OF CL. 3A]

4. To amend clause 4 of the Note (Events of Default), and to add as an additional Event of Default, that for any of the last ~~ninety thirty~~ (390) calendar days preceding the Maturity Date:

   a. ~~The failure of the Company's Common Stock to be traded on a National Market System ("NMS") as defined by the U.S. S.E.C. 17 CFR Part § 242.600 (NMS Security Designation and Definitions).~~

   b. ~~The Company's Common Stock Market Capitalization (defined as the total outstanding shares multiplied by the closing stock price) to be less than five (5) times~~

3

~~the total Outstanding Note Amount (defined as the Principal and any accrued interest thereon and any True-up-Amount remaining unpaid of the Note).~~

c.a. The Company's Common Stock to be ~~traded~~ quoted on the OTCQX, OTCQB, or OTC Pink market.

~~d.   The Daily Average Dollar Volume of the Company's Common Stock to be less than $100,000 (one hundred thousand dollars).~~

5.   The Maturity Date is deferred to 4 August 2018.

~~5.~~6.   All other provisions of the Note shall remain in full force and effect.

~~6.~~7.   This Addendum shall in all respects be governed by, and construed in accordance with the internal laws of the State of New York.


**IN WITNESS WHEREOF,** the presents have been duly executed the day and year first before written.


**SIGNED** by:                                          )
M. ZOLOTAS                                              )
for and on behalf of:                                   )
**NEWLEAD HOLDINGS LTD .**                              )
in the presence of:                                     )



~~ACKNOWLEDGED~~ SIGNED by:                              )
                                                        )
for and on behalf of:                                   )
**OPPENHEIM CAPITAL LTD.**                              )
in the presence of:                                     )

4

DATE: 14 September 2015

NEWLEAD HOLDINGS LTD.
Of Bermuda

-and-

OPPENHEIM CAPITAL LTD.
Of the Republic of the Marshall Islands

ADDENDUM No. 2

to

the Unsecured Convertible Note dated 4st August 2014.
In the amount of USD2,499,955.98 (United States Dollars two million four hundred ninety nine
thousand nine hundred fifty five and ninety eight cents)

**THIS ADDENDUM No. 2 is made on this 14th day of September 2015,**

**BETWEEN:**

(1)   **NEWLEAD HOLDINGS LTD.,** a corporation incorporated under the laws of the Islands of Bermuda having its registered office at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda (hereinafter called the **"Company"**); and

(2)   **OPPENHEIM CAPITAL LTD.,** a corporation established under the laws of the Republic of the Marshall Islands having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter referred to as **"OPPENHEIM"** or **"Holder"**);

*(Jointly the "Parties", singly the "Party").*

*Terms used, but not otherwise defined, in this Addendum have the same meaning as those in the Note or previous Addendum(s).*

**WHEREAS,** Pursuant to an Unsecured Convertible Note dated 4th August 2014 as amended by an Addendum No.1 dated March 16, 2015, issued by the Company to OPPENHEIM (hereinafter called as the same as has been and as may from time to time be further amended, supplemented or varied the **"Note"**), the Company promises to pay to OPPENHEIM the principal amount of USD 2,499,955.98  (United States Dollars two million four hundred ninety nine thousand nine hundred fifty five and ninety eight cents) (hereinafter the **"Principal Amount"**) under the terms and conditions set forth therein.

**WHEREAS,** in consideration of the payment of the Note, a Third Preferred Liberian Mortgage m.v. "NEWLEAD CASTELLANO" has been issued between NEWLEAD CASTELLANO LTD and OPPENHEIM dated 16 October 2014 (the **"Mortgage"**), pursuant to which "Events of Default" shall mean any events or circumstances set out in clause 4 of the Note as amended by this Addendum.

**WHEREAS,** the Maturity Date of the Note is 4 August 2016.

**WHEREAS,** pursuant to the Note, the Company shall at all times reserve and keep available out of its authorised but unissued shares of its Common Stock, available fifty times the number of Common shares that are actually issuable upon conversion of the Note.

**WHEREAS,** pursuant to Addendum No. 1 of the Note dated March 16th 2015 (the **"Addendum No. 1"**), the parties agreed as follows:
- To waive the requirements for any accrued and unpaid interest of the Note to be due and payable in quarterly instalments concluding with the final instalments on the Maturity Date.
- That any accrued and unpaid interest on the Note to be paid by the Company on the Maturity Date.
- That Oppenheim agrees and warrants that it shall sell up to twenty percent (20%) of the Monthly Dollar Value (as defined herein below) of the Company's Common Stock per month. "Monthly Dollar Volume" means a dollar amount of the Company's

Common Stock which is traded in the U.S. public markets in the relevant month in which it is calculated (not including the amount of shares of the Company's Common Stock traded by Oppenheim).

