# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION
### IN ADMIRALTY

| | | |
|---|---|---|
| **RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED** | § § § § § | |
| **PLAINTIFFS** | § | **C.A. NO. 16-CV-093** |
| **V.** | § § | |
| **M/V NEWLEAD CASTELLANO, IMO NO. 9686338 HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM*, AND NEWLEAD CASTELLANO LTD.** | § § § § § § § § | |
| **DEFENDANTS** | § § | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE ARREST; AND MOTIONS AND BRIEFING IN SUPPORT THEREOF TO:

1. **AUTHORIZE IN CUSTODIA LEGIS EXPENSES**
2. **SELL THE VESSEL; and**
3. **ALLOW PLAINTIFFS TO INSPECT THE VESSEL**

Plaintiffs, Ray Capital Inc. ("Ray"), Oppenheim Capital Ltd. ("Oppenheim Capital"), Cheyenne Holdings Ltd. ("Cheyenne") and Labroy Shiptrade Limited ("Labroy"), through undersigned counsel and upon the First Declaration of Alan Swimmer, dated May 25, 2016 (the "Swimmer Dec.") (Mr. Swimmer is an employee of National Maritime Services, Inc. ("NM") the court-appointed substitute custodian) and the Declaration of Dimitrios Tsouvelekakis, dated May 25, 2016 (the "DT Dec.") respectfully submit this Memorandum in Opposition to Defendants' Motion to Vacate Arrest and Attachment (the "Motion to Vacate") and Motions and Briefing in

Support Thereof to (1) Authorize In Custodia Legis Expenses; (2) Sell M/V NEWLEAD CASTELLANO (the "Vessel"); and (3) Allow Plaintiffs to Inspect the Vessel, as follows:

**FACTS**

For consistency and the Court's ease of reference, references to defined terms are the same as those used in the First Amended Verified Complaint filed May 12, 2016 (the "Amended Complaint") and in the DT Dec., while references to the exhibits to the Amended Complaint are made as "Complaint Ex. __".

**Procedural Background**

Defendant NewLead Castellano, Ltd. ("NC") filed the Motion to Vacate on May 3, 2016, seeking vacatur of the arrest and attachment of the Vessel pursuant to the Verified Complaint filed by Plaintiffs on April 19, 2016.  Docket 1 and 15.  The Motion to Vacate does not purport to be filed by the Vessel, against which *in rem* claims have been alleged.  *See* Motion to Vacate p. 1. Plaintiffs filed a First Amended Verified Complaint on May 12, 2016 (the "Amended Complaint") which contains several significant revisions.  Docket 18.  Among these, Plaintiffs no longer seek a Rule B attachment related to the Guarantee and Indemnity agreements between Plaintiffs and NC, but continue to assert a Rule B attachment against Defendant NC for breach of the Mortgages.  *See* Amended Complaint.  Plaintiffs also allege a number of additional breaches of the Mortgages, and an additional cause of action for crew wages that were not paid by NC but which have been paid on an emergency basis by Plaintiff Ray.  Id.  Defendants have not filed an amended Rule E Motion addressing these additional breaches and cause of action.  *See* Docket.

Accordingly, it is not procedurally possible for Defendants to obtain the relief they seek because (1) the *in rem* defendant has not moved for this relief; and (2) Defendants have not addressed the allegations of the Amended Complaint.

2

## **Substantive Facts**

As is detailed in the Amended Complaint, Plaintiffs each hold a promissory note, as amended (each a "Note" and together the "Notes") issued by NewLead as follows:

  i.  The Ray Note dated December 27, 2013 in the amount of USD $6,000,000 (the "Ray Note") (Complaint Ex. 1);

  ii.  The Oppenheim Capital Note dated August 4, 2014 in the amount of USD $2,499,955.98 (Complaint Ex. 2);

  iii.  The Cheyenne Note Dated September 12, 2014 in the amount of USD $1,250,000 (Complaint Ex. 3); and

  iv.  The Labroy Note dated May 26, 2015 in the amount of USD $1,215,000 (Complaint Ex. 4).

DT Dec. ¶ 11.

Each Note was initially: (i) convertible to equity in NewLead; or (ii) payable in cash, at NewLead's option, though this eventually became Plaintiffs' option. Complaint Exs. 1 - 4; DT Dec. ¶ 12. Until approximately mid-2014, NewLead's shares were listed on the NASDAQ Global Market. DT Dec. ¶ 13. However, during 2014 NewLead stock declined 99.99% in value. Id.

During 2015, the previous year's precipitous share price decline continued unabated, declining a further 99.6% (in addition to the 2014 decline). DT Dec. ¶ 14. This decline in NewLead's share price coincided with both (i) a civil suit filed in New York alleging fraud and securities laws violations against NewLead; and (ii) a massive ongoing dilution of shareholders from the constant issuance of new shares by NewLead. Id. ¶ 15.

The continual dilution of NewLead shares totally destroyed any value they might have once had. In 2015 alone, the number of outstanding NewLead shares increased from 309,453,336 to 6,637,948,343 shares, an astounding 2,045% increase. DT Dec. ¶ 16.

The Livanos Dec. largely refers to the breaches of the Ray Note, but as the Amended Complaint details, there are breaches of all four Mortgages, including:

3

1. NC has not secured the release of the Vessel within 14 days as required by the Mortgages;
2. NC has allowed significant debt to accumulate against the Vessel;
3. NC has failed to pay the crew on time;
4. NC has failed to maintain insurance cover;
5. NC has not provided audited financial statements; and
6. NC has not, upon information and belief, kept the Vessel in a complete state of repair.

The Motion to Vacate does not address these alleged breaches.