**NOW THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged) the Parties do hereby agree to amend the Note as follows:

1. To waive the Company's obligation to reserve fifty times the number of Common shares that are actually issuable upon conversion of the Note, such waiver being effective as from the date of execution of the Note.

2. That the Company as from the date hereof, shall at its discretion reserve, but always keep available out of its authorized but unissued shares of capital stock, such shares of Common Stock as shall from time to time be sufficient to effect any conversions of this Note.

3. To amend Clause 1 of the Note (Payments) such that any and all Payments effected on the Maturity Date are to be due in cash and not in stock. Specifically, the Company Agrees that:
    a. Any amount of the Note, including the Principal and any accrued unpaid interest thereon and any True-up Amount or any other amount thereof, remaining unpaid on the Maturity Date shall become due and payable in cash by the Company without any other notice or demand of any kind or any presentment or protest by the Holder. Failure to pay any amounts pursuant to this clause shall constitute an Event of Default under clause 4 of the Note as is amended hereby or may be further amended from time to time.

4. To amend clause 4 of the Note (Events of Default), and to add as an additional Event of Default, that for any of the last thirty (30) calendar days preceding the Maturity Date:
    a. The Company's Common Stock to be quoted on the OTCQX, OTCQB, or OTC Pink market.

5. The Maturity Date is deferred to 4 August 2018.

6. All other provisions of the Note shall remain in full force and effect.

7. This Addendum shall in all respects be governed by, and construed in accordance with the internal laws of the State of New York.

**IN WITNESS WHEREOF**, the presents have been duly executed the day and year first before written.

SIGNED by:                               )
M. ZOLOTAS                               )
for and on behalf of:                    )
**NEWLEAD HOLDINGS LTD .**               )
in the presence of:                      )


SIGNED by:                               )
                                         )
for and on behalf of:                    )
**OPPENHEIM CAPITAL LTD.**               )
in the presence of:                      )

3

**NOTICE OF ASSIGNMENT OF CONVERTIBLE PROMISSORY NOTE**

To:     NewLead Holdings Ltd. (hereinafter "NewLead")
        Canon's Court 22, Hamilton HM12
        Bermuda

Date:   May 19th 2015

Dear Sirs,

We refer to the Convertible Promissory Note in the amount of USD 2,190,320 (United States Dollars two million one hundred ninety thousand three hundred twenty) issued by NewLead to **Oppenheim & Co. Limited** (hereinafter "OppCo") (the "Note").

**NOW WE HEREBY GIVE YOU NOTICE THAT:**

1. We have assigned to **LABROY SHIPTRADE LIMITED**, a Marshall Islands company (Reg. No. 72822) with registered address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (hereinafter "LABROY" or the "Assignee"), the amount of **USD 1,215,000** (United States Dollars one million two hundred fifteen thousand) of the Note from the inception of the Note (the "Assignment"), including our rights, title, interest and benefits resulting pro-rata therefrom of the Note.

2. You are hereby irrevocably authorized and instructed by us to issue a Convertible Promissory Note to LABROY, under the terms and conditions agreed between NewLead and OppCo of the amount of **USD 1,215,000** (United States Dollars one million two hundred fifteen thousand) and any accrued interest.

3. The authority and instructions herein contained cannot be revoked or varied by us without the consent of the Assignee, to whom a copy of this Assignment Notice is given today.

4. The Assignee's correspondence details are as follows:

   Dimitrios Stavrianos LAW        Tel:    +30 6942 880874
   90 Kapoditriou Avenue           Email:  dstav@stavrianoslaw.com
   N. Ionia, 14235, GREECE

This Notice of Assignment is governed by the Laws of England. In relation to this Notice of Assignment and all claims and disputes arising herefrom, we submit for the exclusive benefit of you to the jurisdiction of the English courts.

For and on behalf of Oppenheim & Co. Limited

DIMITRIOS TSOUVELEKAKIS
OPPENHEIM & CO.LIMITED

Dimitrios Tsouvelekakis, Director
Tudor House, 1st Floor
Le Bordage, St Peter Port
Guernsey, GY1 1DB, Channel Islands

Acknowledged, Agreed and Accepted:

Dimitrios Stavrianos, Director
LABROY SHIPTRADE LIMITED
Trust Company Complex, Ajeltake Road,
Ajeltake Island, Majuro, MH96960, Marshall Islands