Initially, Ray was able to reduce the indebtedness under the Ray Note by converting some of the debt to NewLead shares and selling them.  DT Dec. ¶ 18.  However, the decline in NewLead's share price, de-listing from NASDAQ, and eventual re-listing on the over-the-counter "grey sheets", ended the ability to meaningfully liquidate NewLead shares and so the remaining indebtedness could not be further reduced in this manner.  Id.

NewLead's inability to pay the Notes in either cash or stock led to a series of requests to amend each Note to make quarterly interest and principal payments due only at maturity and to extend the maturity date of each Note.  DT Dec. ¶ 21.  For example, the Ray Note addendum 3 extended the maturity date of that Note by a year, from December 27, 2014 to December 27, 2015.  Complaint Exs. 1-4; DT Dec. ¶ 21.

Part of the consideration for entering into the addendums to the Notes was the provision of security by NC as guarantor.  DT Dec. ¶ 22.  As is detailed more fully in the Amended Complaint, NC secured the Notes by giving Plaintiffs the Mortgages over the Vessel. Id.

The Livanos Dec. focuses on the language of the Ray Note and specifically addendum 3, which, *inter alia*, provides:

> That the Holder agrees and warrants that it shall sell <u>up to</u> twenty percent (20%) of the Monthly Dollar Volume (as defined below) of the Company's Common Stock per month to reduce the Company's outstanding obligations owing to the Holder pursuant to the Note.

4

Complaint Ex. 1, Ray Note addendum 3 (emphasis added).

Notably, addendum 3 to the Ray Note contains no requirement that Ray sell any minimum volume of NewLead stock.  Put another way, addendum 3 to the Ray Note allowed Ray to sell any amount of NewLead stock from none to twenty percent of the Monthly Dollar Volume.

NC's argument that Plaintiffs, including Ray, can be paid by converting debt to equity (which is at Plaintiffs' sole option) is thus counterfactual in that Plaintiffs were not required to convert any portion of the Notes to NewLead shares to subsequently sell on the public market, but even if they were there was no way to actually do so because the amount owed often exceeded the capitalization of the entire company. DT Dec. ¶¶ 19-20.  In other words, Defendants are arguing that Plaintiffs, including Ray, should have exercised their options to convert debt to equity even though this equity was functionally impossible to sell.[1]

<u>NC Admits That Plaintiffs Could Not Be Paid Even By Selling Shares</u>

Even if Ray had been able to trade NewLead stock, it is and was worth fractions of a penny per share and there is simply no way for Ray or any of the Plaintiffs to be paid this way. DT Dec. ¶ 26.  The Livanos Dec. admits that, even if Ray could have sold NewLead stock, such sales would only have yielded $300,000 (though Plaintiffs deny even this was possible).[2]  Livanos Dec. ¶ 22.

While the parties appear to disagree on the amount due under the Ray Note, the Livanos Dec. admits there is an outstanding balance of least $1,100,000 (Ray alleges $1,671,671 as of

---

[1]   Although it is still traded "over the counter" and is hence a public company (although even this is uncertain, as NewLead has recently failed to make required securities filings), NewLead is a holding company with no inherent value.  DT Dec. ¶ 20. When the Verified Complaint was filed, NewLead's share price was approximately $0.003 with a total market capitalization of approximately $22,000.  Id.  NewLead's market capitalization as of the date hereof is approximately $77,000.  Id.

[2]   The Livanos Dec. argues that Ray could be paid by selling NewLead shares and that the failure to do so is "inexplicable".  Livanos Dec. ¶ 22.  This is incorrect.  DT Dec. ¶ 40.  Plaintiffs have no desire to engage in a complicated legal case that will almost certainly result in a deficiency, and if Plaintiffs had a way to be paid other than by foreclosing on the Vessel, they would certainly take it.  Id.

May 10, 2016).  Livanos Dec. ¶ 13.  But irrespective of which figure is used, the Livanos Dec. is clear that this debt cannot be paid by NewLead or NC.  Plaintiffs' only way to be paid is by foreclosing on the Vessel.

*NC Admits the Default*

As Mr. Livanos concedes, NewLead was unable to pay the Ray Note when it matured. Livanos Dec. ¶ 23.  This failure was due to NewLead's precarious financial position and the collapse of its shares, not any action or omission of Ray or any other Plaintiff.  DT Dec. ¶ 28.

*NC Admits There Was No Additional Extension of the Ray Note*

Mr. Livanos also concedes that NewLead proposed a fifth addendum to the Ray Note, seeking to extend the maturity date by another year.  Livanos Dec. ¶ 24.  As Mr. Livanos admits however, Ray did not agree to this proposed additional extension.  Id.

NC argues that Ray's refusal to grant an additional, year-long, extension of the Ray Note's maturity date was contrary to the course of dealing between the parties.  Livanos Dec. ¶ 24. However, there is no course of dealing by which Ray, or any other Plaintiff, agreed to extend any of the Notes.  DT Dec. ¶ 30.  Cognizant of the fact that entering into one addendum does not obligate the parties to enter into additional modifications, NC also alleges that Plaintiffs breached an agreement to extend the maturity dates of the Notes.  Livanos Dec. ¶ 27.  However, there is no such agreement and NC cannot point to any evidence of one.  DT Dec. ¶ 31.

NC is desperately trying to paint the addendum extending the maturity date of the Ray Note as a *carte blanche* agreement to allow as many extensions as NewLead wants.  DT Dec. ¶ 31.  However, there is no evidence that supports this view, and there is certainly no law requiring such a result (indeed, if there were such a rule, no contracts would ever be amended or modified).

6

As NC concedes, following NewLead's failure to pay the Ray Note by the December 27, 2015 maturity date, Ray sent a notice of default to NewLead and NC.  Livanos Dec. ¶ 25.  Ray gave the required period to cure the default, but payment was not forthcoming from either obligor.  Id.; DT Dec. ¶ 32.

Plaintiffs were not unsympathetic to NewLead despite the default.  DT Dec. ¶ 33.  To the contrary, no immediate action was taken, and Plaintiffs introduced NewLead to a third party that expressed interest in refinancing the Vessel.  Id.  In a series of discussions and E-mail and text exchanges with Mr. Zolotas, NewLead's principal, Plaintiffs offered to facilitate a refinancing agreement that would provide a cash component to the Plaintiffs but also contemplated subordinating some of the debt due under the Notes, thus surrendering the first mortgages held by Plaintiffs.  Id. ¶ 34.

Unfortunately, NewLead was overly optimistic in valuing the Vessel, and proved unable to consummate the refinancing.  DT Dec. ¶ 35. Where NewLead had represented that the Vessel was worth about $8,000,000 – a sum sufficient to fully secure Plaintiffs' claims – it appears her true value is $7,000,000 or less.  Id. ¶ 36.

In the intervening months following the default, the Vessel moved from an idle position in the Philippines and Plaintiffs were advised that she was headed to Savannah to discharge a cargo of sugar.  DT Dec. ¶ 38.  The voyage was lengthy, but during this time NewLead made no effort to pay the Ray Note nor to provide the third-party financier with information requested by them to progress the proposed refinancing of the Vessel.  Id.

Plaintiffs were advised by U.S. counsel that failure to pay the Ray Note is an event of default entitling Ray to call on the Guarantee and Indemnity, which is secured by the maritime Mortgage issued by the Vessel's flag state.  DT Dec. ¶ 39.  The Mortgage gives Ray a maritime

lien over the Vessel, entitling Ray to foreclose.  Id.  Defendants do not contest the establishment and validity of Plaintiffs' maritime liens.  *See* Livanos Dec.

*The Arrest*

The Vessel was arrested April 19, 2016 while she was at the Imperial Sugar Company terminal in Savannah discharging her cargo.  Docket 12.  It quickly emerged that the Vessel had limped into Savannah with a long trail of unpaid debts and with the crew unpaid since January.  Swimmer Dec. ¶ 18-19, Ex. 4.  In fact, the Vessel crew threatened to stop discharge operations if they were not paid, and the Vessel's provisions were also low (NC has not provisioned the Vessel since her arrival on April 19, 2016).  Amended Complaint ¶ 72.

NewLead has corresponded with the substitute custodian, and has advised that the Vessel has numerous unpaid pre-arrest debts totaling at least $279,941.49, specifically for various goods and/or services provided to the Vessel.  Swimmer Dec. ¶ 18-20 and Ex. 4.  NewLead advised that the underlying providers need to be paid immediately "so that the vessel is maintained in a seaworthy state".  Id., Ex. 4.

Ray paid the crew of the Vessel their wages for February, 2016, including arranging the payment of wages to home bank accounts, mostly in the Philippines.  DT Dec. ¶ 42.  These payments totaled $48,876.93 and were made through the substitute custodian.  Id., Ex. 1.  Plaintiffs have also funded NM by advancing $139,982.00 toward the care of the Vessel, including arranging the delivery of provisions, including food, and supplies.  Id. ¶ 43.

The Vessel's debt includes unpaid insurance premiums and communications invoices.  Swimmer Dec. ¶¶ 18-20.  These debts are further evidence that NewLead and NC are out of money and are unable to pay even the costs of the Vessel, let alone the Notes.  DT Dec. ¶ 44.  However, the failure to pay insurance is particularly problematic because the insurance is

assigned to Plaintiffs so that in the event of a casualty the value of Vessel as collateral is protected.  Id. ¶ 45.  The failure to pay the communications invoices is also a threat to the Vessel's well-being because it risks rendering her unable to communicate in the event of an emergency, which greatly increases the chance of an accident.  Id. ¶ 46.

NC has not taken any steps to pay the costs of the Vessel or care for her crew and has allowed significant debt to accumulate on her, including some that primes Plaintiffs' mortgages. This impairment to Plaintiffs' security is continuing and ongoing because the *in custodia legis* costs increase every day, and these debts reduce the net recovery available to the Vessel's creditors.

In this case, the substitute custodian has advised that since the arrest the Vessel has incurred (or will incur in the next 30 days) approximately $403,859.48 in additional expenses in addition to the $279,941.49 NC advised must be paid immediately.  Swimmer Dec. ¶ 31.  On top of these figures are the wages for February, March and April up to April 19, 2016, which have not been paid by NC.  DT Dec. ¶ 41.  March wages were $48,876.93, and it is anticipated that the balance of wages due from the pre-arrest period will add approximately $100,000 to this, for a total of about $148,876.93 in unpaid pre-arrest wages.  *See* DT Dec. ¶ 42.

In sum, the Vessel currently has about $832,677.90 in debt and *in custodia legis* costs that NC is either unable or unwilling to pay.  NC has taken no steps to care for the Vessel or her crew in the five weeks since the Vessel was arrested, and has not even provisioned her.  Under the circumstances, it appears that NC has functionally abandoned the Vessel to her creditors.

80435365v1

## LEGAL ARGUMENT

### Legal Standard

The legal standard for challenging a F.R.Civ.P. Rule B attachment and a Rule C arrest are well-established and do not appear to be in dispute here.   Pursuant to F.R.Civ.P. Rule E(4)(f), "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules."   Plaintiffs thus bear the burden of making a *prima facie* case showing why the Rule B attachment and the Rule C arrest are valid.   *See, e.g., Aqua Stoli v. Gardner Smith Pty. Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006).

Plaintiffs note that much of the Motion to Vacate is directed at the Rule B attachment based on the Guarantee and Indemnity Agreements.   However, this cause of action is not continued in the Amended Complaint, and so NC's argument (Motion to Vacate Point 1, pp. 10 – 14) on this point is irrelevant.

In order to challenge the arrests and attachments in this case, NC must offer some colorable evidence in support of its arguments.   NC supports the Motion to Vacate with the Livanos Dec., but Mr. Livanos is not an officer, director or employee of NC or NewLead.   *See* Livanos Dec.   Mr. Livanos states that he is a director with NewLead Bulkers S.A. ("NewLead Bulkers"), the manager of the Vessel.   Id. ¶ 1.   However, NewLead Bulkers is not a party to this action, does not own the Vessel, and is not a party to any of the Notes, Mortgages, Guarantees, or Assignments at issue in this case.   *See* Amended Complaint and exhibits.   Accordingly, the Livanos Dec. is on its face not provided by someone with actual knowledge or an officer, director, or employee of a party to this action or even of a party to the underlying agreements.

10

Equally fatally for the Motion to Dismiss, it does not address the Amended Complaint. When NC made the decision to essentially abandon the Vessel and make no provision for her care or that of her crew, a number of additional events of default under the Mortgages occurred, all of which are alleged in the Amended Complaint.  NC elected, for whatever reason, not to revise the Motion to Dismiss and to leave these allegations unchallenged.  The additional events of default under the Mortgages are accompanied by an additional cause of action related to the unpaid crew wages, which also give rise to a lien and arrest cause of action.  NC has apparently chosen not to address this cause of action either.

Even if the Livanos Dec. is considered, Plaintiffs have convincingly shown why they are entitled to the attachment and arrest of the Vessel on all of the causes of action alleged in the Amended Complaint.

## Point 1

### The Amended Complaint and DT Dec. Establish Plaintiffs' Prima Facie Case

The Amended Complaint alleges four separate causes of action:

1.  Rule C foreclosure by Ray for breach of the Ray Note;

2.  Rule C foreclosure by all Plaintiffs for breach of the Mortgages;

3.  Rule C foreclosure by Ray for unpaid crew wages; and

4.  Rule B attachment by all Plaintiffs for breach of the Mortgages.

In order for Plaintiffs to make out a *prima facie* case for the Rule C arrests, Plaintiffs must show that they are enforcing a maritime lien:

[a]n action in rem may be brought:

(a) To enforce any maritime lien;

(b)  Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto.

11

Except as otherwise provided by law a party who may proceed in rem may also, or in the alternative, proceed in personam against any person who may be liable.

F.R.Civ.P. Rule C(1)

Plaintiffs demonstrate their *prima facie* case for each challenged cause of action below:

*Cause of Action 1: Ray Has a Maritime Lien and can Foreclose for Breach of the Ray Note*

In this case, there is no dispute that the Ray Note is validly secured by the Guarantee and Indemnity issued by NC.  The Guarantee and Indemnity provide for the Mortgage over the Vessel, which is duly registered with the Vessel's flag state.  Amended Complaint Exs. 1 and 7. Pursuant to 46 U.S.C. §31325:

> (a) A preferred mortgage is a lien on the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by the vessel.
>
> (b) On default of any term of the preferred mortgage, the mortgagee may--
>
> (1) enforce the preferred mortgage lien in a civil action in rem for a documented vessel, a vessel to be documented under chapter 121 of this title, a vessel titled in a State, or a foreign vessel. . .

Accordingly, there is no doubt that Ray has a valid maritime lien over the Vessel.  There is also no question that if there is a default under the Mortgage, Ray has the right to proceed in a civil action *in rem*.

Ray has alleged that neither NewLead nor NC has paid the Ray Note.  Amended Complaint ¶ 52.  The Livanos Dec. admits that NewLead failed to pay the Ray Note when it became due December 27, 2015.  Livanos Dec. ¶ 23.  The Livanos Dec. attempts to shift the blame for this failure to Ray, arguing that Ray should have converted debt to equity and sold this on a non-existent market.  Id.  However, Mr. Livanos concedes that even if Ray managed to do this (and Ray contends it was not obligated to and could not) the sale would only have netted $300,000.  Mr. Livanos also admits that there is at least $1,100,000 due and owing under the Ray

12

Note, though Plaintiffs dispute this figure as too low.   Livanos Dec. ¶ 13.   There is thus no

question, even if Mr. Livanos' testimony is credited, that the Ray Note could not have been paid

by NewLead under any circumstances.

The Livanos Dec. also argues that Ray was obliged to sell NewLead stock to pay down the

Ray Note.   Livanos Dec. ¶ 16.   However, addendum 1 to the Ray Note makes the Ray Note

convertible to NewLead shares <u>at Ray's option</u>:

> <u>Ray shall have the right</u> from time to time and at any time during the period
> commencing from the date of execution of the Note and ending on the later of the
> Maturity Date to convert all or any part of the outstanding and unpaid Principal
> Amount of the Note into fully paid and nonassessable shares of the Common
> Stock of the Company at the Stock Price.

Amended Complaint Ex. 1; Livanos Dec. Ex. 3 (emphasis added).

The clear language of addendum 1 to the Ray Note makes the convertibility of debt to equity

Ray's option.   Addendum 2 is not relevant to the instant dispute, but addendum 3 to the Ray Note

requires NewLead to make the final payment due at the maturity date payable in cash:

> That the Company agrees that any amount of the Note, including the Principal and
> any accrued interest thereon and any and any True Up Amount or any other
> amount thereof, remaining unpaid on the Maturity Date <u>shall become due and
> payable in cash</u> by the Company without any other notice or demand of any kind
> or any presentment or protest by the Holder.   Failure to pay any amounts pursuant
> to this clause shall constitute an Event of Default under clause 4 of the Note . . .

Amended Complaint Ex. 1; Livanos Dec. Ex. 5 (emphasis added).

It is therefore clear, notwithstanding Mr. Livanos' protestations to the contrary, that it

was Ray's option to convert remaining debt under the Note to equity and that NewLead

defaulted on the Ray Note by failing to pay the remaining indebtedness on the maturity

date.

NC's argument that addendum 3 to the Ray Note somehow obliged Ray to pay down the Ray Note by converting this debt to equity and then selling the shares is ultimately ended by the very language NC cites:

> That the Holder agrees and warrants that it shall sell <u>up to</u> twenty percent (20%) of the Monthly Dollar Volume [of NewLead shares] . . .

Amended Complaint Ex. 1; Livanos Dec. Ex. 5 (emphasis added).

The clear meaning of this language is that Ray, as holder, was capped at selling no more than twenty percent of the Monthly Dollar Volume.  Critically, there is no minimum amount that Ray was required to sell, and as shown above any conversion of the Note to NewLead equity was at Ray's sole option.  Accordingly, Ray has shown that it has a *prima facie* case to enforce its maritime lien by arresting the Vessel under F.R.Civ.P. Rule C and 46 U.S.C. §31325.

### *Cause of Action 2: All Plaintiffs Have Maritime Liens and can Foreclose for Breach of the Mortgages*

The Mortgages held by each of the Plaintiffs over the Vessel are valid and duly registered with the Vessel's flag state.  Amended Complaint ¶ 49, Ex. 7.  These mortgages give rise to maritime liens under 46 U.S.C. §31325(a), *supra*.  The only issue before the Court is whether Plaintiffs have made out a *prima facie* case alleging a default under these Mortgages.  By failing to address the Amended Complaint, NC has not challenged Plaintiffs' allegations that there are breaches of the Mortgages in addition to the breach of the Ray Note.

The reason for NC's reluctance to challenge the allegations of the Amended Complaint is likely that they cannot muster countervailing facts.  As is detailed more thoroughly in the Amended Complaint, there are the following alleged events of default under all four Mortgages:

1. NC has not maintained the insurance covering the Vessel, a breach of sections 5.1.1 and 5.1.2 of the Mortgages;

14

2. NC has failed to keep the Vessel seaworthy and in a state of complete repair, in breach of section 6.1 of the Mortgages;

3. NC has, by its own admission, not complied with the Maritime Labor Convention in breach of section 6.4 of the Mortgages;

4. NC has allowed significant debt to accumulate against the Vessel in breach of section 6.22 of the Mortgages;

5. NC has failed to cause the Vessel to be released from arrest within fourteen days in breach of section 6.23 of the Mortgages; and

6. NC has also failed to provide financial statement in respect of the Vessel and her earnings, a breach of section 6.25 of the Mortgages.

Most of these breaches of the Mortgages are admitted by NC in the May 10, 2016 E-mail annexed to the Amended Complaint as Exhibit 8 and to the Swimmer Dec. as Ex. 4. Plaintiffs have thus made out a valid *prima facie* case showing default of the Mortgages, which give rise to the same right of foreclosure discussed in relation to the Ray Note, *supra*.

### *Cause of Action 3: Ray is Entitled to a Rule C Foreclosure for Unpaid Crew Wages*

As the foregoing facts make clear, the Vessel arrived in Savannah in desperate condition. Chief among the problems was the fact that the crew was unpaid for months. Swimmer Dec. ¶ 9 and Ex. 4; DT Dec. ¶ 41. This created several issues, including that the crew refused to complete discharge operations unless they were paid. Amended Complaint ¶ 72. It also created a serious humanitarian issue, as many of the crew are from the Philippines and the sole source of financial support for their families. Amended Complaint ¶ 76. Finally, the lack of payment of crew wages could imperil the safety and security of the Vessel. Swimmer Dec. ¶ 12.

In light of the serious issues created by NC's failure to pay the crew, Plaintiff Ray paid the crew $48,876.93 in outstanding wages owed for the month of March, 2016, arranging cash

80435365v1

payment aboard for those that requested it and arranging a number of wire transfers to the home bank accounts of the crew.  DT Dec. ¶ 41 – 42.  These wage claims have been assigned to Ray.

It has long been the law that claims for wages by seamen occupy a preferential place in the echelon of maritime liens. Indeed, a bedrock of maritime law is that seamen's wages "are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages." *Admiral Cruise Services, Inc. v. M/V ST. TROPEZ*, 524 F.Supp.2d 1378, 2008 A.M.C. 661 (S.D.Fl. 2007) *citing The John G. Stevens*, 170 U.S. 113, 119, 18 S.Ct. 544, 42 L.Ed. 969 (1898).

An assignment of a crew wage claim is allowable: "one who advances money to pay crew's wages is entitled to a maritime lien of the same rank." *Bank of New Orleans and Trust Co. v. Oil Screw Tracy Mari*e, 455 F.Supp. 78, 80 (W.D.La.), *aff'd*, 580 F.2d 808 (5th Cir. 1978).  Ray has thus made a *prima facie* showing of its right to foreclose on the Vessel as assignee of the crew wages advanced by Ray.

*Cause of Action 4: All Plaintiffs Have a Maritime Claim and Can Attach the Vessel Pursuant to Rule B*

In addition to creating maritime liens in favor of Plaintiffs that allow for arrest under Rule C, the Mortgages can also be enforced against NC, the mortgagor, pursuant to Rule B.  For Plaintiffs to maintain the Rule B attachment, they must show (1) a *prima facie* admiralty claim; (2) that the defendant cannot be found in the district; (3) that the defendant's property may be found in the district; and (4) there is no statutory or maritime law bar to the attachment.  *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539-40 (4th Cir. 2013).

80435365v1

Here, Plaintiffs all have a *prima facie* admiralty claim under the Mortgages because specific authority for this remedy is granted by the Federal Rules of Civil Procedure: "Except as otherwise provided by law a party who may proceed in rem may also, or in the alternative, proceed in personam against any person who may be liable."   F.R.Civ.P. Rule C(1).   The Affidavit of Todd Baiad in Support of Motion for Rule B Attachment shows that NC is not found within the district, and NC does not contend otherwise.   Docket 13.   There is no question that NC's property is in the district, as the Vessel was arrested in the Port of Savannah.   Docket 12. Finally, there is no statutory or maritime law bar to the attachment – indeed, it is specifically authorized by Rule C.   Since this cause of action rests on the explicit authority of the Federal Rules of Civil Procedure to plead Rule B in this circumstance, and all of the other Rule B factors are met, Plaintiffs respectfully submit that they have demonstrated their entitlement to this relief.

### Point 2

### **Defendants' Wrongful Arrest Claim is Meritless**

NC appears to allege a claim for wrongful arrest.   Motion to Vacate pp. 17-18.   The standard to show a wrongful arrest is high, and in this case NC's wrongful arrest argument is legally and factually meritless.   The Eleventh Circuit has held that in cases involving the wrongful seizure of a ship, awards for attorney's fees "are necessarily based on findings of bad faith, malice, or such negligence as would constitute bad faith." *Indus. Mar. Carriers, LLC v. Dantzler, Inc.*, 611 F.Appx. 600, 603 (11th Cir. 2015) (*quoting Frontera Fruit Co., Inc. v. Dowling*, 91 F.2d 293, 294 (5th Cir. 1937)).   Moreover, "mere negligence is insufficient for liability . . .   bad faith may be found in acting in disregard of what one knows." *Dantzler*, 611 F.Appx. at 604-5.

One absolute defense to a wrongful arrest claim is the "honest reliance on advice of counsel." *Id.* at 606 (*citing Frontera Fruit Co.*, 91 F.2d at 297).   In order to have a valid claim for

17

wrongful arrest, "there must be . . . no bona fide claim of a maritime lien on the vessel." *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 574 (5th Cir. 2015).

Here, NC's wrongful arrest claim fails as a matter of law and on the facts. Legally, the claim fails because Plaintiffs have relied on the advice of counsel in arresting the Vessel, which provides a complete legal defense. DT Dec. ¶39. Factually, the claim fails because NC recognizes the Mortgages and do not deny that Plaintiffs have valid maritime liens over the Vessel. *See* Livanos Dec. ¶¶31-32. Plaintiffs have shown that the Mortgages are duly and validly registered with the flag state and hence are valid and registered liens. Complaint Ex. 7. As discussed *supra*, NC does not even seriously deny that it is in default, instead arguing that Plaintiffs should have agreed to extend the maturity date of the Ray Note by an additional year and that, at best, Plaintiffs could have paid down the Ray Note by $300,000 of the approximately $1,671,671 still owing (as of May 10, 2016). *See* Livanos Dec. ¶22, ¶¶26-27. Thus, even if the Court were to credit NC's argument, there would still be a payment default. Accordingly, NC's wrongful arrest claim fails legally and factually.

## PLAINTIFFS' RELATED MOTIONS

In addition to opposing NC's Motion to Vacate, Plaintiffs respectfully move the Court to:

(1) Authorize In Custodia Legis Expenses;

(2) Sell the Vessel; and

(4) Allow Plaintiff to Inspect the Vessel

Plaintiffs' arguments in support of each of these motions follow:

## MOTION TO AUTHORIZE IN CUSTODIA LEGIS EXPENSES

Plaintiffs respectfully move the Court to authorize certain *in custodia legis* expenses incurred by the substitute custodian, NM. Plaintiffs move the Court for this relief because "the

long established rule in admiralty law is that "no lien can attach to a vessel while she is in judicial custody." *Donald D. Forsht Assocs., Inc. v. Transamerica ICS, Inc.*, 821 F.2d 1556, 1561 (11th Cir. 1987); *accord Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 176, 178–79 (3d Cir. 1993) ("Since the seizure revokes all authority to incur liabilities on behalf of the ship, one who renders services without first requiring the Court's permission, does so at his risk." (emphasis added)).

Instead, claims for necessaries provided to a ship after its arrest "are paid as 'expenses of justice' in priority to all lien claims when the dictates of 'equity and good conscious' so require." *Donald D.  Forsht Assocs.*, 821 F.2d at 1561; *Bassis v. Universal Line, S. A.*, 484 F.2d 1065, 1068 (2d Cir. 1973) ("[T]hose furnishing custodial services to a ship in custodia legis are gambling on a wholly unpredictable result unless they take the precaution of having their services authorized in advance by an order of the custodial court." (internal quotation marks omitted)(emphasis added)); *Payne v. S.S. TROPIC BREEZE*, 423 F.2d 236, 239 (1st Cir. 1970) ("Expenditures while a ship is in custodia legis do not give rise to maritime liens.... [But] a district court, sitting in admiralty, has the equitable power to give priority to [such] claims.").

Pursuant to 28 U.S.C. § 1921 and long-established case law, the substitute custodian is entitled to an award of its custodial fees. *See* 28 U.S.C. § 1921(a)(1)(E) ("The United States marshals or deputy marshals shall routinely collect, and a court may tax as costs, fees for the following:.... The keeping of attached property (including boats, vessels, or other property attached or libeled), actual expenses incurred, such as storage, moving, boat hire, or other special transportation, watchmen's or keepers' fees, insurance, and an hourly rate, including overtime, for each deputy marshal required for special services, such as guarding, inventorying, and moving");

*Turner v. Neptune Towing & Recovery, Inc.*, No. 8:09–CV–1071–T–27AEP, 2011 WL 4542265, at \*10 (M.D.Fla. Sept. 23, 2011) (finding that substitute custodian is entitled to recover reasonable expenses) (citation omitted).

NM has or will incur certain *in custodia legis* costs during the period of arrest of the Vessel.  As the Swimmer Dec. explains, the crew of the Vessel has continued to serve aboard post-arrest and are entitled to their wages for this period.  In addition, the owner of the Vessel has advised that she is seriously delinquent on payments to the Vessel's insurers and the provider of telecommunications.  Both of these are critical services provided to the Vessel and must be maintained during the arrest.   The Vessel has also and will continue to incur various and sundry other costs for items such as fuel, water, and provisions, and authority is respectfully sought for incurring these additional costs as further authorized *in custodia legis* expenses.

Accordingly, Plaintiffs respectfully move the Court to authorize the following *in custodia legis* costs as detailed in the Swimmer Dec.:

    i)  $26,423.55 in April Post-Arrest Wages;

    ii)  $66,058.88 in May Post-Arrest Wages;

    iii) $50,107.95 in Additional Vessel Expenses; and

    iv) $261,269.10 in charges contained in the 30 Day Estimate.

Based on the foregoing, Plaintiffs respectfully submit that the Motion to Approve *In Custodia Legis* Costs should be granted.

### MOTION TO SELL VESSEL

Plaintiffs respectfully move the Court for an Order directing the sale of the Vessel.  This motion has two parts:  (i) the request for a sale order; and (ii) the request to appoint two

80435365v1

independent ship brokers to value the Vessel so that a minimum reserve price can be set. Plaintiffs address these points in turn:

*(i) Request for Sale Order*

Plaintiffs move the Court to issue a sale order directing the United States Marshal to conduct a public admiralty auction of the Vessel.  F.R.Civ.P. Supp. Admiralty Rule E(9)(b) sets forth the criteria for the disposition of property and interlocutory sales:

> On application of a party . . . the court may order all or part of the property sold – with the sales proceeds, or as much of them as will satisfy the judgment, paid into court to await further orders of the court – if:
>
> (A)   The attached or arrested property is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action;
>
> (B)   The expense of keeping the property is excessive or disproportionate; or
>
> (C)   There is an unreasonable delay in securing release of the property.

Fed. R. Civ. P., Supp. Admiralty Rule E(9)(a)(i).

It is well established that, to obtain an order for an interlocutory sale, lien holders need show only the existence of one of the three criteria set forth in Rule E(9)(a)(i).  *Merchants Nat'l Bank v. Dredge General G.L. Gillespie*, 663 F.2d 1338, 1342 (5th Cir. 1981) (cited by *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 868 (11th Cir. 2010)[3].  In this case, all three have been met.

First, it is clear that the vessel is deteriorating in a number of respects.  She is idle.  She is of steel construction, and therefore requires regular maintenance of her hull and machinery, and maintenance schedules have been disrupted.  The crew responsible for the ongoing maintenance and routine operation of the vessel has gone unpaid for months.  By sitting idle in the water, the

---

[3]   The Eleventh Circuit has held that, in matters of admiralty and maritime contracts, the decisions of the "former Fifth Circuit rendered before October 1, 1981 are binding on this circuit . . . After that date . . . [Fifth Circuit] Unit A decisions are merely persuasive."  *Dresdner Bank AG v. M/V Olympia Voyager*, 446 F.3d 1377, Footnote 1 (11th Cir. 2006).

80435365v1

Vessel is susceptible to decay and deterioration.  The Vessel is wasting away and the Owner is either unwilling or unable to reverse this course.   Therefore, criteria (a) of Supplemental Admiralty Rule 9(a)(i) has been met.

Second, the expense of keeping the Vessel in custody is excessive and is unnecessarily eroding the amount of sale proceeds which would be available to satisfy judgment in this case. Plaintiffs have secured the services of a substitute custodian to maintain custody of the vessel for a fee below that usually charged by the United States Marshal, but this service still requires payment of fees.   In addition, the Vessel must be insured, fueled, stocked with appropriate provisions, and have her communications services kept current.   The Vessel's crew remains aboard, and wages accrue at the rate of about $60,000 per month.  As the Vessel remains under arrest, the related costs and fees are significant and continue to mount, all to the prejudice of the Vessel's creditors.

Upon information and belief, arrest costs to date exceed $50,107.95, with an additional $261,269.10 likely to be incurred in the next 30 days.  Beyond ordinary arrest costs, Plaintiffs are preparing the costly, but necessary, hurricane and high wind action plans required by the Port of Savannah. Because the Owner does not appear willing or able to secure release of the Vessel, every dollar spent to maintain custody of the Vessel is a dollar spent unnecessarily.  Money spent unnecessarily in maintaining custody of the Vessel is by definition excessive.  Criteria (b) of Supplemental Admiralty Rule 9(a)(i) therefore has been met.

Finally, the Owner has not secured the release of the Vessel, and, in fact, appears to have abandoned her and her crew.  The Owner has provided Plaintiffs with documentation of the significant debt incurred by the Vessel, making it clear that the Vessel has numerous creditors in

addition to Plaintiffs.   The Owner has made no effort to provide substitute security or pay Plaintiffs' claims.  Delay in selling the Vessel essentially deprives Plaintiffs of the opportunity to realize the value of their security.  Given the (as of the date hereof) 37 day delay in securing the release of the Vessel since its initial arrest and that the fact that the Owner appears to have no intention of securing her release, criteria (C) of Supplemental Admiralty Rule 9(a)(i) has been met.

In light of the foregoing, Plaintiffs respectfully ask the Court to Order the sale of the Vessel.  Plaintiffs further request that the Court set a minimum auction price at 80% of the value of the Vessel as established by two (2) independent ship brokers, as further discussed below.

### (ii) Request to Appoint Brokers to Value Vessel

Plaintiffs respectfully move the Court to appoint two (2) qualified ship brokers to value the Vessel based on comparable sales and comparable vessels in the market.  Pursuant to Local Admiralty Rule 10(a):

> Order for appraisement of property under arrest or attachment, or of plaintiff's interest in the vessel and pending freight under Supplemental Rule F(7), shall issue only upon motion and notice pursuant to Federal Rule of Civil Procedure 7(b) or upon consent of the attorneys for the respective parties.

It is well settled that the determination as to the fairness of the sale price of a vessel at public sale is left to the sound discretion of the District Court; that is, the Court can refuse to confirm the sale if it feels that the price is grossly inadequate. *United States v. Wells*, 5th Cir. 1968, 403 F.2d 596, 598 (5th Cir. 1968).

In the case at bar, Plaintiffs respectfully submit that the interests of justice and of all possible claimants to the proceeds of sale of the Vessel, should Plaintiffs' motion be granted, are best served by establishing the fair market price of the Vessel so that a realistic minimum reserve

price for the Vessel can be set.  Accordingly, Plaintiffs respectfully move the Court to appoint two ship brokers located in the United States, Compass Maritime, Inc. of New Jersey and Jacq. Pierot Jr. & Sons of New York to prepare "desktop valuations" of the Vessel, estimating a market price for the Vessel based on recent sales of similar Vessels and the experience and knowledge of the brokers.  Plaintiffs request that the Court set a minimum bid for the vessel at eighty percent (80%) of the average of the two valuations.

Plaintiffs have no ownership or other interest of any kind in the proposed brokers and have not previously engaged either broker for any reason.  There is no reason to doubt that the proposed brokers have the requisite skill and experience to value the Vessel.  The estimated cost for each valuation is $1,500.

## MOTION TO INSPECT VESSEL

The Vessel's Owner has advised that Owner's inability to pay certain debts has led to a situation where the Vessel is not seaworthy or will shortly be in that condition.  Swimmer Dec. Ex. 4.  Plaintiffs are thus concerned about the condition of their collateral.  Pursuant to the Mortgages, Plaintiffs have the right to inspect the condition of the Vessel:

The Owner covenants with the Mortgagee:

> 6.7     to permit the Mortgagee and all persons appointed by the Mortgagee to board the Vessel from time to time during the Facility Period to inspect the Vessel's state and condition . . .

(Amended Complaint, Ex. 6, ¶ 6.7).

Since Plaintiffs each have the right under the Mortgage to inspect the Vessel, and this inspection will allow Plaintiffs to better determine the condition of their collateral and identify any safety or other problems with the Vessel, it is respectfully submitted that this motion should be granted.

24

## CONCLUSION

The Motion to Vacate should be dismissed for the reasons aforesaid. It is respectfully submitted that Plaintiff's accompanying Motions to sell the Vessel, approve *in custodia legis* costs, and inspect the Vessel should be granted, as these motions will benefit all creditors of the Vessel and will limit the rapid decrease in the net value of this asset.

RESPECTFULLY SUBMITTED 26th DAY OF MAY, 2016.

**BOUHAN FALLIGANT LLP**

/s/ Todd M. Baiad
TODD M. BAIAD
Georgia Bar No. 031605
LUCAS D. BRADLEY
Georgia Bar No. 672136

*Attorneys for Plaintiffs*

Bouhan Falligant, LLP
The Armstrong House
447 Bull Street (31401)
Post Office Box 2139
Savannah, Georgia 31402-2139
(912) 232-7000 Telephone
(912) 233-0811 Facsimile
tmbaiad@bouhan.com

**Of Counsel**
(*Pro Hac Vice*)
Neil A. Quartaro (NQ 9640)
Zachary Farley (ZF 1281)
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
(212) 922-2200
nquartaro@wfw.com
zfarley@wfw.com

80435365v1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**
**IN ADMIRALTY**

| | | |
|---|---|---|
| **RAY CAPITAL INC., OPPENHEIM CAPITAL LTD, CHEYENNE HOLDINGS LTD. AND LABROY SHIPTRADE LIMITED** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **PLAINTIFFS** | § | **C.A. NO. 16-CV-093** |
| **V.** | § | |
| | § | |
| **M/V NEWLEAD CASTELLANO,** **IMO NO. 9686338** **HER ENGINES, TACKLE, EQUIPMENT, FURNITURE, APPURTENANCES, ETC., *IN REM*, AND** **NEWLEAD CASTELLANO LTD.** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **DEFENDANTS** | § | |

## CERTIFICATE OF SERVICE

    This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court.

    Respectfully submitted, this 26th day of May, 2016.

                             **BOUHAN FALLIGANT LLP**

                             /s/ Todd M. Baiad
                             TODD M. BAIAD
                             Georgia Bar No. 031605
                             LUCAS D. BRADLEY
                             Georgia Bar No. 672136

                             *Attorneys for Plaintiffs*

80435365v1

Bouhan Falligant, LLP
The Armstrong House
447 Bull Street (31401)
Post Office Box 2139
Savannah, Georgia 31402-2139
(912) 232-7000 Telephone
(912) 233-0811 Facsimile

**Of Counsel**
(*Pro Hac Vice*)
Neil A. Quartaro (NQ 9640)
Zachary Farley (Federal admission pending)
Watson Farley & Williams LLP
250 West 55th Street
New York, NY 10019
(212) 922-2200
nquartaro@wfw.com
zfarley@wfw.com